**Nos. 2024-1600, 2024-1601, 2024-1602, 2024-1603, 2024-1604, 2024-1605**

---

# United States Court of Appeals for the Federal Circuit

---

**CAROLYN W. HAFEMAN,**
*Appellant*

v.

**GOOGLE LLC, MICROSOFT CORPORATION,**
*Appellees*

---

Consolidated Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2022-01188, IPR2022-01189, IPR2022-01190, IPR2022-01191, IPR2022-01192, IPR2022-01193.

---

**CAROLYN W. HAFEMAN'S OPENING BRIEF**

---

Lawrence M. Hadley
Stephen Underwood
Jason C. Linger
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Blvd., Floor 19
Los Angeles, CA 90067
(310) 553-3000

*Attorneys for Appellant*
*Carolyn W. Hafeman*

September 3, 2024

# REPRESENTATIVE PATENT CLAIMS AT ISSUE ON APPEAL

## U.S. Patent No. 10,325,122, Claim 1

1. A method for displaying information to assist with returning a computer comprising the steps of:

activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying return information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the return information is visible to anyone viewing the display screen, the lock screen locks the display screen and protects the computer;

**initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer**, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;

displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and

activating the processor to allow a message to the user.

## U.S. Patent No. 10,789,393, Claim 1

1. A method for displaying information to assist with returning a computer comprising the steps of:

activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer;

**initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer**, wherein the initiating or changing of the return information is done through an interactive program stored in the memory of the computer which is remotely

accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;

displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and

activating the processor to allow a message to the user.

## U.S. Patent No. 9,892,287, Claim 1

1. A method for displaying information to assist with returning a computer comprising the steps of:

activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying recovery information, to facilitate return of the computer so the return information is visible to anyone viewing the display screen;

**initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer**, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;

displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and

activating the processor to allow a warning message to the user.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1600, 24-1601, 24-1602, 24-1603, 24-1604, 24-1605

**Short Case Caption** Hafeman v. Google LLC

**Filing Party/Entity** Carolyn W. Hafeman, Appellant

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/03/2024

Signature: /s/ Lawrence M. Hadley

Name: Lawrence M. Hadley

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Carolyn W. Hafeman | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

**STATEMENT OF RELATED CASES** ....... **1**

**PRELIMINARY STATEMENT** ....... **2**

**JURISDICTIONAL STATEMENT** ....... **6**

**ISSUES PRESENTED** ....... **6**

**STATEMENT OF THE CASE** ....... **8**

I. THE PATENTED TECHNOLOGY AND ITS ABILITY TO "INITIATE" OR "CHANGE" RETURN AND RECOVERY INFORMATION "WITHOUT USER ASSISTANCE" ....... 8

II. THE IPR AND DISTRICT COURT PROCEEDINGS ....... 13

A. Hafeman Files Suit Against LG, and Google and Microsoft File Six IPRs Against Hafeman. ....... 13

B. LG Files a *Sotera* Stipulation, Four Months After Filing the IPRs. ....... 15

C. The PTAB Grants Institution Based on the *Sotera* Stipulation and the Priority Date Issue. ....... 17

D. LG Violates the *Sotera* Stipulation. ....... 17

E. The Parties Proceed to Trial in Texas. ....... 18

F. The PTAB Ignores the *Sotera* Violation. ....... 19

III. THE PTAB's FWDs ....... 19

IV. SUMMARY OF THE PRIOR ART ....... 20

A. U.S. Pat. Pub. No. 2003/0122864 ("Jenne") ....... 20

B. EP 687968 A2 ("Cohen") ....... 21

V. OVERVIEW OF STRONG SECONDARY CONSIDERATIONS ....... 22

**SUMMARY OF ARGUMENT** .......... **24**

**STANDARD OF REVIEW** .......... **28**

**ARGUMENT** .......... **29**

I. THE PTAB ABUSED ITS DISCRETION BY FAILING TO ADDRESS THE *SOTERA* VIOLATION AND TERMINATE THE IPRs .......... 29

II. THE PTAB ERRED AS A MATTER OF LAW IN ITS IMPLIED CONSTRUCTION OF "WITHOUT ASSISTANCE BY A USER" TO EXCLUDE ESTABLISHING A REMOTE CONNECTION .......... 35

A. "Without assistance by a user" means that a user can provide no assistance, including the establishment of an Internet connection. .......... 35

B. The PTAB implicitly construed "without assistance" to allow a user to establish a remote connection. .......... 40

III. THE JENNE/COHEN COMBINATION FAILS TO MEET THE "WITHOUT ASSISTANCE" LIMITATION UNDER THE LEGALLY CORRECT CONSTRUCTION .......... 44

IV. THE PTAB ERRED IN ITS ANALYSIS OF THE STRONG SECONDARY CONSIDERATIONS OF THE CHALLENGED PATENTS .......... 48

**CONCLUSION** .......... **54**

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apple Inc. v. Vidal*,
63 F.4th 1 (Fed. 2023) ....................30

*Codexis, Inc. v. EnzymeWorks, Inc.*,
759 F. App'x 962 (Fed. Cir. 2019) ....................34

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000) ....................51

*Google LLC v. EcoFactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024) .................... 28, 40, 44

*GTNX, Inc. v. INTTRA, Inc.*,
789 F.3d 1309 (Fed. Cir. 2015) .................... 25, 33

*Hafeman v. LG Elecs., Inc.*, No. 6:21-CV-00696-ADA,
2023 WL 4362863 (W.D. Tex. Apr. 14, 2023) ....................18

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ....................44

*In re NuVasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016) ....................28

*In re Thrift*,
298 F.3d 1357 (Fed. Cir. 2002) .................... 25, 30

*In re Vivint, Inc.*,
14 F.4th 1342 (Fed. Cir. 2021) .................... 26, 28, 34

*InVue Security Products Inc. v. Vanguard Products Group, Inc.*,
2020 WL 2425721 (M.D. Fla. 2020) ....................34

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) ....................44

*Medtronic, Inc. v. Robert Bosch Healthcare Sys., Inc.*,
839 F.3d 1382 (Fed. Cir. 2016) .................... 25, 33

*Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*,
70 F.4th 1331 (Fed. Cir. 2023) ....................53

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ....................44

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................27

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016) .................... 50, 51

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016) ....................29

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022) .................... 25, 30

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)....................30

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983) ....................48

*Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*,
97 F.4th 882 (Fed. Cir. 2024) ....................28

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ....................50

**STATUTES**

35 U.S.C. § 316(e) ....................44

America Invents Act, Public Law 112-29, 125 Stat. 284 (Sept. 16, 2011) ............34

**AGENCY DECISIONS**

*Apple Inc. v. Fintiv, Inc.*,
IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020)........................................29

*I.M.L. SLU v. WAG Acquisition, LLC*,
IPR2016-01658, Paper 46 (PTAB Feb. 27, 2018) ........................................33

Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation (June 21, 2022)....................... 15, 26, 30, 32

*NXP USA, Inc. v. Impinj, Inc.*,
IPR2021-01556, Paper 10 (PTAB Apr. 21, 2022) ........................................26

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for Carolyn W. Hafeman provides as follows: (a) No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court; and (b) The Court's decision in this appeal may directly affect or be directly affected by the following pending case: *Carolyn W. Hafeman v. LG Electronics Inc.*, No. 6:21-cv-00696-ADA (W.D. Tex.).

## PRELIMINARY STATEMENT

Carolyn W. Hafeman is a trailblazing female inventor who pioneered the "Find My Device" technology found in virtually every smartphone, laptop, tablet, and personal computer sold today. Hafeman has 11 patents on her inventions in the United States and Europe, including the three patents at issue in this appeal (U.S. Patents Nos. 10,325,122 ("'122 patent"), 10,789,393 ("'393 patent"), and 9,892,287 ("'287 patent"), together the "Challenged Patents").

In December 1996, Hafeman formed a company called World Computer Security Corporation. The company sold all types of products to help prevent computer theft, including recovery labels, alarms, and steel cables. At that time, studies showed that over 600,000 laptops were stolen annually, and the owner had only a three percent chance of recovery.

At a June 1999 trade show in San Diego, Hafeman envisioned a new computer security product. Her envisioned product would display a message instructing a person in possession of a lost or stolen computer how to return it to its rightful owner. The message could include the owner's name and contact information. The message would be displayed and updated *without any assistance* from the person holding the device—not even requiring that the person touch a key or connect to the Internet—because the person could be a thief. Equally important, the message would be displayed *before* the password screen, so the device's data was protected.

By 2002, Hafeman had documented her idea, filed her first patent application, and began creating a product implementing her vision that could be installed on devices and servers. This was a significant challenge given the requirement that the person possessing a lost or stolen computer had to see the most current owner information message without logging in (giving full access to the computer's contents) and connecting to a network. After several years of work, Hafeman completed a working software product in March of 2007. The new software program would allow the remote device to have continuous communication with a remote server via an interactive program and *before* the user satisfies any password or security prompt. The software could remotely communicate with a server by simply turning on the device—*before* the entry of any password or user-directed action. Hafeman named her product "The Retriever," and in May 2007, she formed a new company, Front Door Software, to bring it to market.

The Retriever was a huge success. Hafeman sold The Retriever to customers in government, corporate, healthcare, and education, including dozens of major universities who made the product available to their students. It also proved popular with individual computer owners through sales at retail stores such as Staples and Office Max. The Retriever received rave reviews from the press and public for its ability to display a message to aid in the return of lost or stolen computers.

But like many products at the time, maintaining market share proved difficult

once major tech companies figured out how to provide the same technology and offer it for free as part of their device sales. Google introduced its "Find My Device" application for Android smartphones in 2013, and Microsoft followed suit for Windows computers in 2015. While Front Door Software's revenues dramatically diminished, the U.S. Patent Office began issuing Hafeman's patents.

In 2021, Hafeman sued LG Electronics, Inc., a major customer of both Google and Microsoft, for patent infringement in the U.S. District Court for the Western District of Texas. One year later, Google and Microsoft responded with six IPRs and identified LG as a real party-in-interest. The PTAB granted institution in all six IPRs, basing its decision on a priority date issue of the Challenged Patents and a "*Sotera*" stipulation made by LG and submitted by Google and Microsoft to the PTAB.

In the stipulation, LG promised not to raise in district court any invalidity defenses asserted in the IPRs. LG did just the opposite, violating its *Sotera* stipulation. The district court *agreed* that the stipulation was violated. Hafeman informed the PTAB and argued that the IPRs should be terminated. But the PTAB refused to terminate the IPRs or even *address* the violation in its Final Written Decisions ("FWDs").

Aside from ignoring the *Sotera* violation, the PTAB made two reversible errors in the FWDs invalidating all claims of the Challenged Patents.

First, the PTAB erred in applying an implicit construction of "initiating or

changing return information which appears on the display through remote communication *without assistance by a user* with the computer"—a limitation found in each of the Challenged Patents—as *excluding* user-initiated communications with a remote computer. In contrast to the implicit construction, the Challenged Patents throughout describe the claimed improvement as initiating or changing return information *without* user assistance, including establishing communications with a remote computer. Thus, "without assistance by a user" *includes* the establishing of remote communication with a computer.

Second, under the legally correct meaning of "without assistance by a user," the PTAB erred in finding that the Jenne/Cohen combination disclosed "all elements" of the Challenged Claims. The Jenne/Cohen combination expressly requires that a user first establish an Internet connection before receiving any updates from a remote computer.

Third, the PTAB erred in rejecting the strong objective indicia of nonobviousness of the Challenged Patents, including praise, market success, and copying by others. In large part, the PTAB refused to consider the indica of non-obviousness as it found no nexus between the Challenged Claims and The Retriever. But the specification uses the term "The Retriever" synonymously with the invention and no fewer than 34 times to describe the invention. LG even admitted to the district court that The Retriever practiced the claims.

This Court should reverse, or alternatively, vacate and remand.

## JURISDICTIONAL STATEMENT

This appeal arises from six IPRs filed by Google LLC and Microsoft Corporation, challenging all claims of three patents owned by Hafeman: U.S. Patents Nos. 10,325,122, 10,789,393, and 9,892,287. Two IPR petitions were filed against each of the three patents. Appx7896, Appx8863, Appx9642, Appx10017, Appx10853, Appx11238. The PTAB asserted jurisdiction under 35 U.S.C. §§ 314(a), 318(a). Appx8094, Appx9020, Appx9803, Appx10173, Appx11015, Appx11393. The PTAB consolidated the two IPRs against each patent and issued three FWDs on January 23, 2024. Appx1, Appx37, Appx76. Hafeman timely appealed on March 25, 2024. Appx8538, Appx9145, Appx9972, Appx10302, Appx11194, Appx11518. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.[1]

## ISSUES PRESENTED

1. Whether the PTAB's failure to address the violation of the *Sotera* stipulation, as the district court found, in the FWDs and its refusal to terminate the IPRs based on the violation, were arbitrary, capricious, contrary to law, or otherwise

---

[1] Throughout this brief, Hafeman mainly cites to documents in the first two IPRs (IPR2022-01188, -01189), but the records in the six IPRs are substantially similar.

inconsistent with reasoned decision-making, particularly when the PTAB expressly relied on the *Sotera* stipulation as a basis to grant institution.

2. Whether the PTAB erred in implicitly construing "without assistance by a user" to *exclude* establishing communications between a lost or stolen computer with a remote server, when the specification describes the claimed improvement as an owner's ability to initiate or change return information *without* a user doing *anything* other than turning on power.

3. Whether, under the legally correct meaning of "without assistance by a user" as *any* assistance, including the user establishing communications between a lost or stolen computer with a remote server, the Jenne/Cohen combination, which requires the user to establish an Internet connection, discloses this limitation.

4. Whether the PTAB erred in rejecting secondary considerations of non-obviousness, including praise, commercial success, and copying, based largely on the PTAB finding a lack of nexus between the Challenged Claims and Hafeman's The Retriever product, even though the specification uses the term "The Retriever" synonymously with the invention and LG represented to the district court that The Retriever product practiced the Challenged Claims.

# STATEMENT OF THE CASE

## I. THE PATENTED TECHNOLOGY AND ITS ABILITY TO "INITIATE" OR "CHANGE" RETURN AND RECOVERY INFORMATION "WITHOUT USER ASSISTANCE"

This appeal concerns three of Hafeman's patents (the '122, '393, and '287 patents, together the "Challenged Patents"). The Challenged Patents share a common specification, and for purposes of this appeal, each recites substantially similar claim language.[2]

Prior to Hafeman's inventions in the Challenged Patents, there were a number of "computer return or recovery products" on the market, including "physical labels," "computer programs" using the "computer's modem," "Bios Based Password Identification systems," and the personal digital assistant (PDA) recovery system. Appx125-26 (1:30-3:26). However, all of these had deficiencies that enabled a user to circumvent the return of the computer to the owner. Physical labels with return information could be defeated by simply removing the label, and could "not be interactively changed by the owner." Appx125 (1:35-65). Modem-based programs would not work when the device lacked Internet access, and would not generally display return information. Appx125 (2:1-57). Bios-based systems could be defeated by removing the hard drive and installing it in a different computer, and

[2] In this brief, Hafeman cites to disclosures in the '122 patent, but these same disclosures are in the '393 and '287 patents.

generally did not display return information. Appx125-26 (2:57-3:26). The PDA program gave control to the assigned-to individual, making it impossible for the owner of the device (*e.g.*, the individual's company) to regain control if the individual was disgruntled or uncooperative. Appx130 (11:63-12:6).

The Challenged Patents solved these, and other, problems in the prior art. They recognized that, in many situations, a device can have both an "Owner," and a "user." Appx126 (4:42-61). "The Owner has greater control over the computer 12 than the user." *Id.* The "owner" could be "a company that owns the computer 12," while the "user" could be "an employee of [the] company," to whom the computer is assigned. *Id.* The owner is "the person or entity that owns, rents, or licenses" the device, while the "user" is the person in current possession of it. *Id.*

The owner is "prompted to provide some recovery/return information that the owner would like displayed; for example, contact name, phone and email information." Appx128 (8:37-47). Using that information, the software "create[s] [a] recovery/return display 18 screen," such as the one shown in Fig. 2 below:




Appx116 (Fig. 2). This return/recovery screen is displayed during "the initial start up program of the computer 12, so that the recovery/return display 18 information [is displayed] during or before a password or security prompt screen." Appx127 (6:20-36). Such pre-login (or during-login) display "ensures that the person finding the equipment will see the owner recovery/return information," because "[i]f the program initiated after the password or security prompt screen, the person finding the lost or stolen equipment would have difficulty ever seeing the recovery/return display." Appx128 (7:18-27).

As the Challenged Patents explain, "one of the most important and critical differences between the Retriever and the existing programs is the type of communication … made possible with the Retriever." Appx131 (13:16-20). In prior art systems, the user could change or update recovery information directly on the device. Appx131 (13:27-33). But if the device was lost or stolen—for instance, by a "disgruntled employee"—this would be useless. Appx131 (13:35-65). The person in possession of the device could simply list his own contact information as the proper "return" information, thwarting any attempt by the owner to recover the device. *Id.*

The Challenged Patents solved this problem by allowing the owner to control and change the return information from "an administration program … [on] a computer 12 that is *completely remote* from the protected equipment." *Id.* This "very unique and important feature … allows the 'owner' to … initiate a download of changes to the protected equipment, control the entire recovery screen displayed, and even override the 'assigned to' person's input." *Id.* This is because the protected equipment automatically establishes a connection with the owner's recovery center *without any assistance by the user*. Such communication can be achieved by any suitable means, including "phone line … cable, wi-fi, Bluetooth, satellite, etc." *Id.* Such communication "allows the owner to eliminate erroneous or misleading 'assigned to' recovery information that might have been created by the rogue

'assigned to' individual" and "replace the display 18 screen with correct owner recovery information." *Id.*

This communication capability gave the Challenged Patents an "on the fly ability to change owner recovery information." Appx127 (6:9-10). This is extremely valuable for people who frequently change locations. Appx127 (6:11-19). For example, the Challenged Patents allow an owner who is traveling to change their return/recovery information at any time. *Id.*

Consistent with the specification's description of this central improvement, the Challenged Patents all recite this feature as a claim limitation: the initiating or changing of the owner's return/recovery information is done "without assistance by a user with the computer." Appx132-33 (claims 1, 4, 7). The intrinsic record describes that, once the computer is powered on, the return/recovery information can be initiated or changed remotely without any input or action by the user, including any user input to connect to the Internet. This is because the computer automatically connects with the recovery center simply by being turned on. This makes complete sense, as a Good Samaritan or thief will likely not know the password and be unable to connect the device to the Internet, but the owner is still able to change their return/recovery information in such situations.

In Figure 3, the return/recovery dialog box appears on the monitor's display screen before or simultaneously with any password or security prompt dialog box

(*i.e.*, prior to the user pressing any key to enter a password). Appx117 (Fig. 3). The specification teaches that "[e]ach computer security program will attempt to display the recovery information on the initial screen when possible." Appx128 (7:34-35). The invention offers a "unique communication power" that can "synchronize the international recovery center information" and "seize[] control of the display 18 monitor" before or with a security prompt. Appx131 (14:16-40). The Challenged Patents' "back and forth" communication capability is a "critical" aspect of the invention because if the user does not know the password, then the return/recovery information would not be visible. Appx128 (8:34-36), Appx131 (13:17-27).

## II. THE IPR AND DISTRICT COURT PROCEEDINGS

### A. Hafeman Files Suit Against LG, and Google and Microsoft File Six IPRs Against Hafeman.

Hafeman filed suit against LG for patent infringement of the Challenged Patents on July 2, 2021. Appx4734. The suit progressed as the parties completed *Markman* proceedings, conducted fact discovery, and briefed a motion to dismiss. Appx4576, Appx4713-19, Appx4720. Over one year after the lawsuit was filed, on July 8, 2022, Google and Microsoft filed six IPR petitions at the PTAB, two petitions against each of the Challenged Patents. Appx7891, Appx7981. Google and Microsoft contended that the filing of two petitions against each Challenged Patents was "justifie[d]" because of a "priority dispute between the parties." Appx7892. Each IPR petition identified LG as a real party-in-interest. Appx7979.

The six IPRs fall into two buckets. In the first bucket (IPR2022-01189, -01190, and -01192), Google and Microsoft attacked the priority date of the Challenged Patents and ranked the priority date issue first for consideration by the PTAB. Appx7894. In substance, Google and Microsoft argued that Hafeman was not entitled to her September 20, 2004, priority date because her application for her first-issued patent (Hafeman's Application No. 10/945,332) allegedly lacked written description support for the limitation "initiating … through remote communication." Appx8883. Google and Microsoft alleged November 22, 2013—the filing date of Hafeman's U.S. Patent No. 9,021,610—as the priority date. Appx8891. With the alleged November 22, 2013, priority date, Google and Microsoft asserted Hafeman's own original patent application as "prior art," arguing the original application disclosed the Challenged Claims. Appx8870. Google and Microsoft's argument thus focused the first three IPRs exclusively on the priority date issue, Appx9132, Appx9140, and the PTAB agreed in the institution decisions, declining to analyze the asserted combinations. Appx9037, Appx9039. In the second, lower-ranked bucket (IPR2022-01189, -01191, and -01193), Google and Microsoft assumed the September 20, 2004, priority date and asserted prior art based on that date, including the Jenne and Cohen references. Appx7894, Appx7903-04.

Throughout the litigation, Google and Microsoft worked in close coordination with LG by sharing attorneys, exchanging documents, and providing witnesses to

each other. Appx8026-29. Hafeman further alleged that Google and Microsoft were indemnifying LG, and such allegation was never disputed. Appx8026. The PTAB acknowledged that "Google and Microsoft are standing in LG's shoes." Appx8100.

### B. LG Files a *Sotera* Stipulation, Four Months After Filing the IPRs.

In the IPR petitions, LG, Google, and Microsoft offered no *Sotera* stipulation. Appx7976-78. In a *Sotera* stipulation, a party stipulates not to pursue in district court the same grounds or any grounds that could have been raised in the IPR. Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation (June 21, 2022), at 3 ("Interim Procedure"). Without a stipulation, LG expressly used and incorporated the IPR grounds in its final invalidity contentions in district court, despite the pending IPRs filed "in LG's shoes." Appx4750, Appx8100. Indeed, LG's contentions included thousands of pages of claim charts using the IPR references. Appx4795-6999. As the IPRs progressed, LG continued to use the IPR grounds and references in district court, including in a motion for summary judgment, Appx7076, and in its requests for admission, Appx7111-13 ("Admit that … 'Cohen' … depicts a computer with a screen displaying Return or Recovery Information with a Security Prompt.").

In early November 2022, Hafeman filed her IPR preliminary responses. Appx7997. Hafeman argued, among other things, that institution should be denied under the PTAB's *Fintiv* precedent because there had been significant investment in

the same validity issues before the district court, and trial was scheduled for less than two months from the institution deadline (and ten months before any final written decision). Hafeman further showed the substantial overlap between the IPRs and LG's invalidity defenses. Appx8018-31. Hafeman explained that Google and Microsoft sought to re-litigate claim construction issues that had already been decided in district court. Appx8025-26. Finally, Hafeman argued that institution should be denied because no "*Sotera*" stipulation had been entered. Appx8022-23.

Attempting to save the IPRs, LG, Google, and Microsoft formed a plan. On November 30, 2022, with trial quickly approaching, LG belatedly sent Hafeman a *Sotera* stipulation. Appx4375. Despite the extensive invalidity litigation that had already taken place, LG claimed it "will not pursue in [this litigation] 'any ground that Google or Microsoft raised or reasonably could have raised' during the instituted IPRs." Appx4375. The PTAB granted Google and Microsoft's request to submit LG's stipulation and file supplemental briefing on the issue. Appx8066. Hafeman opposed the use of an untimely *Sotera* stipulation, arguing that the district court trial would begin within a few months. Appx8085-86. Hafeman further demonstrated that the *Sotera* stipulation was a sham—LG's invalidity expert, Dr. Sandeep Chatterjee, had submitted an expert report advancing the IPR grounds, including the Jenne/Cohen combination, even *after* LG sent the stipulation. Appx7176-78, Appx7182-85, Appx7458.

### C. The PTAB Grants Institution Based on the *Sotera* Stipulation and the Priority Date Issue.

On January 31, 2023—after the completion of all fact and expert discovery in the district court and with trial less than two months away—the PTAB granted institution in all six IPRs. Appx8094. The PTAB found that LG's *Sotera* stipulation "mitigates concerns of potentially conflicting decisions and duplicative efforts between the district court and the PTAB." Appx8100. The PTAB also found that two petitions against each Asserted Patent was "justified" "due to the priority date issue" of whether the Challenged Patents were entitled to the September 20, 2004 date. Appx8101. The PTAB recognized that priority date was the only material dispute between the parties and declined to analyze any of the prior art in the IPRs challenging priority date. Appx9037, Appx9039.

### D. LG Violates the *Sotera* Stipulation.

LG quickly proved Hafeman correct in asserting that LG's *Sotera* stipulation was a sham. One week after the IPRs were instituted, on February 6, 2023, LG moved for summary judgment on invalidity, raising the *same* priority date issue that formed the basis of the PTAB's granting of institution. Appx7637. LG's motion even cross-referenced and responded to Hafeman's IPR arguments on this issue and unabashedly stated that the district court should reach the "same conclusion" the PTAB reached in its institution decisions. Appx7641.

Hafeman initially alerted the PTAB to LG's motion via email on March 17, 2023. Appx7832. In response, on March 20, 2023, the PTAB wrote that "any dispute regarding the scope or alleged violation of stipulations should be addressed in the district court proceedings in which such stipulations are to have effect." Appx7830.

On April 12, 2023, the district court found that LG's motion violated its *Sotera* stipulation. Appx7676-78 (*Hafeman v. LG Elecs., Inc.*, No. 6:21-CV-00696-ADA, 2023 WL 4362863, at *1 (W.D. Tex. Apr. 14, 2023)). As a result, the district court refused to consider LG's priority-date arguments, stating that "LG [was] estopped from raising the priority date issue in this Court." The district court further rejected LG's efforts to avoid the stipulation, including LG's argument that it was using other prior art references. *Id.* Indeed, the district court concluded that LG's challenges were "materially identical" to the IPR issues and lacked any "substantive difference." *Id.* But the damage had already been done: Hafeman was forced to defend the same invalidity challenges in both the IPRs and district court all the way though expert proceedings, depositions, and summary judgment. Appx8175.

**E. The Parties Proceed to Trial in Texas.**

The trial between Hafeman and LG occurred, as originally scheduled, from April 24 to 28, 2023, in Waco, Texas. After five days of trial, the jury returned its verdict, finding each of the asserted claims of the Challenged Patents to be non-infringed and invalid. Appx7626-36. Hafeman has filed a motion for judgment as a

matter of law and for a new trial, based in part on LG's violation of the district court's evidentiary rulings (which the district court found during trial). Hafeman's motion remains pending in the district court, and no judgment has been entered.

### F. The PTAB Ignores the *Sotera* Violation.

In her patent owner response and sur-reply, Hafeman explained why the IPRs should be terminated based on the district court's finding that LG violated its stipulation. Appx8172-76, Appx8281-83. At oral argument, the PTAB questioned Hafeman's counsel at length about the *Sotera* violation. Appx8466-73. During their questioning, the PTAB seemed to view the violation as only the district court's issue, even though the PTAB had relied on the stipulation and used it to grant institution. Appx8469 (29:14-15) ([Judge Galligan:] "the court enforced [the stipulation]. So that was the point of the Sotera [stipulation], right?"), Appx8471 (30:5-6) ([Judge Smith:] "let's say we agree with you on 100 percent of the facts. We agree with you 100 percent. What would that have to do with us?"). Aside from the institution decision, however, the *Sotera* violation continued to infect the IPR proceedings through the FWDs, as Hafeman was forced to once again defend the priority date challenge through the duration of the IPRs. Appx9072-80, Appx9134-40.

## III. THE PTAB's FWDs

On January 23, 2024, the PTAB issued its FWDs finding all claims in the Challenged Patents to be invalid. Appx1-36. The PTAB did not address the *Sotera*

violation, which formed the basis of its grant of institution, let alone explain why the IPRs should have continued after the district court determined it had been violated.

The PTAB consolidated the two IPRs against each Challenged Patent and found all Challenged Claims across the IPRs to be obvious based on the combination of Jenne and Cohen. Appx2, Appx36. The PTAB did not analyze any other combination. *Id.* The PTAB found that all limitations, including the "without assistance by a user" limitation, was met, and rejected the strong objective evidence of non-obviousness of the Challenged Claims. Appx20-24, Appx28-32.

## IV. SUMMARY OF THE PRIOR ART

### A. U.S. Pat. Pub. No. 2003/0122864 ("Jenne")

Jenne has nothing to do with device security or recovery. Jenne does not disclose lock screens or the display of *any* recovery or return information—let alone remotely-changeable return information by the owner without user assistance.

Jenne, as confirmed in paragraph 27, requires the user to assist by connecting to the Internet to establish a remote connection before updating and downloading advertisements to the memory. Appx887 (¶ 27). Jenne displays advertisements during "user waiting times" on a computer, such as "booting [time], waking up from sleep mode, or similar events." Appx886 (¶ 13). Jenne notes that there are many "user waiting times" during which a computer is performing a resource-intensive task, and the user cannot perform another task. Appx886 (¶ 18). Jenne proposes that

"computer manufacturers" could monetize that time, and "generate additional revenue" for themselves, by delivering and displaying ads during such times. Appx886-87 (¶¶ 18-20). To that end, Jenne proposes a system in which computer manufacturers can send ads to a "memory 520" on the computer, "through the Internet" after the user has connected to the Internet. Appx887 (¶ 25), Appx884 (Fig. 1). Such ads can be selected based on "user advertisement preferences" provided based on a survey or by "track[ing] the user's Internet information," such as browsing history. *Id.* Once stored in the memory 520, the advertisements are displayed during "waiting times," such as boot-up. Appx887 (¶¶ 25-27).

**B. EP 687968 A2 ("Cohen")**

Cohen discloses nothing about the remote change of return information. The words "remote," "online," or "Internet" do not appear in Cohen. Instead, Cohen discloses a purely local system in which "textual indica of personal ownership [are] entered by the owner" locally on the device. Appx891 (2:30-47). Cohen discloses that, during initial "set-up" of the device, the device "prompt[s] the user to enter personal ownership indicia, such as name and address." Appx892 (4:27-44). Subsequently, whenever the device is turned on, the device displays the "personal ownership indicia" during the "Power-On-System Test (POST) process." Appx893 (5:20-27). Thus, Cohen comes nowhere near disclosing the claimed features of remotely changing recovery/return information after setup.

## V. OVERVIEW OF STRONG SECONDARY CONSIDERATIONS

Hafeman's inventions in the Challenged Patents were embodied in Front Door Software Corporation's The Retriever product. The specification of the Challenged Patents refers to "the invention" as "The Retriever" dozens of times, Appx113-33, and LG even used the "The Retriever" as an alleged anticipatory reference in the district court. Appx7653 ("[Hafeman] admits that her own product, the Retriever, practiced the limitations of the Asserted Claims ….. these systems anticipate the Asserted Claims.").

The Retriever received tremendous praise. In various news articles, including a 2009 article in the Associated Press, The Retriever was praised for its ability to locate and return lost or stolen computers by allowing the owner to display return/recovery information from a remote location before or with a password lock screen without the person possessing the device to do anything. Appx7728, Appx7729 (mentioning reviews in 57 such articles). The Associated Press article stated that The Retriever "displays your contact information [while your] computer boots up." Appx7728. Another article stated that The Retriever has gone "global," is getting customers from around the world, and works by sending "a bulletin-board message saying, 'This computer has been lost or stolen' to the computer screen." Appx7729. In 2011, the product placed first out of 175 companies at the Vator start-up pitch contest in San Francisco. Appx7737.

The Retriever also proved commercially successful. The Retriever sold for $29.95, for a three-year license, and over 150,000 people in over 100 countries downloaded and used the product. Appx7728, Appx7738, Appx1337. Major universities like UCLA and Brown purchased The Retriever for their student bodies. Appx3020. In 2008, Hafeman signed a deal with Staples who ordered 7,500 Retriever product CDs for 40 stores. Appx1279. By 2009, there were over two million product activations of The Retriever, proving overwhelming product usage, and Hafeman had signed another deal with Office Max. Appx1333, Appx1378. These orders for thousands of CDs of The Retriever product occurred prior to the introduction of any audio or GPS features in The Retriever, which are not recited in the Challenged Claims. Appx7729.

Evidence also showed that others copied The Retriever product. In 2013 and 2015, Google and Microsoft released substantially similar "Find My Device" products in which an owner could send a custom message to their lost or stolen device without user assistance. Appx7741, Appx7746. Google and Microsoft's products can be seen below:







Appx3792, Appx3855. Hafeman's substantially similar invention has a priority date of September 2004, approximately a decade earlier. Appx113.

## **SUMMARY OF ARGUMENT**

1. The PTAB abused its discretion in handling the *Sotera* stipulation violation. The PTAB relied on the *Sotera* stipulation and priority date issue as the bases to grant institution in all six IPRs. Appx8099-101. In the IPRs challenging priority date, the PTAB recognized that priority date was the *only* material dispute

between the parties and *declined* to analyze any of the prior art. Appx9037, Appx9039. The district court subsequently determined that the *Sotera* stipulation had been violated by the filing of LG's motion for summary judgment of invalidity because the challenges were "materially identical." Appx7676-77. Put simply, the "prior art" associated with the priority date challenge (including Hafeman's own patent applications and The Retriever product) added nothing. Appx7653. The PTAB then failed to address the stipulation's violation in the FWDs. Appx1-36.

Under settled law, the PTAB had to provide *some* reasoning as to why it would permit the IPRs to continue. *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 123 (Fed. Cir. 2022) (holding that PTAB abused its discretion where it did not address arguments made by the patent owner); *In re Thrift*, 298 F.3d 1357, 1364 (Fed. Cir. 2002) (emphasizing that the Board is required to "document its reasoning on the record to allow accountability" and to facilitate "effective judicial review"). The PTAB abused its discretion by failing to do so.

Moreover, when a necessary basis of institution is later determined to be incorrect, such as a mis-identification of real parties-in-interest or non-compliance with the one-year statutory bar, this Court has recognized the PTAB's ability to terminate IPRs without issuing a final written decision. *Medtronic, Inc. v. Robert Bosch Healthcare Sys., Inc.*, 839 F.3d 1382, 1386 n.2 (Fed. Cir. 2016); *GTNX, Inc. v. INTTRA, Inc.*, 789 F.3d 1309, 1311-12 (Fed. Cir. 2015). The PTAB abused its

discretion in not terminating the IPRs once the undisputed facts established that the basis of its grant of institution, the *Sotera* stipulation, had been a sham all along.

Indeed, the USPTO's June 2022 Interim Procedure places significant value on *Sotera* stipulations to avoid duplication and conflict between district court proceedings and IPRs. Interim Procedure at 3. The PTAB thus allows IPRs to be instituted when such stipulations are provided, and denies IPRs when they are not. *NXP USA, Inc. v. Impinj, Inc.*, IPR2021-01556, Paper 10, 9 (PTAB Apr. 21, 2022) (denying institution where "Petitioner does not offer a stipulation, such as the one considered in *Sotera*"). Any value offered by such stipulations is destroyed if the stipulations prove to be a sham, which is exactly what occurred here. The IPRs constituted an abusive and duplicative attack on the Challenged Patents that drew significant time and investment by Hafeman to defend through expert discovery and summary judgment in the District Court and for the duration of the IPRs. Appx8175. Not having any consequences in IPR for the violation of a stipulation increases litigation costs for inventors and creates conflict with district court proceedings. Under the AIA and PTAB policy and precedent, "nothing short of termination" would be appropriate. *In re Vivint, Inc.*, 14 F.4th 1342, 1348 (Fed. Cir. 2021).

2. The PTAB implicitly construed "without assistance by a user"—a limitation in each of the Challenged Claims—to *exclude* establishing communications between a lost or stolen computer with a remote computer. This

was legally incorrect. The specification expressly describes the claimed improvement as an owner's ability to initiate or change return information *without* a user doing *anything* (other than powering on the device), such as establishing an Internet connection.

3. Applying its implicit, legally incorrect, construction, the PTAB erred in finding that the Jenne/Cohen combination met the "without assistance by a user" limitation. In Jenne, the *user* must establish an Internet connection for Jenne's software (the "commercial message application") to update any information. Appx884 (Fig. 1), Appx886-88 (¶¶ 13, 24, 25, 27). Indeed, Google and Microsoft's expert, Dr. Erez Zadok, confirmed in his deposition and rebuttal report that Jenne teaches no other way to establish the Internet connection. Appx7774, Appx4563-66. Thus, Jenne does not disclose the required "without assistance by a user" limitation.

4. The PTAB declined to consider the substantial evidence of secondary considerations of non-obviousness that Hafeman offered based on a supposed lack of nexus between The Retriever and the invention. Appx29. But the specification expressly describes The Retriever *as the invention*, Appx113-22, Appx7653, and LG admitted as much in the district court. Appx7653. Thus, the PTAB erred in refusing to take into account the substantial evidence of secondary considerations that Hafeman offered. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018).

## STANDARD OF REVIEW

1. ***The Sotera Violation***: This Court reviews de novo the PTAB's compliance with the Administrative Procedure Act ("APA"). *In re NuVasive, Inc.*, 841 F.3d 966, 970 (Fed. Cir. 2016); *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1054 (Fed. Cir. 2024). The APA requires the Court to "decide all relevant questions of law" and to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "Agency action is an abuse of discretion when it '(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) involves a record that contains no evidence on which the [agency] could rationally base its decision.' A decision is arbitrary and capricious when the agency fails to articulate a 'rational connection between the facts found and the choice made.'" *Vivint*, 14 F.4th at 1351.

2. ***Claim Construction***: This Court reviews the issue of claim construction of a patent claim de novo with any underlying fact findings reviewed for substantial evidence. *Google*, 92 F.4th at 1054.

3. ***Obviousness Findings***: This Court "review[s] the [PTAB's] ultimate determination of obviousness de novo and its underlying findings of fact for substantial evidence." *Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 97 F.4th 882, 886 (Fed. Cir. 2024).

4. ***Secondary Considerations***: The PTAB's legal decisions regarding secondary considerations are reviewed de novo and its underlying factual determinations for substantial evidence. *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 739 (Fed. Cir. 2016).

## ARGUMENT

### I. THE PTAB ABUSED ITS DISCRETION BY FAILING TO ADDRESS THE *SOTERA* VIOLATION AND TERMINATE THE IPRs

LG, through Google and Microsoft, made a binding promise to the PTAB. Based on that promise, that PTAB exercised its discretion to institute all six IPRs. The district court found that LG violated its promise. The PTAB then ignored the issue in its FWDs and found all claims to be invalid.

The PTAB acted arbitrarily and abused its discretion in doing so, particularly without addressing the broken promise in its FWDs. The USPTO uses a precedential six-factor test to determine whether to institute IPR when there is co-pending litigation in the district court. *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020). Known as the *Fintiv* factors, the PTAB must consider proximity to trial, investment in the district court proceeding, overlap in issues, and the likelihood of a stay in district court. *Id.* In June 2022, the USPTO issued further binding agency guidance stating that "the PTAB will not discretionarily deny institution … where a petitioner presents a stipulation not to pursue in a parallel proceeding the same grounds or any grounds that could have reasonably been raised

before the PTAB." Interim Procedure at 3. This is known as a *Sotera* stipulation. *Id.* The USPTO's binding guidance stated that the purpose of these stipulations is to reduce or eliminate "potentially conflicting decisions and duplicative efforts between the district court and the PTAB." *Id.* at 7.

The district court found that LG violated the *Sotera* stipulation, and by extension, Google and Microsoft necessarily did so as well, standing in "LG's shoes" for the IPRs. Appx8100. While the PTAB's institution decisions are not appealable, *Apple Inc. v. Vidal*, 63 F.4th 1, 7 (Fed. 2023), its FWDs are. And in FWDs, the PTAB must comply with the APA. "Under the APA, the [PTAB] must fully and particularly set out the bases upon which it reached its decision." *Provisur Techs.*, 50 F.4th at 123 (holding that PTAB abused its discretion where it did not address arguments made by the patent owner). To permit effective appellate review, the PTAB's analysis must be "clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *In re Thrift*, 298 F.3d at 1364 (emphasizing that the Board is required to "document its reasoning on the record to allow accountability" and to facilitate "effective judicial review"). Yet the PTAB here completely ignored the *Sotera* violation—a stipulation that LG voluntarily made and submitted to the PTAB—in its FWDs. This was a clear abuse of discretion. Beyond that, the *Sotera* violation warranted dismissal of the IPRs in the FWDs, as LG simultaneously

pursued the same invalidity challenges in the district court after promising it would not.

First, the PTAB should have recognized in the FWDs that the six IPRs would not have been instituted but for LG's stipulation and priority date challenge. Appx8100-01. Despite LG's continued use of the IPR grounds, the significant investment in district court, and the approaching trial, the PTAB concluded at institution that LG's stipulation "mitigate[d] concerns of potentially conflicting decisions and duplicative efforts between the district court and the PTAB." Appx8100. The PTAB also found that two petitions against each Challenged Patent was "justified" "due to the priority date issue." Appx8101. When an Article III judge determines a stipulation has been violated, it deserves consideration by the administrative body that previously relied on it.

Second, the district court's action in precluding LG from making the priority data challenge did not cure the *Sotera* violation. Hafeman expended significant time and resources defending the priority challenge, including by submitting an opposition brief, expert report, and declaration, and presenting oral argument, in the district court, all of which occurred after the *Sotera* stipulation was submitted and the PTAB granted institution. Appx8282. Hafeman then had to defend against this issue *again* in her IPR patent owner responses, expert declarations, sur-replies, and at IPR oral argument. Stipulations should be self-executing by the parties that proffer

them and not require judicial intervention to enforce. The June 2022 USPTO Guidance states that *Sotera* stipulations are meant to create efficiency and less duplication of efforts. Interim Procedure at 7. LG, Google, and Microsoft's actions intentionally defied these rules.

Third, the *Sotera* violation should have been binding on Google and Microsoft (and LG) in the IPRs. The district court expressly found LG's motion violated the *Sotera* stipulation, rejecting the argument that the challenges differed based on the nominally different references. Appx7676-77. In the district court, LG argued that the Challenged Patents could not claim priority to September 20, 2004, based on the same limitation, using the same evidence and arguments, that had been raised in the IPRs. Appx7645-53. LG's motion even stated that the district court should reach the "same conclusion" the PTAB had made in its institution decisions. Appx7641. With this undeniable overlap, the district court properly found that there was "no substantive difference" between LG's challenge and the challenge being made in IPR. *Id.* Thus, Google and Microsoft should have been judicially estopped from challenging the *Sotera* violation.

Fourth, the fact that LG was not a party to the IPRs cannot justify the PTAB's failure to either address the *Sotera* violation in the FWDs or to dismiss the IPRs. Google and Microsoft identified LG as the real party-in-interest in the IPRs. Appx8949. Google and Microsoft never challenged Hafeman's allegation that

Google and Microsoft were likely indemnifying LG. Appx8026. Google, Microsoft, and LG were represented by many of the same attorneys, Appx7048, Appx7050, and the PTAB found that Google, Microsoft, and LG were all standing in the same "shoes." Appx8100. LG's *Sotera* stipulation was used to not only convince the PTAB to institute the IRPs, but to proceed with FWDs on the merits. These facts easily required the PTAB to at least address the *Sotera* violation in the FWDs and explain whether the violation warranted dismissal.

Under 37 C.F.R. §§ 42.71(a) and 42.72, the PTAB has broad authority to dismiss a petition and to terminate a trial without rendering a final written decision. This Court has recognized the PTAB's authority to terminate proceedings post-institution based on a failure to list all real parties-in-interest in the petition, *Medtronic*, 839 F.3d at 1386, or where a petition was barred by an early-filed civil action, *GTNX*, 789 F.3d at 1311. In her patent owner responses, Hafeman provided authority holding that, when a party provides misrepresentations to obtain institution, the appropriate remedy is termination of the IPR. Appx8176 (citing *I.M.L. SLU v. WAG Acquisition, LLC*, IPR2016-01658, Paper 46, 13-14 (PTAB Feb. 27, 2018) (vacating institution and terminating IPR where the petitioner made inaccurate representations)). But the PTAB refused to consider either Hafeman's argument or this authority in its FWDs.

The PTAB's FWDs should have not only addressed, but applied that remedy here. Google, Microsoft, and LG's *Sotera* violation forced Hafeman to defend invalidity challenges on two fronts in direct contradiction to the purpose of the America Invents Act, Public Law 112-29, 125 Stat. 284 (Sept. 16, 2011). This wasted Hafeman's, the PTAB's, and the district court's limited resources. *Vivint*, 14 F.4th at 1354 ("nothing short of termination … would be appropriate" where decision was inconsistent with USPTO previous policy and decision-making). When a party violates a stipulation, courts have stricken arguments or even held a party in contempt. *See InVue Security Products Inc. v. Vanguard Products Group, Inc.*, 2020 WL 2425721, *2 (M.D. Fla. 2020) (striking invalidity ground that violated an IPR stipulation); *Codexis, Inc. v. EnzymeWorks, Inc.*, 759 F. App'x 962, 965 (Fed. Cir. 2019) (affirming district court order holding party in contempt for violating stipulation involving settlement terms). Given the heavy weight the PTAB placed on the *Sotera* stipulation at institution, termination is entirely appropriate here.

The IPRs should have been terminated. At a minimum, the Court should vacate and remand with directions that the PTAB address the appropriate remedy for the proven *Sotera* violation.

## II. THE PTAB ERRED AS A MATTER OF LAW IN ITS IMPLIED CONSTRUCTION OF "WITHOUT ASSISTANCE BY A USER" TO EXCLUDE ESTABLISHING A REMOTE CONNECTION

The Challenged Claims in the three Challenged Patents recite "initiating or changing return information … through remote communication *without assistance by a user* with the computer" or substantially similar language. Appx132-33 (claims 1, 4, 7). Thus, the Challenged Claims require that there be no "assistance" by the user to initiate or change return/recovery information.

In determining that Jenne discloses the "without assistance" limitation—the *only* prior art reference that Google and Microsoft relied on for this limitation, Appx7934—the PTAB impliedly construed "without assistance by a user" to exclude a user's establishment of a remote network connection, such that the user still provides "no assistance" even if the user must establish an Internet connection. This implied construction was incorrect as a matter of law.

### A. "Without assistance by a user" means that a user can provide no assistance, including the establishment of an Internet connection.

The "without assistance" claim limitation means what it says: the user *cannot* provide *any assistance whatsoever* (besides turning on power) to receive return and recovery information, including the establishment of an Internet connection. This is not only the legally correct meaning of "without assistance," it is the cornerstone of Hafeman's invention in the Challenged Patents.

The intrinsic patent documents overwhelming demonstrate that establishing a connection or pressing a key is "assistance." In Figure 3, the return/recovery dialog box appears on the monitor's display screen before or simultaneously with any password or security prompt dialog box (*i.e.*, prior to the user pressing a key to enter a password). Appx117 (Fig. 3). There is no step in Figure 3 for the user to establish an Internet connection, only to turn the computer on. *Id.* "Each computer security program will attempt to display the recovery information *on the initial screen when possible*." Appx128 (7:33-35). The specification further explains that the return/recovery information can be displayed *before or during* any password or security prompt, so that "the person finding the equipment will see the owner recovery/return information." Appx128 (7:24-29). This is an "important" or "critical" aspect of the invention, because if such information was only displayed *after* the password screen, and the user did not know the password (which is most likely), then the return/recovery information would never be visible. Appx128-29 (7:18-23, 7:30-33, 8:24-33, 10:1-7).

The distinction between the prior art and the Hafeman invention also compels the correct meaning of "without assistance." As the specification explains, in the PDA prior art, the person in possession of the device "may never access" the network, but the invention allows the *owner* "to access" the equipment "over the Internet, phone lines, cable, etc." Appx131 (14:4-15, 13:42-47 ("[t]he program …

allows the 'owner' to … initiate a download of changes to the protected equipment")). In other words, with power and an available connection, Hafeman's invention allows establishment of a remote connection *automatically*—*i.e.*, without any assistance by the user. Appx125, 2:39-40 ("The present invention automatically initiates during the boot-up process of the equipment …"), Appx126, 4:49-50 ("The apparatus 10 comprises a return screen 20 that the processor 14 automatically causes to appear during or after boot-up of the processor 14 …), Appx132, 15:63-66 ("The Retriever provides an interactive method of designing and changing the entire recovery screen 'on the fly' … Organization logos or ads can be easily and quickly downloaded onto the recovery screens of protected equipment.").

The Challenged Patents improve PDA's "synchronization" capabilities (which still required user assistance to establish an Internet connection) by offering a "unique communication power" to "seize[] control of the display 18 monitor until a security prompt is satisfied." Appx 131 (14:22-40). In this respect, the Challenged Patents provide a critical improvement over the prior art: if a thief or Good Samaritan finds the device, they will almost certainly not know the password to log-on. Appx130 (11:63-12:17). Thus, they cannot go into the settings and establish an Internet connection. But Hafeman's invention still works, and the owner can "initiat[e] or chang[e]" return/recovery information when the user does not establish a connection by pushing a new message to the device via an interactive program

(*e.g.*, "My computer is lost. Please return to the Hotel Metropol Moscow"), *even when the user has not already established a connection*. Appx128 (8:34-36) (the owner may "change the recovery/return information at any time"), Appx 131 (13:44-45) (the owner may "initiate a download of changes to the protected equipment"). Of course, the computer must be powered on, and there must be some form of connection available. Appx117 (Fig. 3) ("Turn Computer On"), Appx128 7:35-42 (explaining that in some operating systems, user has to boot-up the device). But with the Hafeman invention, a stolen computer remains useless to a thief. After all, what thief wants a stolen laptop when he cannot access the data and "THIS DEVICE IS STOLEN" is prominently displayed on the screen?

The prosecution history further demonstrates that no input or action by the user is needed to remotely initiate or change return/recovery information. During prosecution of a parent application, Hafeman added the "without assistance by a user" limitation by amendment filed December 21, 2006. Appx1133. Hafeman explained that, as a result of this amendment, the pending claims overcame the patent examiner's rejection based on the Broyles reference. Appx1141-43. As she explained, to change "ownership information," Broyles "requires that *the user depress a suitable key* to generate a keyboard interrupt at the proper time." Appx1142. Thus, Hafeman overcame Boyles by making clear that the "without assistance by a user" limitation would *not* be satisfied if the user must press a

"suitable key" on the device's keyboard. By the same rationale, logging on to establish a connection would also be user assistance because it also requires pressing a key (*i.e.*, submitting a username and password).

Later on in prosecution, Hafeman provided an applicant declaration demonstrating how a competitor's product met the limitations of her claims. Hafeman stated that the product in which "[t]he user using the computer has ***no*** ability whatsoever to help initiate and control the display on the screen" would satisfy the "without assistance" limitation. Appx3061. Similarly, Hafeman stated that a product in which "[a]ll control over the display on the screens of the users is done without user assistance" would meet the limitation. Appx3065. Hafeman further explained that "[i]t would not make any sense for an owner using my invention to have to first try to find a way to contact the equipment user (possibly a thief!) to ask them to help push an interrupt key to help the owner display recovery information …. My product design and claimed features … allows an owner to control the equipment *without any user assistance*." Appx3083.

In sum, the legally correct meaning of "without assistance by a user" is *no user assistance* (besides turning on power) to receive return and recovery information, including the establishment on an Internet or remote connection.

### B. The PTAB implicitly construed "without assistance" to allow a user to establish a remote connection.

In determining that Jenne met the "without assistance" limitation, Appx20-24, the PTAB necessarily and implicitly construed "without assistance" to *exclude* establishing remote communications, such as an Internet connection, between a lost device and a remote computer. This implicit construction was incorrect as a matter of law. *Google*, 92 F.4th at 1056 ("We have found implicit claim constructions even when the Board does not recognize that it is construing a claim.").

Jenne undisputedly teaches the user must establish an Internet connection to update and download information into the memory. Appx21, Appx23. In the FWDs, the PTAB acknowledged Hafeman's position that the Challenged Patents "allow[] an owner to push recovery information changes to the computer even when the user of the computer has not connected to the Internet, such as when a computer is found by someone who does not know the password and, therefore, cannot connect to the Internet." Appx20. Nonetheless, by impliedly construing "without assistance" to *exclude* establishing an Internet connection, the PTAB found that Jenne met this limitation. Appx21.

In her patent owner response, Hafeman argued that "without assistance by a user" means that there can be "no input or action by the user … to remotely initiate or change return/recovery information." Appx8186. As Hafeman explained, if the person finding the lost or stolen device had to login and establish a connection, a

critical aspect of the invention would be rendered meaningless. *Id.* The PTAB rejected Hafeman's description of her own invention and then proceeded to implicitly construe "without assistance" in the FWDs to still allow a user's establishment of an Internet connection. The PTAB's reasons for doing so cannot withstand close examination.

First, the PTAB found that the claims do not "prohibit[]" user interactions such as "establishing the remote communication in the first instance." Appx21. But, as discussed above, the claim language, specification, and prosecution history all demonstrate that "assistance" includes the user pressing any key whatsoever, including to establish an Internet connection. The remote communication is controlled by the owner without any involvement of the user.

Second, the PTAB pointed to the following passage in the specification, finding that Hafeman's argument would "exclude" this functionality in the Challenged Patents:

> Using this unique communication power, both 'owner' and "assigned to" information can be uploaded to the recovery center and/or downloaded to the protected equipment in order to synchronize the international recovery center information and the recovery information displayed on the initial display 18 screen. (This is a combination of the PDA type of synchronization between the main computer 12 and the PDA, and the McAfee anti-virus software Internet updating capability where *every time you go on-line, your computer 12 automatically checks to make sure that you have the most current anti-virus software and automatically updates your computer 12 with the latest changes.*) Nobody has ever before considered or designed a product *combining this type* of communication ability *with this type of recovery security*

> *program that seizes control* of the display 18 monitor until a security prompt is satisfied. The Retriever design allows an equipment recovery capability that just does not exist on today's market, and is completely unique from all current products on the market[.]

Appx21 (citing Appx131 (14:22-40)) (first emphasis original). This passage (which Google and Microsoft did not even cite in their IPR papers) discusses two prior art communications systems—"PDA type of synchronization" and "McAfee anti-virus software." Both required user assistance in establishing a network connection before any synchronization or anti-virus software updates could occur. *Id.* It then describes Hafeman's improvement (never before considered or designed) over these systems by eliminating the requirement for any user assistance to establish a remote network connection. As the passage explains, the Hafeman improvement takes "this type" of known technology—using PDA synchronization to update anti-virus software—and *combines it* with Hafeman's *recovery security program that seizes control* of the display 18 monitor until a security prompt is satisfied. *Id.*

In erroneously finding that the claimed invention also requires "the user [to go] online," Appx22, the PTAB confused the distinction between using the known PDA and McAfee systems, on the one hand, with Hafeman's novel security program, which seizes control of the display until a security prompt is satisfied, on the other hand. The specification plainly explains that the invention improves both systems: the invention "synchronize[s] the international recovery center information and the recovery information displayed on the initial display 18 screen" and "seizes

control of the display 18 monitor until a security prompt is satisfied." Appx131 (14:22-40). And the Internet connection can be established "automatically" and "on the fly" without any "assistance" by the user. Appx131 (13:32-24) ("This recovery display information can then be synchronized using the PDA synchronize capability."), Appx 131 (14:8-10) (even if the user "never access[es]" the network, the owner can "attempt to access" the device "such as over the Internet, phone lines, cable, etc.").

Third, although the PTAB acknowledged that Hafeman successfully traversed a reference (Broyles) during prosecution that required a system refresh by pressing a key to update return/recovery information, Appx23, it still stated that Broyles was different from Jenne because Jenne does not "requir[e] the user at the computer to press a particular key to start the process" of updating advertisements. Appx23. This misses the point. Jenne teaches (and Google and Microsoft's own expert confirmed) that no information will be changed in Jenne unless an Internet connection is established by the user." Appx4563 (¶ 75). The only way a user can establish an Internet connection in Jenne is by pressing a key. Thus, there is *no difference* between Broyles and Jenne relevant to the proper meaning of the "without assistance" limitation. If anything, a person's act of logging and establishing a connection in Jenne is even *greater* assistance that touching a single key in Broyles.

In sum, the PTAB's reasoning for its implicit construction of "without assistance by a user" was legal error. *Google*, 92 F.4th at 1056.

## III. THE JENNE/COHEN COMBINATION FAILS TO MEET THE "WITHOUT ASSISTANCE" LIMITATION UNDER THE LEGALLY CORRECT CONSTRUCTION

In the IPRs, Google and Microsoft bore the burden to prove "unpatentability by a preponderance of the evidence." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375 (Fed. Cir. 2016); 35 U.S.C. § 316(e). This includes the "burden to prove that all claimed limitations are disclosed in th[at] prior art." *Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014). Indeed, the PTAB could not eve "consider motivation to combine" unless Google and Microsoft first succeeded in proving that "all the elements of [the] invention are found in [the] combination of prior art references." *Id.*; *see also Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006).

Google and Microsoft relied only on Jenne in arguing that the Jenne/Cohen combination satisfies the "without assistance by a user" limitation. Appx7934. Google and Microsoft did not rely on Cohen to supplement Jenne for the "without assistance by a user" limitation for good reason. Cohen's "ownership indicia," even if combined with Jenne, is limited to what is already stored on the computer. Appx893 (5:21-27). Thus, in Cohen, nothing is "initiat[ed]" or "change[ed" using "remote communication."

Unlike the Challenged Patents, Jenne is useless for receiving remote instructions for returning a lost or stolen computer. With Jenne, if an owner loses her computer or has it stolen, the person holding the computer (the "user") cannot connect to the Internet because he will not know the computer password, and thus he cannot get past the log-on screen and into the Wi-Fi settings. Without remote communications, the user can only turn on the computer and see ads already stored in memory. The owner has no way to send return or recovery information to the user because no remote connection exists. Appx884 (Fig. 1) (block 55 checks for Internet connection) Appx886-88, ¶ 13 ("commercial messages in the non-volatile memory may be securely updated through the Internet using a password"); ¶ 25 ("if an Internet connection to the system exists, the user may occasionally request to provide advertisement preferences"), ¶ 27 ("The Internet browser 545 can be connected with the Internet 525 by the user, and the user can access a website 530 through the Internet 525.").

According to Google and Microsoft, Jenne's downloads and updates "occur automatically during execution of the message application or via instruction by the manufacturer or authorized agent," thereby satisfying the claim. *Id*. But the record contradicted Google and Microsoft's assertion and neither Google and Microsoft's own expert or the PTAB supported their position.

First, it is undisputed that Jenne's system requires assistance from the user by logging in and establishing a connection before sending an advertisement through remote communication. Appx884 (Fig. 1, block 55), Appx887-88, ¶ 24 ("the commercial message application 50 checks to see if the computer 500 is connected to the Internet"), ¶ 27 ("The Internet browser 545 can be connected with the Internet 525 *by the user*, and the user can access a website 530 through the Internet 525.").

Second, nowhere does Jenne teach that an owner can "initiat[e]" or "chang[e]" return/recovery information "without assistance by the user." To the contrary, Jenne discloses an advertisement display system that has nothing to do with recovering lost or stolen mobile devices. Jenne displays advertisements during "user waiting times" on a computer, such as "booting [time], waking up from sleep mode, or similar events," when which a computer performs resource-intensive tasks, preventing the user from performing other tasks. Appx886 (¶¶ 13, 18-20). To "generate additional revenue" during these "waiting times" by displaying ads, Jenne's system teaches that computer manufacturers can collect user feedback and preferences, and then send ads into onboard memory "through the Internet." Appx887 (¶ 25). Once stored in memory, the ads are displayed during the "waiting times." Appx887 (¶¶ 25-27).

Indeed, any 'manufacturer password' only works *after* a user with the device connects to the Internet. As shown in Jenne's Figure 1, the computer program on the remote computer checks to see if there is an Internet connection. If the answer is

"No," no new updates or downloads can go into the memory of the remote computer in block 65. Instead, the computer can only display and rotate through old ads or messages that are already in the memory, and Jenne *does not* check for updates and downloads in block 65:




Appx884 (Fig. 1). Thus, when Jenne's manufacturer checks for updates and downloads, it is required that the user connected to the Internet. Appx7771 (63:14-18) (Dr. Zadok acknowledging that when the manufacturer checks for updates and downloads, it must first pass through block 65). Thus, Jenne's download and update process cannot occur unless the user has provided "assistance."

Google and Microsoft's own expert, Dr. Zadok, confirmed that Jenne teaches no other way the Internet connection is established. Appx7774, 76:15-16 ("Q. Putting aside the user, does Jenne teach anyone else connecting the device to the

Internet? A. I don't know if Jenne mentions anyone else who might connect to the Internet."). Dr. Zadok further confirmed in his declaration that Jenne's software will "proceed to the remote changing of return/recovery information" only "if another entity (such as the owner) has already connected the device to the Internet." Appx4563 (¶ 75). Thus, Dr. Zadok confirms that some "entity" in possession of the device must establish an Internet connection for Jenne to update any information.

Under the legally correct construction of "without assistance" as *no user assistance* (besides turning on power), Google and Microsoft failed to carry their burden of proof to show that limitation in the asserted "[Jenne] prior art." *Par Pharm.*, 773 F.3d at 1194. Thus, as a matter of law, the Jenne/Cohen combination could not render the Challenged Claims obvious and the PTAB's decision should be reversed.

## IV. THE PTAB ERRED IN ITS ANALYSIS OF THE STRONG SECONDARY CONSIDERATIONS OF THE CHALLENGED PATENTS

"[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983). Here, the nonobviousness of the claims of the Challenged Patents is confirmed by various secondary considerations: the praise Hafeman received for her inventions, the inventions' huge commercial

success, and copying by Google and Microsoft, all of which is described in detail above in the Statement of the Case. In rejecting Hafeman's strong evidence of secondary considerations, the PTAB made multiple errors.

First, the PTAB wrongly found that there was no nexus between The Retriever software and the claimed invention. Appx29. The specification uses the term "The Retriever" to refer to the invention in the specification no fewer than 34 times, and Google and Microsoft's attorneys had used The Retriever as an allegedly anticipatory reference in the district court. Appx126 (4:55), Appx7653. Thus, there was no dispute that The Retriever practiced the Challenged Claims.

The nexus was clear from the specification figures of the Challenged Patents, which prominently show The Retriever's return/recovery and lock screens.




*FIG.2*

Appx116-24 (Figs. 2, 6, 8, 9, 10, 11). The Retriever met each and every limitation of the Challenged Patents, by allowing an owner to "initiat[e] or chang[e] return information which appears on the display through remote communication without assistance by a user" the return/recovery information was "display[ed] … before with or with a security prompt."

Second, the PTAB committed reversible legal error in finding that there was no nexus without providing any explanation. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016) ("there is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'"); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 747 (Fed. Cir. 2016) ("When the patentee has presented undisputed evidence that its product is the invention disclosed in the challenged claims, it is error for the Board to find to the contrary without further explanation.").

Third, the PTAB incorrectly found that the praise for the invention was directed only at non-patented features, such as a verbal alarm. Appx29-30. The evidence of record established that there was significant praise for displaying a custom message before or with the password lock screen, and that is the subject of the claimed invention. For example, the 2009 article in the Associated Press states "Front Door Software Corp.'s Retriever program displays your contact information

[as your] computer boots up. … a big yellow and red banner appears on the screen, bolding [declaring] the laptop lost or stolen … you can even let off steam [by] sending new messages to the nagging 'Stolen Computer!' screen." Appx7728. This was just one of many articles praising the invention's ability to display and change custom messages. Appx7728 (mentioning articles in the Seattle Times, London Times Online, Fox News, Channel 9, Channel 7, MSN.com, and the Rocky Mountain News). The start-up brochure from 2011 does not mention The Retriever's audio features, but its "page view delivery capabilities" (*i.e.*, the return/recovery display screen). Appx7737. Even if there was some praise for non-patented features like the verbal alarm, that would not be a reason to disregard the commercial success of the patented invention. *PPC Broadband*, 815 F.3d at 747 (citation omitted) ("Because the evidence shows that the SignalTight connectors are "the invention disclosed and claimed in the patent, we presume that any commercial success of these products is due to the patented invention. This is true even when the product has additional, unclaimed features."); *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000) (applying presumption even through commercial embodiment had unclaimed mobility feature).

Fourth, the PTAB incorrectly dismissed the evidence of The Retriever's commercial success as unsupported. Appx30-31. Contrary to the PTAB's conclusion, Hafeman offered evidence from Front Door Software's website listing

customers from 104 colleges and universities and mentioning "thousands of additional customers." Appx7738. Hafeman also pointed to evidence that The Retriever cost $29.95 for a three-year license. Appx7728. Moreover, Hafeman submitted several declarations to the USPTO during prosecution in 2008 and 2009—before The Retriever's verbal alarm was introduced—stating that The Retriever had generated over $600,000 in sales. Appx1333, Appx1378. Staples alone ordered 7,500 units of the software in that period. *Id.*

Finally, the PTAB wrongly rejected evidence of copying. According to the PTAB, Google and Microsoft's Find My Device programs are limited to "finding a device by ascertaining the location of the device." Appx32. But the evidence showed otherwise. Google and Microsoft's products allow a user to send and display a custom message to the device, just as The Retriever did.






Appx3792, Appx3855. In their IPR petitions, Google and Microsoft relied on a similar screenshot of Google's Find My Device. Appx7940, Appx7972. Copying does not require direct evidence. Rather, copying can be established when the products are substantially similar and there was access to the patented product. *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1340 (Fed. Cir. 2023). Nor is limitation-by-limitation correspondence required to show copying. *Id.* The PTAB's copying determination required direct evidence and correspondence contrary to this well-settled law.

In sum, the PTAB's refusal to consider secondary considerations of non-obviousness rested on a misapplication of the law and on incorrect descriptions of Google and Microsoft's Find My Device features of programs. The FWDs should be reversed for this reason as well.

## **CONCLUSION**

The PTAB's decision invalidating the Challenged Claims should be reversed or vacated.

Dated: September 3, 2024

Respectfully submitted,

*/s/ Lawrence M. Hadley*

Lawrence M. Hadley
Stephen Underwood
Jason C. Linger
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Blvd., Floor 19
Los Angeles, CA 90067
(310) 553-3000

*Attorneys for Appellant*
*Carolyn W. Hafeman*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Starting Page**


| **DECISIONS** | |
|---|---|
| Final Written Decision in IPR2022-01188, -01189 | Appx1 |
| Final Written Decision in IPR2022-01190, -01191 | Appx37 |
| Final Written Decision in IPR2022-01192, -01193 | Appx76 |
| **PATENTS IN SUIT** | |
| U.S. Patent No. 10,325,122 (Ex. 1001 in -01188, -01189) | Appx113 |
| U.S. Patent No. 10,789,393 (Ex. 1001 in -01190, -01191) | Appx134 |
| U.S. Patent No. 9,892,287 (Ex. 1001 in -01192, -01193) | Appx155 |

Trials@uspto.gov
571-272-7822

Paper 32
Date: January 23, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

GOOGLE LLC, MICROSOFT CORPORATION,
Petitioner,

v.

CAROLYN W. HAFEMAN,
Patent Owner.

---

IPR2022-01188
IPR2022-01189
Patent 10,325,122 B2

---

Before JEFFREY S. SMITH, DANIEL J. GALLIGAN, and ARTHUR M. PESLAK, *Administrative Patent Judges*.

GALLIGAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

ORDER
Granting Petitioner's Request for Consolidation
*37 C.F.R. § 42.122(a)*

# I. INTRODUCTION

In these *inter partes* reviews, Google LLC and Microsoft Corporation (collectively "Petitioner") challenge the patentability of claims 1–7 of U.S. Patent 10,325,122 B2 (Ex. 1001 ("'122 patent")), which is owned by Carolyn W. Hafeman ("Patent Owner"). Petitioner requests that we consolidate these cases. IPR2022-01188, Paper 24 at 1. Patent Owner opposes. IPR2022-01188, Paper 28 at 1. Because these cases address the same claims, we grant Petitioner's request to consolidate them pursuant to 37 C.F.R. § 42.122(a). *See also* 35 U.S.C. § 315(d) (giving Director discretion to consolidate proceedings).

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trials in these *inter partes* reviews. For the reasons discussed below, we determine that Petitioner has proven by a preponderance of the evidence that claims 1–7 of the '122 patent are unpatentable. *See* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.").

## *A. Procedural History*

Petitioner filed two petitions, each of which challenges claims 1–7 of the '122 patent on the grounds set forth in the tables below.

**IPR2022-01188**

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–7 | 103(a)[1] | Jenne,[2] Cohen[3] |
| 1, 4, 7 | 103(a) | Angelo,[4] Helle[5] |

IPR2022-01188, Paper 4 ("Pet.") at 2–3.[6]

**IPR2022-01189**

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–7 | 102(a)(1) | Hafeman 670[7] |
| 1–7 | 103 | Hafeman 298,[8] Chiu[9] |

IPR2022-01189, Paper 4 at 2–3.

Patent Owner filed preliminary responses in both proceedings. Paper 8 in each proceeding. With Board authorization, Petitioner filed a reply in each case (Paper 11 in each proceeding), and Patent Owner filed a

[1] The '122 patent claims priority through a chain of continuations to an application that was filed before the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA") amendments to 35 U.S.C. §§ 102 and 103. In IPR2022-01188, Petitioner asserts that the references are prior art under the pre-AIA versions of these sections. Pet. 2–3. In IPR2022-01189, however, Petitioner argues that the effective filing date of the claims of the '122 patent is after the AIA effective dates, and Petitioner applies the AIA version of sections 102 and 103 in that case. IPR2022-01189, Paper 4 at 2–3 n.2. For purposes of this Decision, we need not resolve the priority dispute because, as discussed below, the claims are unpatentable over the combination of Jenne and Cohen, the pre-AIA prior art.
[2] US 2003/0122864 A1, published July 3, 2003 (Ex. 1005).
[3] EP 0687968 A2, published Dec. 20, 1995 (Ex. 1006).
[4] US 2003/0065934 A1, published Apr. 3, 2003 (Ex. 1007).
[5] US 6,662,023 B1, issued Dec. 9, 2003 (Ex. 1008).
[6] Unless otherwise noted, we refer to the papers in IPR2022-01188.
[7] US 2005/0071670 A1, published Mar. 31, 2005 (Ex. 1011).
[8] US 2004/0103298 A1, published May 27, 2004 (Ex. 1009).
[9] US 2003/0088633 A1, published May 8, 2003 (Ex. 1010).

sur-reply (Paper 14 in each proceeding). Trial was instituted on the asserted grounds of unpatentability in each proceeding. IPR2022-01188, Paper 16 ("Inst. Dec.") at 21; IPR2022-01189, Paper 16 at 20.

In each proceeding, Patent Owner filed a Response (IPR2022-01188, Paper 20 ("PO Resp."); IPR2022-01189, Paper 20), Petitioner filed a Reply (Paper 24 ("Pet. Reply"); IPR2022-01189, Paper 24), and Patent Owner filed a Sur-reply (Paper 28 ("PO Sur-reply"); IPR2022-01189, Paper 28).

An oral hearing was held on November 2, 2023, a transcript of which appears in the record in each case. Paper 31 in each proceeding.

Petitioner relies on testimony from Erez Zadok, Ph.D. Exs. 1003, 1048 (same declarations filed in both proceedings). Patent Owner relies on testimony from Scott Schaefer, Ph.D. Ex. 2040 in each proceeding. Patent Owner has entered in the record a transcript of the deposition of Dr. Zadok. Ex. 2048 in each proceeding.

### *B. Real Parties in Interest*

Petitioner identifies the following real parties in interest: Google LLC, Microsoft Corporation, LG Electronics Inc., and LG Electronics U.S.A., Inc. Pet. 78; IPR2022-01189, Paper 4 at 81.

Patent Owner identifies herself as the real party in interest. Paper 5 (in each proceeding) at 1.

### *C. Related Matters*

As required by 37 C.F.R. § 42.8(b)(2), the parties identify various related matters. Pet. 78; IPR2022-01189, Paper 4 at 81–82; Paper 5 (in each proceeding) at 1.

*D. The ’122 Patent and Illustrative Claim*

The ’122 patent relates to the “return of lost or stolen computers using a recovery screen that appears during or after boot-up of the computer.” Ex. 1001, 1:24–27. Claims 1, 4, and 7 are independent, and claim 1 is reproduced below.

> 1. A method for displaying information to assist with returning a computer comprising the steps of:
>
> > activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying return information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the return information is visible to anyone viewing the display screen, the lock screen locks the display screen and protects the computer;
> >
> > initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;
> >
> > displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and
> >
> > activating the processor to allow a message to the user.

## II. ANALYSIS

### *A. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations, if in evidence. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

### *B. Level of Ordinary Skill in the Art*

Citing the testimony of Dr. Zadok, Petitioner contends that a person of ordinary skill in the art

> would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or the equivalent and at least two years of experience in the relevant field, e.g., electronic communications systems. Significantly more practical experience could also qualify one not having the aforementioned education as a person of ordinary skill in the art while, conversely, a higher level of education could offset a lesser amount of experience.

Pet. 12–13 (citing Ex. 1003 ¶ 96).

Patent Owner does not dispute this assessment or offer her own assessment. *See* PO Resp.

To the extent necessary, we accept the uncontested assessment offered by Petitioner, except that we delete the qualifier "at least" to eliminate vagueness as to the amount of experience. The qualifier expands the range indefinitely without an upper bound, and thus precludes a meaningful indication of the level of ordinary skill in the art.

### *C. Claim Construction*

Petitioner presents two issues for claim construction. Pet. 9–12. First, Petitioner argues that certain language in each independent claim should be interpreted to require the automatic display of certain information "during or after every boot-up." Pet. 9–11. Second, Petitioner argues that the return and recovery information recited in the claims is merely printed matter that is not entitled to patentable weight. Pet. 12. Patent Owner disagrees with Petitioner's claim construction arguments. PO Resp. 9–21.

For her part, Patent Owner argues that the terms "computer recovery information," "recovery information," and "return information" mean "information provided by the owner so that the device can be returned to the owner," and she argues that "owner" means "the person or entity that owns, rents, or licenses the recovery application or program, and/or the person or entity who controls the recovery service." PO Resp. 21 (citing Ex. 1001, 3:37–38, 4:9–10, 4:54–56, 11:33–35; Ex. 2035, 6–7, 18–20).

As explained below, the combination of Jenne and Cohen teaches the content of the return/recovery information under Patent Owner's construction, and, therefore, we need not resolve whether such information is entitled to patentable weight. Furthermore, as explained below, the combination of Jenne and Cohen teaches displaying the return/recovery information during or after every boot-up and teaches "owner" under Patent

Owner's construction. Therefore, because there are no claim construction disputes between the parties that affect the analysis of unpatentability based on the combination of Jenne and Cohen, we need not resolve these claim construction issues. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### *D. Obviousness over Jenne and Cohen (Claims 1–7)*

Petitioner asserts that claims 1–7 are unpatentable as obvious over the combined teachings of Jenne and Cohen. Pet. 3, 13–44. Patent Owner opposes. PO Resp. 26–43, 55–57; PO Sur-reply 5–18, 24–26.

#### *1. Overview of the Prior Art*

Jenne discloses a computer system that displays messages during a user wait time, such as during system boot-up, and has the ability to remotely update the messages. Ex. 1005, code (57), ¶¶ 21, 25.

Cohen discloses modifying the Power-On System Test (POST) mode of a computer to display information about the owner of the computer while prompting for a password. Ex. 1006, code (57), 3:57–4:4, Figs. 1, 3.

We discuss additional pertinent details of Jenne and Cohen in our analysis below.

#### *2. Claim 1*

##### *a) Petitioner's Contentions*

Petitioner relies on Jenne for its teachings of displaying messages during boot-up of a computer and updating those messages remotely.

Pet. 13–16 (overview of Jenne), 23–40 (detailed analysis of independent claims). For example, Jenne discloses that, "[d]uring a computer boot-up time or a wake-up time from a low-power mode, the computer user is forced to sit and wait," and Jenne discloses displaying messages during that time. Ex. 1005 ¶¶ 12–13. Jenne explains that such messages may be advertisements but that "other information could be displayed such as announcements, useful productivity tips, utility enhancements and computer upgrades." Ex. 1005 ¶ 22. Jenne discloses that the content of the information displayed can be remotely updated: "The computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password.").

Petitioner relies on Cohen to teach the automatic display of ownership information with a lock screen each time the computer is powered on. Pet. 16–18 (overview of Cohen), 23–40 (detailed analysis of independent claims). Cohen discloses that a "textual indicia of personal ownership is entered by the owner of the system during set-up or during a configuration change and electronically stored within non-volatile memory" and that this information is displayed during the POST process. Ex. 1006, code (57). With reference to Figure 4, Cohen discloses that, when power is turned on to the computer, the POST process retrieves and displays the owner's information and prompts for a password to allow use of the computer. Ex. 1006, 5:5–42, Fig. 4. This is shown in Cohen's Figure 1 below.




*Fig. 1*

Cohen's Figure 1, reproduced above, "display[s] an indication of ownership of portable computer device 10." Ex. 1006, 3:15–18. The display on computer 10 shows the following:

> This system belongs to:
> John Smith
> 121 Elm
> Fort Worth, Tx
> 817-555-1234
> Enter Password_ _ _ _ _ _ _ _ _

Ex. 1006, Fig. 1.

Petitioner argues that it would have been "obvious to combine Jenne's teaching of automatic display of remotely updateable messages during the boot process with Cohen's teaching of displaying ownership indicia messages with a security (lock) screen on every bootup to prohibit a user from accessing the device until proper security credentials (e.g., password)

are entered." Pet. 19 (citing Ex. 1003 ¶¶ 300–308). Petitioner provides several reasons that a person of ordinary skill in the art would have made this combination, including that Cohen expressly teaches that its display of ownership information during boot-up increases the likelihood of returning a lost computer. Pet. 19–22 (citing, *inter alia*, Ex. 1003 ¶ 301; Ex. 1006, 5:43–58[10]).

Petitioner provides a detailed analysis explaining how the combination of Jenne and Cohen teaches the subject matter of claim 1. Pet. 23–40. Petitioner argues that Jenne's disclosure of displaying information in combination with Cohen's disclosure of owner information teaches the preamble of claim 1. Pet. 23–24.

Petitioner argues that the combination of Jenne and Cohen teaches "automatically displaying return/recovery information during or after every boot-up of the computer" and, therefore, teaches "activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer," as recited in claim 1. Pet. 27–28. Petitioner argues that, in the asserted combination, the owner information is displayed with a password prompt as described in Cohen such that the combination teaches "the screen displaying return information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the return information is visible to

---

[10] Although Petitioner cites column 5, lines 43–48 of Cohen, the relevant disclosure appears through line 58, as cited by Dr. Zadok. Ex. 1003 ¶ 302.

anyone viewing the display screen, the lock screen locks the display screen and protects the computer," as recited in claim 1. Pet. 30–32.

Claim 1 recites "initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer." Petitioner addresses "changing" rather than "initiating," noting that only one of these needs to be met by the prior art. Pet. 32–33; *see also* PO Resp. 28 ("As Petitioner notes, 'initiating or changing' is disjunctive: thus, Petitioner only needs to establish that one of the two is satisfied."). Petitioner relies on Jenne's disclosures of remotely updating the message content and argues that a person of ordinary skill in the art "would have been motivated to incorporate the capability to change the stored ownership information using Jenne's '*remote communication*' (EX-1005, Abstract, ¶¶13, 21, 25) so that the most up-to-date ownership information is displayed when a device is lost or stolen." Pet. 33–34 (citing Ex. 1003 ¶¶ 303, 334).

Claim 1 further recites "wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen." Petitioner argues that Jenne's disclosure of remotely updating the message content by the "computer manufacturer or its authorized agent" (Ex. 1005 ¶ 25) teaches an interactive program, which, in combination with Cohen's disclosure of an owner changing owner information, teaches this subject matter. Pet. 35–37.

Claim 1 also recites "displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer."

Petitioner relies on Cohen's disclosure of displaying owner information on the screen with a password prompt as teaching this limitation. Pet. 37–38.

Claim 1 further recites "activating the processor to allow a message to the user." Petitioner relies on Cohen's screen showing the message "This system belongs to:" as teaching a message that is in addition to the return information. Pet. 38–40 (Ex. 1006, Fig. 1).

*b) Patent Owner's Arguments and Our Analysis*

*(1) Reason to Combine*

Patent Owner argues that "Petitioner has not articulated any plausible reason why a [person of ordinary skill in the art], in 2002, would have been led to convert Jenne's ***advertising*** system and Cohen's permanent ownership indicia into a system for ***remote changing of ownership information***." PO Resp. 32. Referring to Petitioner's argument based on Jenne's disclosure that "[b]esides advertisements, other information could be displayed" (Ex. 1005 ¶ 22, *cited in* Pet. 19), Patent Owner argues that "there is no reason why the word 'other' would have led a [person of ordinary skill in the art] specifically to display ***ownership*** information in Jenne." PO Resp. 29–30. According to Patent Owner, "Petitioner's argument is essentially that the word 'other' would have motivated a [person of ordinary skill in the art] to display ***any conceivable type of information***—sports betting information, Babylonian epics, astronomical charts, or anything else, in Jenne. This stretches obviousness beyond its breaking point." PO Resp. 30.

But as noted above, Petitioner relies on Cohen's disclosure that displaying ownership information during boot-up increases the likelihood of returning a lost computer. *See* Pet. 19 (arguing that a person of ordinary skill in the art would have "been motivated to display ownership information

to this captive audience because as taught by Cohen, displaying such information during this time period between boot-up and before entry to the operating system increases the likelihood that a lost or misplaced computer will be returned to its owner"). Patent Owner, however, contends that, "from the perspective of Cohen, ***updating*** the ownership indicia would not be a 'benefit' – it would be a detriment to security" because, according to Patent Owner, "Cohen ensures security by keeping ownership indicia constant after the initial set-up or configuration change." PO Resp. 32 (citing Ex. 2040 ¶ 54(b)). Patent Owner cites the following testimony from Dr. Schaefer to support this assertion:

> Cohen discloses a method where the owner enters "a textual indicia of personal ownership" "during set-up or during a configuration change." Cohen is specifically designed to keep ownership indicia constant. Although Cohen states that ownership indicia can be stored in RAM or nonvolatile memory, Cohen makes clear that nonvolatile memory is preferred because it cannot be altered, whereas ownership information stored in the RAM could be "easily defeated" by removing the battery. Thus, Cohen's objective is to keep its local ownership indicia constant after an initial set-up or configuration change.

Ex. 2040 ¶ 54(b) (citing Ex. 1006, 2:31–35, 4:50–5:4); *see* PO Resp. 29 (quoting this testimony), 32 (citing this testimony).

We do not credit Dr. Schaefer's testimony because it is inconsistent with Cohen's disclosure. In particular, Cohen discloses "storing of the personal ownership indicia and password data within nonvolatile memory, such as ROM 26," which Cohen states "is preferably implemented utilizing so-called 'flash' ROM or serial EEPROM, which may be electrically altered upon application of suitable control signals." Ex. 1006, 3:44–47, 4:47–50. Thus, contrary to Dr. Schaefer's testimony that Cohen states a preference for

nonvolatile memory because it cannot be altered, Cohen expressly discloses using nonvolatile memory that can be altered, so that the system may not "be easily defeated by opening the case of portable computer device 10 and temporarily removing the battery, rendering this information erased." Ex. 1006, 4:54–57. In further contrast to Dr. Schaefer's testimony, Dr. Zadok testifies that Jenne also discloses storing information in nonvolatile memory, such as nonvolatile random access memory (NVRAM) or a flash ROM. Ex 1003 ¶ 319 (citing Ex. 1005 ¶¶ 23, 27, Fig. 3). Dr. Zadok persuasively testifies that Cohen's disclosure of storing information in nonvolatile memory is consistent with Jenne's disclosure. Ex. 1003 ¶ 320.

We find Petitioner's reasoning to combine Jenne and Cohen to be persuasive. As Petitioner correctly points out (Pet. 19), Cohen expressly teaches that the benefits of displaying owner information with a password prompt when the computer is started are that "the likelihood that a lost or misplaced personal computer device will be returned to its owner [is] greatly enhanced and [that] ownership of otherwise fungible devices may be easily determined." Ex. 1006, 5:52–58; *see* Ex. 1003 ¶ 301 (Dr. Zadok testifying that Cohen's disclosure shows that a person of ordinary skill in the art would have been motivated to display owner information during boot-up). Thus, we find that Cohen's express disclosure provides a rationale for a person of ordinary skill in the art to display a particular type of information, specifically owner information, in the system of Jenne. We agree with Petitioner that "the combination would have involved a simple substitution of a known generic element (Jenne's 'other information') with a specific type of information (Cohen's 'ownership indicia') to obtain predictable results." Pet. 20 (citing *KSR*, 550 U.S. at 415–16).

*(2) Owner*

Patent Owner argues that "[e]ach of the [challenged] [c]laims recites an 'owner' whose return/recovery information is displayed on the device," that "Petitioner relies on Jenne's 'computer manufacturer' for the 'owner' limitation," and that Jenne's manufacturer is not an owner. PO Resp. 26–28.

We disagree with this argument because Petitioner relies on Cohen to teach an owner and ownership indicia in combination with Jenne's teachings. *See* Pet. 19 (asserting that it would have been obvious to combine "Jenne's teaching of automatic display of remotely updateable messages during the boot process with Cohen's teaching of displaying ownership indicia messages with a security (lock) screen on every bootup"), 20 ("A [person of ordinary skill in the art] would have therefore found it straightforward to modify the information stored for display during boot-up in Jenne to include Cohen's indicia of ownership (e.g., address and phone number)."); *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (stating that each reference "must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole"); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (stating that, for obviousness, "the test is what the *combined teachings* of the references would have suggested to those of ordinary skill in the art" (emphasis added)).

Patent Owner argues that Petitioner "relied on Cohen's 'ownership indicia' to show the return/recovery information" but did not rely on Cohen's disclosure of an owner such as "John Smith" from Cohen's Figure 1 "to show the 'owner' or authorized agent limitation." PO Sur-reply 5–6 (citing Pet. 36). We disagree. Petitioner relies on Cohen to teach ownership information that is entered by the owner. *See* Pet. 16 ("In

Cohen, a 'textual indicia of personal ownership is entered by the owner of the system during set-up or during a configuration change and electronically stored within non-volatile memory.'" (quoting Ex. 1006, code (57))). Petitioner relies on Cohen's Figure 1 throughout the Petition to show the "owner" of the computer. *See* Pet. 17, 29, 31, 38.

We find that Cohen's disclosure teaches an "owner" under Patent Owner's construction because John Smith (Figure 1) is the person who owns the computer and, therefore, owns the program on the computer and also because John Smith controls the recovery service by entering his information.

*(3) Remotely Changing Return Information*

Patent Owner argues that Jenne "does not disclose *anything* about the display of 'return information.'" PO Resp. 28. Petitioner, however, relies on Cohen to teach the content of the information recited in the claims. *See, e.g.*, Pet. 19–20 (arguing that "it would have been trivial to modify Jenne to display Cohen's ownership indicia information because it would have involved merely substituting the content of the information to be displayed in Jenne"). We find that Cohen's ownership indicia, which includes the name, address, and phone number of the owner (*see* Ex. 1006, Fig. 1), as discussed in the previous section, teaches "computer recovery information," "recovery information," and "return information" under Patent Owner's proposed construction of "information provided by the owner so that the device can be returned to the owner."

Patent Owner argues that Cohen discloses displaying return information but only discloses inputting the information locally. PO Resp. 28–29 (citing Ex. 1006, 4:27–44). According to Patent Owner,

"Cohen does not even disclose that the user can change that information *locally*—rather, it appears to be permanent." PO Resp. 29. Patent Owner cites Dr. Schaefer's testimony that "Cohen is specifically designed to keep ownership indicia constant" and that Cohen prefers nonvolatile memory "because it cannot be altered." Ex. 2040 ¶ 54(b) (citing Ex. 1006, 2:31–35, 4:50–5:4), *quoted in* PO Resp. 29.

As discussed above in Section II.D.2.b.1, we do not credit this testimony from Dr. Schaefer because it is inconsistent with Cohen's disclosure. In particular, Cohen discloses "storing of the personal ownership indicia and password data within nonvolatile memory, such as ROM 26," which Cohen states "is preferably implemented utilizing so-called 'flash' ROM or serial EEPROM, which may be electrically altered upon application of suitable control signals." Ex. 1006, 3:44–47, 4:47–50. Thus, Cohen discloses using alterable nonvolatile memory to store ownership indicia.

We also disagree with Patent Owner's argument that Cohen discloses permanently setting the ownership information, which then cannot be altered. *See* PO Resp. 29; PO Sur-reply 10–11. Cohen discloses entering ownership information as part of a process depicted in Figure 3, and it states that "those skilled in the art will appreciate that an additional level of security, such as a secondary password, may be required to *alter* the ownership indicia which will be entered as part of this process." Ex. 1006, 4:23–26 (emphasis added). Patent Owner argues that Cohen's statement that "ownership indicia which will be entered" means that "ownership indicia *has not yet* been entered" and, therefore, that alteration here refers to the initial input of the ownership information. PO Sur-reply 10–11. We disagree with this reading of Cohen. Rather, we find that Cohen's use of the

term "alter" means that ownership information entered as part of the process of Figure 3 can be changed, which is why "an additional level of security, such as a secondary password," would be required over and above what is disclosed in Figure 3 with the entry of a password in block 36. Ex. 1006, 4:23–26.

Patent Owner argues that, "[a]t the time of invention (2002), it was wholly unconventional for a computer system to allow a device owner to remotely change return information over the Internet." PO Resp. 31. According to Patent Owner, Petitioner's assertion that it would have been obvious to combine Jenne's teachings of delivering advertisements with Cohen's teachings of locally inputting return information "is pure hindsight." PO Resp. 31.

We disagree with Patent Owner's arguments, which focus on the content of the information. As discussed above in Section II.D.2.b.1, Cohen discloses that the benefits of displaying owner information with a password prompt when the computer is started are that ownership of the computer can be determined and that the likelihood of return is increased. Ex. 1006, 5:52–58. As discussed above in Section II.D.2.a, Jenne discloses that the content of the information displayed can be remotely updated: "The computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password."). Jenne discloses that the displayed information can be advertising content but also recognizes that "other information could be displayed" and specifically identifies other content, "such as

announcements, useful productivity tips, utility enhancements and computer upgrades." Ex. 1005 ¶ 22. Based on these disclosures, we agree with Petitioner's argument that "it would have been trivial to modify Jenne to display Cohen's ownership indicia information because it would have involved merely substituting the content of the information to be displayed in Jenne (e.g., commercial/other information/announcements) with the message content disclosed in Cohen (e.g., personal ownership indicia)." *See* Pet. 19–20. As Petitioner correctly asserts, "the combination would have involved a simple substitution of a known generic element (Jenne's 'other information') with a specific type of information (Cohen's 'ownership indicia') to obtain predictable results." Pet. 20.

*(4) Without Assistance by the User*

Claim 1 recites "changing return information which appears on the display through remote communication without assistance by a user with the computer." Patent Owner argues that Jenne does not teach remotely changing information without assistance of a user because the computer user must log in and establish an Internet connection so that communication can occur, which Patent Owner contends is user assistance. PO Resp. 33–37. Patent Owner argues that the '122 patent allows an owner to push recovery information changes to the computer even when the user of the computer has not connected to the Internet, such as when a computer is found by someone who does not know the password and, therefore, cannot connect to the Internet. PO Resp. 34–35. According to Patent Owner,

> Nothing, other than turning on the computer, is required from the user. Hence, there is no "assistance." The owner may *push* return/recovery information to the device via the Internet, but the user does [not] need to establish that connection. This makes

> sense because the user does not and cannot have the password to gain access to the system and establish the connection.

PO Resp. 35.

We disagree with this argument because, as Petitioner correctly asserts, "[t]he language 'without assistance by a user' refers to the specific recited action of 'initiating or changing [return/recovery] information,' rather than to an unrecited action of establishing the remote communication in the first instance." *See* Pet. Reply 15 (second alteration in original). We do not view the claims as prohibiting all other user interactions.

Jenne's disclosure of checking for an internet connection before downloading any updates to the displayed information (Ex. 1005 ¶ 25, Fig. 1) is consistent with the updating process described in the following passage of the '122 patent:

> Using this unique communication power, both 'owner' and "assigned to" information can be uploaded to the recovery center and/or downloaded to the protected equipment in order to synchronize the international recovery center information and the recovery information displayed on the initial display 18 screen. (This is a combination of the PDA type of synchronization between the main computer 12 and the PDA, and the McAfee anti-virus software Internet updating capability where *every time you go on-line, your computer 12 automatically checks to make sure that you have the most current anti-virus software and automatically updates your computer 12 with the latest changes*.) Nobody has ever before considered or designed a product combining this type of communication ability with this type of recovery security program that seizes control of the display 18 monitor until a security prompt is satisfied. The Retriever design allows an equipment recovery capability that just does not exist on today's market, and is completely unique from all current products on the market[.]"

Ex. 1001, 14:22–40 (emphasis added). Thus, the '122 patent explains that downloads of new information occur automatically when the user goes online.

Patent Owner argues that, "as anyone who has turned on a cellphone can attest, a connection can be established *automatically* without any involvement by the user. The user simply turns on the device." PO Sur-reply 15 (citing Ex. 2048, 44:5–13, 45:2–15, 61:25–62:1). According to Patent Owner, "in many cases, there is no assistance in connecting to the Internet in a cellphone. Similarly, the Claims prohibit any assistance as part of the 'remote communication' process (other than turning on the device)." PO Sur-reply 15–16. The cited testimony from Dr. Zadok was in response to questions about how iPhones and smartphones operate and log on to networks. *See* Ex. 2048, 44:5–13 (question and answer about "iPhone or other smartphone"), 45:2–15 (question and answer about iPhone), 61:25–62:1 (answer about iPhone). Patent Owner does not direct us to any evidence that iPhones or other smartphones, to the extent they even existed "[a]t the time of invention (2002)" (PO Resp. 31), had such capabilities in 2002. We see no reason that we should interpret the claim to exclude the automatic updating functionality described in the specification of the '122 patent at column 14, lines 22–40. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (noting that interpreting a claim to exclude a preferred embodiment in the specification "is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case").

Patent Owner also argues that the "prosecution history further demonstrates that no input or action by the user is needed to remotely initiate

or change return/recovery information." PO Resp. 35–36 (citing Ex. 1012 (prosecution history of related U.S. Patent 8,601,606), 143, 151–53, 2071, 2075, 2093). The arguments Patent Owner made during prosecution of related U.S. Patent 8,601,606 show that the language "without assistance by a user" was added to distinguish over prior art that allegedly required a user at the computer "to push an interrupt key to allow the owner to change the display from remote." Ex. 1012, 2093. In contrast, Jenne discloses remotely updating using a password without requiring the user at the computer to press a particular key to start the process. For example, Jenne explains that the "computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password.").

Patent Owner also argues that Jenne's updating process relies on user feedback to tailor advertisements to a user's interests, which means the user provides assistance in updating the information. PO Resp. 37–40 (citing Ex. 1005 ¶¶ 20, 25, Fig. 1; Ex. 2040 ¶ 56(a)). This argument, however, does not respond to the asserted combination in which Petitioner relies on Jenne's disclosure of remotely updating displayed information by an authorized party in combination with Cohen's disclosure of an owner entering ownership information for display. *See* Pet. 32–34. Because, in Petitioner's proposed combination, the content of the information is ownership indicia entered by the owner, we disagree with Patent Owner's argument that, "without the user preferences and advertisements, the commercial message

application [of Jenne] would not be built and would have nothing to execute." *See* PO Sur-reply 17.

In view of the foregoing, we find Jenne teaches changing the content of information through remote communication without assistance by a user with the computer, which in combination with Cohen's disclosure of changing ownership indicia, discussed above in Section II.D.2.b.4, teaches "changing return information which appears on the display through remote communication without assistance by a user with the computer," as recited in claim 1.

*(5) Remote Access Only by the Owner or Authorized Party*

Patent Owner argues that Jenne does not teach that the interactive program "is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen," as recited in claim 1 and similarly recited in claims 4 and 7. PO Resp. 40–43. According to Patent Owner, Jenne fails to teach this subject matter because "Jenne's user can 'uninstall or delete' the application" and thus has access to the application. PO Resp. 40 (citing Ex. 1005 ¶ 21; Ex. 2040 ¶ 57(a)). Patent Owner also argues that Jenne's disclosure that a premium user can enable or disable an advertisement shows access by someone other than the owner. PO Resp. 41 (citing Ex. 1005 ¶ 24).

Addressing similar arguments, the Institution Decision states that the claim limits "remote access," not all access. Inst. Dec. 16–17. Patent Owner disagrees and argues that claim 1's "lock screen" keeps unauthorized users off the system, "not allow[ing] local access to the interactive program, unless the security prompt is satisfied." PO Resp. 41–42. Petitioner,

however, relies on Cohen to teach "a lock screen with password prompt displayed after the computer is powered on and before allowing a user to access the operating system." Pet. 21 (citing Ex. 1006, Fig. 4 (steps 58, 60, 62)), 31 (citing Ex. 1006, Fig. 1), 37–38 (citing Ex. 1006, 5:28–37, Figs. 1, 4). Cohen's Figure 1 shows a screen that prompts the user for a password. *See* Ex. 1006, 5:28–37 ("Block 58 illustrates the prompting of the user for a password. . . . [I]n the event the appropriate password has been entered, the password passes to block 62. Block 62 illustrates the occurrence of normal processing in a manner well known to those having skill in this art."). Thus, the combination of Jenne and Cohen teaches restricting local access unless a security prompt is satisfied.

The claims do not specify that the "interactive program" cannot be accessed locally; rather, they specify that *remote* access is "only by the owner of the computer or the party authorized by the owner." Thus, Patent Owner's arguments regarding local access, including by a premium user in Jenne, are unavailing.

We find Petitioner's contentions for the remote access limitation persuasive. Jenne discloses that remote updating is done with a password. Ex. 1005 ¶¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password."), 25 ("The password may be used by the computer manufacturer or its authorized agent for securely updating the memory 520."). Thus, the entity having the password is the "party authorized by the owner." From the computer's perspective, authorization is determined by checking for the correct password. This is consistent with the '122 patent's disclosure that the software determines who "is in charge" based on who "uses the correct

password." Ex. 1001, 15:4–8. In Petitioner's combination, Cohen's owner has remote access to change the content of the information displayed (i.e., Cohen's ownership indicia). *See* Pet. 34 (arguing that Cohen's ownership indicia are entered by the owner and can be changed subsequently and that a person of ordinary skill in the art "would have been motivated to incorporate the capability to change the stored ownership information using Jenne's 'remote communication' so that the most up-to-date ownership information is displayed when a device is lost or stolen" (citing Ex. 1005, code (57), ¶¶ 13, 21, 25; Ex. 1006, 4:23–26, 4:31–34; Ex. 1003 ¶¶ 303, 334)).

*(6) Summary of Findings*

Based on Petitioner's persuasive contentions and evidence discussed above, we find that the combination of Jenne and Cohen teaches the subject matter of claim 1. We find that Jenne's disclosure of displaying information during boot-up in combination with Cohen's disclosure of displaying owner information with a lock screen during boot-up teaches the preamble of claim 1 and the subject matter reciting

> activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying return information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the return information is visible to anyone viewing the display screen, the lock screen locks the display screen and protects the computer.

Ex. 1005 ¶ 13 (displaying messages during boot-up); Ex. 1006, Fig. 1 (lock screen with owner information and password prompt).

For the reasons discussed above in Sections II.D.2.b.2–5, we find that the combination of Jenne and Cohen teaches

> changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen.

We find that the combination of Jenne and Cohen teaches "displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer" because, as discussed above, Cohen teaches displaying the ownership indicia with a lock screen that has a password prompt. Ex. 1006, Fig. 1. We also find that Cohen's disclosure of the screen in Figure 1 showing the message "This system belongs to:" teaches a message that is in addition to the return information and, therefore, teaches "activating the processor to allow a message to the user."

We find that a person of ordinary skill in the art would have combined the teachings of Jenne and Cohen such that Cohen's ownership information would be displayed and could be remotely updated per Jenne's disclosure of remotely updating information that is displayed for the reasons discussed above. In particular, we find that Cohen's disclosure of the benefits of displaying owner information with a password prompt when the computer is started provides a reason to display ownership information in Jenne, as discussed above in Section II.D.2.b.1. As discussed above in Section II.D.2.b.3, we agree with Petitioner that substituting the content of information in Jenne with Cohen's ownership indicia would have been a trivial modification and a simple substitution of one type of information with another. *See* Pet. 19–20. We also find that it would have been obvious to employ a lock screen, as taught in Cohen, in the system of Jenne because it

would have protected the computer, as taught in Cohen. *See* Ex. 1006, 1:32–37 ("[T]he utilization of password protection schemes maintains the integrity of data and applications within such devices . . . ."), 5:28–37 (referring to Figure 4's process in which access to the computer is denied until entry of the correct password). We agree with Petitioner that a person of ordinary skill in the art would have had a reasonable expectation of success in making the combination to arrive at the claimed subject matter. *See* Pet. 21–22; Ex. 1003 ¶ 306.

*(7) Secondary Considerations*

Patent Owner contends that objective evidence of non-obviousness includes "praise Patent Owner received for her inventions, the inventions' commercial success, copying by others, and failure by others." PO Resp. 55–57; *see also* PO Sur-reply 24–26. Petitioner argues that Patent Owner has not established a nexus between the merits of the claimed invention and the objective evidence. Pet. Reply 25–27. We agree with Petitioner.

As stated by the Federal Circuit,

> [f]or objective evidence of secondary considerations to be relevant, there must be a nexus between the merits of the claimed invention and the objective evidence. *See In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). A showing of nexus can be made in two ways: (1) via a presumption of nexus, or (2) via a showing that the evidence is a direct result of the unique characteristics of the claimed invention.
>
> A patent owner is entitled to a presumption of nexus when it shows that the asserted objective evidence is tied to a specific product that "embodies the claimed features, and is coextensive with them." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

*Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1210 (Fed. Cir. 2023). Furthermore, "even absent a presumption of nexus, 'the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* (quoting *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019)).

Patent Owner argues that her "invention was commercialized under the name of 'The Retriever,'" which "practiced the '122 patent." PO Resp. 56 (citing Ex. 1001, 4:55). This is the extent of Patent Owner's argument supporting a presumption of nexus. Indeed, Patent Owner does not address coextensiveness at all. This is insufficient to show a presumption of nexus. *See Volvo Penta*, 81 F.4th at 1211 (finding that a one sentence assertion that a product embodies the claimed features of the Patent and is coextensive with them is insufficient to show a presumption of nexus).

Patent Owner's arguments also do not prove a nexus independently of a presumption. For example, Patent Owner argues that, "[i]n various news articles and television coverage, her products were praised for their ability to retrieve lost or stolen computers." PO Resp. 56 (citing Exs. 2042, 2043). Exhibit 2043 is a 2009 article titled "Talking software goes global" and mentions that the Retriever software has a "verbal alarm" and has the ability to "let[] law enforcement pinpoint the physical location of a stolen computer." Exhibit 2042, a 2009 Associated Press article titled "Stop thief! Software lets stolen laptops speak up" also discusses an audio alert that a stolen laptop can play. These articles indicate that non-patented features were the object of any alleged praise. Indeed, Exhibit 2043 states that,

"[s]ince Front Door Software Inc. launched the verbal alarm with a software upgrade on Thursday, Feb. 26, the story about the talking laptop software has been published around the world." This suggests that the verbal alarm upgrade to the Retriever software resulted in any alleged praise.

Patent Owner also argues that she "received multiple awards for her products" and that her company "placed first out of 175 companies as the top start-up at a pitch contest in San Francisco." PO Resp. 56 (citing Ex. 2044). Patent Owner does not cite evidence to support the assertion regarding "multiple awards." The pitch contest brochure introduces the Front Door Software product as follows:

> A patent pending laptop tracking and recovery program combined with one of the most powerful targeted opt-in page view delivery capabilities ever! By moving delivery out to the computer ON button, every 15,000 users using our free version automatically generates over 1 million page views @ mo. and over 50 million page views @ user license lifetime! http://vator.co/frontdoorsoftware.

Ex. 2044 at 8. This summary appears to focus more on the potential for page views than on the claimed features and in that regard is similar to Jenne's teachings of showing messages to a "captive audience" during boot-up. Ex. 1005 ¶ 21; *see* PO Resp. 6–7 (describing Jenne's teachings of monetizing user wait times).

Patent Owner also argues the following:

> Patent Owner's products were downloaded and successfully used by thousands of people in over 100 countries. Ex. 2045. Patent Owner tracked how often her customers' devices would display return/recovery information, and such information was displayed millions of times per year. Patent Owner's customers included major universities. *Id.* Patent

> Owner's company generated hundreds of thousands of dollars in revenue from the sale of its products. *Id.*

PO Resp. 56. Exhibit 2045 appears to be a printout of a Front Door Software website from 2013 that lists certain institutional customers and countries where the software is deployed. The printout states the following:

> We cannot tell where the majority of our customers are coming from unless they list their organization. We do know that we have had over 6 million customer visits to our web site in the past year and customers from over 100 countries and nations around the world are creating accounts in record numbers every day.

Ex. 2045 at 1 (emphasis omitted). The only specific evidence here is that there were over six million visits to the website. This is insufficient evidence to show commercial success tied to the merits of the invention. *Cf. Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed. Cir. 1983) ("The evidence of commercial success consisted solely of the number of units sold. There was no evidence of market share, of growth in market share, of replacing earlier units sold by others or of dollar amounts, and no evidence of a nexus between sales and the merits of the invention.").

Patent Owner further argues that "Microsoft did not release its Find My Device product for laptops until 2015, and Google did not release its Find My Device product for smartphones and tablets until 2013. Ex. 2046, Ex. 2047." PO Resp. 57. Patent Owner does not explain how Google's and Microsoft's Find My Device features are evidence of non-obviousness of the '122 patent claims. According to Exhibit 2046, "Find My Device in Windows 10 doesn't do a whole lot right now. There isn't a way to have your tablet make a sound, lock itself, erase data, or anything like that. Instead, you can only find out where its last known general location was."

Ex. 2046 at 1. According to Exhibit 2047, the Android Device Manager "lets you locate your Android device on a map, see when it was last located and when it was last used, as well as ring, lock and wipe the device." Ex. 2047 at 1. Thus, it appears that the Microsoft and Google features are for finding a device by ascertaining the location of the device, which is not a feature of the claims.

Finally, Patent Owner does not provide evidentiary support for her assertion that "the subject matter claimed in the '122 patent is now included or may be downloaded on virtually every smartphone, laptop, tablet, and personal computer today." *See* PO Resp. 57.

For the reasons discussed above, we find that Patent Owner has not provided objective evidence of non-obviousness that has a nexus to the claimed invention.

*c) Conclusion for Claim 1*

We find that the combination of Jenne and Cohen teaches the subject matter recited in claim 1 and that a person of ordinary skill in the art would have combined the teachings of Jenne and Cohen in the manner asserted by Petitioner with a reasonable expectation of success in arriving at the subject matter recited in claim 1. Patent Owner's asserted objective evidence of non-obviousness lacks nexus and does not undermine Petitioner's showing. Therefore, we conclude that the subject matter of claim 1 would have been obvious based on the combined teachings of Jenne and Cohen.

*3. Claims 2–7*

Independent claim 4 is directed to an apparatus for displaying and remotely changing "computer recovery information" or "recovery information," and independent claim 7 is directed to a computer program for

displaying and remotely changing "recovery information." These independent claims recite subject matter substantially similar to claim 1, and the parties' arguments for claim 1 apply to claims 4 and 7. *See* Pet. 13–40; PO Resp. 26–43.

For the reasons explained above in Section II.D.2 and based on Petitioner's persuasive contentions and evidence, we conclude that the subject matter of claims 4 and 7 would have been obvious based on the combined teachings of Jenne and Cohen.

Claim 2 depends from claim 1 and recites "selecting by the owner or user an Internet link on the screen, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is automatically able to access the computer and the Internet location associated with the Internet link." Claim 5 depends from claim 4 and similarly recites "wherein the display includes an Internet link that can be selected by the owner or user, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is able to access the computer and the Internet location associated with the Internet link."

Petitioner argues that, based on Jenne's disclosure of an Internet browser connected to the Internet for a user to access a website, a person of ordinary skill in the art "would have been motivated to include an active, user-selectable, '*Internet link*' on the displayed return/recovery screen" "to allow an individual finding a lost or stolen computer to immediately access information or resources to assist with the return, rather than making the user contact the owner later through a different mechanism (e.g., phone call or postal mail)." Pet. 41–42 (citing Ex. 1005 ¶¶ 18, 27; Ex. 1003 ¶¶ 384–386).

Claim 3 depends from claim 1 and recites "wherein the screen having an active link allowing remote communication to a remote server which provides return information to facilitate return of the computer." Claim 6 depends from claim 4 and similarly recites "wherein the display having an active link to allow remote communication to the remote server which provides recovery information to facilitate return of the computer."

Citing Jenne's disclosure that a user "may be directed to other advertisements through links" (Ex. 1005 ¶ 18), Petitioner argues that such links are active links and that it would have been obvious that such links go to information hosted on a remote server. Pet. 43–44 (citing Ex. 1003 ¶¶ 390–392). Petitioner argues that it "would have been well within the ordinary creativity of a [person of ordinary skill in the art] to include an active Internet link on the display screen as taught by Jenne with more specific return/recovery information," which a person of ordinary skill in the art would have done "to allow an individual finding a lost or stolen computer to immediately access information or resources to assist with the return, rather than making the user contact the owner later through a different mechanism (e.g., phone call or postal mail)." Pet. 44 (citing Ex. 1003 ¶¶ 393–395).

Patent Owner does not separately argue claims 2, 3, 5, and 6. *See* PO Resp.

We find Petitioner's contentions and evidence, summarized above, persuasive, and we conclude that the subject matter of claims 2, 3, 5, and 6 would have been obvious based on the combined teachings of Jenne and Cohen.

### *E. Remaining Grounds*

As noted above in Section I.A, Petitioner presents additional grounds of unpatentability. Because we determine that all challenged claims are unpatentable as discussed above, we need not separately assess the remaining grounds. 35 U.S.C. § 318(a) ("If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)."); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (nonprecedential) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

## III. CONCLUSION

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that claims 1–7 of the '122 patent are unpatentable, as summarized in the following tables:

**IPR2022-01188**

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7 | 103(a) | Jenne, Cohen | 1–7 | |
| 1, 4, 7 | 103(a) | Angelo, Helle[11] | | |
| **Overall Outcome** | | | 1–7 | |

**IPR2022-01189**

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7 | 102(a)(1) | Hafeman 670 | | |
| 1, 4, 7 | 103(a) | Hafeman 298, Chiu | | |

IV. ORDER

Accordingly, it is

ORDERED that Petitioner's request to consolidate these proceedings is granted;

FURTHER ORDERED that claims 1–7 of the '122 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

[11] As explained above, because we determine that the challenged claims are unpatentable based on the combination of Jenne and Cohen, we decline to address this ground and the grounds raised in IPR2022-01189.

FOR PETITIONER:

Matthew Smith
Andrew Baluch
SMITH BALUCHLLP
smith@smithbaluch.com
baluch@smithbaluch.com

Kyle Canavera
PERKINS COIE LLP
canavera-ptab@perkinscoie.com

Kirstin Stoll-DeBell
Carrie Beyer
FAEGRE DRINKER BIDDLE & REATH LLP
kirstin.stolldebell@faegredrinker.com
carrie.beyer@faegredrinker.com

FOR PATENT OWNER:

Stephen Underwood
Jason Linger
GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO LLP
sunderwood@glaserweil.com
jlinger@glaserweil.com

Trials@uspto.gov
571-272-7822

Paper 32
Date: January 23, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

GOOGLE LLC, MICROSOFT CORPORATION,
Petitioner,

v.

CAROLYN W. HAFEMAN,
Patent Owner.

---

IPR2022-01190
IPR2022-01191
Patent 10,789,393 B2

---

Before JEFFREY S. SMITH, DANIEL J. GALLIGAN, and ARTHUR M. PESLAK, *Administrative Patent Judges*.

PESLAK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

ORDER
Granting Petitioner's Request for Consolidation
*37 C.F.R. § 42.122(a)*

# I. INTRODUCTION

In these *inter partes* reviews, Google LLC and Microsoft Corporation (collectively "Petitioner") challenge the patentability of claims 1–7 of U.S. Patent 10,789,393 B2 (Ex. 1001 ("'393 patent")), which is owned by Carolyn W. Hafeman ("Patent Owner"). Petitioner requests that we consolidate these cases. IPR2022-01190, Paper 24 at 1. Patent Owner opposes. IPR2022-01190, Paper 28 at 1. Because these cases address the same claims, we grant Petitioner's request to consolidate them pursuant to 37 C.F.R. § 42.122(a). *See also* 35 U.S.C. § 315(d) (giving Director discretion to consolidate proceedings).

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trials in these *inter partes* reviews. For the reasons discussed below, we determine that Petitioner has proven by a preponderance of the evidence that claims 1–7 of the '393 patent are unpatentable. *See* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.").

## *A. Procedural History*

Petitioner filed two petitions, each of which challenges claims 1–7 of the '393 patent on the grounds set forth in the tables below.

**IPR2022-01190**

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–7 | 103(a)[1] | Jenne,[2] Cohen[3] |
| 1, 4, 7 | 103(a) | Angelo,[4] Helle[5] |

IPR2022-01188, Paper 4 ("Pet.") at 3.[6]

**IPR2022-01191**

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–7 | 102(a)(1) | Hafeman 670[7] |
| 1–7 | 103 | Hafeman 298,[8] Chiu[9] |

IPR2022-01189, Paper 4 at 3.

Patent Owner filed preliminary responses in both proceedings. Paper 8 in each proceeding. With Board authorization, Petitioner filed a reply in each case (Paper 11 in each proceeding), and Patent Owner filed a

---

[1] The '393 patent claims priority through a chain of continuations to an application that was filed before the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA") amendments to 35 U.S.C. §§ 102 and 103. In IPR2022-01190, Petitioner asserts that the references are prior art under the pre-AIA versions of these sections. Pet. 3. In IPR2022-01191, however, Petitioner argues that the effective filing date of the claims of the '393 patent is after the AIA effective dates, and Petitioner applies the AIA version of sections 102 and 103 in that case. IPR2022-01191, Paper 4 at 2–3 n.2. For purposes of this Decision, we need not resolve the priority dispute because, as discussed below, the claims are unpatentable over the combination of Jenne and Cohen, the pre-AIA prior art.

[2] US 2003/0122864 A1, published July 3, 2003 (Ex. 1005).

[3] EP 0687968 A2, published Dec. 20, 1995 (Ex. 1006).

[4] US 2003/0065934 A1, published Apr. 3, 2003 (Ex. 1007).

[5] US 6,662,023 B1, issued Dec. 9, 2003 (Ex. 1008).

[6] Unless otherwise noted, we refer to the papers in IPR2022-01188.

[7] US 2005/0071670 A1, published Mar. 31, 2005 (Ex. 1011).

[8] US 2004/0103298 A1, published May 27, 2004 (Ex. 1009).

[9] US 2003/0088633 A1, published May 8, 2003 (Ex. 1010).

sur-reply (Paper 14 in each proceeding). Trial was instituted on the asserted grounds of unpatentability in each proceeding. IPR2022-01190, Paper 16 ("Inst. Dec.") at 28; IPR2022-01191, Paper 16 at 24.

In each proceeding, Patent Owner filed a Response (IPR2022-01190, Paper 20 ("PO Resp."); IPR2022-01191, Paper 20), Petitioner filed a Reply (IPR2022-01190, Paper 24 ("Pet. Reply"); IPR2022-01191, Paper 24), and Patent Owner filed a Sur-reply (IPR2022-01190, Paper 28 ("PO Sur-reply"); IPR2022-01191, Paper 28).

An oral hearing was held on November 2, 2023, a transcript of which appears in the record in each case. Paper 31 in each proceeding ("Tr.").

Petitioner relies on testimony from Erez Zadok, Ph.D. Exs. 1003, 1048 (same declarations filed in both proceedings). Patent Owner relies on testimony from Scott Schaefer, Ph.D. Ex. 2040 in each proceeding. Patent Owner has entered in the record a transcript of the deposition of Dr. Zadok. Ex. 2048 in each proceeding.

### *B. Real Parties in Interest*

Petitioner identifies the following real parties in interest: Google LLC, Microsoft Corporation, LG Electronics Inc., and LG Electronics U.S.A., Inc. Pet. 78; IPR2022-01191, Paper 4 at 80.

Patent Owner identifies herself as the real party in interest. Paper 5 (in each proceeding) at 1.

### *C. Related Matters*

As required by 37 C.F.R. § 42.8(b)(2), the parties identify various related matters. Pet. 78; IPR2022-01191, Paper 4 at 80; Paper 5 (in each proceeding) at 1.

### *D. The '393 Patent and Illustrative Claim*

The '393 patent relates to the "return of lost or stolen computers using a recovery screen that appears during or after boot-up of the computer." Ex. 1001, 1:28–30. Claims 1, 4, and 7 are independent, and claim 1 is reproduced below.

> 1. A method for displaying information to assist with returning a computer comprising the steps of:
>
> activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer;
>
> initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the initiating or changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;
>
> displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and
>
> activating the processor to allow a message to the user.

Ex. 1001, 16:26–44.

## II. ANALYSIS

### *A. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

(2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations, if in evidence. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

*B. Level of Ordinary Skill in the Art*

Citing the testimony of Dr. Zadok, Petitioner contends that a person of ordinary skill in the art

> would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or the equivalent and at least two years of experience in the relevant field, e.g., electronic communications systems. Significantly more practical experience could also qualify one not having the aforementioned education as a person of ordinary skill in the art while, conversely, a higher level of education could offset a lesser amount of experience.

Pet. 12–13 (citing Ex. 1003 ¶¶ 95–97).

Patent Owner does not dispute this assessment or offer her own assessment. *See* PO Resp.

To the extent necessary, and for purposes of this Decision, we accept the uncontested assessment offered by Petitioner, except that we delete the qualifier "at least" to eliminate vagueness as to the amount of experience. The qualifier expands the range indefinitely without an upper bound, and thus, precludes a meaningful indication of the level of ordinary skill in the art.

*C. Claim Construction*

Petitioner presents two issues for claim construction. Pet. 9–12. First, Petitioner argues that certain language in each independent claim should be interpreted to require the automatic display of certain information "during or after every boot-up." Pet. 9–11. Second, Petitioner argues that the return and recovery information recited in the claims is merely printed matter that is not entitled to patentable weight. Pet. 12. Patent Owner disagrees with Petitioner's claim construction arguments. PO Resp. 9–21.

For her part, Patent Owner argues that the terms "computer recovery information," "recovery information," and "return information" mean "information provided by the owner so that the device can be returned to the owner," and she argues that "owner" means "the person or entity that owns, rents, or licenses the recovery application or program, and/or the person or entity who controls the recovery service." PO Resp. 21 (citing Ex. 1001, 3:33–34, 4:4–5, 4:49–51, 11:11–13; Ex. 2035, 6–7, 19–20).

As explained below, the combination of Jenne and Cohen teaches the content of the return/recovery information under Patent Owner's construction, and, therefore, we need not resolve whether such information is entitled to patentable weight. Furthermore, as explained below, the combination of Jenne and Cohen teaches displaying the return/recovery information during or after every boot-up and teaches "owner" under Patent Owner's construction. Therefore, because there are no claim construction disputes between the parties that affect the analysis of unpatentability based on the combination of Jenne and Cohen, we need not resolve these claim construction issues. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . .

that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### *D. Obviousness over Jenne and Cohen (Claims 1–7)*

Petitioner asserts that claims 1–7 are unpatentable as obvious over the combined teachings of Jenne and Cohen. Pet. 3, 13–45. Patent Owner opposes. PO Resp. 26–42, 55–57; PO Sur-reply 5–18, 24–26.

#### *1. Overview of the Prior Art*

Jenne discloses a computer system that displays messages during a user wait time, such as during system boot-up, and has the ability to remotely update the messages. Ex. 1005, code (57), ¶¶ 21, 25.

Cohen discloses modifying the Power-On System Test (POST) mode of a computer to display information about the owner of the computer while prompting for a password. Ex. 1006, code (57), 3:57–4:4, Figs. 1, 3.

We discuss additional pertinent details of Jenne and Cohen in our analysis below.

#### *2. Claim 1*

##### *a) Petitioner's Contentions*

Petitioner relies on Jenne for its teachings of displaying messages during boot-up of a computer and updating those messages remotely. Pet. 13–16 (overview of Jenne), 23–40 (detailed analysis of independent claims). For example, Jenne discloses that, "[d]uring a computer boot-up time or a wake-up time from a low-power mode, the computer user is forced to sit and wait," and Jenne discloses displaying messages during that time. Ex. 1005 ¶¶ 12–13. Jenne explains that such messages may be

advertisements but that "other information could be displayed such as announcements, useful productivity tips, utility enhancements and computer upgrades." Ex. 1005 ¶ 22. Jenne discloses that the content of the information displayed can be remotely updated: "The computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password.").

Petitioner relies on Cohen to teach the automatic display of ownership information with a lock screen each time the computer is powered on. Pet. 16–18 (overview of Cohen), 23–40 (detailed analysis of independent claims). Cohen discloses that a "textual indicia of personal ownership is entered by the owner of the system during set-up or during a configuration change and electronically stored within non-volatile memory" and that this information is displayed during the POST process. Ex. 1006, code (57). With reference to Figure 4, Cohen discloses that, when power is turned on to the computer, the POST process retrieves and displays the owner's information and prompts for a password to allow use of the computer. Ex. 1006, 5:5–42, Fig. 4. This is shown in Cohen's Figure 1 below.




*Fig. 1*

Cohen's Figure 1, reproduced above, "display[s] an indication of ownership of portable computer device 10." Ex. 1006, 3:15–18. The display on computer 10 shows the following:

> This system belongs to:
> John Smith
> 121 Elm
> Fort Worth, Tx
> 817-555-1234
> Enter Password _ _ _ _ _ _ _ _ _

Ex. 1006, Fig. 1.

Petitioner argues that it would have been obvious to an ordinarily skilled artisan to "combine Jenne's teachings of remotely updateable automatic display of messages during the boot process with Cohen's teaching of displaying ownership indicia messages with a security (lock) screen on every boot of the device to prohibit a user from accessing the

device until proper security credentials (e.g., password) are entered." Pet. 19 (citing Ex. 1003 ¶¶ 291–299). Petitioner provides several reasons why a person of ordinary skill in the art would have made this combination, including that Cohen expressly teaches that its display of ownership information during boot-up increases the likelihood of returning a lost computer. Pet. 19–22 (citing, *inter alia*, Ex. 1003 ¶ 292; Ex. 1006, 5:43–58[10]).

Petitioner provides a detailed analysis explaining how the combination of Jenne and Cohen teaches the subject matter of claim 1. Pet. 23–40. Petitioner argues that Jenne's disclosure of displaying information in combination with Cohen's disclosure of owner information teaches the preamble of claim 1. Pet. 23–24.

Petitioner argues that the combination of Jenne and Cohen teaches "automatically displaying return/recovery information during or after every boot-up of the computer" and, therefore, teaches "activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer" as recited in claim 1. Pet. 26–28.

Claim 1 recites "initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer." Petitioner addresses "changing" rather than "initiating," noting that only one of these needs to be met by the prior art. Pet. 33–34; *see also* PO Resp. 28 ("As Petitioner notes, 'initiating or

---

[10] Although Petitioner cites column 5, lines 43–48 of Cohen (Pet. 19), the relevant disclosure appears through line 58, as cited by Dr. Zadok. Ex. 1003 ¶ 292.

changing' is disjunctive: thus, Petitioner only needs to establish that one of the two is satisfied."). Petitioner relies on Jenne's disclosures of remotely updating the message content and argues that a person of ordinary skill in the art "would have been motivated to incorporate the capability to change the stored ownership information using Jenne's '*remote communication*' (EX-1005, Abstract, ¶¶13, 21, 25) so that the most up-to-date ownership information is displayed when a device is lost or stolen." Pet. 34–35 (citing Ex. 1003 ¶¶ 294, 317).

Claim 1 further recites "wherein the initiating or changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen." Petitioner argues that Jenne's disclosure of remotely updating the message content by the "computer manufacturer or its authorized agent" (Ex. 1005 ¶ 25) teaches an interactive program, which, in combination with Cohen's disclosure of an owner changing owner information, teaches this subject matter. Pet. 35–37.

Claim 1 also recites "displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer." Petitioner relies on Cohen's disclosure of displaying owner information on the screen with a password prompt as teaching this limitation. Pet. 37–38.

Claim 1 further recites "activating the processor to allow a message to the user." Petitioner relies on Cohen's screen showing the message "This system belongs to:" as teaching a message that is in addition to the return information. Pet. 38–40 (Ex. 1006, Fig. 1).

*b) Patent Owner's Arguments and Our Analysis*

*(1) Reason to Combine*

Patent Owner argues that "Petitioner has not articulated any plausible reason why a [person of ordinary skill in the art], in 2002, would have been led to convert Jenne's ***advertising*** system and Cohen's permanent ownership indicia into a system for ***remote changing of ownership information***." PO Resp. 32. Referring to Petitioner's argument based on Jenne's disclosure that "[b]esides advertisements, other information could be displayed" (Ex. 1005 ¶ 22, *cited in* Pet. 19), Patent Owner argues that "there is no reason why the word 'other' would have led a [person of ordinary skill in the art] specifically to display ***ownership*** information in Jenne." PO Resp. 29–30. According to Patent Owner, "Petitioner's argument is essentially that the word 'other' would have motivated a [person of ordinary skill in the art] to display ***any conceivable type of information***—sports betting information, Babylonian epics, astronomical charts, or anything else, in Jenne. This stretches obviousness beyond its breaking point." *Id.* at 30.

But as noted above, Petitioner relies on Cohen's disclosure that displaying ownership information during boot-up increases the likelihood of returning a lost computer. *See* Pet. 19 (arguing that a person of ordinary skill in the art would have "been motivated to display ownership information to this captive audience because as taught by Cohen, displaying such information during this time period between boot-up and before entry to the operating system increases the likelihood that a lost or misplaced computer will be returned to its owner"). Patent Owner, however, contends that, "from the perspective of Cohen, ***updating*** the ownership indicia would be a detriment to security" because, according to Patent Owner, "Cohen ensures

security by keeping ownership indicia constant after the initial set-up or configuration change." PO Resp. 32 (citing Ex. 2040 ¶ 54(b)). Patent Owner cites the following testimony from Dr. Schaefer to support this assertion:

> Cohen discloses a method where the owner enters "a textual indicia of personal ownership" "during set-up or during a configuration change." Cohen is specifically designed to keep ownership indicia constant. Although Cohen states that ownership indicia can be stored in RAM or nonvolatile memory, Cohen makes clear that nonvolatile memory is preferred because it cannot be altered, whereas ownership information stored in the RAM could be "easily defeated" by removing the battery. Thus, Cohen's objective is to keep its local ownership indicia constant after an initial set-up or configuration change.

Ex. 2040 ¶ 54(b) (citing Ex. 1006, 2:31–35, 4:50–5:4); *see* PO Resp. 29 (quoting this testimony), 32 (citing this testimony).

We do not credit Dr. Schaefer's testimony because it is inconsistent with Cohen's disclosure. In particular, Cohen discloses "storing of the personal ownership indicia and password data within nonvolatile memory, such as ROM 26," which Cohen states "is preferably implemented utilizing so-called 'flash' ROM or serial EEPROM, which may be electrically altered upon application of suitable control signals." Ex. 1006, 3:44–47, 4:47–50. Thus, contrary to Dr. Schaefer's testimony that Cohen states a preference for nonvolatile memory because it cannot be altered, Cohen expressly discloses using nonvolatile memory that can be altered, so that the system may not "be easily defeated by opening the case of portable computer device 10 and temporarily removing the battery, rendering this information erased." Ex. 1006, 4:54–57. Dr. Zadok testifies that Jenne also discloses storing information in nonvolatile memory, such as nonvolatile random access

memory (NVRAM) or a flash ROM. Ex 1003 ¶ 310 (citing Ex. 1005 ¶¶ 23, 27, Fig. 3). Dr. Zadok testifies that Cohen's disclosure of storing information in nonvolatile memory is consistent with Jenne's disclosure. *Id.* ¶ 321.

We find Petitioner's reasoning to combine Jenne and Cohen to be persuasive. As Petitioner correctly points out (Pet. 19), Cohen expressly teaches that the benefits of displaying owner information with a password prompt when the computer is started are that "the likelihood that a lost or misplaced personal computer device will be returned to its owner [is] greatly enhanced and [that] ownership of otherwise fungible devices may be easily determined." Ex. 1006, 5:52–58; *see* Ex. 1003 ¶ 292 (Dr. Zadok testifying that Cohen's disclosure shows that a person of ordinary skill in the art would have been motivated to display owner information during boot-up). Thus, we find that Cohen's express disclosure provides a rationale for a person of ordinary skill in the art to display a particular type of information, specifically owner information, in the system of Jenne. We agree with Petitioner that "the combination would have involved a simple substitution of a known generic element (Jenne's 'other information') with a specific type of information (Cohen's 'ownership indicia') to obtain predictable results." Pet. 20 (citing *KSR*, 550 U.S. at 415–16).

*(2) Owner*

Patent Owner argues that "[e]ach of the [challenged] [c]laims recites an 'owner' whose return/recovery information is displayed on the device," that "Petitioner relies on Jenne's 'computer manufacturer' for the 'owner' limitation," and that Jenne's manufacturer is not an owner. PO Resp. 26–28.

We disagree with this argument because Petitioner relies on Cohen to teach an owner and ownership indicia in combination with Jenne's teachings. *See* Pet. 19 (asserting that it would have been obvious to combine "Jenne's teachings of remotely updateable automatic display of messages during the boot process with Cohen's teaching of displaying ownership indicia messages with a security (lock) screen on every boot"), 20 ("A [person of ordinary skill in the art] would have therefore found it straightforward to modify the information stored for display during boot-up in Jenne to include Cohen's indicia of ownership (*e.g.*, address and phone number) from Cohen."); *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (stating that each reference "must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole"); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (stating that, for obviousness, "the test is what the *combined teachings* of the references would have suggested to those of ordinary skill in the art" (emphasis added)).

Patent Owner argues that Petitioner "relied on Cohen's 'ownership indicia' to show the return/recovery information" but did not rely on Cohen's disclosure of an owner such as "John Smith" from Cohen's Figure 1 "to show the 'owner' or authorized agent limitation." PO Sur-reply 5–6 (citing Pet. 37). We disagree. Petitioner relies on Cohen to teach ownership information that is entered by the owner. *See* Pet. 16 ("In Cohen, a 'textual indicia of personal ownership is entered by the owner of the system during set-up or during a configuration change and electronically stored within non-volatile memory.'" (quoting Ex. 1006, code (57)). Petitioner relies on Cohen's Figure 1 throughout the Petition to show the "owner" of the computer. *See* Pet. 17, 30, 32, 38.

We find that Cohen's disclosure teaches an "owner" under Patent Owner's construction because John Smith (Figure 1) is the person who owns the computer and, therefore, owns the program on the computer and also because John Smith controls the recovery service by entering his information.

*(3) Remotely Changing Return Information*

Patent Owner argues that Jenne "does not disclose ***anything*** about the display of 'return information.'" PO Resp. 28. Petitioner, however, relies on Cohen to teach the content of the information recited in the claims. *See, e.g.*, Pet. 19–20 (arguing that "it would have been trivial to modify Jenne to display Cohen's ownership indicia information because it would have involved merely substituting the content of the information to be displayed in Jenne"). We find that Cohen's ownership indicia, which includes the name, address, and phone number of the owner (*see* Ex. 1006, Fig. 1), as discussed in the previous section, teaches "computer recovery information", "recovery information", and "return information" as variously recited in the claims under Patent Owner's proposed construction of "information provided by the owner so that the device can be returned to the owner."

Patent Owner argues that Cohen discloses displaying return information but only discloses inputting the information locally. PO Resp. 28–29 (citing Ex. 1006, 4:27–44). According to Patent Owner, "Cohen does not even disclose that the user can change that information ***locally***—rather, it appears to be permanent." *Id.* at 29. Patent Owner cites Dr. Schaefer's testimony that "Cohen is specifically designed to keep ownership indicia constant" and that Cohen prefers nonvolatile memory

"because it cannot be altered." Ex. 2040 ¶ 54(b) (citing Ex. 1006, 2:31–35, 4:50–5:4), *quoted in* PO Resp. 29.

As discussed above in Section II.D.2.b.1, we do not credit this testimony from Dr. Schaefer because it is inconsistent with Cohen's disclosure. In particular, Cohen discloses "storing of the personal ownership indicia and password data within nonvolatile memory, such as ROM 26," which Cohen states "is preferably implemented utilizing so-called 'flash' ROM or serial EEPROM, which may be electrically altered upon application of suitable control signals." Ex. 1006, 3:44–47, 4:47–50. Thus, Cohen discloses using alterable nonvolatile memory to store ownership indicia.

We also disagree with Patent Owner's argument that Cohen discloses permanently setting the ownership information, which then cannot be altered. *See* PO Resp. 29; PO Sur-reply 10–11. Cohen discloses entering ownership information as part of a process depicted in Figure 3, and it states that "those skilled in the art will appreciate that an additional level of security, such as a secondary password, may be required to *alter* the ownership indicia which will be entered as part of this process." Ex. 1006, 4:23–26 (emphasis added). Patent Owner argues that Cohen's statement that "ownership indicia which will be entered" means that "ownership indicia ***has not yet*** been entered)" and, therefore, that alteration here refers to the initial input of the ownership information. PO Sur-reply 10–11. We disagree with this reading of Cohen. Rather, we find that Cohen's use of the term "alter" means that ownership information entered as part of the process of Figure 3 can be changed, which is why "an additional level of security, such as a secondary password," would be required over and above what is

disclosed in Figure 3 with the entry of a password in block 36. Ex. 1006, 4:23–26.

Patent Owner argues that, "[a]t the time of invention (2002), it was wholly unconventional for a computer system to allow a device owner to remotely change return information over the Internet." PO Resp. 31. According to Patent Owner, Petitioner's assertion that it would have been obvious to combine Jenne's teachings of delivering advertisements with Cohen's teachings of locally inputting return information "is pure hindsight." *Id.*

We disagree with Patent Owner's arguments, which focus on the content of the information. As discussed above in Section II.D.2.b.1, Cohen discloses that the benefits of displaying owner information with a password prompt when the computer is started are that ownership of the computer can be determined and that the likelihood of return is increased. Ex. 1006, 5:52–58. As discussed above in Section II.D.2.a, Jenne discloses that the content of the information displayed can be remotely updated: "The computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password."). Jenne discloses that the displayed information can be advertising content but also recognizes that "other information could be displayed" and specifically identifies other content, "such as announcements, useful productivity tips, utility enhancements and computer upgrades." Ex. 1005 ¶ 22. Based on these disclosures, we agree with Petitioner's argument that "it would have been trivial to modify Jenne to

display Cohen's ownership indicia information because it would have involved merely substituting the content of the information to be displayed in Jenne (*e.g.*, commercial/other information/announcements) with the message content disclosed in Cohen (*e.g.*, personal ownership indicia)." *See* Pet. 19–20. As Petitioner correctly asserts, "the combination would have involved a simple substitution of a known generic element (Jenne's 'other information') with a specific type of information (Cohen's 'ownership indicia') to obtain predictable results." *Id.* at 20.

*(4) Without Assistance by the User*

Claim 1 recites "changing return information which appears on the display through remote communication without assistance by a user with the computer." Patent Owner argues that Jenne does not teach remotely changing information without assistance of a user because the computer user must log in and establish an Internet connection so that communication can occur, which Patent Owner contends is user assistance. PO Resp. 32–37. Patent Owner argues that the '393 patent allows an owner to push recovery information changes to the computer even when the user of the computer has not connected to the Internet, such as when a computer is found by someone who does not know the password and, therefore, cannot connect to the Internet. *Id.* at 33–35. According to Patent Owner,

> Nothing, other than turning on the computer, is required from the user. Hence, there is no "assistance." The owner may ***push*** return/recovery information to the device via the Internet, but the user does [not] need to establish that connection. This makes sense because the user does not and cannot have the password to gain access to the system and establish the connection.

*Id.* at 35.

We disagree with this argument because, as Petitioner correctly asserts, "[t]he language 'without assistance by a user' refers to the specific recited action of 'initiating or changing [return/recovery] information,' rather than to an unrecited action of establishing the remote communication in the first instance." *See* Pet. Reply 15 (second alteration in original). We do not view the claims as prohibiting all other user interactions.

Jenne's disclosure of checking for an internet connection before downloading any updates to the displayed information (Ex. 1005 ¶ 25, Fig. 1) is consistent with the updating process described in the following passage of the '393 patent:

> Using this unique communication power, both 'owner' and "assigned to" information can be uploaded to the recovery center and/or downloaded to the protected equipment in order to synchronize the international recovery center information and the recovery information displayed on the initial display 18 screen. (This is a combination of the PDA type of synchronization between the main computer 12 and the PDA, and the McAfee anti-virus software Internet updating capability where *every time you go on-line, your computer 12 automatically checks to make sure that you have the most current anti-virus software and automatically updates your computer 12 with the latest changes*.) Nobody has ever before considered or designed a product combining this type of communication ability with this type of recovery security program that seizes control of the display 18 monitor until a security prompt is satisfied. The Retriever design allows an equipment recovery capability that just does not exist on today's market, and is completely unique from all current products on the market.

Ex. 1001, 13:64–14:16 (emphasis added). Thus, the '393 patent explains that downloads of new information occur automatically when the user goes online.

Patent Owner argues that, "as anyone who has turned on a cellphone can attest, a connection can be established *automatically* without any involvement by the user. The user simply turns on the device." PO Sur-reply 15 (citing Ex. 2048, 44:5–13, 45:2–15, 61:25–62:1). According to Patent Owner, "in many cases, there is no assistance in connecting to the Internet in a cellphone. Similarly, the Claims prohibit any assistance as part of the 'remote communication' process (other than turning on the device)." *Id.* at 15–16. The cited testimony from Dr. Zadok was in response to questions about how iPhones and smartphones operate and log on to networks. *See* Ex. 2048, 44:5–13 (question and answer about "iPhone or other smartphone"), 45:2–15 (question and answer about iPhone), 61:25–62:1 (answer about iPhone). Patent Owner does not direct us to any evidence that iPhones or other smartphones, to the extent they even existed "[a]t the time of invention (2002)" (PO Resp. 31), had such capabilities in 2002. We see no reason that we should interpret the claim to exclude the automatic updating functionality described in the specification of the '393 patent at column 13, line 64 to column 14 line 16. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (noting that interpreting a claim to exclude a preferred embodiment in the specification "is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case").

Patent Owner also argues that the "prosecution history further demonstrates that no input or action by the user is needed to remotely initiate or change return/recovery information." PO Resp. 35–36 (citing Ex. 1012 (prosecution history of related U.S. Patent 8,601,606), 143, 151–53, 2071, 2075, 2093). The arguments Patent Owner made during prosecution of

related U.S. Patent 8,601,606 show that the language "without assistance by a user" was added to distinguish over prior art that allegedly required a user at the computer "to push an interrupt key to allow the owner to change the display from remote." Ex. 1012 at 2093. In contrast, Jenne discloses remotely updating using a password without requiring the user at the computer to press a particular key to start the process. For example, Jenne explains that the "computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password.").

Patent Owner also argues that Jenne's updating process relies on user feedback to tailor advertisements to a user's interests, which means the user provides assistance in updating the information. PO Resp. 37–40 (citing Ex. 1005 ¶¶ 20, 25, Fig. 1; Ex. 2040 ¶ 56(a)). This argument, however, does not respond to the asserted combination in which Petitioner relies on Jenne's disclosure of remotely updating displayed information by an authorized party in combination with Cohen's disclosure of an owner entering ownership information for display. *See* Pet. 33–35. Because, in Petitioner's proposed combination, the content of the information is ownership indicia entered by the owner, we disagree with Patent Owner's argument that, "without the user preferences and advertisements, the commercial message application [of Jenne] would not be built and would have nothing to execute." *See* PO Sur-reply 17.

In view of the foregoing, we find Jenne teaches changing the content of information through remote communication without assistance by a user

with the computer, which in combination with Cohen's disclosure of changing ownership indicia, discussed above in Section II.D.2.b.4, teaches "changing return information which appears on the display through remote communication without assistance by a user with the computer," as recited in claim 1.

*(5) Remote Access Only by the Owner or Authorized Party*

Patent Owner argues that Jenne does not teach that the interactive program "is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen," as recited in claim 1 and similarly recited in claims 4 and 7. PO Resp. 40–43. According to Patent Owner, Jenne fails to teach this subject matter because "Jenne's user can 'uninstall or delete' the application" and thus not only the owner has access to the application. *Id.* at 40 (citing Ex. 1005 ¶ 21; Ex. 2040 ¶ 57(a)). Patent Owner also argues that Jenne's disclosure that a premium user can enable or disable an advertisement shows access by someone other than the owner. *Id.* at 41 (citing Ex. 1005 ¶ 24).

Addressing similar arguments, the Institution Decision states that the claim limits "*remote* access," not all access. Inst. Dec. 21. Patent Owner disagrees and argues that claim 1's security prompt and claim 7's lock screen prevent "local access to the interactive program, unless the security prompt is satisfied." PO Resp. 41–42. Petitioner, however, relies on Cohen to teach "a lock screen with password prompt that is displayed after the computer is powered on and before allowing a user to access the operating system." Pet. 21 (citing Ex. 1006, Fig. 4 (steps 58, 60, 62)), 31 (citing Ex. 1006, Fig. 1), 37–38 (citing Ex. 1006, 5:28–37, Figs. 1, 4). Cohen's

Figure 1 shows a screen that prompts the user for a password. *See* Ex. 1006, 5:28–37 ("Block 58 illustrates the prompting of the user for a password. . . . [I]n the event the appropriate password has been entered, the password passes to block 62. Block 62 illustrates the occurrence of normal processing in a manner well known to those having skill in this art."). Thus, the combination of Jenne and Cohen teaches restricting local access unless a security prompt is satisfied.

The claims do not specify that the "interactive program" cannot be accessed locally; rather, they specify that *remote* access is "only by the owner of the computer or the party authorized by the owner." Thus, Patent Owner's arguments regarding local access, including by a premium user in Jenne, are unavailing.

We find Petitioner's contentions for the remote access limitation persuasive. Jenne discloses that remote updating is done with a password. Ex. 1005 ¶¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password."), 25 ("The password may be used by the computer manufacturer or its authorized agent for securely updating the memory 520."). Thus, the entity having the password is the "party authorized by the owner." From the computer's perspective, authorization is determined by checking for the correct password. This is consistent with the '393 patent's disclosure that the software determines who "is in charge" based on who "uses the correct password." Ex. 1001, 14:48–51. In Petitioner's combination, Cohen's owner has remote access to change the content of the information displayed (i.e., Cohen's ownership indicia). *See* Pet. 34–35 (arguing that Cohen's ownership indicia are entered by the owner and can be changed subsequently

and that a person of ordinary skill in the art "would have been motivated to incorporate the capability to change the stored ownership information using Jenne's '*remote communication*' . . . so that the most up-to-date ownership information is displayed when a device is lost or stolen" (citing Ex. 1003 ¶¶ 294, 317; Ex. 1005, code (57), ¶¶ 13, 21, 25; Ex. 1006, 4:31–34, 6:23–26).

*(6) Summary of Findings*

Based on Petitioner's persuasive contentions and evidence discussed above, we find that the combination of Jenne and Cohen teaches the subject matter of claim 1. We find that Jenne's disclosure of displaying information during boot-up in combination with Cohen's disclosure of displaying owner information with a lock screen during boot-up teaches the preamble of claim 1 and the subject matter reciting

> activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer;

Ex. 1005 ¶ 13 (displaying messages during boot-up); Ex. 1006, Fig. 1 (lock screen with owner information and password prompt).

For the reasons discussed above in Sections II.D.2.b.2–5, we find that the combination of Jenne and Cohen teaches

> changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the initiating or changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen.

We find that the combination of Jenne and Cohen teaches "displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer" because, as discussed above, Cohen teaches displaying the ownership indicia with a lock screen that has a password prompt. Ex. 1006, Fig. 1. We also find that Cohen's disclosure of the screen in Figure 1 showing the message "This system belongs to:" teaches a message that is in addition to the return information and, therefore, teaches "activating the processor to allow a message to the user."

We find that a person of ordinary skill in the art would have combined the teachings of Jenne and Cohen such that Cohen's ownership information would be displayed and could be remotely updated per Jenne's disclosure of remotely updating information that is displayed for the reasons discussed above. In particular, we find that Cohen's disclosure of the benefits of displaying owner information with a password prompt when the computer is started provides a reason to display ownership information in Jenne, as discussed above in Section II.D.2.b.1. As discussed above in Section II.D.2.b.3, we agree with Petitioner that substituting the content of information in Jenne with Cohen's ownership indicia would have been a trivial modification and a simple substitution of one type of information with another. *See* Pet. 19–20. We also find that it would have been obvious to employ a lock screen, as taught in Cohen, in the system of Jenne because it would have protected the computer, as taught in Cohen. *See* Ex. 1006, 1:32–37 ("[T]he utilization of password protection schemes maintains the integrity of data and applications within such devices . . . ."), 5:28–37 (referring to Figure 4's process in which access to the computer is denied until entry of the correct password). We agree with Petitioner that a person of ordinary

skill in the art would have had a reasonable expectation of success in making the combination to arrive at the claimed subject matter. *See* Pet. 21–22; Ex. 1003 ¶ 297.

*(7) Secondary Considerations*

Patent Owner contends that objective evidence of non-obviousness includes "praise Patent Owner received for her inventions, the inventions' commercial success, copying by others, and failure by others." PO Resp. 55–57; *see also* PO Sur-reply 24–26. Petitioner argues that Patent Owner has not established a nexus between the merits of the claimed invention and the objective evidence. Pet. Reply 25–27. We agree with Petitioner.

As stated by the Federal Circuit,

> [f]or objective evidence of secondary considerations to be relevant, there must be a nexus between the merits of the claimed invention and the objective evidence. *See In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). A showing of nexus can be made in two ways: (1) via a presumption of nexus, or (2) via a showing that the evidence is a direct result of the unique characteristics of the claimed invention.
>
> A patent owner is entitled to a presumption of nexus when it shows that the asserted objective evidence is tied to a specific product that "embodies the claimed features, and is coextensive with them." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

*Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1210 (Fed. Cir. 2023). Furthermore, "even absent a presumption of nexus, 'the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique

characteristics of the claimed invention.'" *Id.* (quoting *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019)).

Patent Owner argues that her "invention was commercialized under the name of 'The Retriever,'" which "practiced the '393 patent." PO Resp. 55 (citing Ex. 1001, 4:50). This is the extent of Patent Owner's argument supporting a presumption of nexus. Indeed, Patent Owner does not address coextensiveness at all. This is insufficient to show a presumption of nexus. *See Volvo Penta*, 81 F.4th at 1211 (finding that a one sentence assertion that a product embodies the claimed features of the Patent and is coextensive with them is insufficient to show a presumption of nexus).

Patent Owner's arguments also do not prove a nexus independently of a presumption. For example, Patent Owner argues that, "[i]n various news articles and television coverage, her products were praised for their ability to retrieve lost or stolen computers." PO Resp. 56 (citing Exs. 2042, 2043). Exhibit 2043 is a 2009 article titled "Talking software goes global" and mentions that the Retriever software has a "verbal alarm" and has the ability to "let[] law enforcement pinpoint the physical location of a stolen computer." Exhibit 2042, a 2009 Associated Press article titled "Stop thief! Software lets stolen laptops speak up" also discusses an audio alert that a stolen laptop can play. These articles indicate that non-patented features were the object of any alleged praise. Indeed, Exhibit 2043 states that, "[s]ince Front Door Software Inc. launched the verbal alarm with a software upgrade on Thursday, Feb. 26, the story about the talking laptop software has been published around the world." This suggests that the verbal alarm upgrade to the Retriever software resulted in any alleged praise.

Patent Owner also argues that she "received multiple awards for her products" and that her company "placed first out of 175 companies as the top start-up at a pitch contest in San Francisco." PO Resp. 56 (citing Ex. 2044). Patent Owner does not cite evidence to support the assertion regarding "multiple awards." The pitch contest brochure introduces the Front Door Software product as follows:

> A patent pending laptop tracking and recovery program combined with one of the most powerful targeted opt-in page view delivery capabilities ever! By moving delivery out to the computer ON button, every 15,000 users using our free version automatically generates over 1 million page views @ mo. and over 50 million page views @ user license lifetime! http://vator.co/frontdoorsoftware.

Ex. 2044 at 8. This summary appears to focus more on the potential for page views than on the claimed features and in that regard is similar to Jenne's teachings of showing messages to a "captive audience" during boot-up. Ex. 1005 ¶ 21; *see* PO Resp. 6–7 (describing Jenne's teachings of monetizing user wait times).

Patent Owner also argues the following:

> Patent Owner's products were downloaded and successfully used by thousands of people in over 100 countries. Ex. 2045. Patent Owner tracked how often her customers' devices would display return/recovery information, and such information was displayed millions of times per year. Patent Owner's customers included major universities. *Id.* Patent Owner's company generated hundreds of thousands of dollars in revenue from the sale of its products. *Id.*

PO Resp. 56. Exhibit 2045 appears to be a printout of a Front Door Software website from 2013 that lists certain institutional customers and countries where the software is deployed. The printout states the following:

> We cannot tell where the majority of our customers are coming from unless they list their organization. We do know that we have had over 6 million customer visits to our web site in the past year and customers from over 100 countries and nations around the world are creating accounts in record numbers every day.

Ex. 2045 at 1 (emphasis omitted). The only specific evidence here is that there were over six million visits to the website. This is insufficient evidence to show commercial success tied to the merits of the invention. *Cf. Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed. Cir. 1983) ("The evidence of commercial success consisted solely of the number of units sold. There was no evidence of market share, of growth in market share, of replacing earlier units sold by others or of dollar amounts, and no evidence of a nexus between sales and the merits of the invention.").

Patent Owner further argues that "Microsoft did not release its Find My Device product for laptops until 2015, and Google did not release its Find My Device product for smartphones and tablets until 2013. Ex. 2046, Ex. 2047." PO Resp. 57. Patent Owner does not explain how Google's and Microsoft's Find My Device features are evidence of non-obviousness of the '393 patent claims. According to Exhibit 2046, "Find My Device in Windows 10 doesn't do a whole lot right now. There isn't a way to have your tablet make a sound, lock itself, erase data, or anything like that. Instead, you can only find out where its last known general location was." Ex. 2046 at 1. According to Exhibit 2047, the Android Device Manager "lets you locate your Android device on a map, see when it was last located and when it was last used, as well as ring, lock and wipe the device." Ex. 2047 at 1. Thus, it appears that the Microsoft and Google features are

for finding a device by ascertaining the location of the device, which is not a feature of the claims or a feature discussed in the ’393 patent.

Finally, Patent Owner does not provide evidentiary support for her assertion that “the subject matter claimed in the ’393 patent is now included or may be downloaded on virtually every smartphone, laptop, tablet, and personal computer today.” *See* PO Resp. 57.

For the reasons discussed above, we find that Patent Owner has not provided objective evidence of non-obviousness that has a nexus to the claimed invention.

*c) Conclusion for Claim 1*

We find that the combination of Jenne and Cohen teaches the subject matter recited in claim 1 and that a person of ordinary skill in the art would have combined the teachings of Jenne and Cohen in the manner asserted by Petitioner with a reasonable expectation of success in arriving at the subject matter recited in claim 1. Patent Owner’s asserted objective evidence of non-obviousness lacks nexus and does not undermine Petitioner’s showing. Therefore, after considering all of the *Graham* factors, we conclude that the subject matter of claim 1 would have been obvious based on the combined teachings of Jenne and Cohen.

*3. Claims 2–7*

Independent claim 4 is directed to an apparatus for displaying and remotely changing “computer recovery information” or “recovery information,” and independent claim 7 is directed to a computer program for displaying and remotely changing “recovery information.” These independent claims recite subject matter substantially similar to claim 1 except that claim 4 additionally recites “so the recovery information is

visible to anyone viewing the display" and claim 7 additionally recites "to facilitate return of the computer and which is maintained on or before or with the lock screen so the recovery information is available to anyone viewing the display." *See* Pet. 30–32 (setting forth specific contentions for the additional limitations of claims 4 and 7 together).

For the limitations in claims 4 and 7 that recite subject matter substantially similar to claim 1, the parties' arguments for claim 1 apply to claims 4 and 7. *See* Pet. 23–41; PO Resp. 26–42.

For the additional limitations of claims 4 and 7, Petitioner argues that, in the asserted combination, the owner information is displayed with a password prompt as described in Cohen such that the combination teaches "displays recovery for returning the computer to an owner . . . to facilitate return of the computer and which is maintained on or before or with the lock screen so the recovery information is visible to anyone viewing the display" as recited in claim 7. Pet. 30–32. Patent Owner does not offer argument directed to these additional limitations. PO Resp. 26–42. Having reviewed the additional evidence cited by Petitioner, we find that the combination of Jenne and Cohen teaches these additional limitations.

For the reasons explained above in Section II.D.2 and based on Petitioner's persuasive contentions and evidence, we conclude that the subject matter of claims 4 and 7 would have been obvious based on the combined teachings of Jenne and Cohen.

Claim 2 depends from claim 1 and recites "selecting by the owner or user an Internet link on the screen, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is automatically able to access the computer and the Internet location

associated with the Internet link." Claim 5 depends from claim 4 and similarly recites "wherein the display includes an Internet link that can be selected by the owner or user, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is able to access the computer and the Internet location associated with the Internet link."

Petitioner argues that, based on Jenne's disclosure of an Internet browser connected to the Internet for a user to access a website, a person of ordinary skill in the art "would have been motivated to include an active, user-selectable, '*Internet link*' on the return/recovery displayed screen" "to allow an individual finding a lost or stolen computer to immediately access information or resources to assist with the return, rather than making the user contact the owner later through a different mechanism (e.g., phone call or postal mail)." Pet. 41–43 (citing Ex. 1005 ¶¶ 18, 27; Ex. 1003 ¶¶ 374–378).

Claim 3 depends from claim 1 and recites "wherein the screen having an active link allowing remote communication to a remote server which provides return information to facilitate return of the computer." Claim 6 depends from claim 4 and similarly recites "wherein the display having an active link to allow remote communication to the remote server which provides recovery information to facilitate return of the computer."

Citing Jenne's disclosure that a user "may be directed to other advertisements through links" (Ex. 1005 ¶ 18), Petitioner argues that such links are active links and that it would have been obvious that such links go to information hosted on a remote server. Pet. 44 (citing Ex. 1003 ¶¶ 381–383). Petitioner argues that it "would have been well within the ordinary creativity of a [person of ordinary skill in the art] to include an active

Internet link on the display screen as taught by Jenne with more specific return/recovery information," which a person of ordinary skill in the art would have done "to allow an individual finding a lost or stolen computer to immediately access information or resources to assist with the return, rather than making the user contact the owner later through a different mechanism (e.g., phone call or postal mail)." *Id.* (citing Ex. 1003 ¶¶ 384–386).

Patent Owner does not separately argue claims 2, 3, 5, and 6. *See* PO Resp.

We find Petitioner's contentions and evidence, summarized above, persuasive, and we conclude that the subject matter of claims 2, 3, 5, and 6 would have been obvious based on the combined teachings of Jenne and Cohen.

### *E. Remaining Grounds*

As noted above in Section I.A, Petitioner presents additional grounds of unpatentability. Because we determine that all challenged claims are unpatentable as discussed above, we need not separately assess the remaining grounds. 35 U.S.C. § 318(a) ("If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)."); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (nonprecedential) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

## III. CONCLUSION

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that claims 1–7 of the ’393 patent are unpatentable, as summarized in the following tables:

**IPR2022-01190**

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7 | 103(a) | Jenne, Cohen | 1–7 | |
| 1, 4, 7 | 103(a) | Angelo, Helle[11] | | |
| **Overall Outcome** | | | 1–7 | |

**IPR2022-01191**

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7 | 102(a)(1) | Hafeman 670 | | |
| 1–7 | 103(a) | Hafeman 298, Chiu | | |

## IV. ORDER

Accordingly, it is

ORDERED that Petitioner's request to consolidate these proceedings is granted;

FURTHER ORDERED that claims 1–7 of the '393 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

[11] As explained above, because we determine that the challenged claims are unpatentable based on the combination of Jenne and Cohen, we decline to address this ground and the grounds raised in IPR2022-01191.

FOR PETITIONER:

Matthew A. Smith
Kirstin Stoll-DeBell
Carrie Beyer
Andrew S. Baluch
FAEGRE DRINKER BIDDLE & REATH LLP
smith@smithbaluch.com
kirstin.stolldebell@faegredrinker.com
carrie.beyer@faegredrinker.com
baluch@smithbaluch.com

FOR PATENT OWNER:

Stephen Underwood
Jason Linger
GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO LLP
sunderwood@glaserweil.com
jlinger@glaserweil.com

Trials@uspto.gov
571-272-7822

Paper 32
Date: January 23, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

GOOGLE LLC, MICROSOFT CORPORATION,
Petitioner,

v.

CAROLYN W. HAFEMAN,
Patent Owner.

---

IPR2022-01192
IPR2022-01193
Patent 9,892,287 B2

---

Before JEFFREY S. SMITH, DANIEL J. GALLIGAN, and ARTHUR M. PESLAK, *Administrative Patent Judges*.

SMITH, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

ORDER
Granting Petitioner's Request for Consolidation
*37 C.F.R. § 42.122(a)*

# I. INTRODUCTION

In these *inter partes* reviews, Google LLC and Microsoft Corporation (collectively "Petitioner") challenge the patentability of claims 1–7 of U.S. Patent 9,892,287 B2 (Ex. 1001 ("'287 patent")), which is owned by Carolyn W. Hafeman ("Patent Owner"). Petitioner requests that we consolidate these cases. IPR2022-01192, Paper 24 at 1. Patent Owner opposes. IPR2022-01192, Paper 28 at 1. Because these cases address the same claims, we grant Petitioner's request to consolidate them pursuant to 37 C.F.R. § 42.122(a). *See also* 35 U.S.C. § 315(d) (giving Director discretion to consolidate proceedings).

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trials in these *inter partes* reviews. For the reasons discussed below, we determine that Petitioner has proven by a preponderance of the evidence that claims 1–7 of the '287 patent are unpatentable. *See* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.").

## *A. Procedural History*

Petitioner filed two petitions, each of which challenges claims 1–7 of the '287 patent on the grounds set forth in the tables below.

**IPR2022-01192**

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–7 | 103(a)[1] | Jenne,[2] Cohen[3] |
| 1, 4, 7 | 103(a) | Angelo,[4] Helle[5] |

IPR2022-01192, Paper 4 ("Pet.") at 2–3.[6]

**IPR2022-01193**

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–7 | 102(a)(1) | Hafeman 670[7] |
| 1–7 | 103 | Hafeman 298,[8] Chiu[9] |

IPR2022-01193, Paper 4 at 2–3.

Patent Owner filed Preliminary Responses in both proceedings. Paper 8 in each proceeding. With Board authorization, Petitioner filed a Reply in each case (Paper 11 in each proceeding), and Patent Owner filed a

[1] The '287 patent claims priority through a chain of continuations to an application that was filed before the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA") amendments to 35 U.S.C. §§ 102 and 103. In IPR2022-01192, Petitioner asserts that the references are prior art under the pre-AIA versions of these sections. Pet. 2–3. In IPR2022-01193, however, Petitioner argues that the effective filing date of the claims of the '287 patent is after the AIA effective dates, and Petitioner applies the AIA version of sections 102 and 103 in that case. IPR2022-01193, Paper 4 at 2–3 n.2. For purposes of this Decision, we need not resolve the priority dispute because, as discussed below, the claims are unpatentable over the combination of Jenne and Cohen, the pre-AIA prior art.
[2] US 2003/0122864 A1, published July 3, 2003 (Ex. 1005).
[3] EP 0687968 A2, published Dec. 20, 1995 (Ex. 1006).
[4] US 2003/0065934 A1, published Apr. 3, 2003 (Ex. 1007).
[5] US 6,662,023 B1, issued Dec. 9, 2003 (Ex. 1008).
[6] Unless otherwise noted, we refer to the papers in IPR2022-01192.
[7] US 2005/0071670 A1, published Mar. 31, 2005 (Ex. 1011).
[8] US 2004/0103298 A1, published May 27, 2004 (Ex. 1009).
[9] US 2003/0088633 A1, published May 8, 2003 (Ex. 1010).

Sur-reply (Paper 14 in each proceeding). Trial was instituted on the asserted grounds of unpatentability in each proceeding. Paper 16 ("Inst. Dec.") at 39; IPR2022-01193, Paper 16 at 20.

In each proceeding, Patent Owner filed a Response (Paper 20 ("PO Resp."); IPR2022-01193, Paper 20), Petitioner filed a Reply (Paper 24 ("Pet. Reply"); IPR2022-01193, Paper 24), and Patent Owner filed a Sur-reply (Paper 28 ("PO Sur-reply"); IPR2022-01193, Paper 28).

An oral hearing was held on November 2, 2023, a transcript of which appears in the record in each case. Paper 31 in each proceeding.

Petitioner relies on testimony from Erez Zadok, Ph.D. Exs. 1003, 1048 (same Declarations filed in both proceedings). Patent Owner relies on testimony from Scott Schaefer, Ph.D. Ex. 2040 in each proceeding. Patent Owner has entered in the record a transcript of the deposition of Dr. Zadok. Ex. 2048 in each proceeding.

### *B. Real Parties in Interest*

Petitioner identifies the following real parties in interest: Google LLC, Microsoft Corporation, LG Electronics Inc., and LG Electronics U.S.A., Inc. Pet. 78; IPR2022-01193, Paper 4 at 79.

Patent Owner identifies herself as the real party in interest. Paper 5 (in each proceeding) at 1.

### *C. Related Matters*

As required by 37 C.F.R. § 42.8(b)(2), the parties identify various related matters. Pet. 78–79; IPR2022-01193, Paper 4 at 79–80; Paper 5 (in each proceeding) at 1.

### *D. The '287 Patent and Illustrative Claim*

The '287 patent relates to the "return of lost or stolen computers using a recovery screen that appears during or after boot-up of the computer." Ex. 1001, 1:24–26. Claims 1, 4, and 7 are independent, and claim 1 is reproduced below.

> 1. A method for displaying information to assist with returning a computer comprising the steps of:
>
> activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying recovery information, to facilitate return of the computer so the return information is visible to anyone viewing the display screen;
>
> initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;
>
> displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and
>
> activating the processor to allow a warning message to the user.

## II. ANALYSIS

### *A. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations, if in evidence. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

### *B. Level of Ordinary Skill in the Art*

Citing the testimony of Dr. Zadok, Petitioner contends that a person of ordinary skill in the art

> would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or the equivalent and at least two years of experience in the relevant field, e.g., electronic communications systems. Significantly more practical experience could also qualify one not having the aforementioned education as a person of ordinary skill in the art while, conversely, a higher level of education could offset a lesser amount of experience.

Pet. 12–13 (citing Ex. 1003 ¶ 96). Patent Owner does not dispute this assessment or offer her own assessment. *See* PO Resp.

To the extent necessary, we accept the uncontested assessment offered by Petitioner, except that we delete the qualifier "at least" to eliminate vagueness as to the amount of experience. The qualifier expands the range indefinitely without an upper bound, and thus precludes a meaningful indication of the level of ordinary skill in the art.

### *C. Claim Construction*

Petitioner presents two issues for claim construction. Pet. 9–12. First, Petitioner argues that certain language in each independent claim should be

interpreted to require the automatic display of certain information "during or after every boot-up." Pet. 9–11. Second, Petitioner argues that the return and recovery information recited in the claims is merely printed matter that is not entitled to patentable weight. Pet. 11–12. Patent Owner disagrees with Petitioner's claim construction arguments. PO Resp. 9–21.

For her part, Patent Owner argues that the terms "computer recovery information," "recovery information," and "return information" mean "information provided by the owner so that the device can be returned to the owner," and she argues that "owner" means "the person or entity that owns, rents, or licenses the recovery application or program, and/or the person or entity who controls the recovery service." PO Resp. 21 (citing Ex. 1001, 3:42–43, 4:14–15, 4:60–63, 11:53–55; Ex. 2035, 6–7, 18–20).

As explained below, the combination of Jenne and Cohen teaches the content of the return/recovery information under Patent Owner's construction, and, therefore, we need not resolve whether such information is entitled to patentable weight. Furthermore, as explained below, the combination of Jenne and Cohen teaches displaying the return/recovery information during or after every boot-up and teaches "owner" under Patent Owner's construction. Therefore, because there are no claim construction disputes between the parties that affect the analysis of unpatentability based on the combination of Jenne and Cohen, we need not resolve these claim construction issues. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### *D. Obviousness over Jenne and Cohen (Claims 1–7)*

Petitioner asserts that claims 1–7 are unpatentable as obvious over the combined teachings of Jenne and Cohen. Pet. 3, 13–44. Patent Owner opposes. PO Resp. 26–43, 55–57; PO Sur-reply 5–18, 24–26.

#### *1. Overview of the Prior Art*

Jenne discloses a computer system that displays messages during a user wait time, such as during system boot-up, and has the ability to remotely update the messages. Ex. 1005, code (57), ¶¶ 21, 25.

Cohen discloses modifying the Power-On System Test (POST) mode of a computer to display information about the owner of the computer while prompting for a password. Ex. 1006, code (57), 3:57–4:4, Figs. 1, 3.

We discuss additional pertinent details of Jenne and Cohen in our analysis below.

#### *2. Claim 1*

##### *a) Petitioner's Contentions*

Petitioner relies on Jenne for its teachings of displaying messages during boot-up of a computer and updating those messages remotely. Pet. 13–15 (overview of Jenne), 22–41 (detailed analysis of independent claims). For example, Jenne discloses that, "[d]uring a computer boot-up time or a wake-up time from a low-power mode, the computer user is forced to sit and wait," and Jenne discloses displaying messages during that time. Ex. 1005 ¶¶ 12–13. Jenne explains that such messages may be advertisements but that "other information could be displayed such as announcements, useful productivity tips, utility enhancements and computer upgrades." Ex. 1005 ¶ 22. Jenne discloses that the content of the

information displayed can be remotely updated: "The computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password.").

Petitioner relies on Cohen to teach the automatic display of ownership information with a lock screen each time the computer is powered on. Pet. 16–18 (overview of Cohen), 22–41 (detailed analysis of independent claims). Cohen discloses that a "textual indicia of personal ownership is entered by the owner of the system during set-up or during a configuration change and electronically stored within non-volatile memory" and that this information is displayed during the POST process. Ex. 1006, code (57). With reference to Figure 4, Cohen discloses that, when power is turned on to the computer, the POST process retrieves and displays the owner's information and prompts for a password to allow use of the computer. Ex. 1006, 5:5–42, Fig. 4. This is shown in Cohen's Figure 1 below.




*Fig. 1*

Cohen's Figure 1, reproduced above, "display[s] an indication of ownership of portable computer device 10." Ex. 1006, 3:15–18. The display on computer 10 shows the following:

> This system belongs to:
> John Smith
> 121 Elm
> Fort Worth, Tx
> 817-555-1234
> Enter Password_ _ _ _ _ _ _ _ _

Ex. 1006, Fig. 1.

Petitioner argues that it would have been "obvious to combine Jenne's teaching of automatic display of remotely updateable messages during the boot process with Cohen's teaching of displaying ownership indicia messages with a security (lock) screen on every bootup to prohibit a user from accessing the device until proper security credentials (e.g., password)

are entered." Pet. 18–19 (citing Ex. 1003 ¶¶ 288–296). Petitioner provides several reasons that a person of ordinary skill in the art would have made this combination, including that Cohen expressly teaches that its display of ownership information during boot-up increases the likelihood of returning a lost computer. Pet. 18–22 (citing, *inter alia*, Ex. 1003 ¶ 289; Ex. 1006, 5:43–58[10]).

Petitioner provides a detailed analysis explaining how the combination of Jenne and Cohen teaches the subject matter of claim 1. Pet. 22–41. Petitioner argues that Jenne's disclosure of displaying information in combination with Cohen's disclosure of owner information teaches the preamble of claim 1. Pet. 22–24.

Petitioner argues that the combination of Jenne and Cohen teaches "automatically displaying return/recovery information during or after every boot-up of the computer" and, therefore, teaches "activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer," as recited in claim 1. Pet. 26–28. Petitioner argues that, in the asserted combination, the owner information is displayed with a password prompt as described in Cohen such that the combination teaches "the screen displaying recovery information, to facilitate return of the computer so the return information is visible to anyone viewing the display screen," as recited in claim 1. Pet. 30–32.

---

[10] Although Petitioner cites column 5, lines 43–48 of Cohen, the relevant disclosure appears through line 58, as cited by Dr. Zadok. Ex. 1003 ¶ 302.

Claim 1 recites "initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer." Petitioner addresses "changing" rather than "initiating," noting that only one of these needs to be met by the prior art. Pet. 32; *see also* PO Resp. 28 ("As Petitioner notes, 'initiating or changing' is disjunctive: thus, Petitioner only needs to establish that one of the two is satisfied."). Petitioner relies on Jenne's disclosures of remotely updating the message content and argues that a person of ordinary skill in the art "would have been motivated to incorporate the capability to change the stored ownership information using Jenne's '*remote communication*' (EX-1005, Abstract, ¶¶ 13, 21, 25) so that the most up-to-date ownership information is displayed when a device is lost or stolen." Pet. 32–34 (citing Ex. 1003 ¶¶ 291, 321).

Claim 1 further recites "wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen." Petitioner argues that Jenne's disclosures of remotely updating the message content by the "computer manufacturer or its authorized agent" (Ex. 1005 ¶ 25) teaches an interactive program, which, in combination with Cohen's disclosure of an owner changing owner information, teaches this subject matter. Pet. 34–37.

Claim 1 also recites "displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer." Petitioner relies on Cohen's disclosure of displaying owner information on the screen with a password prompt as teaching this limitation. Pet. 37–39.

Claim 1 further recites "activating the processor to allow a warning message to the user." Petitioner relies on Cohen's screen showing the message "This system belongs to:" as teaching allowing a warning message. Pet. 39–41 (Ex. 1006, Fig. 1).

*b) Patent Owner's Arguments and Our Analysis*

*(1) Reason to Combine*

Patent Owner argues that "Petitioner has not articulated any plausible reason why a [person of ordinary skill in the art], in 2002, would have been led to convert Jenne's ***advertising*** system and Cohen's permanent ownership indicia into a system for ***remote changing of ownership information***." PO Resp. 32. Referring to Petitioner's argument based on Jenne's disclosure that "[b]esides advertisements, other information could be displayed" (Ex. 1005 ¶ 22, *cited in* Pet. 19), Patent Owner argues that "there is no reason why the word 'other' would have led a [person of ordinary skill in the art] specifically to display ***ownership*** information in Jenne." PO Resp. 29–30. According to Patent Owner, "Petitioner's argument is essentially that the word 'other' would have motivated a [person of ordinary skill in the art] to display ***any conceivable type of information***—sports betting information, Babylonian epics, astronomical charts, or anything else, in Jenne. This stretches obviousness beyond its breaking point." PO Resp. 30.

But as noted above, Petitioner relies on Cohen's disclosure that displaying ownership information during boot-up increases the likelihood of returning a lost computer. *See* Pet. 19 (arguing that a person of ordinary skill in the art would have "been motivated to display ownership information to this captive audience because as taught by Cohen, displaying such information during this time period between boot-up and before entry to the

operating system increases the likelihood that a lost or misplaced computer will be returned to its owner"). Patent Owner, however, contends that, "from the perspective of Cohen, ***updating*** the ownership indicia would not be a 'benefit' – it would be a detriment to security" because, according to Patent Owner, "Cohen ensures security by keeping ownership indicia constant after the initial set-up or configuration change." PO Resp. 32 (citing Ex. 2040 ¶ 54(b)). Patent Owner cites the following testimony from Dr. Schaefer to support this assertion:

> Cohen discloses a method where the owner enters "a textual indicia of personal ownership" "during set-up or during a configuration change." Cohen is specifically designed to keep ownership indicia constant. Although Cohen states that ownership indicia can be stored in RAM or nonvolatile memory, Cohen makes clear that nonvolatile memory is preferred because it cannot be altered, whereas ownership information stored in the RAM could be "easily defeated" by removing the battery. Thus, Cohen's objective is to keep its local ownership indicia constant after an initial set-up or configuration change.

Ex. 2040 ¶ 54(b) (citing Ex. 1006, 2:31–35, 4:50–5:4); *see* PO Resp. 29 (quoting this testimony), 32 (citing this testimony).

We do not credit Dr. Schaefer's testimony because it is inconsistent with Cohen's disclosure. In particular, Cohen discloses "storing of the personal ownership indicia and password data within nonvolatile memory, such as ROM 26," which Cohen states "is preferably implemented utilizing so-called 'flash' ROM or serial EEPROM, which may be electrically altered upon application of suitable control signals." Ex. 1006, 3:44–47, 4:47–50. Thus, contrary to Dr. Schaefer's testimony that Cohen states a preference for nonvolatile memory because it cannot be altered, Cohen expressly discloses using nonvolatile memory that can be altered, so that the system may not "be

easily defeated by opening the case of portable computer device 10 and temporarily removing the battery, rendering this information erased." Ex. 1006, 4:54–57. In further contrast to Dr. Schaefer's testimony, Dr. Zadok testifies that Jenne also discloses storing information in nonvolatile memory, such as nonvolatile random access memory (NVRAM) or a flash ROM. Ex 1003 ¶ 319 (citing Ex. 1005 ¶¶ 23, 27, Fig. 3). Dr. Zadok persuasively testifies that Cohen's disclosure of storing information in nonvolatile memory is consistent with Jenne's disclosure. Ex. 1003 ¶ 308.

We find Petitioner's reasoning to combine Jenne and Cohen to be persuasive. As Petitioner correctly points out (Pet. 19), Cohen expressly teaches that the benefits of displaying owner information with a password prompt when the computer is started are that "the likelihood that a lost or misplaced personal computer device will be returned to its owner [is] greatly enhanced and [that] ownership of otherwise fungible devices may be easily determined." Ex. 1006, 5:52–58; *see* Ex. 1003 ¶ 289 (Dr. Zadok testifying that Cohen's disclosure shows that a person of ordinary skill in the art would have been motivated to display owner information during boot-up). Thus, we find that Cohen's express disclosure provides a rationale for a person of ordinary skill in the art to display a particular type of information, specifically owner information, in the system of Jenne. We agree with Petitioner, that "the combination would have involved a simple substitution of a known generic element (Jenne's 'other information') with a specific type of information (Cohen's 'ownership indicia') to obtain predictable results." Pet. 20 (citing *KSR*, 550 U.S. at 415–16).

*(2) Owner*

Patent Owner argues that "[e]ach of the [challenged] [c]laims recites an 'owner' whose return/recovery information is displayed on the device," that "Petitioner relies on Jenne's 'computer manufacturer' for the 'owner' limitation," and that Jenne's manufacturer is not an owner. PO Resp. 26–28.

We disagree with this argument because Petitioner relies on Cohen to teach an owner and ownership indicia in combination with Jenne's teachings. *See* Pet. 18–19 (asserting that it would have been obvious to combine "Jenne's teaching of automatic display of remotely updateable messages during the boot process with Cohen's teaching of displaying ownership indicia messages with a security (lock) screen on every bootup"), 20 ("A [person of ordinary skill in the art] would have therefore found it straightforward to modify the information stored for display during boot-up in Jenne to include Cohen's indicia of ownership (e.g., address and phone number)."); *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (stating that each reference "must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole"); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (stating that, for obviousness, "the test is what the *combined teachings* of the references would have suggested to those of ordinary skill in the art" (emphasis added)).

Patent Owner argues that Petitioner "relied on Cohen's 'ownership indicia' to show the return/recovery information" but did not rely on Cohen's disclosure of an owner such as "John Smith" from Cohen's Figure 1 "to show the 'owner' or authorized agent limitation." PO Sur-reply 5–6 (citing Pet. 36). We disagree. Petitioner relies on Cohen to teach ownership information that is entered by the owner. *See* Pet. 16 ("In

Cohen, a 'textual indicia of personal ownership is entered by the owner of the system during set-up or during a configuration change and electronically stored within non-volatile memory.'" (quoting Ex. 1006, code (57))). Petitioner relies on Cohen's Figure 1 throughout the Petition to show the "owner" of the computer. *See* Pet. 17, 29, 31, 38.

We find that Cohen's disclosure teaches an "owner" under Patent Owner's construction because John Smith (Figure 1) is the person who owns the computer and, therefore, owns the program on the computer and also because John Smith controls the recovery service by entering his information.

*(3) Remotely Changing Return Information*

Patent Owner argues that Jenne "does not disclose *anything* about the display of 'return information.'" PO Resp. 28. Petitioner, however, relies on Cohen to teach the content of the information recited in the claims. *See, e.g.*, Pet. 19–20 (arguing that "it would have been trivial to modify Jenne to display Cohen's ownership indicia information because it would have involved merely substituting the content of the information to be displayed in Jenne"). We find that Cohen's ownership indicia, which includes the name, address, and phone number of the owner (*see* Ex. 1006, Fig. 1), as discussed in the previous section, teaches "computer recovery information," "recovery information," and "return information" under Patent Owner's proposed construction of "information provided by the owner so that the device can be returned to the owner."

Patent Owner argues that Cohen discloses displaying return information but only discloses inputting the information locally. PO Resp. 28–29 (citing Ex. 1006, 4:27–44). According to Patent Owner,

"Cohen does not even disclose that the user can change that information *locally*—rather, it appears to be permanent." PO Resp. 29. Patent Owner cites Dr. Schaefer's testimony that "Cohen is specifically designed to keep ownership indicia constant" and that Cohen prefers nonvolatile memory "because it cannot be altered." Ex. 2040 ¶ 54(b) (citing Ex. 1006, 2:31–35, 4:50–5:4), *quoted in* PO Resp. 29.

As discussed above in Section II.D.2.b.1, we do not credit this testimony from Dr. Schaefer because it is inconsistent with Cohen's disclosure. In particular, Cohen discloses "storing of the personal ownership indicia and password data within nonvolatile memory, such as ROM 26," which Cohen states "is preferably implemented utilizing so-called 'flash' ROM or serial EEPROM, which may be electrically altered upon application of suitable control signals." Ex. 1006, 3:44–47, 4:47–50. Thus, Cohen discloses using alterable nonvolatile memory to store ownership indicia.

We also disagree with Patent Owner's argument that Cohen discloses permanently setting the ownership information, which then cannot be altered. *See* PO Resp. 29; PO Sur-reply 10–11. Cohen discloses entering ownership information as part of a process depicted in Figure 3, and it states that "those skilled in the art will appreciate that an additional level of security, such as a secondary password, may be required to *alter* the ownership indicia which will be entered as part of this process." Ex. 1006, 4:23–26 (emphasis added). Patent Owner argues that Cohen's statement that "ownership indicia which will be entered" means that "ownership indicia *has not yet* been entered" and, therefore, that alteration here refers to the initial input of the ownership information. PO Sur-reply 10–11. We disagree with this reading of Cohen. Rather, we find that Cohen's use of the

term "alter" means that ownership information entered as part of the process of Figure 3 can be changed, which is why "an additional level of security, such as a secondary password," would be required over and above what is disclosed in Figure 3 with the entry of a password in block 36. Ex. 1006, 4:23–26.

Patent Owner argues that, "[a]t the time of invention (2002), it was wholly unconventional for a computer system to allow a device owner to remotely change return information over the Internet." PO Resp. 31. According to Patent Owner, Petitioner's assertion that it would have been obvious to combine Jenne's teachings of delivering advertisements with Cohen's teachings of locally inputting return information "is pure hindsight." PO Resp. 31.

We disagree with Patent Owner's arguments, which focus on the content of the information. As discussed above in Section II.D.2.b.1, Cohen discloses that the benefits of displaying owner information with a password prompt when the computer is started are that ownership of the computer can be determined and that the likelihood of return is increased. Ex. 1006, 5:52–58. As discussed above in Section II.D.2.a, Jenne discloses that the content of the information displayed can be remotely updated: "The computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password."). Jenne discloses that the displayed information can be advertising content but also recognizes that "other information could be displayed" and specifically identifies other content, "such as

announcements, useful productivity tips, utility enhancements and computer upgrades." Ex. 1005 ¶ 22. Based on these disclosures, we agree with Petitioner's argument that "it would have been trivial to modify Jenne to display Cohen's ownership indicia information because it would have involved merely substituting the content of the information to be displayed in Jenne (e.g., commercial/other information/announcements) with the message content disclosed in Cohen (e.g., personal ownership indicia)." *See* Pet. 19–20. As Petitioner correctly asserts, "the combination would have involved a simple substitution of a known generic element (Jenne's 'other information') with a specific type of information (Cohen's 'ownership indicia') to obtain predictable results." Pet. 20.

*(4) Without Assistance by the User*

Claim 1 recites "changing return information which appears on the display through remote communication without assistance by a user with the computer." Patent Owner argues that Jenne does not teach remotely changing information without assistance of a user because the computer user must log in and establish an Internet connection so that communication can occur, which Patent Owner contends is user assistance. PO Resp. 33–37. Patent Owner argues that the '287 patent allows an owner to push recovery information changes to the computer even when the user of the computer has not connected to the Internet, such as when a computer is found by someone who does not know the password and, therefore, cannot connect to the Internet. PO Resp. 34–35. According to Patent Owner,

> Nothing, other than turning on the computer, is required from the user. Hence, there is no "assistance." The owner may *push* return/recovery information to the device via the Internet, but the user does [not] need to establish that connection. This makes

> sense because the user does not and cannot have the password to gain access to the system and establish the connection.

PO Resp. 35.

We disagree with this argument because, as Petitioner correctly asserts, "[t]he language 'without assistance by a user' refers to the specific recited action of 'initiating or changing [return/recovery] information,' rather than to an unrecited action of establishing the remote communication in the first instance." *See* Pet. Reply 15 (second alteration in original). We do not view the claims as prohibiting all other user interactions.

Jenne's disclosure of checking for an internet connection before downloading any updates to the displayed information (Ex. 1005 ¶ 25, Fig. 1) is consistent with the updating process described in the following passage of the '287 patent:

> Using this unique communication power, both 'owner' and "assigned to" information can be uploaded to the recovery center and/or downloaded to the protected equipment in order to synchronize the international recovery center information and the recovery information displayed on the initial display 18 screen. (This is a combination of the PDA type of synchronization between the main computer 12 and the PDA, and the McAfee anti-virus software Internet updating capability where *every time you go on-line, your computer 12 automatically checks to make sure that you have the most current anti-virus software and automatically updates your computer 12 with the latest changes*.) Nobody has ever before considered or designed a product combining this type of communication ability with this type of recovery security program that seizes control of the display 18 monitor until a security prompt is satisfied. The Retriever design allows an equipment recovery capability that just does not exist on today's market, and is completely unique from all current products on the market[.]"

Ex. 1001, 14:47–15:7 (emphasis added). Thus, the ’287 patent explains that downloads of new information occur automatically when the user goes online.

Patent Owner argues that, “as anyone who has turned on a cellphone can attest, a connection can be established *automatically* without any involvement by the user. The user simply turns on the device.” PO Sur-reply 15 (citing Ex. 2048, 44:5–13, 45:2–15, 61:25–62:1). According to Patent Owner, “in many cases, there is no assistance in connecting to the Internet in a cellphone. Similarly, the Claims prohibit any assistance as part of the ‘remote communication’ process (other than turning on the device).” PO Sur-reply 15–16. The cited testimony from Dr. Zadok was in response to questions about how iPhones and smartphones operate and log on to networks. *See* Ex. 2048, 44:5–13 (question and answer about “iPhone or other smartphone”), 45:2–15 (question and answer about iPhone), 61:25–62:1 (answer about iPhone). Patent Owner does not direct us to any evidence that iPhones or other smartphones, to the extent they even existed “[a]t the time of invention (2002)” (PO Resp. 31), had such capabilities in 2002. We see no reason that we should interpret the claim to exclude the automatic updating functionality described in the specification of the ’287 patent. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (noting that interpreting a claim to exclude a preferred embodiment in the specification “is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case”).

Patent Owner also argues that the “prosecution history further demonstrates that no input or action by the user is needed to remotely initiate or change return/recovery information.” PO Resp. 35–36 (citing Ex. 1012

(prosecution history of related U.S. Patent 8,601,606), 143, 151–53, 2071, 2075, 2093). The arguments Patent Owner made during prosecution of related U.S. Patent 8,601,606 show that the language "without assistance by a user" was added to distinguish over prior art that allegedly required a user at the computer "to push an interrupt key to allow the owner to change the display from remote." Ex. 1012, 2093. In contrast, Jenne discloses remotely updating using a password without requiring the user at the computer to press a particular key to start the process. For example, Jenne explains that the "computer manufacturer may also check for updates and downloads in block 65 via a manufacturer password that only the manufacturer or its authorized agent possesses." Ex. 1005 ¶ 25; *see also* Ex. 1005 ¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password.").

Patent Owner also argues that Jenne's updating process relies on user feedback to tailor advertisements to a user's interests, which means the user provides assistance in updating the information. PO Resp. 37–39 (citing Ex. 1005 ¶¶ 20, 25, Fig. 1; Ex. 2040 ¶ 56(a)). This argument, however, does not respond to the asserted combination in which Petitioner relies on Jenne's disclosure of remotely updating displayed information by an authorized party in combination with Cohen's disclosure of an owner entering ownership information for display. *See* Pet. 32–34. Because, in Petitioner's proposed combination, the content of the information is ownership indicia entered by the owner, we disagree with Patent Owner's argument that, "without the user preferences and advertisements, the commercial message application [of Jenne] would not be built and would have nothing to execute." *See* PO Sur-reply 17.

In view of the foregoing, we find Jenne teaches changing the content of information through remote communication without assistance by a user with the computer, which in combination with Cohen's disclosure of changing ownership indicia, discussed above in Section II.D.2.b.4, teaches "changing return information which appears on the display through remote communication without assistance by a user with the computer," as recited in claim 1.

*(5) Remote Access Only by the Owner or Authorized Party*

Patent Owner argues that Jenne does not teach that the interactive program "is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen," as recited in claim 1 and similarly recited in claims 4 and 7. PO Resp. 39–42. According to Patent Owner, Jenne fails to teach this subject matter because "Jenne's user can 'uninstall or delete' the application" and thus has access to the application. PO Resp. 40 (citing Ex. 1005 ¶ 21; Ex. 2040 ¶ 57(a)). Patent Owner also argues that Jenne's disclosure that a premium user can enable or disable an advertisement shows access by someone other than the owner. PO Resp. 40–41 (citing Ex. 1005 ¶ 24).

Addressing similar arguments, the Institution Decision states that the claim limits "remote access," not all access. Inst. Dec. 24–25. Patent Owner disagrees and argues that claim 1's "lock screen" keeps unauthorized users off the system, "not allow[ing] local access to the interactive program, unless the security prompt is satisfied." PO Resp. 41–42. Petitioner, however, relies on Cohen to teach "a lock screen with password prompt displayed after the computer is powered on and before allowing a user to

access the operating system." Pet. 21 (citing Ex. 1006, Fig. 4 (steps 58, 60, 62)), 31 (citing Ex. 1006, Fig. 1), 37–38 (citing Ex. 1006, 5:28–37, Figs. 1, 4). Cohen's Figure 1 shows a screen that prompts the user for a password. *See* Ex. 1006, 5:28–37 ("Block 58 illustrates the prompting of the user for a password. . . . [I]n the event the appropriate password has been entered, the password passes to block 62. Block 62 illustrates the occurrence of normal processing in a manner well known to those having skill in this art."). Thus, the combination of Jenne and Cohen teaches restricting local access unless a security prompt is satisfied.

The claims do not specify that the "interactive program" cannot be accessed locally; rather, they specify that *remote* access is "only by the owner of the computer or the party authorized by the owner." Thus, Patent Owner's arguments regarding local access, including by a premium user in Jenne, are unavailing.

We find Petitioner's contentions for the remote access limitation persuasive. Jenne discloses that remote updating is done with a password. Ex. 1005 ¶¶ 13 ("The commercial messages in the non-volatile memory may be securely updated through the Internet using a password."), 25 ("The password may be used by the computer manufacturer or its authorized agent for securely updating the memory 520."). Thus, the entity having the password is the "party authorized by the owner." From the computer's perspective, authorization is determined by checking for the correct password. This is consistent with the '287 patent's disclosure that the software determines who "is in charge" based on who "uses the correct password." Ex. 1001, 15:33–41. In Petitioner's combination, Cohen's owner has remote access to change the content of the information displayed

(i.e., Cohen's ownership indicia). *See* Pet. 34 (arguing that Cohen's ownership indicia are entered by the owner and can be changed subsequently and that a person of ordinary skill in the art "would have been motivated to incorporate the capability to change the stored ownership information using Jenne's '*remote communication*' so that the most up-to-date ownership information is displayed when a device is lost or stolen" (citing Ex. 1005, code (57), ¶¶ 13, 21, 25; Ex. 1006, 4:23–26, 4:31–34; Ex. 1003 ¶¶ 303, 334)).

*(6) Summary of Findings*

Based on Petitioner's persuasive contentions and evidence discussed above, we find that the combination of Jenne and Cohen teaches the subject matter of claim 1. We find that Jenne's disclosure of displaying information during boot-up in combination with Cohen's disclosure of displaying owner information with a lock screen during boot-up teaches the preamble of claim 1 and the subject matter reciting

> activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying return information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the return information is visible to anyone viewing the display screen, the lock screen locks the display screen and protects the computer.

Ex. 1005 ¶ 13 (displaying messages during boot-up); Ex. 1006, Fig. 1 (lock screen with owner information and password prompt).

For the reasons discussed above in Sections II.D.2.b.2–5, we find that the combination of Jenne and Cohen teaches

> changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen.

We find that the combination of Jenne and Cohen teaches "displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer" because, as discussed above, Cohen teaches displaying the ownership indicia with a lock screen that has a password prompt. Ex. 1006, Fig. 1. We also find that Cohen's disclosure of the screen in Figure 1 showing the message "This system belongs to:" teaches "activating the processor to allow a warning message to the user."

We find that a person of ordinary skill in the art would have combined the teachings of Jenne and Cohen such that Cohen's ownership information would be displayed and could be remotely updated per Jenne's disclosure of remotely updating information that is displayed for the reasons discussed above. In particular, we find that Cohen's disclosure of the benefits of displaying owner information with a password prompt when the computer is started provides a reason to display ownership information in Jenne, as discussed above in Section II.D.2.b.1. As discussed above in Section II.D.2.b.3, we agree with Petitioner that substituting the content of information in Jenne with Cohen's ownership indicia would have been a trivial modification and a simple substitution of one type of information with another. *See* Pet. 19–20. We also find that it would have been obvious to employ a lock screen, as taught in Cohen, in the system of Jenne because it would have protected the computer, as taught in Cohen. *See* Ex. 1006, 1:32–

37 ("[T]he utilization of password protection schemes maintains the integrity of data and applications within such devices . . . ."), 5:28–37 (referring to Figure 4's process in which access to the computer is denied until entry of the correct password). We agree with Petitioner that a person of ordinary skill in the art would have had a reasonable expectation of success in making the combination to arrive at the claimed subject matter. *See* Pet. 21–22; Ex. 1003 ¶ 306.

*(7) Secondary Considerations*

Patent Owner contends that objective evidence of non-obviousness includes "praise Patent Owner received for her inventions, the inventions' commercial success, copying by others, and failure by others." PO Resp. 55–56; *see also* PO Sur-reply 24–26. Petitioner argues that Patent Owner has not established a nexus between the merits of the claimed invention and the objective evidence. Pet. Reply 25–27. We agree with Petitioner.

As stated by the Federal Circuit,

> For objective evidence of secondary considerations to be relevant, there must be a nexus between the merits of the claimed invention and the objective evidence. *See In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). A showing of nexus can be made in two ways: (1) via a presumption of nexus, or (2) via a showing that the evidence is a direct result of the unique characteristics of the claimed invention.
>
> A patent owner is entitled to a presumption of nexus when it shows that the asserted objective evidence is tied to a specific product that "embodies the claimed features, and is coextensive with them." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

*Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1210 (Fed. Cir. 2023). Furthermore, "even absent a presumption of nexus, 'the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.''" *Id.* (quoting *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019)).

Patent Owner argues that her "invention was commercialized under the name of 'The Retriever,'" which "practiced the '287 patent." PO Resp. 55 (citing Ex. 1001, 4:61). This is the extent of Patent Owner's argument supporting a presumption of nexus. Indeed, Patent Owner does not address coextensiveness at all. This is insufficient to show a presumption of nexus. *See Volvo Penta*, 81 F.4th at 1211 (finding that a one sentence assertion that a product embodies the claimed features of the Patent and is coextensive with them is insufficient to show a presumption of nexus).

Patent Owner's arguments also do not prove a nexus independently of a presumption. For example, Patent Owner argues that, "[i]n various news articles and television coverage, her products were praised for their ability to retrieve lost or stolen computers." PO Resp. 55 (citing Exs. 2042, 2043). Exhibit 2043 is a 2009 article titled "Talking software goes global" and mentions that the Retriever software has a "verbal alarm" and has the ability to "let[] law enforcement pinpoint the physical location of a stolen computer." Exhibit 2042, a 2009 Associated Press article titled "Stop thief! Software lets stolen laptops speak up," also discusses an audio alert that a stolen laptop can play. These articles indicate that non-patented features were the object of any alleged praise. Indeed, Exhibit 2043 states that,

"[s]ince Front Door Software Inc. launched the verbal alarm with a software upgrade on Thursday, Feb. 26, the story about the talking laptop software has been published around the world." This suggests that the verbal alarm upgrade to the Retriever software resulted in any alleged praise.

Patent Owner also argues that she "received multiple awards for her products" and that her company "placed first out of 175 companies as the top start-up at a pitch contest in San Francisco." PO Resp. 55 (citing Ex. 2044). Patent Owner does not cite evidence to support the assertion regarding "multiple awards." The pitch contest brochure introduces the Front Door Software product as follows:

> A patent pending laptop tracking and recovery program combined with one of the most powerful targeted opt-in page view delivery capabilities ever! By moving delivery out to the computer ON button, every 15,000 users using our free version automatically generates over 1 million page views @ mo. and over 50 million page views @ user license lifetime! http://vator.co/frontdoorsoftware.

Ex. 2044 at 8. This summary appears to focus more on the potential for page views than on the claimed features and in that regard is similar to Jenne's teachings of showing messages to a "captive audience" during boot-up. Ex. 1005 ¶ 21; *see* PO Resp. 6–7 (describing Jenne's teachings of monetizing user wait times).

Patent Owner also argues the following:

> Patent Owner's products were downloaded and successfully used by thousands of people in over 100 countries. Ex. 2045. Patent Owner tracked how often her customers' devices would display return/recovery information, and such information was displayed millions of times per year. Patent Owner's customers included major universities. *Id.* Patent

> Owner's company generated hundreds of thousands of dollars in revenue from the sale of its products. *Id.*

PO Resp. 55. Exhibit 2045 appears to be a printout of a Front Door Software website from 2013 that lists certain institutional customers and countries where the software is deployed. The printout states the following:

> We cannot tell where the majority of our customers are coming from unless they list their organization. We do know that we have had over 6 million customer visits to our web site in the past year and customers from over 100 countries and nations around the world are creating accounts in record numbers every day.

Ex. 2045 at 1 (emphasis omitted). The only specific evidence here is that there were over six million visits to the website. This is insufficient evidence to show commercial success tied to the merits of the invention. *Cf. Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed. Cir. 1983) ("The evidence of commercial success consisted solely of the number of units sold. There was no evidence of market share, of growth in market share, of replacing earlier units sold by others or of dollar amounts, and no evidence of a nexus between sales and the merits of the invention.").

Patent Owner further argues that "Microsoft did not release its Find My Device product for laptops until 2015, and Google did not release its Find My Device product for smartphones and tablets until 2013. Ex. 2046, Ex. 2047." PO Resp. 55. Patent Owner does not explain how Google's and Microsoft's Find My Device features are evidence of non-obviousness of the '287 patent claims. According to Exhibit 2046, "Find My Device in Windows 10 doesn't do a whole lot right now. There isn't a way to have your tablet make a sound, lock itself, erase data, or anything like that. Instead, you can only find out where its last known general location was."

Ex. 2046 at 1. According to Exhibit 2047, the Android Device Manager "lets you locate your Android device on a map, see when it was last located and when it was last used, as well as ring, lock and wipe the device." Ex. 2047 at 1. Thus, it appears that the Microsoft and Google features are for finding a device by ascertaining the location of the device, which is not a feature of the claims.

Finally, Patent Owner does not provide evidentiary support for her assertion that "the subject matter claimed in the '287 patent is now included or may be downloaded on virtually every smartphone, laptop, tablet, and personal computer today." *See* PO Resp. 56.

For the reasons discussed above, we find that Patent Owner has not provided objective evidence of non-obviousness that has a nexus to the claimed invention.

*c) Conclusion for Claim 1*

We find that the combination of Jenne and Cohen teaches the subject matter recited in claim 1 and that a person of ordinary skill in the art would have combined the teachings of Jenne and Cohen in the manner asserted by Petitioner with a reasonable expectation of success in arriving at the subject matter recited in claim 1. Patent Owner's asserted objective evidence of non-obviousness lacks nexus and does not undermine Petitioner's showing. Therefore, we conclude that the subject matter of claim 1 would have been obvious based on the combined teachings of Jenne and Cohen.

*3. Claims 2–7*

Independent claim 4 is directed to an apparatus for displaying and remotely changing "computer recovery information," "recovery information," or "return information," and independent claim 7 is directed to

a computer program for displaying and remotely changing "recovery information" or "return information." These independent claims recite subject matter substantially similar to claim 1, and the parties' arguments for claim 1 apply to claims 4 and 7. *See* Pet. 13–40; PO Resp. 26–43.

For the reasons explained above in Section II.D.2 and based on Petitioner's persuasive contentions and evidence, we conclude that the subject matter of claims 4 and 7 would have been obvious based on the combined teachings of Jenne and Cohen.

Claim 2 depends from claim 1 and recites "selecting by the owner or user an Internet link on the screen, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is automatically able to access the computer and the Internet location associated with the Internet link." Claim 5 depends from claim 4 and similarly recites "wherein the display includes an Internet link that can be selected by the owner or user, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is able to access the computer and the Internet location associated with the Internet link."

Petitioner argues that, based on Jenne's disclosure of an Internet browser connected to the Internet for a user to access a website, a person of ordinary skill in the art "would have been motivated to include an active, user-selectable, '*Internet link*' on the displayed return/recovery screen" "to allow an individual finding a lost or stolen computer to immediately access information or resources to assist with the return, rather than making the user contact the owner later through a different mechanism (e.g., phone call or postal mail)." Pet. 41–42 (citing Ex. 1005 ¶¶ 18, 27; Ex. 1003 ¶¶ 369–373).

Claim 3 depends from claim 1 and recites "wherein the screen having an active link allowing remote communication to a remote server which provides return information to facilitate return of the computer." Claim 6 depends from claim 4 and similarly recites "wherein the display having an active link to allow remote communication to the remote server which provides recovery information to facilitate return of the computer."

Citing Jenne's disclosure that a user "may be directed to other advertisements through links" (Ex. 1005 ¶ 18), Petitioner argues that such links are active links and that it would have been obvious that such links go to information hosted on a remote server. Pet. 42–44 (citing Ex. 1003 ¶¶ 379–381). Petitioner argues that it "would have been well within the ordinary creativity of a [person of ordinary skill in the art] to include an active Internet link on the display screen as taught by Jenne with more specific return/recovery information," which a person of ordinary skill in the art would have done "to allow an individual finding a lost or stolen computer to immediately access information or resources to assist with the return, rather than making the user contact the owner later through a different mechanism (e.g., phone call or postal mail)." Pet. 44 (citing Ex. 1003 ¶¶ 374–382).

Patent Owner does not separately argue claims 2, 3, 5, and 6. *See* PO Resp.

We find Petitioner's contentions and evidence, summarized above, persuasive, and we conclude that the subject matter of claims 2, 3, 5, and 6 would have been obvious based on the combined teachings of Jenne and Cohen.

### *E. Remaining Grounds*

As noted above in Section I.A, Petitioner presents additional grounds of unpatentability. Because we determine that all challenged claims are unpatentable as discussed above, we need not separately assess the remaining grounds. 35 U.S.C. § 318(a) ("If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)."); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (nonprecedential) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

## III. CONCLUSION

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that claims 1–7 of the '287 patent are unpatentable, as summarized in the following tables:

**IPR2022-01192**

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claim(s) Shown Unpatentable** | **Claim(s) Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–7 | 103(a) | Jenne, Cohen | 1–7 | |
| 1, 4, 7 | 103(a) | Angelo, Helle[11] | | |
| **Overall Outcome** | | | 1–7 | |

[11] As explained above, because we determine that the challenged claims are unpatentable based on the combination of Jenne and Cohen, we decline to address this ground and the grounds raised in IPR2022-01193.

**IPR2022-01193**

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7 | 102(a)(1) | Hafeman 670 | | |
| 1, 4, 7 | 103(a) | Hafeman 298, Chiu | | |

IV. ORDER

Accordingly, it is

ORDERED that Petitioner's request to consolidate these proceedings is granted;

FURTHER ORDERED that claims 1–7 of the '287 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Matthew A. Smith
Andrew S. Baluch
SMITH BALUCH LLP
smith@smithbaluch.com
baluch@smithbaluch.com

Kirstin Stoll-DeBell
Carrie Beyer
FAEGRE DRINKER BIDDLE & REATH LLP
Kirstin.stolldebell@faegredrinker.com
Carrie.beyer@faegredrinker.com

FOR PATENT OWNER:

Stephen Underwood
Jason Linger
GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO LLP
sunderwood@glaserweil.com
jlinger@glaserweil.com

US010325122B2

(12) **United States Patent**
**Hafeman**

(10) **Patent No.: US 10,325,122 B2**
(45) **Date of Patent: *Jun. 18, 2019**

(54) **COMPUTER RECOVERY OR RETURN**

(71) Applicant: **Carolyn W. Hafeman**, Evergreen, CO (US)

(72) Inventor: **Carolyn W. Hafeman**, Evergreen, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/864,749**

(22) Filed: **Jan. 8, 2018**

(65) **Prior Publication Data**

US 2018/0137312 A1 May 17, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/601,645, filed on May 22, 2017, now Pat. No. 9,892,287, which is a continuation of application No. 15/199,316, filed on Jun. 30, 2016, now Pat. No. 9,672,388, which is a continuation of application No. 14/691,222, filed on Apr. 20, 2015, now Pat. No. 9,390,296, which is a continuation of application No. 14/087,866, filed on Nov. 22, 2013, now Pat. No. 9,021,610, which is a continuation of application No. 10/945,332, filed on Sep. 20, 2004, now Pat. No. 8,601,606, which is a continuation-in-part of application No. 10/304,827, filed on Nov. 25, 2002, now abandoned.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 17/22*** | (2006.01) |
| ***G06F 21/31*** | (2013.01) |
| ***G06F 21/51*** | (2013.01) |
| ***G06F 21/57*** | (2013.01) |
| ***G06F 21/62*** | (2013.01) |
| ***G06F 21/88*** | (2013.01) |

(52) **U.S. Cl.**

CPC .......... ***G06F 21/88*** (2013.01); ***G06F 17/2235*** (2013.01); ***G06F 21/31*** (2013.01); ***G06F 21/51*** (2013.01); ***G06F 21/575*** (2013.01); ***G06F 21/6218*** (2013.01); *G06F 2221/2117* (2013.01)

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,715,174 A 2/1998 Cotichini
5,748,084 A 5/1998 Isikoff
(Continued)

OTHER PUBLICATIONS

Crouch, "Tips for keeping a leash on your PDA's data," Network World, Dialog text search, p. 1-3, (Feb. 9, 2001).

*Primary Examiner* — Christopher A Revak
(74) *Attorney, Agent, or Firm* — Ansel M. Schwartz

(57) **ABSTRACT**

A computer return apparatus includes a processor. The apparatus includes a memory connected to the processor. The apparatus includes a display. The apparatus includes a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in the memory. A method for displaying information to assist with returning a computer to its owner.

**7 Claims, 10 Drawing Sheets**






EX-1001
US Patent 10,325,122

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,764,892 | A | 6/1998 | Cain | |
| 5,802,280 | A | 9/1998 | Cotichini | |
| 5,896,497 | A | 4/1999 | Halstead | |
| 5,987,609 | A | 11/1999 | Hasebe | |
| 6,087,937 | A | 7/2000 | McCarthy | |
| 6,244,758 | B1 | 6/2001 | Solymar | |
| 6,269,392 | B1 | 7/2001 | Cotichini | |
| 6,300,863 | B1 | 10/2001 | Cotichini | |
| 6,300,946 | B1 | 10/2001 | Lincke et al. | |
| 6,507,914 | B1 | 1/2003 | Cain | |
| 6,601,095 | B1 * | 7/2003 | Duffield | G06F 9/44505 709/222 |
| 6,609,656 | B1 | 8/2003 | Elledge | |
| 6,662,023 | B1 | 12/2003 | Helle | |
| 6,725,339 | B2 | 4/2004 | Dailey | |
| 6,804,699 | B1 | 10/2004 | Henrie | |
| 6,832,320 | B1 * | 12/2004 | Broyles, III | G06F 21/88 713/155 |
| 7,107,349 | B2 | 9/2006 | Britt, Jr. | |
| 7,752,288 | B2 | 7/2010 | Mihira | |
| 7,818,557 | B2 | 10/2010 | Bestmann | |
| 7,818,803 | B2 | 10/2010 | Gordon | |
| 7,945,709 | B2 | 5/2011 | Cain | |
| 8,062,380 | B2 | 11/2011 | Stevens | |
| 8,234,359 | B2 | 7/2012 | Bestmann | |
| 8,241,369 | B2 | 8/2012 | Stevens | |
| 8,307,055 | B2 | 11/2012 | Banga | |
| 8,317,878 | B2 | 11/2012 | Chhabra | |
| 8,332,953 | B2 | 12/2012 | Lemieux | |
| 8,346,234 | B2 | 1/2013 | Banga | |
| 8,362,901 | B2 | 1/2013 | Jung | |
| 8,418,226 | B2 | 4/2013 | Gardner | |
| 8,419,806 | B2 | 4/2013 | Chase | |
| 8,441,348 | B2 | 5/2013 | Loveland | |
| 8,510,825 | B2 | 8/2013 | Tarkhanyan | |
| 8,528,105 | B1 | 9/2013 | Miller | |
| 8,601,606 | B2 * | 12/2013 | Hafeman | G06F 21/88 726/34 |
| 8,721,738 | B1 | 5/2014 | Miller | |
| 9,021,610 | B2 * | 4/2015 | Hafeman | G06F 21/88 726/34 |
| 9,390,296 | B2 * | 7/2016 | Hafeman | G06F 21/88 |
| 9,558,338 | B2 * | 1/2017 | Lee | G06F 21/60 |
| 9,672,388 | B2 * | 6/2017 | Hafeman | G06F 21/88 |
| 9,892,287 | B2 * | 2/2018 | Hafeman | G06F 21/88 |
| 2004/0103298 | A1 | 5/2004 | Hafeman | |
| 2015/0319178 | A1 | 11/2015 | Desai | |
| 2018/0124232 | A1 * | 5/2018 | Tokutake | H04L 63/0861 |

* cited by examiner


10
12
14
PROCESSOR
16
MEMORY
CHANGING MEANS
CAUSING MEANS
22
SOFTWARE PROGRAM
24
PRIMARY OPERATING SYSTEM
18
DISPLAY
RETURN SCREEN
20
OPERATING SCREEN
26
REMOTE STATION
CHANGING MEANS

FIG.1

Workstation Locked

[Picture]
Red Stop
Sign w/white
word STOP

The Retriever by WorldsecurityCorp.com

The workstation has been locked. This equipment is protected against theft by the World Security Corp. International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.

---

To Indentify Rightful Owner & Avoid Prosecution CALL NOW :

[Recovery Name/(input from database / required)]
[Organization Name / ABC Corp/ input/ not required]
[Address 1 / input from database / not required]
[Address 2 / input from database / not required]
[City] [State] [Zip / all of these input from database / not required
[Phone 1 / input from database / required][Phone 2 / not required]
[Email / input from database / required][Fax / not required]

OR VISIT

[Picture]
Retriever Logo

www.worldsecuritycorp.com/lostandfound.html
Email : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx

Registration # : xxxxxxxxxxxxxxxx (sequential number unique to each software license

User : [ ______________ ]

Password : [ ______________ ]

[OK]
(moves user to operating system with correct password)

[SHUTDOWN]
(initiates operating system shutdown)

*FIG. 2*


Turn Computer On
Recovery / Return Dialog Box appears on monitor's display screen.
(Occurs before or with Password or Security Prompt : Dialog Box)
Computer Password or Security Prompt Dialog Box Prompt Screen
(Can appear as a screen after the Recovery / Return Dialog box or preferably at the bottom of the Recovery/Return Dialog Box as in Sample 1 above)
[OK] [SHUTDOWN]
User enters computer operating system to access programs and information.
Windows or Other Operating System Standard Shutdown Computer Screen
(*) Shutdown
( ) Shutdown and Reboot
[OK]
[CANCEL]
(Shuts down computer)
(Returns back to previous screen)
Back up to previous screen.

FIG. 3


Turn Computer On
Welcome
[Picture] Windows hand with key
Press [CTRL + ALT + DEL] to Logon.
C 2002-200_ World Computer Security Corp
Distribuited by www.worldsecuritycorp.com
Telephone : (303) 670-8800
[Picture] Retriever Logo
Recovery/Return Dialog Box appears on monitor's display screen.
(Occurs before or with password or Security Prompt Dialog Box)
Computer Password or Security Dialog Box Prompt Screen
(Can appear as a screen after the Recovery/Return Dialog box or preferably at the bottom of the Recovery/Return Dialog Box)

*FIG. 4*


Computer Monitor Screen
at Operating System Screen
MS Word >
MS Excel >
Programs >
Administration Section >
Find >
DVD Player >
Help >
Etc ... >
Run >
START

FIG. 5


Windows Logon
[Picture]
Keys
Enter a valid user name and password to logon to this system :
User : [ ]
Password : [ ]
[Picture]
Retriever Logo
[OK]
[CANCEL]
[SHUTDOWN]

FIG. 7


Workstation Locked
[Picture] Red Stop Sign w/white word STOP
The Retriever by WorldsecurityCorp.com
The workstation has been locked. This equipment is protected against theft by the World Security Corp. International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.
To Indentify Rightful Owner & Avoid Prosecution CALL NOW :
[Recovery Name/(input from database / required)]
[Organization Name / ABC Corp/ input/ not required]
[Address 1 / input from database / not required]
[Address 2 / input from database / not required]
[City] [State] [Zip / all of these input from database / not required
[Phone 1 / input from database / required][Phone 2 / not required]
[Email / input from database / required][Fax / not required]
OR VISIT
[Picture] Retriever Logo
www.worldsecuritycorp.com/lostandfound.html
Email : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx
Registration # : xxxxxxxxxxxxxxxx
PRESS
[OK]
[CANCEL]
[SHUTDOWN]

FIG.6



The Retriever Owner Administration
Logo
Last login: Date, Time, Time Zone/ex. Oct 27, 2003 14:41 MST
Customer# : Appears and is protected/ex. 54658653
Log-Off
Select Registration # for global or single update :
?
Select Scroll
Edit All/Global Edit-----------0
100012345--Assigned To---Dept---0
100012346--Assigned To---Dept---0
Edit Record
Cancel
Update/Save
Clear All Fields
Reported
Report Lost/Stolen
X
Report Equip Sold
X
Export Record
Report All
OR select the
Browse List View
button to see entire list.
Selected Registration # Displayed
Owner Display Recovery Info
Assigned to Display Recovery Info
Property of :
Owner Contact : *
Owner Phone : *
Owner Email : *
Assigned To :
Department :
Phone :
Email :
* Required
CHANGE OWNER PASSWORD
CHANGE/CLEAR "ASSIGNED TO" PASSWORD


FIG.8


The Retriever "Assigned To" Administration
Log-Off
Assigned TO : Appears and is protected / ex. Sam Stoneworth
Department : Appears and is protected / ex. Harvard Law Dept
Logo
Edit Record
Cancel
Update/Save
Assigned to Display Recovery Info
Phone :
Email :
CHANGE ASSIGNED TO PASSWORD
Screensaver Automatic
Log Off Time: ?
seconds
www.worldsecuritycorp.com (add to the bottom of every page)

*FIG.9*


Windows Logon
The RETRIEVER from World Security Corp
[Stop Sign]
Enter a valid user name and password to log on this system.
Sign On
Name :
Password :
PRESS :
OK
CANCEL
SHUTDOWN
Correct PW
Incorrect PW
This equipment is protected against theft by the World Security Corp International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.
To Identify Rightful Owner, Collect Reward & Avoid Prosecution CALL NOW :
Owner Info:
Property of ABC Corporation
Bill Smith, Security Dept
800-222-1234
itadmin@abccorp.com
AD SPACE
Assigned To:
Carrie Hafeman
303-670-8800
lightguardian@msn.com
AD SPACE
Distributed by
AD SPACE
OR VISIT
Web Site : www.worldsecuritycorp.com/lostandfound/html
Emai : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx
The Retriever
Registration # : xxxxxxxxxxxxxxxxxxxxxx

*FIG.10*


Workstation Locked
The RETRIEVER from World Security Corp
[Stop Sign]
Enter a valid user name and password to log on this system.
Sign On
Name :
Password :
PRESS :
OK
CANCEL
SHUTDOWN
Correct PW
Incorrect PW
This equipment is protected against theft by the World Security Corp International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.
To Identify Rightful Owner, Collect Reward & Avoid Prosecution CALL NOW :
Owner Info:
Property of ABC Corporation
Bill Smith, Security Dept
800-222-1234
itadmin@abccorp.com
AD SPACE
Assigned To:
Carrie Hafeman
303-670-8800
lightguardian@msn.com
AD SPACE
Distributed by
AD SPACE
OR VISIT
Web Site :
www.worldsecuritycorp.com/lostandfound/html
Emai :
lostandfound@worldsecuritycorp.com
Phone :
1-800-xxx-xxxx
The Retriever
Registration # : xxxxxxxxxxxxxxxxxxxxxx

*FIG.11*

# COMPUTER RECOVERY OR RETURN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of U.S. patent application Ser. No. 15/601,645 filed May 22, 2017, which is a continuation of U.S. patent application Ser. No. 15/199,316 filed Jun. 30, 2016, now U.S. Pat. No. 9,672,388 issued Jun. 6, 2017, which is a continuation of U.S. patent application Ser. No. 14/691,222 filed Apr. 20, 2015, now U.S. Pat. No. 9,390,296 issued Jul. 12, 2016, which is a continuation of U.S. patent application Ser. No. 14/087,866 filed Nov. 22, 2013, now U.S. Pat. No. 9,021,610 issued Apr. 28, 2015, which is a continuation of U.S. patent application Ser. No. 10/945,332 filed Sep. 20, 2004, now U.S. Pat. No. 8,601,606 issued Dec. 3, 2013, which is a continuation-in-part of U.S. patent application Ser. No. 10/304,827 filed Nov. 25, 2002, all of which are incorporated by reference herein.

## FIELD OF THE INVENTION

The present invention is related to the return of lost or stolen computers. More specifically, the present invention is related to the return of lost or stolen computers using a recovery screen that appears during or after boot-up of the computer.

## BACKGROUND OF THE INVENTION

Current methods of computer return or recovery products include:

(1) Physical labels that attach to the outside hardware of the computer equipment.

These hardware labels can contain custom recovery information, but because they are hardware based, they can not be interactively changed by the owner.

Also, since they do not have any ability to affect the computer boot-up process, they can do nothing to help protect the confidential owner information on the hard drive. An example of a well known physical hardware/recovery label is the STOP Tag by Security Tracking of Office Property in Connecticut. This labeling system has been patented in France, the US, and other countries. The product can be easily defeated by removing the physical label. In the case of STOP Tag which includes a 'recovery mark' which states "STOLEN PROPERTY" underneath the label, a new label can be simply added over the 'recovery mark' to hide the STOLEN PROPERTY sign. (The Security Tracking of Office Property equipment recovery patent is U.S. Pat. No. 5,163,711 This patent actually refers to how the labels adhere to the equipment—but this is their patent).

The computer security recovery/return program of the present invention utilizes this type of hardware recovery approach to a small degree, but is greatly different from this system, because this is a software program rather than a hardware solution. Additionally, the present invention is greatly superior, since the owner can interactively customize the return/recovery information displayed at any time, and the present invention also helps protect the important, confidential owner information on the hard drive, by the positioning of the program layer in the equipment boot-up process.

(2) Computer Software Programs that attempt recovery through the use of the modem.



There are several patented computer security software products on the market today that are designed for the purpose of recovering lost or stolen equipment. These programs use the computer's modem to regularly call a recovery center. Then once a computer is stolen, the recovery center waits for the stolen computer to call in. When the computer modem calls in, the recovery centers use something similar to the reverse 911 system to get the phone number that the stolen equipment is accessing. Using the phone number, the recovery system then can try to get a map of where the computer is. Some of these computer security recovery programs can also attempt to locate stolen computers through an IP address. Some of these computer security recovery software programs, can actually attempt to seize the communication between the stolen computer and the recovery center and delete selected files to help protect the owner's confidential information. Products like these include CompuTrace, PC Phone Home, CyberAngel, LapTrak and Luceria.

The present invention is also designed for the purpose of recovering lost or stolen equipment, but the method is distinctively different and unique from the current methods. The present invention does not rely on the use of the computer modem. The present invention uses a layered program in the boot-up process to provide a display of the proper owner recovery and return information using the computer's own monitor or screen. The present invention is also different and superior to the above software tracking products, in helping to accomplish international recovery. None of the above products to date have been able to use the modem phone or IP system to track stolen equipment internationally. The present invention provides international recovery by displaying owner email information as well as providing recovery help through an international recovery internet web site.

There are other differences as well in how these programs try to also protect the information on the hard drive. The present invention automatically initiates during the boot-up process of the equipment, in order to display the recovery/return information before a security prompt screen to always help protect the owner's confidential information on the hard drive. Some of the programs above do nothing to protect the user information. Others like LapTrak include a Hide-A-File feature that an owner can access after the user enters the operating system. CyberAngel includes an encryption feature. Luceria includes the ability to delete preselected files from the recovery center. By layering this computer security application strategically before or during a security prompt in the boot-up process, this application provides a unique and different method to help protect owner information.

(An example of patents for these types of products would be the CompuTrace U.S. Pat. Nos. 5,715,174, 5,764,892, and 5,802,280).

(3) Bios Based Password Identification systems.

There are some computers that are sold with Bios based identification systems included. These products activate immediately when a computer is turned on, and prompt the user for a password before accessing the data on the computer.

The present invention is very different and unique from the Bios based program, for many reasons. Most importantly the bios based password identification products are built into the hardware of the computer equipment—not the hard drive. In other words, if you

removed the hard drive from a stolen or lost laptop, and inserted the stolen hard drive into a different laptop, you would bypass the bios based password identification system, and the bios based password identification system would remain with the original equipment. Thus, the Bios Based Password Identification system can identify the computer hardware, but not the hard drive (the most important part of the computer equipment).

In addition, the Bios Based Password Identification systems are designed as a unique method for providing an additional layer of password protection to the equipment hardware, but are not designed for recovery or return. There is no design for including complete owner information, no recovery information displayed, no effective protection of the information on the hard drive, no effective method for the recovery or return of the hard drive—the most important item that a consumer would want back. In fact the Bios Password Identification product occurs before allowing the hard drive to boot up. The present invention is unique because it is an application software program that provides its layer of protection during the hoot-up process (not before), and thus allows the security product to move with the hard drive, the most critical part of the computer.

## SUMMARY OF THE INVENTION

The present invention pertains to a computer return apparatus. The apparatus comprises a processor. The apparatus comprises a memory connected to the processor. The apparatus comprises a display. The apparatus comprises a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that displays ownership information concerning who owns the computer and return information for returning the computer to the owner from data stored in the memory.

The present invention pertains to a method for returning a computer to its owner. The method comprises the steps of activating a computer. Then there is the step of displaying automatically a return screen on a display of the computer during or after boot-up of the computer, which displays information concerning owner information about who owns the computer and return information for returning the computer to the owner from data stored in the memory of the computer.

The present invention pertains to a computer readable medium whose contents cause a computer to show who is its owner by performing the steps of activating a computer. Then there is the step of displaying automatically a return screen on a display of the computer during or after boot-up of the computer, which displays information concerning owner information about who owns the computer and return information for returning the computer to the owner from data stored in the memory of the computer.

The present invention pertains to a computer return apparatus. The apparatus comprises a processor. The apparatus comprises a memory connected to the processor. The apparatus comprises a display. The apparatus comprises a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in the memory.



The present invention pertains to a method for displaying information to assist with returning a computer to its owner. The method comprises the steps of activating a computer. There is the step of displaying automatically a return screen on a display of the computer during or after boot-up which displays information concerning owner information about who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in a memory of the computer.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings, the preferred embodiment of the invention and preferred methods of practicing the invention are illustrated in which:

FIG. **1** is a schematic representation of the apparatus of the present invention.

FIG. **2** is a representation of a return/recovery dialog box of an embodiment of the present invention.

FIG. **3** is a flow chart regarding an embodiment of the present invention.

FIG. **4** is a flow chart regarding a second embodiment of the present invention.

FIG. **5** is a representation of an administration program section of the present invention.

FIG. **6** is a representation of a return screen of the present invention.

FIG. **7** is an example of a password screen utilized by the present invention.

FIG. **8** is a return administration screen of the present invention.

FIG. **9** is a second return administration screen of the present invention.

FIG. **10** is a third return administration screen of the present invention.

FIG. **11** is a fourth return administration screen of the present invention.

## DETAILED DESCRIPTION

Referring now to the drawings wherein like reference numerals refer to similar or identical parts throughout the several views, and more specifically to FIG. **1** thereof, there is shown a computer **12** return apparatus **10**. The apparatus **10** comprises a processor **14**. The apparatus **10** comprises a memory **16** connected to the processor **14**. The apparatus **10** comprises a display **18**. The apparatus **10** comprises a return screen **20** that the processor **14** automatically causes to appear during or after boot-up of the processor **14** on the display **18**, that displays ownership information concerning who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16**. The Owner is defined as the person or entity that owns, rents, or licenses the Retriever, and/or the person or entity who controls the recovery service. The Owner has greater control over the computer **12** than the user. This could include, but not be limited to, an employee of a company that owns the computer **12**, or an agent of the owner or a friend that has the permission of the owner to use or have or recover the computer **12**.

Preferably, the apparatus **10** includes means for causing the screen to appear on the display **18** with the owner and return information. The causing means **22** is stored in the memory **16**. The causing means **22** preferably is a software program **24**. Preferably, the memory **16** includes a primary operating system having an operating screen **26** for the

computer **12**, and the return screen **20** appears on the display **18** before the operating screen **26** of the operating system appears on the display **18**.

The software program **24** preferably appears before a security prompt such as a password to be entered to obtain access to the primary operating system of the computer **12**. Preferably, the software program **24** allows the owner to change the return information and the owner information, after the password or security prompt is satisfied for the computer **12**. The software program **24** is preferably able to communicate through a modem (or wireless) to a predetermined location to transfer the return information to the location to facilitate return of the computer **12** if it becomes lost by the owner.

The present invention pertains to a method for returning a computer **12** to its owner. The method comprises the steps of activating a computer **12**. Then there is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up of the computer **12**, which displays information concerning owner information about who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16** of the computer **12**.

Preferably, the displaying step includes the step of displaying automatically the return screen **20** before an operating screen **26** of the primary operating system of the computer **12**. There is preferably the step of displaying the return screen **20** before satisfying a security prompt such as entering a password into the computer **12** to access the primary operating system. Preferably, there is the step of changing the return information, and the owner information after the step of satisfying a security prompt such as entering the password into the computer **12**.

The present invention pertains to a computer **12** readable medium whose contents cause a computer **12** to show who is its owner by performing the steps of activating a computer **12**. Then there is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up of the computer **12**, which displays information concerning owner information about who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16** of the computer **12**.

Preferably, the displaying step includes the step of displaying automatically the return screen **20** before an operating screen **26** of the primary operating system of the computer **12**. There is preferably the step of displaying the return screen **20** before satisfying a security prompt such as entering a password into the computer **12** to access the primary operating system. Preferably, there is the step of changing the return information and the owner information after the step of satisfying a security prompt such as entering a password into the computer **12**.

In the operation of the invention, first, the owner of the computer **12** would install the computer **12** security recovery/return software program **24** application. The program could be installed to work on any type of computer **12** screen including but not limited to, PC's, laptops, handheld computers (such as blackberries, palm pilots), UPS computerized handheld tracking display units, and even cell phone displays. The unique recovery/return computer **12** security program could in fact, be installed and used by any type of computer **12** that utilized a monitor display screen. The software application program provides an additional layer to the existing operating system of each computer **12**. The coding language used for the software program **24** could and would vary depending upon the computer **12** equipment, but the core structure of how the program operates would be similar in all items.

Once the computer **12** security software program **24** is installed, the monitor of the computer **12** will display the complete and current recovery/return information that the program has allowed the owner of the equipment to interactively enter, change and update at anytime.

This "on the fly" ability to change owner recovery information to aid return of equipment is an important feature for anyone, including college students who travel from home to college during different parts of the year, people who move, and particularly business people who travel throughout the world. The recovery/return information would not only allow the display **18** of physical address return information, and owner contact telephone information, but would also provide for international internet based recovery through the added display **18** of owner email information, as well as the ability to display an international recovery center web site.

In addition to increasing chances of return and recovery of the stolen or lost equipment by using the computer's **12** display **18** monitor, the program is an additional programming layer added into the initial start up program of the computer **12**, so that the recovery/return display **18** information occurs during or before a password or security prompt screen. This is an important feature that helps create an environment whereby the individual that happens upon a stolen or lost piece of equipment will see the owner recovery/return information displayed before a password or security prompt screen. By automatically initiating this program during or before a user's security prompt, such as a password screen program, the recovery/return program will not only increase chances of recovery, but will also increase chances that the computer **12** information on the hard drive is protected while the computer **12** is not in the owner's possession.

For example, the actual step by step operation of the program is as follows:

(1) Someone finds a lost or stolen computer **12**. The person who finds the computer **12**, turns the computer **12** on.

(The software program **24** could be provided with a warning sticker that will be placed on the outside of the equipment telling anyone finding the equipment, about the program and the display recovery screen.)

(2) The computer **12** display **18** screen turns on. The computer **12** security software return/recovery program automatically initiates during the computer's **12** boot-up process.

(3) As the computer **12** booting up process moves the user to a password or security prompt screen, the computer **12** security software program **24** displays a dialog box which includes owner recovery and return information, so that the person finding the equipment can return the equipment either directly or through the international web site recovery center. The information screen can include any of the following items of information that the owner would like displayed including but not limited to: contact name, organization name, owner address, owner telephone number, owner email, international web site recovery site, international recovery email information, unique program seriallregistration number. (See FIG. **2**).

Virtually all of this information would have been interactively inputted by the owner, and the owner would have control over how much recovery information is displayed. (This is important, because some owners

would like all the available information displayed, and others would not. For example, a U.S. secret service agent, accountant, or military personnel, might only want his name and phone number displayed, and would not like the organization name displayed for fear that would encourage a thief to try harder to break into the system rather than return the equipment.)

(4) The individual who has found the lost or stolen computer **12**, is now able to easily return the equipment to the rightful owner. Because the display **18** screen showing the owner information is before, or during a password or security prompt screen that occurs before allowing the user to access the full operating system, the person recovering the equipment is blocked by the password or security prompt screen from accessing the data, and is unable to avoid seeing the recovery information screen.

It is important to note only that the computer **12** security software recovery/return program be displayed on the computer **12** screen monitor before, or during a password or security prompt display screen, because the operating system password screen creates a 'wall' before taking the computer **12** user to the computer **12** operating system. (See FIG. **3**). This helps not only protect the owner's information on the hard drive, but also ensures that the person finding the equipment will see the owner recovery/return information. If the program initiated after the password or security prompt screen, the person finding the lost or stolen equipment would have difficulty ever seeing the recovery/return display **20**.

It is also important to note that even through the recovery screen dialog box would ideally be the first screen, this may not be possible due to the wide variety of software operating systems used by computer **12** systems. Each computer **12** security program will attempt to display the recovery information on the initial screen when possible. However, for one of the Window operating systems for example, the first boot-up default screen is a CTR+ALT+DEL screen, and then the program can move to a password screen. In this case, the recovery/return program could provide a display **18** dialog screen that would be an additional layer between the CTR+ALT+DEL dialog box and the password dialog box. (See FIG. **4**). Other operating systems could allow the program to display the recovery dialog box, with the password or security prompt at the bottom of the dialog box (so that even though the recovery dialog application is an additional layer during the boot-up, it would appear that the password or security prompt is included within the same dialog box). (See FIGS. **2** and **3**). The recovery dialog box would occur before or during the password or security dialog box that 'blocks' the user from accessing the operating system.

Operation Administration Feature:

The computer **12** security software recovery/return program would also include an administration section to the program through hard drive or remote. The operation of the administration section features could work like this:

(1) The owner of the computer **12** would turn their machine on.

(2) As the boot-up begins, the owner sees the recovery/return display **18** dialog box appear.

(3) The owner then may see a password or security prompt to allow the owner into the operating system.

(4) In the event that there is a security prompt, the owner types in the correct password or satisfies the security prompt to access the hard drive's operating system and programs.

(5) Once the owner gains access to the primary operating system, the owner will have the ability to select an administration section for the computer **12** security software recovery/return program through the Start Up button or a shortcut icon on the display **18** screen. (See FIG. **5**). The administration dialog box will allow the owner to interactively change the recovery/return display **18** information that appears in the recovery/return dialog box displayed during the boot-up process.

(6) There are additional features to the administration dialog box that may be added. Some of the features include:

a) added password or security protection prompt to allow the owner to access the administrative part of the program in order to change the recovery/return dialog display information,

b) interactive email based registration capability that would export owner information to an international recovery center using the internet,

c) a 'where to order more licenses' information screen (that could be tailored to allow dealer/distributor contact information),

d) screen saver lock feature, and

e) possible audit log to track user activity.



There are at least 3 important features that are critical and unique to the program, and make this program vastly different from other equipment security recovery products:

(1) The ability to display recovery/return information on the computer's **12** monitor screen.

(2) The ability to make sure that the display **18** occurs before or during a password or security prompt stopping the user from accessing the full operating system and hard drive information.

(3) The ability using an administrative program feature to allow the owner to interactively change the recovery/return information at any time.

Installation of the program is simple. The owner would load an installation CD into the computer **12** equipment or download the program from the internet. During the installation process, the owner will be prompted to provide some recovery/return information that the owner would like displayed; for example, contact name, phone and email information. The installation process will create the recovery/return display **18** screen, input the owner information, and create an administration section that can be accessed by the owner to be able to change recovery information at any time. After installation is complete, the computer **12** will be rebooted, and the program installation will be complete.

The program is essentially a recovery/return information screen that is displayed, and does not attempt to duplicate or replace more sophisticated access security programs already on the system. In the event that there is a security access program on the system using a password, security card, or biometric recognition device, the recovery/return screen **20** is ideally layered before the security screen (otherwise the recovery/return information would never be displayed—except to the owner since the person finding the equipment would not be able to enter the correct security information to get to the return screen **20**). In operation:

1) The equipment is turned on.

2) The equipment processor **14** begins to go through the steps necessary to open up and allow access to the equipment's operating system. These steps may involve displaying various visual screens, depending upon the equipment.

a) For example, a typical Gateway computer may have the following series of displays:

| Ideal Return Dialog Display Spots | | | | | At minimum needs to display before Operating System and should appear before security prompt. |
|---|---|---|---|---|---|
| Monitor self-test display | Gateway & Gateway logo display | Copyright Promise Technology display | MS Windows 98 Logo display | Microsoft Password Security Prompt | Main Primary Operating System where user can begin using equip & programs |

In this example, the recovery/return program would display before or with the Microsoft password or security prompt.

b) Another example is with a Dell computer, which may have the following series of displays:

| Ideal Return Dialog Display Spots | | | | At minimum needs to display before Operating System and should appear before security prompt | | |
|---|---|---|---|---|---|---|
| Dell Name and Logo display | MS Windows 98 Logo ology display | Copyright ESS Tech- Prompt | MS Ctr + Alt + Del Logon display | Security Program that uses a Windows password and a physical access card | Network Prompts if not connected | Main Operating System where user can begin using equip. & programs |

c) Another example is with an AT&T Cellular phone, which may have the following series of displays:

| Ideal Display Spots for Return Display Program using OK prompt | | At minimum needs to display before operating system |
|---|---|---|
| AT&T Name & Logo display | Display showing phone number | Main/Primary Operating System where user can begin using equip. & programs |

3) The Return/Recovery owner information display screen is displayed before the main operating system. The Return/Recovery owner information screen has been customized by the owner (and can be interactively changed using an administrative program that can be accessed when the user gets to the operating system).

4) Once the owner information dialog box is displayed, it remains displayed until the user satisfies a security prompt and/or pushes an OK button or says "OK". The security program prompt could include a password that might need to be entered, a card access card that might need to be used, or a biometric impression that might need to be used, such as fingerprint, face, eye, or voice recognition system. Once the security program is satisfied, the computer **12** program continues to the main operating system.

The definition of the "boot-up" process includes a series of steps that the computer **12** is taking (including the series of displays that the programs are automatically displaying) in order to move the user to gaining access to the main operating system. And, as can be seen from the 3 examples above, the booting up process entails different steps and different display **18** screens on its way to the operating system.



It is important that

1) the Recovery/Return screen **20** be displayed before the operating system, and
2) that the display remains displayed until the user does something (like pushes an OK button on the screen, or says OK for future voice activation programs, or satisfies a security prompt).

This software application:

should be layered before the main operating system,

and in the event that a security program exists,

should be layered before or during the security program prompt (otherwise the recovery screen would only be seen by the authorized owner).

Security programs that currently exist could include:

a) entering a correct password (in the example of the current computers that have a Microsoft password system already built in and available).
b) entering another type of security prompt such as future security applications with a voice activated security prompt, an access card which needs to be within the vicinity of the computer **12**, or even a fingerprint or eye recognition security program (which are currently available).

The basic Recovery/Return computer **12** security software program **24** may or may not include a security prompt feature as an option. The point of the program is that the recovery information can be customized, interactively changed, and displayed using the computer's **12** screen, and layered at the correct point (before the operating system, and before or during a security program prompt if a security program exists).

The present invention pertains to a computer **12** return apparatus **10**, as shown in FIG. **1**. The apparatus **10** comprises a processor **14**. The apparatus **10** comprises a memory **16** connected to the processor **14**. The apparatus **10** comprises a display **18**. The apparatus **10** comprises a return screen **20** that the processor **14** automatically causes to appear during or after boot-up of the processor **14** on the display **18**, that displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer **12** is assigned to for use, and return information for returning the computer **12** to the owner from data stored in the memory **16**.

Preferably, the apparatus **10** includes means **22** for causing the screen to appear on the display **18** with the owner, user and return information. The causing means **22** is stored in the memory **16**. The apparatus **10** preferably includes means for changing the return information by the user through remote communication with the computer **12**. Preferably, the changing means changes a security prompt by the owner, overriding any security prompt entered into the computer **12** by the user. The apparatus **10** preferably includes means for changing recovery information of addi-

tional computers **12** owned by the owner through remote communication by the owner with the additional computers **12**.

The present invention pertains to a method for displaying information to assist with returning a computer **12** to its owner. The method comprises the steps of activating a computer **12**. There is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up which displays information concerning owner information about who owns the computer **12**, concerning user information about who the user is who the computer **12** is assigned to for use, and return information for returning the computer **12** to the owner from data stored in a memory **16** of the computer **12**.

Preferably, the displaying step includes the step of changing the return information by the user. The changing step preferably includes the step of changing the return information by the user through remote communication with the computer **12**. Preferably, there is the step of changing a security prompt by the owner, overriding any security prompt entered into the computer **12** by the user. There is preferably the step of the owner changing recovery information of additional computers **12** owned by the owner through remote communication by the owner with the additional computers **12**.

The Retriever is preferably a software program **24** that is disposed in a memory **16** of a computer **12** and at a remote station to allow an owner to communicate and control the computer **12**, as needed.

The Retriever clearly distinguishes between the "Owner" of the equipment and the person(s) "Assigned To" the equipment. See FIGS. **9** and **10**.

The Owner is defined as the person or entity that owns, rents, or licenses the Retriever, and/or the person or entity who controls the recovery service. The Owner has greater control over the computer **12** than the user.

The Retriever allows the ability to distinguish between the 'owner' and the 'assigned to' person who may be allowed possession of the equipment. These two entities can be the same, but very often are not. For example, a bank may be the owner of 5,000 laptops, and then issue them out to 5,000 different employees. The Bank owns the laptops, and the employees are the "assigned to" persons. Another example would be a company that may provide a recovery security service to equipment owners, and would also be able to control the recovery screen information and display through their recovery service.

The Retriever allows the 'owner' of the protected equipment to ultimately control the recovery information displayed on the protected equipment, not the user.

The current PDA recovery programs, for example, are all completely controlled by the equipment user. Again the 'owner' and 'assigned to' user of the equipment may or may not be the same people, but the Retriever is unique because it allows the ability to distinguish between the 'owner' and the 'assigned to' person. The Retriever allows the 'owner' to have control over both the 'owner' recovery information displayed AND the 'assigned to' recovery information displayed. The 'assigned to' person(s) can only change or control the 'assigned to' recovery information.

The Retriever also allows the owner ultimate control over the security prompt, not the user.

The current PDA software recovery program gives ultimate control over the security prompt to the user or 'assigned to' individual(s). The 'owner' would want the ability to reassign the equipment to a new person. The current PDA recovery program does not satisfy this need. If a disgruntled employee quits or gets fired and hands back their PDA with a unique secret password prompt and says they cannot remember the password, the current PDA recovery program makes it very difficult for the owner to be able to regain control over the password prompt and assign the equipment to someone new.

Both the pocket PC, Palm and other handhelds do have the ability to create a screen on the monitor in conjunction with a password prompt. However, the design of these current programs are flawed, as evidenced by the fact that the program feature is rarely used, even though available.

The Retriever satisfies a need that the pocket PC, Palm and other PDA recovery programs do not. It is the 'owner' of the equipment that needs to have ultimate control of (1) the program, (2) the recovery screen and (3) the password—not the person who is using the equipment. There are many reasons why this is important.

## EXAMPLES

There is a school district in Virginia that issued 25,000 laptops to students at the high school and middle school level last year. The school district owns the laptops—not the students assigned to the equipment. The students are unlikely to care as much as the school district as to the loss of the equipment.

If the current PDA recovery software program **24** was loaded onto these laptops, the kids could easily (and more than likely would) disable the security prompt since it would be inconvenient to continually have to satisfy a password prompt every time the computer **12** was turned on or timed out. In addition, with the current PDA recovery system the owner of the equipment (the school district) would loose control of not only the recovery information displayed on the monitor, but the password that allows access to the equipment. The Retriever is unique since it distinguishes between the 'owner' and the 'assigned to' person, allows the owner to have ultimate control over the display **18** screen, allows the 'owner' to override recovery information displayed by the 'assigned to' person if necessary, and allows the 'owner' to have ultimate control of the password to access the equipment.

Individuals who are 'assigned to' equipment have inherently less liability and concern if the equipment is lost or stolen than 'the owner'. This is true for not only students, but employees at sales firms, banks, accounting firms, corporations, healthcare facilities, high school students, university personnel, people who rent or lease equipment, etc.

It is the 'owner' who should have ultimate control over security decisions regarding the equipment, not necessarily the person who happens to be in possession of or assigned to the equipment. The current PDA design causes an 'inconvenience' by creating an extra logon screen, and therefore, is not likely to be used by the equipment holder, especially if the equipment holder is not the owner. The owner needs the ability to control whether the program is enabled, and thus ensure that the 'assigned to' person use the program if the owner desires for them to use it.

The current PDA recovery system design is indeed flawed. With the current PDA recovery program, the user or person assigned to the equipment has complete and sole control over recovery information, complete and sole control over the security password, and complete and sole control over whether the security program is even enabled or not. These are some of the reasons that help explain why people that do have a PDA rarely use the recovery security feature available.

As further proof as to the inadequacy of this current program, is the fact that The World Computer Security Company of Colorado has sold "outside" glue on recovery labels to customers to protect hundreds of PDAs, Palms, etc. that indeed already have the PDA recovery program mentioned by the patent office. In fact, this company recently sold a couple hundred of these glue-on security STOP Tag recovery labels that were PDA size this month to Bertek Pharmaceuticals and Washington University St. Louis (June 2004). This is further proof that the current program design is flawed and not commercially viable.

Most alarmingly, the current program does not take into account that many crime statistics suggest that 90% of all theft is internal (committed by those non-owners allowed access to property)!

Perhaps one of the most important and critical differences between the Retriever and the existing programs is the type of communication possible made possible with the Retriever. The Retriever is designed to enable communication of the recovery display information back and forth from the recovery administration center to the equipment being protected to control changes to the recovery display **18** screen, and this communication from the recovery administration center is not limited to only the hard drive of the equipment being protected or the computer **12** that the equipment is synchronized with.

The recovery administration update center for the current PDA recovery program is limited to the user updating the owner information directly on the PDA, or directly on the computer **12** the PDA is set up to synchronize with when accessing the PDA program on the main computer **12**. This recovery display information can then be synchronized using the PDA synchronize capability.

The Retriever's recovery administration update center can be an administration program located on the hard drive of the protected equipment, an administration program located on a server on a network and/or an administration program located on a hard drive of a computer **12** that is completely remote from the protected equipment, for example, a web based recovery center. This is an very unique and important feature.

The program design feature allows the 'owner' to access the recovery center administration program, initiate a download of changes to the protected equipment, control the entire recovery screen displayed, and even override the 'assigned to' person's input. This is an important feature, in case the 'assigned to' person is a disgruntled employee who simply reports equipment as stolen and is still using the equipment or has sold it. The Retriever program design allows the owner to make changes at the recovery center level, have the recovery center attempt to communicate those changes to the 'stolen equipment' via phone line (or cable, wi-fi, bluetooth, satellite etc. in the future). This allows the owner to eliminate erroneous or misleading 'assigned to' recovery information that might have been created by the rogue "assigned to" individual, replace the display **18** screen with correct owner recovery information and even change or delete the 'assigned to' password to stop access to the equipment information. By attempting to disable the 'assigned to' password from remote, the equipment becomes extremely difficult if not impossible to use, the information on the hard drive is better protected, and the chances of a quick recovery of the stolen equipment are dramatically enhanced. This remote communication ability makes the Retriever design completely unique and very different from the current PDA recovery software programs.



It is this remote communication ability in the design of the Retriever software recovery program that helps better meet the challenges of internal theft (again many statistics suggest that it is internal theft that comprises 90% of all theft). With the current PDA recovery program, the 'owner' is limited to only making changes directly on the 'assigned to' person's equipment and/or the 'assigned to' person's computer **12** or over a limited network that the assigned to person may never access again. With the Retriever's recovery software design, the 'owner' can also attempt to access the 'assigned to' person's equipment by additional ways, such as over the Internet, phone lines, cable, etc. thereby having a more effective ability to try to locate the equipment and control the recovery information displayed by remote.

The "assigned to" person can only control the "assigned to" recovery information and password. The "owner" can control both the owner information and all the "assigned to" recovery information at the recovery center level, and then attempt to communicate this to the protected equipment using the Retriever licensed security recovery program.

Using this unique communication power, both 'owner' and "assigned to" information can be uploaded to the recovery center and/or downloaded to the protected equipment in order to synchronize the international recovery center information and the recovery information displayed on the initial display **18** screen. (This is a combination of the PDA type of synchronization between the main computer **12** and the PDA, and the McAfee anti-virus software Internet updating capability where every time you go on-line, your computer **12** automatically checks to make sure that you have the most current anti-virus software and automatically updates your computer **12** with the latest changes.) Nobody has ever before considered or designed a product combining this type of communication ability with this type of recovery security program that seizes control of the display **18** monitor until a security prompt is satisfied. The Retriever design allows an equipment recovery capability that just does not exist on today's market, and is completely unique from all current products on the market,

Current PDA Communication is limited:

User input/update PDA↔User input/update Host Computer w/PDA program

The Retriever Design Communication is much broader:

Outside communication via phone line < ---- > Protected Computer < ---- > Network Server
cable, wireless, internet etc. user input/update    user input/update
|
|
User input/update on equip

The Retriever design has both a stand-alone and a network based program. This allows an owner to handle multiple machines easily for organizations or entities with more than one equipment.

Each program license has a unique program registration license number that is unique. This is extremely important feature that allows many features that owners would need in handling the protection of multiple machines. From looking at the current PDA security recovery software, the program appears to be only to have 'single license' capability.

The Retriever program design can also allow global changes by the owner who might handle multiple computers.

This is a very important feature for organizations who are in charge of large numbers of computers. For example, let's

say that Sgt. Cody is the crime prevention officer at Georgetown University and then retires. Let's say that Sgt. Grier is the contact person currently listed on 700 university owned computers. Now Sgt. Smith is in charge. The Retriever program design allows Sgt. Smith (assuming she uses the correct password), to access the recovery center and globally change all the computers that she wants to change and display her phone number and name to help with recovery. This ability to allow the owner to globally make changes to certain display information over multiple licensed computers is also extremely useful if a phone number changes, a corporate name or logo changes, a recovery contact name changes or a phone number area code changes.

The program also allows owners to easily tag or mark equipment that is ready or available to be sold making it easy for new owners to re-register under the initial security software license registration number. Let's say for example that ABC Telecommunications decided to sell 100 laptops that they are replacing with new ones. The owner or authorized person representing the owner (the IT director for example) can preset the 100 serial license numbers as for sale to allow easier sales to new owners using organizations such as Ebay. New owners can easily be allowed to re-register under the released registration number that is associated with the Retriever recovery license.

The program also allows owners to easily report equipment as stolen over the internet. Owners can go to the recovery administration center, find the license number of the equipment they believe might be lost or stolen, update the information for this specific license number and report the information over the internet for all to see. This is very helpful resource for both owners and authorities to facilitate recovery of lost or stolen items.

The security program can also not only display 'owner' and 'assigned to' information but also display organization logos and/or other pictures or designs. This is another extremely important feature. The Retriever program seizes control of the entire display **18** screen.

Many, many customers currently desire to customize their physical security tags with owner and logo information. This is often difficult, since the security label manufacturer has to get art design approval, fit corporate and logo information on an often limited space, and then set the tool to run the special labels at the manufacturing plant. Lead times can often go over 3 weeks, and once the customer has their special customized tag, they must often order a minimum amount (STOP Tag has a minimum order of 200 tags for customization for example). If the company changes names, logos or phone numbers the physical security label suddenly becomes incorrect. And, when these customized security tag customers want to sell their equipment, it becomes difficult, since the security label can permanently read 'Property of ABC Corp".

Let's say the company wants to donate 25 laptops to the church. A nun or other church personnel would not really want to be carrying around laptops where the cover of the laptops state "Property of the US Army", "Property of Waste Management Company", or "Property of XYZ University". This becomes awkward for the new owner who actually is the new rightful owner, and cannot always easily remove the existing security label.

The Retriever provides an interactive method of designing and changing the entire recovery screen 'on the fly' that eliminates all of these current problems. Organization logos or ads can be easily and quickly downloaded onto the recovery screens of protected equipment. The current PDA system does not allow this.



The Retriever creates an audit trail of changes. Time and Date fields registering changes are logged and maintained at the recovery center to provide the customer with a security audit trail of changes.

The Retriever display not only appears during the initial boot-up, but the Retriever program security recovery display screen can also be manually initiated by the computer **12** user. This would be the Workstation Locked display. (FIG. **10**). This allows the computer **12** user to manually lock the computer **12** screen and protect the computer **12** if they need to leave their computer **12** for a few minutes. This feature is handy for all types of situations, like emergency room laptops at hospitals, etc.

The Retriever display not only appears during the initial boot-up or with a manual activation by the computer **12** user; the Retriever workstation locked recovery screen can also be initiated automatically using a screen saver timer feature that can be changed by the Owner or the Assigned To person. For example, let's say the computer **12** screen saver time feature has a 10 minute timer. If there is no activity on the computer **12**, the Workstation Locked security Recovery screen will display and stay displayed until the password prompt is satisfied.

The owner can browse the entire database of there own licensed Retriever security software licenses. The owner can look at an individual license record, or browse the entire database and use features such as EDIT, SORT, SEARCH/FIND, and EXPORT when working with the licensed records.

The Retriever provides the owner with extra data information fields that owners can assign their own values to. These data fields are not really related to recovery information displayed, but this is a handy convenience for owners who would like to correlate their own inventory numbers to Retriever license numbers, search by lease dates on equipment, etc.

It should be noted that the communication ability is not limited to Internet communication. Satellite, WI-FI, cable, bluetooth, or any other type of remote communication can be used.

Although the invention has been described in detail in the foregoing embodiments for the purpose of illustration, it is to be understood that such detail is solely for that purpose and that variations can be made therein by those skilled in the art without departing from the spirit and scope of the invention except as it may be described by the following claims.

What is claimed is:

**1**. A method for displaying information to assist with returning a computer comprising the steps of:

activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying return information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the return information is visible to anyone viewing the display screen, the lock screen locks the display screen and protects the computer;

initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of

the computer or the party authorized by the owner to enable the initiating or changing of the display screen;

displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and

activating the processor to allow a message to the user.

**2**. The method as described in claim **1** including the step of selecting by the owner or user an Internet link on the screen, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is automatically able to access the computer and the Internet location associated with the Internet link.

**3**. The method as described in claim **1** wherein the screen having an active link allowing remote communication to a remote server which provides return information to facilitate return of the computer.

**4**. An apparatus for displaying information at a computer owned by an owner which can be used by an owner or user, the apparatus comprising:

a computer comprising;

a memory;

a display; and

a processor in communication with the display and the memory which displays on the display with the computer recovery information before or with a lock screen for returning the computer to an owner from data stored in the memory of the computer to facilitate return of the computer and which is maintained on or before or with the lock screen so the recovery information is visible to anyone viewing the display, the processor initiating or changing the recovery information through remote communication without assistance by the user with the computer, wherein the changing of the recovery information is done through an interactive program stored in the memory of the computer and which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the recovery information on the display, the lock screen locks the display screen and protects the computer.



**5**. The apparatus as described in claim **4** wherein the display includes an Internet link that can be selected by the owner or user, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is able to access the computer and the Internet location associated with the Internet link.

**6**. The system as described in claim **4** wherein the display having an active link to allow remote communication to the remote server which provides recovery information to facilitate return of the computer.

**7**. A computer program stored in a non-transient memory for displaying information to assist with returning a computer to its owner comprising the computer generated steps of:

displaying by a processor on a display of the computer which displays recovery information for returning the computer to an owner from data stored in a memory of the computer, the display displaying the recovery information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the recovery information is visible to anyone viewing the display, the lock screen locks the display screen and protects the computer; and

initiating or changing the recovery information through remote communication without assistance by the user with the computer, wherein the initiating or changing of the recovery information is done through an interactive program stored in the memory of the computer and is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the recovery information.

* * * * *

US010789393B2

(12) **United States Patent**
**Hafeman**

(10) **Patent No.: US 10,789,393 B2**
(45) **Date of Patent: *Sep. 29, 2020**

(54) **COMPUTER RECOVERY OR RETURN**

(71) Applicant: **Carolyn W. Hafeman**, Evergreen, CO (US)

(72) Inventor: **Carolyn W. Hafeman**, Evergreen, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/377,768**

(22) Filed: **Apr. 8, 2019**

(65) **Prior Publication Data**

US 2019/0236319 A1 Aug. 1, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/864,749, filed on Jan. 8, 2018, now Pat. No. 10,325,122, which is a continuation of application No. 15/601,645, filed on May 22, 2017, now Pat. No. 9,892,287, which is a continuation of application No. 15/199,316, filed on Jun. 30, 2016, now Pat. No. 9,672,388, which is a continuation of application No. 14/691,222, filed on Apr. 20, 2015, now Pat. No. 9,390,296, which is a continuation of application No. 14/087,866, filed on Nov. 22, 2013, now Pat. No. 9,021,610, which is a

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 21/88*** | (2013.01) |
| ***G06F 40/134*** | (2020.01) |
| ***G06F 21/31*** | (2013.01) |
| ***G06F 21/51*** | (2013.01) |
| ***G06F 21/57*** | (2013.01) |
| ***G06F 21/62*** | (2013.01) |

(52) **U.S. Cl.**

CPC .............. ***G06F 21/88*** (2013.01); ***G06F 21/31*** (2013.01); ***G06F 21/51*** (2013.01); ***G06F 21/575*** (2013.01); ***G06F 21/6218*** (2013.01); ***G06F 40/134*** (2020.01); *G06F 2221/2117* (2013.01)

(58) **Field of Classification Search**

CPC ...... G06F 21/88; G06F 40/134; G06F 21/575; G06F 21/6218; G06F 21/51; G06F 21/31; G06F 2221/2117

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,715,174 A 2/1998 Cotichini
5,748,084 A 5/1998 Isikoff

(Continued)

OTHER PUBLICATIONS

Crouch, "Tips for keeping a leash on your PDA's data," Network World, Dialog text search, p. 1-3, (Feb. 9, 2001).

*Primary Examiner* — Christopher A Revak

(74) *Attorney, Agent, or Firm* — Ansel M. Schwartz

(57) **ABSTRACT**

A computer return apparatus includes a processor. The apparatus includes a memory connected to the processor. The apparatus includes a display. The apparatus includes a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in the memory. A method for displaying information to assist with returning a computer to its owner.

**7 Claims, 10 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 10/945,332, filed on Sep. 20, 2004, now Pat. No. 8,601,606, which is a continuation-in-part of application No. 10/304,827, filed on Nov. 25, 2002, now abandoned.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 5,764,892 | A | 6/1998 | Cain | |
| 5,802,280 | A | 9/1998 | Cotichini | |
| 5,896,497 | A | 4/1999 | Halstead | |
| 5,987,609 | A | 11/1999 | Hasebe | |
| 6,087,937 | A | 7/2000 | McCarthy | |
| 6,244,758 | B1 | 6/2001 | Solymar | |
| 6,269,392 | B1 | 7/2001 | Cotichini | |
| 6,300,863 | B1 | 10/2001 | Cotichini | |
| 6,300,946 | B1 | 10/2001 | Lincke et al. | |
| 6,507,914 | B1 | 1/2003 | Cain | |
| 6,601,095 | B1 * | 7/2003 | Duffield | G06F 9/44505 709/222 |
| 6,609,656 | B1 | 8/2003 | Elledge | |
| 6,662,023 | B1 | 12/2003 | Helle | |
| 6,725,339 | B2 | 4/2004 | Dailey | |
| 6,804,699 | B1 | 10/2004 | Henrie | |
| 6,832,320 | B1 * | 12/2004 | Broyles, III | G06F 21/88 713/155 |
| 7,107,349 | B2 | 9/2006 | Britt, Jr. | |
| 7,752,288 | B2 | 7/2010 | Mihira | |
| 7,818,557 | B2 | 10/2010 | Bestmann | |
| 7,818,803 | B2 | 10/2010 | Gordon | |
| 7,945,709 | B2 | 5/2011 | Cain | |
| 8,062,380 | B2 | 11/2011 | Stevens | |
| 8,234,359 | B2 | 7/2012 | Bestmann | |
| 8,241,369 | B2 | 8/2012 | Stevens | |
| 8,307,055 | B2 | 11/2012 | Banga | |
| 8,317,878 | B2 | 11/2012 | Chhabra | |
| 8,332,953 | B2 | 12/2012 | Lemieux | |
| 8,346,234 | B2 | 1/2013 | Banga | |
| 8,362,901 | B2 | 1/2013 | Jung | |
| 8,418,226 | B2 | 4/2013 | Gardner | |
| 8,419,806 | B2 | 4/2013 | Chase | |
| 8,441,348 | B2 | 5/2013 | Loveland | |
| 8,510,825 | B2 | 8/2013 | Tarkhanyan | |
| 8,528,105 | B1 | 9/2013 | Miller | |
| 8,601,606 | B2 * | 12/2013 | Hafeman | G06F 21/6218 726/34 |
| 8,721,738 | B1 | 5/2014 | Miller | |
| 9,021,610 | B2 * | 4/2015 | Hafeman | G06F 40/134 726/34 |
| 9,390,296 | B2 * | 7/2016 | Hafeman | G06F 21/88 |
| 9,558,338 | B2 * | 1/2017 | Lee | G06F 21/60 |
| 9,672,388 | B2 * | 6/2017 | Hafeman | G06F 21/6218 |
| 9,892,287 | B2 * | 2/2018 | Hafeman | G06F 21/51 |
| 10,325,122 | B2 * | 6/2019 | Hafeman | G06F 21/51 |
| 2004/0103298 | A1 | 5/2004 | Hafeman | |
| 2015/0319178 | A1 | 11/2015 | Desai | |
| 2018/0124232 | A1 * | 5/2018 | Tokutake | G06F 21/31 |


* cited by examiner


10
12
14
PROCESSOR
16
MEMORY
CHANGING MEANS
CAUSING MEANS
22
SOFTWARE PROGRAM
24
PRIMARY OPERATING SYSTEM
18
DISPLAY
RETURN SCREEN
20
OPERATING SCREEN
26
REMOTE STATION
CHANGING MEANS

*FIG.1*

Workstation Locked

[Picture]
Red Stop
Sign w/white
word STOP

The Retriever by WorldsecurityCorp.com

The workstation has been locked. This equipment is protected against theft by the World Security Corp. International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.

---

To Indentify Rightful Owner & Avoid Prosecution CALL NOW :

[Recovery Name/(input from database / required)]
[Organization Name / ABC Corp/ input/ not required]
[Address 1 / input from database / not required]
[Address 2 / input from database / not required]
[City] [State] [Zip / all of these input from database / not required
[Phone 1 / input from database / required][Phone 2 / not required]
[Email / input from database / required][Fax / not required]

OR VISIT

[Picture]
Retriever Logo

www.worldsecuritycorp.com/lostandfound.html
Email : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx

Registration # : xxxxxxxxxxxxxxxx (sequential number unique to each software license

User : [ ________________ ]

Password : [ ________________ ]

[OK]
(moves user to operating system with correct password)

[SHUTDOWN]
(initiates operating system shutdown)

*FIG.2*


Turn Computer On
Recovery / Return Dialog Box appears on monitor's display screen.
(Occurs before or with Password or Security Prompt : Dialog Box)
Computer Password or Security Prompt Dialog Box Prompt Screen
(Can appear as a screen after the Recovery / Return Dialog box or preferably at the bottom of the Recovery/Return Dialog Box as in Sample 1 above)
[OK] [SHUTDOWN]
User enters computer operating system to access programs and information.
Windows or Other Operating System Standard Shutdown Computer Screen
(*) Shutdown
( ) Shutdown and Reboot
[OK]
[CANCEL]
(Shuts down computer)
(Returns back to previous screen)
Back up to previous screen.

*FIG. 3*


Turn Computer On
Welcome
[Picture]
Windows hand with key
Press [CTRL + ALT + DEL] to Logon.
C 2002-200_ World Computer Security Corp
Distribuited by www.worldsecuritycorp.com
Telephone : (303) 670-8800
[Picture]
Retriever Logo
Recovery/Return Dialog Box appears on monitor's display screen.
(Occurs before or with password or Security Prompt Dialog Box)
Computer Password or Security Dialog Box Prompt Screen
(Can appear as a screen after the Recovery/Return Dialog box or preferably at the bottom of the Recovery/Return Dialog Box)

*FIG. 4*


Computer Monitor Screen
at Operating System Screen
MS Word >
MS Excel >
Programs >
Administration Section >
Find >
DVD Player >
Help >
Etc ... >
Run >
START

FIG. 5


Windows Logon
[Picture]
Keys
Enter a valid user name and password to logon to this system :
User : [ ]
Password : [ ]
[Picture]
Retriever Logo
[OK]
[CANCEL]
[SHUTDOWN]

FIG. 7

Workstation Locked

[Picture] Red Stop Sign w/white word STOP

The Retriever by WorldsecurityCorp.com

The workstation has been locked. This equipment is protected against theft by the World Security Corp. International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.

---

To Indentify Rightful Owner & Avoid Prosecution CALL NOW :

[Recovery Name/(input from database / required)]
[Organization Name / ABC Corp/ input/ not required]
[Address 1 / input from database / not required]
[Address 2 / input from database / not required]
[City] [State] [Zip / all of these input from database / not required
[Phone 1 / input from database / required][Phone 2 / not required]
[Email / input from database / required][Fax / not required]

OR VISIT

[Picture] Retriever Logo

www.worldsecuritycorp.com/lostandfound.html
Email : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx

Registration # : xxxxxxxxxxxxxxxx

PRESS

[OK] [CANCEL] [SHUTDOWN]

FIG.6



The Retriever Owner Administration
Logo
Last login: Date, Time, Time Zone/ex. Oct 27, 2003 14:41 MST
Customer# : Appears and is protected/ex. 54658653
Log-Off
Select Registration # for global or single update : ?
Select Scroll
Edit All/Global Edit-------------0
100012345--Assigned To---Dept---0
100012346--Assigned To---Dept---0
OR select the Browse List View button to see entire list.
Edit Record
Cancel
Update/Save
Clear All Fields
Reported
Report Lost/Stolen
X
Report Equip Sold
X
Export Record
Report All
Selected Registration # Displayed
Owner Display Recovery Info
Property of :
Owner Contact : *
Owner Phone : *
Owner Email : *
* Required
CHANGE OWNER PASSWORD
Assigned to Display Recovery Info
Assigned To :
Department :
Phone :
Email :
CHANGE/CLEAR "ASSIGNED TO" PASSWORD


*FIG. 8*


The Retriever "Assigned To" Administration
Assigned TO : Appears and is protected / ex. Sam Stoneworth
Department : Appears and is protected / ex. Harvard Law Dept
Log-Off
Edit Record
Cancel
Update/Save
Logo
Assigned to Display Recovery Info
Phone :
Email :
CHANGE ASSIGNED TO PASSWORD
Screensaver Automatic Log Off Time: ?
seconds
www.worldsecuritycorp.com (add to the bottom of every page)

*FIG. 9*


Windows Logon
The RETRIEVER from World Security Corp
[Stop Sign] Enter a valid user name and password to log on this system.
Sign On Name : Password :
PRESS : OK CANCEL SHUTDOWN
Correct PW
Incorrect PW
This equipment is protected against theft by the World Security Corp International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.
To Identify Rightful Owner, Collect Reward & Avoid Prosecution CALL NOW :
Owner Info: Property of ABC Corporation
Bill Smith, Security Dept
800-222-1234
itadmin@abccorp.com
AD SPACE
Assigned To: Carrie Hafeman
303-670-8800
lightguardian@msn.com
AD SPACE
Distributed by
AD SPACE
OR VISIT
Web Site : www.worldsecuritycorp.com/lostandfound/html
Emai : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx
The Retriever
Registration # : xxxxxxxxxxxxxxxxxxxxxx

*FIG.10*


Workstation Locked
The RETRIEVER from World Security Corp
[Stop Sign] Enter a valid user name and password to log on this system.
Sign On Name : Password :
PRESS : OK CANCEL SHUTDOWN
Correct PW
Incorrect PW
This equipment is protected against theft by the World Security Corp International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.
To Identify Rightful Owner, Collect Reward & Avoid Prosecution CALL NOW :
Owner Info: Property of ABC Corporation
Bill Smith, Security Dept
800-222-1234
itadmin@abccorp.com
AD SPACE
Assigned To: Carrie Hafeman
303-670-8800
lightguardian@msn.com
AD SPACE
Distributed by
AD SPACE
OR VISIT
Web Site : www.worldsecuritycorp.com/lostandfound/html
Emai : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx
The Retriever
Registration # : xxxxxxxxxxxxxxxxxxxxx

*FIG. 11*

# COMPUTER RECOVERY OR RETURN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of U.S. patent application Ser. No. 15/864,749 filed Jan. 8, 2018, which is a continuation of U.S. patent application Ser. No. 15/601,645 filed May 22, 2017, which is a continuation of U.S. patent application Ser. No. 15/199,316 filed Jun. 30, 2016, now U.S. Pat. No. 9,672,388 issued Jun. 6, 2017, which is a continuation of U.S. patent application Ser. No. 14/691,222 filed Apr. 20, 2015, now U.S. Pat. No. 9,390,296 issued Jul. 12, 2016, which is a continuation of U.S. patent application Ser. No. 14/087,866 filed Nov. 22, 2013, now U.S. Pat. No. 9,021,610 issued Apr. 28, 2015, which is a continuation of U.S. patent application Ser. No. 10/945,332 filed Sep. 20, 2004, now U.S. Pat. No. 8,601,606 issued Dec. 3, 2013, which is a continuation-in-part of U.S. patent application Ser. No. 10/304,827 filed Nov. 25, 2002, all of which are incorporated by reference herein.

## FIELD OF THE INVENTION

The present invention is related to the return of lost or stolen computers. More specifically, the present invention is related to the return of lost or stolen computers using a recovery screen that appears during or after boot-up of the computer.

## BACKGROUND OF THE INVENTION

Current methods of computer return or recovery products include:

(1) Physical Labels That Attach to the Outside Hardware of the Computer Equipment.

These hardware labels can contain custom recovery information, but because they are hardware based, they can not be interactively changed by the owner. Also, since they do not have any ability to affect the computer boot-up process, they can do nothing to help protect the confidential owner information on the hard drive. An example of a well known physical hardware/recovery label is the STOP Tag by Security Tracking of Office Property in Connecticut. This labeling system has been patented in France, the U.S., and other countries. The product can be easily defeated by removing the physical label. In the case of STOP Tag which includes a 'recovery mark' which states "STOLEN PROPERTY" underneath the label, a new label can be simply added over the 'recovery mark' to hide the STOLEN PROPERTY sign. (The Security Tracking of Office Property equipment recovery patent is U.S. Pat. No. 5,163,711 This patent actually refers to how the labels adhere to the equipment—but this is their patent).

The computer security recovery/return program of the present invention utilizes this type of hardware recovery approach to a small degree, but is greatly different from this system, because this is a software program rather than a hardware solution. Additionally, the present invention is greatly superior, since the owner can interactively customize the return/recovery information displayed at any time, and the present invention also helps protect the important, confidential owner information on the hard drive, by the positioning of the program layer in the equipment boot-up process.

(2) Computer Software Programs That Attempt Recovery Through the Use of the Modem.

There are several patented computer security software products on the market today that are designed for the purpose of recovering lost or stolen equipment. These programs use the computer's modem to regularly call a recovery center. Then once a computer is stolen, the recovery center waits for the stolen computer to call in. When the computer modem calls in, the recovery centers use something similar to the reverse 911 system to get the phone number that the stolen equipment is accessing. Using the phone number, the recovery system then can try to get a map of where the computer is. Some of these computer security recovery programs can also attempt to locate stolen computers through an IP address. Some of these computer security recovery software programs, can actually attempt to seize the communication between the stolen computer and the recovery center and delete selected files to help protect the owner's confidential information. Products like these include CompuTrace, PC Phone Home, CyberAngel, LapTrak and Luceria.

The present invention is also designed for the purpose of recovering lost or stolen equipment, but the method is distinctively different and unique from the current methods. The present invention does not rely on the use of the computer modem. The present invention uses a layered program in the boot-up process to provide a display of the proper owner recovery and return information using the computer's own monitor or screen. The present invention is also different and superior to the above software tracking products, in helping to accomplish international recovery. None of the above products to date have been able to use the modem phone or IP system to track stolen equipment internationally. The present invention provides international recovery by displaying owner email information as well as providing recovery help through an international recovery internet web site.

There are other differences as well in how these programs try to also protect the information on the hard drive. The present invention automatically initiates during the boot-up process of the equipment, in order to display the recovery/return information before a security prompt screen to always help protect the owner's confidential information on the hard drive. Some of the programs above do nothing to protect the user information. Others like LapTrak include a Hide-A-File feature that an owner can access after the user enters the operating system. CyberAngel includes an encryption feature. Luceria includes the ability to delete pre-selected files from the recovery center. By layering this computer security application strategically before or during a security prompt in the boot-up process, this application provides a unique and different method to help protect owner information.

(An example of patents for these types of products would be the CompuTrace U.S. Pat. Nos. 5,715,174, 5,764,892, and 5,802,280).

(3) Bios Based Password Identification Systems.

There are some computers that are sold with Bios based identification systems included. These products activate immediately when a computer is turned on, and prompt the user for a password before accessing the data on the computer.

The present invention is very different and unique from the Bios based program, for many reasons. Most importantly the bios based password identification products are built into the hardware of the computer equipment—not the hard drive. In other words, if you removed the hard drive from a stolen or lost laptop, and inserted the stolen hard drive into

a different laptop, you would bypass the bios based password identification system, and the bios based password identification system would remain with the original equipment. Thus, the Bios Based Password Identification system can identify the computer hardware, but not the hard drive (the most important part of the computer equipment).

In addition, the Bios Based Password Identification systems are designed as a unique method for providing an additional layer of password protection to the equipment hardware, but are not designed for recovery or return. There is no design for including complete owner information, no recovery information displayed, no effective protection of the information on the hard drive, no effective method for the recovery or return of the hard drive—the most important item that a consumer would want back. In fact the Bios Password Identification product occurs before allowing the hard drive to boot up. The present invention is unique because it is an application software program that provides its layer of protection during the boot-up process (not before), and thus allows the security product to move, with the hard drive, the most critical part of the computer.

## SUMMARY OF THE INVENTION

The present invention pertains to a computer return apparatus. The apparatus comprises a processor. The apparatus comprises a memory connected to the processor. The apparatus comprises a display. The apparatus comprises a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that displays ownership information concerning who owns the computer and return information for returning the computer to the owner from data stored in the memory.

The present invention pertains to a method for returning a computer to its owner. The method comprises the steps of activating a computer. Then there is the step of displaying automatically a return screen on a display of the computer during or after boot-up of the computer, which displays information concerning owner information about who owns the computer and return information for returning the computer to the owner from data stored in the memory of the computer.

The present invention pertains to a computer readable medium whose contents cause a computer to show who is its owner by performing the steps of activating a computer. Then there is the step of displaying automatically a return screen on a display of the computer during or after boot-up of the computer, which displays information concerning owner information about who owns the computer and return information for returning the computer to the owner from data stored in the memory of the computer.

The present invention pertains to a computer return apparatus. The apparatus comprises a processor. The apparatus comprises a memory connected to the processor. The apparatus comprises a display. The apparatus comprises a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in the memory.

The present invention pertains to a method for displaying information to assist with returning a computer to its owner. The method comprises the steps of activating a computer. There is the step of displaying automatically a return screen on a display of the computer during or after boot-up which displays information concerning owner information about who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in a memory of the computer.



## BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings, the preferred embodiment of the invention and preferred methods of practicing the invention are illustrated in which:

FIG. **1** is a schematic representation of the apparatus of the present invention.

FIG. **2** is a representation of a return/recovery dialog box of an embodiment of the present invention.

FIG. **3** is a flow chart regarding an embodiment of the present invention.

FIG. **4** is a flow chart regarding a second embodiment of the present invention.

FIG. **5** is a representation of an administration program section of the present invention.

FIG. **6** is a representation of a return screen of the present invention.

FIG. **7** is an example of a password screen utilized by the present invention.

FIG. **8** is a return administration screen of the present invention.

FIG. **9** is a second return administration screen of the present invention.

FIG. **10** is a third return administration screen of the present invention.

FIG. **11** is a fourth return administration screen of the present invention.

## DETAILED DESCRIPTION

Referring now to the drawings wherein like reference numerals refer to similar or identical parts throughout the several views, and more specifically to FIG. **1** thereof, there is shown a computer **12** return apparatus **10**. The apparatus **10** comprises a processor **14**. The apparatus **10** comprises a memory **16** connected to the processor **14**. The apparatus **10** comprises a display **18**. The apparatus **10** comprises a return screen **20** that the processor **14** automatically causes to appear during or after boot-up of the processor **14** on the display **18**, that displays ownership information concerning who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16**. The Owner is defined as the person or entity that owns, rents, or licenses the Retriever, and/or the person or entity who controls the recovery service. The Owner has greater control over the computer **12** than the user. This could include, but not be limited to, an employee of a company that owns the computer **12**, or an agent of the owner or a friend that has the permission of the owner to use or have or recover the computer **12**.

Preferably, the apparatus **10** includes means for causing the screen to appear on the display **18** with the owner and return information. The causing means **22** is stored in the memory **16**. The causing means **22** preferably is a software program **24**. Preferably, the memory **16** includes a primary operating system having an operating screen **26** for the computer **12**, and the return screen **20** appears on the display **18** before the operating screen **26** of the operating system appears on the display **18**.

The software program **24** preferably appears before a security prompt such as a password to be entered to obtain

access to the primary operating system of the computer **12**. Preferably, the software program **24** allows the owner to change the return information and the owner information, after the password or security prompt is satisfied for the computer **12**. The software program **24** is preferably able to communicate through a modem (or wireless) to a predetermined location to transfer the return information to the location to facilitate return of the computer **12** if it becomes lost by the owner.

The present invention pertains to a method for returning a computer **12** to its owner. The method comprises the steps of activating a computer **12**. Then there is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up of the computer **12**, which displays information concerning owner information about who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16** of the computer **12**.

Preferably, the displaying step includes the step of displaying automatically the return screen **20** before an operating screen **26** of the primary operating system of the computer **12**. There is preferably the step of displaying the return screen **20** before satisfying a security prompt such as entering a password into the computer **12** to access the primary operating system. Preferably, there is the step of changing the return information, and the owner information after the step of satisfying a security prompt such as entering the password into the computer **12**.

The present invention pertains to a computer **12** readable medium whose contents cause a computer **12** to show who is its owner by performing the steps of activating a computer **12**. Then there is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up of the computer **12**, which displays information concerning owner information about who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16** of the computer **12**.

Preferably, the displaying step includes the step of displaying automatically the return screen **20** before an operating screen **26** of the primary operating system of the computer **12**. There is preferably the step of displaying the return screen **20** before satisfying a security prompt such as entering a password into the computer **12** to access the primary operating system. Preferably, there is the step of changing the return information and the owner information after the step of satisfying a security prompt such as entering a password into the computer **12**.

In the operation of the invention, first, the owner of the computer **12** would install the computer **12** security recovery/return software program **24** application. The program could be installed to work on any type of computer **12** screen including but not limited to, PC's, laptops, handheld computers (such as blackberries, palm pilots), UPS computerized handheld tracking display units, and even cell phone displays. The unique recovery/return computer **12** security program could in fact, be installed and used by any type of computer **12** that utilized a monitor display screen. The software application program provides an additional layer to the existing operating system of each computer **12**. The coding language used for the software program **24** could and would vary depending upon the computer **12** equipment, but the core structure of how the program operates would be similar in all items.

Once the computer **12** security software program **24** is installed, the monitor of the computer **12** will display the complete and current recovery/return information that the program has allowed the owner of the equipment to interactively enter, change and update at anytime.



This "on the fly" ability to change owner recovery information to aid return of equipment is an important feature for anyone, including college students who travel from home to college during different parts of the year, people who move, and particularly business people who travel throughout the world. The recovery/return information would not only allow the display **18** of physical address return information, and owner contact telephone information, but would also provide for international internet based recovery through the added display **18** of owner email information, as well as the ability to display an international recovery center web site.

In addition to increasing chances of return and recovery of the stolen or lost equipment by using the computer's **12** display **18** monitor, the program is an additional programming layer added into the initial start up program of the computer **12**, so that the recovery/return display **18** information occurs during or before a password or security prompt screen. This is an important feature that helps create an environment whereby the individual that happens upon a stolen or lost piece of equipment will see the owner recovery/return information displayed before a password or security prompt screen. By automatically initiating this program during or before a user's security prompt, such as a password screen program, the recovery/return program will not only increase chances of recovery, but will also increase chances that the computer **12** information on the hard drive is protected while the computer **12** is not in the owner's possession.

For example, the actual step by step operation of the program is as follows:

(1) Someone finds a lost or stolen computer **12**. The person who finds the computer **12**, turns the computer **12** on.

(The software program **24** could be provided with a warning sticker that will be placed on the outside of the equipment telling anyone finding the equipment, about the program and the display recovery screen.)

(2) The computer **12** display **18** screen turns on. The computer **12** security software return/recovery program automatically initiates during the computer's **12** boot-up process.

(3) As the computer **12** booting up process moves the user to a password or security prompt screen, the computer **12** security software program **24** displays a dialog box which includes owner recovery and return information, so that the person finding the equipment can return the equipment either directly or through the international web site recovery center. The information screen can include any of the following items of information that the owner would like displayed including but not limited to: contact name, organization name, owner address, owner telephone number, owner email, international web site recovery site, international recovery email information, unique program serial/registration number. (See FIG. **2**).

Virtually all of this information would have been interactively inputted by the owner, and the owner would have control over how much recovery information is displayed. (This is important, because some owners would like all the available information displayed, and others would not. For example, a U.S. secret service agent, accountant, or military personnel, might only want his name and phone number displayed, and would not like the organization name displayed for fear that would encourage a thief to try harder to break into the system rather than return the equipment.)

(4) The individual who has found the lost or stolen computer **12**, is now able to easily return the equipment to the rightful owner. Because the display **18** screen showing the owner information is before, or during a password or security prompt screen that occurs before allowing the user to access the full operating system, the person recovering the equipment is blocked by the password or security prompt

screen from accessing the data, and is unable to avoid seeing the recovery information screen.

It is important to note only that the computer **12** security software recovery/return program be displayed on the computer **12** screen monitor before, or during a password or security prompt display screen, because the operating system password screen creates a 'wall' before taking the computer **12** user to the computer **12** operating system. (See FIG. **3**). This helps not only protect the owner's information on the hard drive, but also ensures that the person finding the equipment will see the owner recovery/return information. If the program initiated after the password or security prompt screen, the person finding the lost or stolen equipment would have difficulty ever seeing the recovery/return display **20**.

It is also important to note that even through the recovery screen dialog box would ideally be the first screen, this may not be possible due to the wide variety of software operating systems used by computer **12** systems. Each computer **12** security program will attempt to display the recovery information on the initial screen when possible. However, for one of the Window operating systems for example, the first boot-up default screen is a CTR+ALT+DEL screen, and then the program can move to a password screen. In this case, the recovery/return program could provide a display **18** dialog screen that would be an additional layer between the CTR+ALT+DEL dialog box and the password dialog box. (See FIG. **4**). Other operating systems could allow the program to display the recovery dialog box, with the password or security prompt at the bottom of the dialog box (so that even though the recovery dialog application is an additional layer during the boot-up, it would appear that the password or security prompt is included within the same dialog box). (See FIGS. **2** and **3**). The recovery dialog box would occur before or during the password or security dialog box that 'blocks' the user from accessing the operating system.

Operation Administration Feature:

The computer **12** security software recovery/return program would also include an administration section to the program through hard drive or remote. The operation of the administration section features could work like this:

(1) The owner of the computer **12** would turn their machine on.

(2) As the boot-up begins, the owner sees the recovery/return display **18** dialog box appear.

(3) The owner then may see a password or security prompt to allow the owner into the operating system.

(4) In the event that there is a security prompt, the owner types in the correct password or satisfies the security prompt to access the hard drive's operating system and programs.

(5) Once the owner gains access to the primary operating system, the owner will have the ability to select an administration section for the computer **12** security software recovery/return program through the Start Up button or a shortcut icon on the display **18** screen. (See FIG. **5**). The administration dialog box will allow the owner to interactively change the recovery/return display **18** information that appears in the recovery/return dialog box displayed during the boot-up process.

(6) There are additional features to the administration dialog box that may be added. Some of the features include:

a) added password or security protection prompt to allow the owner to access the administrative part of the program in order to change the recovery/return dialog display information,

b) interactive email based registration capability that would export owner information to an international recovery center using the internet,



c) a 'where to order more licenses' information screen (that could be tailored to allow dealer/distributor contact information),

d) screen saver lock feature, and

e) possible audit log to track user activity.

There are at least 3 important features that are critical and unique to the program, and make this program vastly different from other equipment security recovery products:

(1) The ability to display recovery/return information on the computer's **12** monitor screen.

(2) The ability to make sure that the display **18** occurs before or during a password or security prompt stopping the user from accessing the full operating system and hard drive information.

(3) The ability using an administrative program feature to allow the owner to interactively change the recovery/return information at any time.

Installation of the program is simple. The owner would load an installation CD into the computer **12** equipment or download the program from the internet. During the installation process, the owner will be prompted to provide some recovery/return information that the owner would like displayed; for example, contact name, phone and email information. The installation process will create the recovery/return display **18** screen, input the owner information, and create an administration section that can be accessed by the owner to be able to change recovery information at any time. After installation is complete, the computer **12** will be rebooted, and the program installation will be complete.

The program is essentially a recovery/return information screen that is displayed, and does not attempt to duplicate or replace more sophisticated access security programs already on the system. In the event that there is a security access program on the system using a password, security card, or biometric recognition device, the recovery/return screen **20** is ideally layered before the security screen (otherwise the recovery/return information would never be displayed—except to the owner since the person finding the equipment would not be able to enter the correct security information to get to the return screen **20**). In operation:

1) The equipment is turned on.

2) The equipment processor **14** begins to go through the steps necessary to open up and allow access to the equipment's operating system. These steps may involve displaying various visual screens, depending upon the equipment.

a) For example, a typical Gateway computer may have the following series of displays:

| Ideal Return Dialog Display Spots | | | | At minimum needs to display before Operating System and should appear before security prompt. | |
|---|---|---|---|---|---|
| Monitor self-test display | Gateway & Gateway logo display | Copyright Promise Technology display | MS Windows 98 Logo display | Microsoft Password Security Prompt | Main Primary Operating System where user can begin using equip & programs |

In this example, the recovery/return program would display before or with the Microsoft password or security prompt.

b) Another example is with a Dell computer, which may have the following series of displays:

| Ideal Return Dialog Display Spots | | | | At minimum needs to display before Operating System and should appear before security prompt | | |
|---|---|---|---|---|---|---|
| Dell Name and Logo display | MS Windows 98 Logo ology display | Copyright ESS Tech- Prompt | MS Ctr + Alt + Del Logon display | Security Program that uses a Windows password and a physical access card | Network Prompts if not connected | Main Operating System where user can begin using equip. & programs |

c) Another example is with an AT&T Cellular phone, which may have the following series of displays:

| Ideal Display Spots for Return Display Program using OK prompt | | At minimum needs to display before operating system |
|---|---|---|
| AT&T Name & Logo display | Display showing phone number | Main/Primary Operating System where user can begin using equip. & programs |

3) The Return/Recovery owner information display screen is displayed before the main operating system. The Return/Recovery owner information screen has been customized by the owner (and can be interactively changed using an administrative program that can be accessed when the user gets to the operating system).

4) Once the owner information dialog box is displayed, it remains displayed until the user satisfies a security prompt and/or pushes an OK button or says "OK". The security program prompt could include a password that might need to be entered, a card access card that might need to be used, or a biometric impression that might need to be used, such as fingerprint, face, eye, or voice recognition system. Once the security program is satisfied, the computer **12** program continues to the main operating system.

The definition of the "boot-up" process includes a series of steps that the computer **12** is taking (including the series of displays that the programs are automatically displaying) in order to move the user to gaining access to the main operating system. And, as can be seen from the 3 examples above, the booting up process entails different steps and different display **18** screens on its way to the operating system.

It is important that

1) the Recovery/Return screen **20** be displayed before the operating system, and

2) that the display remains displayed until the user does something (like pushes an OK button on the screen, or says OK for future voice activation programs, or satisfies a security prompt).

This software application:

should be layered before the main operating system,

and in the event that a security program exists,

should be layered before or during the security program prompt (otherwise the recovery screen would only be seen by the authorized owner).

Security programs that currently exist could include:

a) entering a correct password (in the example of the current computers that have a Microsoft password system already built in and available).

b) entering another type of security prompt such as future security applications with a voice activated security prompt, an access card which needs to be within the vicinity of the computer **12**, or even a fingerprint or eye recognition security program (which are currently available).

The basic Recovery/Return computer **12** security software program **24** may or may not include a security prompt feature as an option. The point of the program is that the recovery information can be customized, interactively changed, and displayed using the computer's **12** screen, and layered at the correct point (before the operating system, and before or during a security program prompt if a security program exists).

The present invention pertains to a computer **12** return apparatus **10**, as shown in FIG. **1**. The apparatus **10** comprises a processor **14**. The apparatus **10** comprises a memory **16** connected to the processor **14**. The apparatus **10** comprises a display **18**. The apparatus **10** comprises a return screen **20** that the processor **14** automatically causes to appear during or after boot-up of the processor **14** on the display **18**, that displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer **12** is assigned to for use, and return information for returning the computer **12** to the owner from data-stored in the memory **16**.

Preferably, the apparatus **10** includes means **22** for causing the screen to appear on the display **18** with the owner, user and return information. The causing means **22** is stored in the memory **16**. The apparatus **10** preferably includes means for changing the return information by the user through remote communication with the computer **12**. Preferably, the changing means changes a security prompt by the owner, overriding any security prompt entered into the computer **12** by the user. The apparatus **10** preferably includes means for changing recovery information of additional computers **12** owned by the owner through remote communication by the owner with the additional computers **12**.

The present invention pertains to a method for displaying information to assist with returning a computer **12** to its owner. The method comprises the steps of activating a computer **12**. There is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up which displays information concerning owner information about who owns the computer **12**, concerning user information about who the user is who the computer **12** is assigned to for use, and return information for returning the computer **12** to the owner from data stored in a memory **16** of the computer **12**.

Preferably, the displaying step includes the step of changing the return information by the user. The changing step preferably includes the step of changing the return information by the user through remote communication with the computer **12**. Preferably, there is the step of changing a security prompt by the owner, overriding any security prompt entered into the computer **12** by the user. There is preferably the step of the owner changing recovery infor-

mation of additional computers **12** owned by the owner through remote communication by the owner with the additional computers **12**.

The Retriever is preferably a software program **24** that is disposed in a memory **16** of a computer **12** and at a remote station to allow an owner to communicate and control the computer **12**, as needed.

The Retriever clearly distinguishes between the "Owner" of the equipment and the person(s) "Assigned To" the equipment. See FIGS. **9** and **10**.

The Owner is defined as the person or entity that owns, rents, or licenses the Retriever, and/or the person or entity who controls the recovery service. The Owner has greater control over the computer **12** than the user.

The Retriever allows the ability to distinguish between the 'owner' and the 'assigned to' person who may be allowed possession of the equipment. These two entities can be the same, but very often are not. For example, a bank may be the owner of 5,000 laptops, and then issue them out to 5,000 different employees. The Bank owns the laptops, and the employees are the "assigned to" persons. Another example would be a company that may provide a recovery security service to equipment owners, and would also be able to control the recovery screen information and display through their recovery service.

The Retriever allows the 'owner' of the protected equipment to ultimately control the recovery information displayed on the protected equipment, not the user.

The current PDA recovery programs, for example, are all completely controlled by the equipment user. Again the 'owner' and 'assigned to' user of the equipment may or may not be the same people, but the Retriever is unique because it allows the ability to distinguish between the 'owner' and the 'assigned to' person. The Retriever allows the 'owner' to have control over both the 'owner' recovery information displayed AND the 'assigned to' recovery information displayed. The 'assigned to' person(s) can only change or control the 'assigned to' recovery information.

The Retriever also allows the owner ultimate control over the security prompt, not the user.

The current PDA software recovery program gives ultimate control over the security prompt to the user or 'assigned to' individual(s). The 'owner' would want the ability to reassign the equipment to a new person. The current PDA recovery program does not satisfy this need. If a disgruntled employee quits or gets fired and hands back their PDA with a unique secret password prompt and says they cannot remember the password, the current PDA recovery program makes it very difficult for the owner to be able to regain control over the password prompt and assign the equipment to someone new.

Both the pocket PC, Palm and other handhelds do have the ability to create a screen on the monitor in conjunction with a password prompt. However, the design of these current programs are flawed, as evidenced by the fact that the program feature is rarely used, even though available.

The Retriever satisfies a need that the pocket PC, Palm and other PDA recovery programs do not. It is the 'owner' of the equipment that needs to have ultimate control of (1) the program, (2) the recovery screen and (3) the password—not the person who is using the equipment. There are many reasons why this is important.

Examples. There is a school district in Virginia that issued 25,000 laptops to students at the high school and middle school level last year. The school district owns the laptops—not the students assigned to the equipment. The students are unlikely to care as much as the school district as to the loss of the equipment.



If the current PDA recovery software program **24** was loaded onto these laptops, the kids could easily (and more than likely would) disable the security prompt since it would be inconvenient to continually have to satisfy a password prompt every time the computer **12** was turned on or timed out. In addition, with the current PDA recovery system the owner of the equipment (the school district) would loose control of not only the recovery information displayed on the monitor, but the password that allows access to the equipment. The Retriever is unique since it distinguishes between the 'owner' and the 'assigned to' person, allows the owner to have ultimate control over the display **18** screen, allows the 'owner' to override recovery information displayed by the 'assigned to' person if necessary, and allows the 'owner' to have ultimate control of the password to access the equipment.

Individuals who are 'assigned to' equipment have inherently less liability and concern if the equipment is lost or stolen than 'the owner'. This is true for not only students, but employees at sales firms, banks, accounting firms, corporations, healthcare facilities, high school students, university personnel, people who rent or lease equipment, etc.

It is the 'owner' who should have ultimate control over security decisions regarding the equipment, not necessarily the person who happens to be in possession of or assigned to the equipment. The current PDA design causes an 'inconvenience' by creating an extra logon screen, and therefore, is not likely to be used by the equipment holder, especially if the equipment holder is not the owner. The owner needs the ability to control whether the program is enabled, and thus ensure that the 'assigned to' person use the program if the owner desires for them to use it.

The current PDA recovery system design is indeed flawed. With the current PDA recovery program, the user or person assigned to the equipment has complete and sole control over recovery information, complete and sole control over the security password, and complete and sole control over whether the security program is even enabled or not. These are some of the reasons that help explain why people that do have a PDA rarely use the recovery security feature available.

As further proof as to the inadequacy of this current program, is the fact that The World Computer Security Company of Colorado has sold "outside" glue on recovery labels to customers to protect hundreds of PDAs, Palms, etc. that indeed already have the PDA recovery program mentioned by the patent office. In fact, this company recently sold a couple hundred of these glue-on security STOP Tag recovery labels that were PDA size this month to Bertek Pharmaceuticals and Washington University St. Louis (June 2004). This is further proof that the current program design is flawed and not commercially viable.

Most alarmingly, the current program does not take into account that many crime statistics suggest that 90% of all theft is internal (committed by those non-owners allowed access to property)!

Perhaps one of the most important and critical differences between the. Retriever and the existing programs is the type of communication possible made possible with the Retriever. The Retriever is designed to enable communication of the recovery display information back and forth from the recovery administration center to the equipment being protected to control changes to the recovery display **18** screen, and this communication from the recovery admin-

istration center is not limited to only the hard drive of the equipment being protected or the computer **12** that the equipment is synchronized with.

The recovery administration update center for the current PDA recovery program is limited to the user updating the owner information directly on the PDA, or directly on the computer **12** the PDA is set up to synchronize with when accessing the PDA program on the main computer **12**. This recovery display information can then be synchronized using the PDA synchronize capability.

The Retriever's recovery administration update center can be an administration program located on the hard drive of the protected equipment, an administration program located on a server on a network and/or an administration program located on a hard drive of a computer **12** that is completely remote from the protected equipment, for example, a web based recovery center. This is an very unique and important feature.

The program design feature allows the 'owner' to access the recovery center administration program, initiate a download of changes to the protected equipment, control the entire recovery screen displayed, and even override the 'assigned to' person's input. This is an important feature, in case the 'assigned to' person is a disgruntled employee who simply reports equipment as stolen and is still using the equipment or has sold it. The Retriever program design allows the owner to make changes at the recovery center level, have the recovery center attempt to communicate those changes to the 'stolen equipment' via phone line (or cable, wi-fi, bluetooth, satellite etc. in the future). This allows the owner to eliminate erroneous or misleading 'assigned to' recovery information that might have been created by the rogue "assigned to" individual, replace the display **18** screen with correct owner recovery information and even change or delete the 'assigned to' password to stop access to the equipment information. By attempting to disable the 'assigned to' password from remote, the equipment becomes extremely difficult if not impossible to use, the information on the hard drive is better protected, and the chances of a quick recovery of the stolen equipment are dramatically enhanced. This remote communication ability makes the Retriever design completely unique and very different from the current PDA recovery software programs.

It is this remote communication ability in the design of the Retriever software recovery program that helps better meet the challenges of internal theft (again many statistics suggest that it is internal theft that comprises 90% of all theft). With the current PDA recovery program, the 'owner' is limited to only making changes directly on the 'assigned to' person's equipment and/or the 'assigned to' person's computer **12** or over a limited network that the assigned to person may never access again. With the Retriever's recovery software design, the 'owner' can also attempt to access the 'assigned to' person's equipment by additional ways, such as over the internet, phone lines, cable, etc. thereby having a more effective ability to try to locate the equipment and control the recovery information displayed by remote.

The "assigned to" person can only control the "assigned to" recovery information and password. The "owner" can control both the owner information and all the "assigned to" recovery information at the recovery center level, and then attempt to communicate this to the protected equipment using the Retriever licensed security recovery program.

Using this unique communication power, both 'owner' and "assigned to" information can be uploaded to the recovery center and/or downloaded to the protected equipment in order to synchronize the international recovery



center information and the recovery information displayed on the initial display **18** screen. (This is a combination of the PDA type of synchronization between the main computer **12** and the PDA, and the McAfee anti-virus software internet updating capability where every time you go on-line, your computer **12** automatically checks to make sure that you have the most current anti-virus software and automatically updates your computer **12** with the latest changes.) Nobody has ever before considered or designed a product combining this type of communication ability with this type of recovery security program that seizes control of the display **18** monitor until a security prompt is satisfied. The Retriever design allows an equipment recovery capability that just does not exist on today's market, and is completely unique from all current products on the market.

Current PDA Communication is limited:

User input/update PDA <---> User input/update Host Computer w/PDA program

The Retriever Design Communication is much broader:

Outside communication via phone line < ---- > Protected Computer < --- > Network Server
cable, wireless, internet etc. user input/update          user input/update
|
|
User input/update on equip

The Retriever design has both a stand-alone and a network based program. This allows an owner to handle multiple machines easily for organizations or entities with more than one equipment.

Each program license has a unique program registration license number that is unique. This is extremely important feature that allows many features that owners would need in handling the protection of multiple machines. From looking at the current PDA security recovery software, the program appears to be only to have 'single license' capability.

The Retriever program design can also allow global changes by the owner who might handle multiple computers.

This is a very important feature for organizations who are in charge of large numbers of computers. For example, let's say that Sgt. Cody is the crime prevention officer at Georgetown University and then retires. Let's say that Sgt. Grier is the contact person currently listed on 700 university owned computers. Now Sgt. Smith is in charge. The Retriever program design allows Sgt. Smith (assuming she uses the correct password), to access the recovery center and globally change all the computers that she wants to change and display her phone number and name to help with recovery. This ability to allow the owner to globally make changes to certain display information over multiple licensed computers is also extremely useful if a phone number changes, a corporate name or logo changes, a recovery contact name changes or a phone number area code changes.

The program also allows owners to easily tag or mark equipment that is ready or available to be sold making it easy for new owners to re-register under the initial security software license registration number. Let's say for example that ABC Telecommunications decided to sell 100 laptops that they are replacing with new ones. The owner or authorized person representing the owner (the IT director for example) can preset the 100 serial license numbers as for sale to allow easier sales to new owners using organizations such as Ebay. New owners can easily be allowed to re-

register under the released registration number that is associated with the Retriever recovery license.

The program also allows owners to easily report equipment as stolen over the internet. Owners can go to the recovery administration center, find the license number of the equipment they believe might be lost or stolen, update the information for this specific license number and report the information over the internet for all to see. This is very helpful resource for both owners and authorities to facilitate recovery of lost or stolen items.

The security program can also not only display 'owner' and 'assigned to' information but also display organization logos and/or other pictures or designs. This is another extremely important feature. The Retriever program seizes control of the entire display **18** screen.

Many, many customers currently desire to customize their physical security tags with owner and logo information. This is often difficult, since the security label manufacturer has to get art design approval, fit corporate and logo information on an often limited space, and then set the tool to run the special labels at the manufacturing plant. Lead times can often go over 3 weeks, and once the customer has their special customized tag, they must often order a minimum amount (STOP Tag has a minimum order of 200 tags for customization for example). If the company changes names, logos or phone numbers the physical security label suddenly becomes incorrect. And, when these customized security tag customers want to sell their equipment, it becomes difficult, since the security label can permanently read 'Property of ABC Corp".

Let's say the company wants to donate 25 laptops to the church. A nun or other church personnel would not really want to be carrying around laptops where the cover of the laptops state "Property of the US Army", "Property of Waste Management Company", or "Property of XYZ University". This becomes awkward for the new owner who actually is the new rightful owner, and cannot always easily remove the existing security label.

The Retriever provides an interactive method of designing and changing the entire recovery screen 'on the fly' that eliminates all of these current problems. Organization logos or ads can be easily and quickly downloaded onto the recovery screens of protected equipment. The current PDA system does not allow this.

The Retriever creates an audit trail of changes. Time and Date fields registering changes are logged and maintained at the recovery center to provide the customer with a security audit trail of changes.

The Retriever display not only appears during the initial boot-up, but the Retriever program security recovery display screen can also be manually initiated by the computer **12** user. This would be the Workstation Locked display. (FIG. **10**). This allows the computer **12** user to manually lock the computer **12** screen and protect the computer **12** if they need to leave their computer **12** for a few minutes. This feature is handy for all types of situations, like emergency room laptops at hospitals, etc.

The Retriever display not only appears during the initial boot-up or with a manual activation by the computer **12** user; the Retriever workstation locked recovery screen can also be initiated automatically using a screen saver timer feature that can be changed by the Owner or the Assigned To person. For example, let's say the computer **12** screen saver time feature has a 10 minute timer. If there is no activity on the computer **12**, the Workstation Locked security Recovery screen will display and stay displayed until the password prompt is satisfied.

The owner can browse the entire database of there own licensed Retriever security software licenses. The owner can look at an individual license record, or browse the entire database and use features such as EDIT, SORT, SEARCH/FIND, and EXPORT when working with the licensed records.

The Retriever provides the owner with extra data information fields that owners can assign their own values to. These data fields are not really related to recovery information displayed, but this is a handy convenience for owners who would like to correlate their own inventory numbers to Retriever license numbers, search by lease dates on equipment, etc.

It should be noted that the communication ability is not limited to internet communication. Satellite, WI-FI, cable, bluetooth, or any other type of remote communication can be used.

Although the invention has been described in detail in the foregoing embodiments for the purpose of illustration, it is to be understood that such detail is solely for that purpose and that variations can be made therein by those skilled in the art without departing from the spirit and scope of the invention except as it may be described by the following claims.

What is claimed is:

**1**. A method for displaying information to assist with returning a computer comprising the steps of:

activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer;

initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the initiating or changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;

displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and

activating the processor to allow a message to the user.

**2**. The method as described in claim **1** including the step of selecting by the owner or user an Internet link on the screen, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is automatically able to access the computer and the Internet location associated with the Internet link.

**3**. The method as described in claim **1** wherein the screen having an active link allowing remote communication to a remote server which provides return information to facilitate return of the computer.

**4**. An apparatus for displaying information at a computer owned by an owner which can be used by an owner or user, the apparatus comprising:

a computer comprising;

a memory;

a display; and

a processor in communication with the display and the memory which displays on the display with the computer recovery information for returning the computer to an owner from data stored in the memory of the computer to facilitate return of the computer so the recovery information is visible to anyone viewing the display, the processor initiating or changing the recov-

ery information through remote communication without assistance by the user with the computer, wherein the initiating or changing of the recovery information is done through an interactive program stored in the memory of the computer and which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the recovery information on the display.

**5**. The apparatus as described in claim **4** wherein the display includes an Internet link that can be selected by the owner or user, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is able to access the computer and the Internet location associated with the Internet link.

**6**. The system as described in claim **4** wherein the display having an active link to allow remote communication to the remote server which provides recovery information to facilitate return of the computer.

**7**. A computer program stored in a non-transient memory for displaying information to assist with returning a computer to its owner comprising the computer generated steps of:

displaying by a processor on a display of the computer which displays recovery information for returning the computer to an owner from data stored in a memory of the computer to facilitate return of the computer and which is maintained on or before or with the lock screen so the recovery information is visible to anyone viewing the display; and

initiating or changing the recovery information through remote communication without assistance by the user with the computer, wherein the initiating or changing of the recovery information is done through an interactive program stored in the memory of the computer and is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the recovery information.

* * * * *

US009892287B2

(12) **United States Patent**
**Hafeman**

(10) **Patent No.: US 9,892,287 B2**
(45) **Date of Patent: *Feb. 13, 2018**

(54) **COMPUTER RECOVERY OR RETURN**

(71) Applicant: **Carolyn W. Hafeman**, Evergreen, CO (US)

(72) Inventor: **Carolyn W. Hafeman**, Evergreen, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/601,645**

(22) Filed: **May 22, 2017**

(65) **Prior Publication Data**

US 2017/0262662 A1 Sep. 14, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 15/199,316, filed on Jun. 30, 2016, now Pat. No. 9,672,388, which is a continuation of application No. 14/691,222, filed on Apr. 20, 2015, now Pat. No. 9,390,296, which is a continuation of application No. 14/087,866, filed on Nov. 22, 2013, now Pat. No. 9,021,610, which is a

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 29/06*** | (2006.01) |
| ***H04L 9/32*** | (2006.01) |
| ***G06F 21/88*** | (2013.01) |
| ***G06F 17/22*** | (2006.01) |
| ***G06F 21/31*** | (2013.01) |
| ***G06F 21/51*** | (2013.01) |
| ***G06F 21/57*** | (2013.01) |
| ***G06F 21/62*** | (2013.01) |

(52) **U.S. Cl.**
CPC .......... ***G06F 21/88*** (2013.01); ***G06F 17/2235*** (2013.01); ***G06F 21/31*** (2013.01); ***G06F 21/51*** (2013.01); ***G06F 21/575*** (2013.01); ***G06F 21/6218*** (2013.01); *G06F 2221/2117* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,715,174 A * 2/1998 Cotichini .............. G06F 21/313 340/568.2
5,748,084 A 5/1998 Isikoff

(Continued)

OTHER PUBLICATIONS

"2,001 tips: portables—whether you're on the road or back at home, here's how to get the most from your portable computer," Windows Magazine, vol. 5 ( No. 2), p. 149-152.

(Continued)

*Primary Examiner* — Christopher Revak
(74) *Attorney, Agent, or Firm* — Ansel M. Schwartz

(57) **ABSTRACT**

A computer return apparatus includes a processor. The apparatus includes a memory connected to the processor. The apparatus includes a display. The apparatus includes a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in the memory. A method for displaying information to assist with returning a computer to its owner.

**7 Claims, 10 Drawing Sheets**






EX-1001
US Patent 9,892,287

**Related U.S. Application Data**

continuation of application No. 10/945,332, filed on Sep. 20, 2004, now Pat. No. 8,601,606, which is a continuation-in-part of application No. 10/304,827, filed on Nov. 25, 2002, now abandoned.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,764,892 | A * | 6/1998 | Cain | G06F 21/313 340/5.5 |
| 5,802,280 | A * | 9/1998 | Cotichini | G06F 21/313 340/5.33 |
| 5,896,497 | A * | 4/1999 | Halstead | G06F 21/313 726/35 |
| 5,987,609 | A | 11/1999 | Hasebe | |
| 6,087,937 | A * | 7/2000 | McCarthy | G06F 21/84 340/12.54 |
| 6,244,758 | B1 * | 6/2001 | Solymar | G06F 21/313 709/200 |
| 6,269,392 | B1 * | 7/2001 | Cotichini | G06F 11/006 709/200 |
| 6,300,863 | B1 * | 10/2001 | Cotichini | G06F 11/006 340/10.42 |
| 6,300,946 | B1 | 10/2001 | Lineke et al. | |
| 6,507,914 | B1 * | 1/2003 | Cain | G06F 21/313 709/202 |
| 6,601,095 | B1 | 7/2003 | Duffield et al. | |
| 6,609,656 | B1 | 8/2003 | Elledge | |
| 6,662,023 | B1 | 12/2003 | Helle | |
| 6,725,339 | B2 | 4/2004 | Dailey | |
| 6,804,699 | B1 | 10/2004 | Henrie | |
| 6,832,320 | B1 * | 12/2004 | Broyles, III | G06F 21/88 713/155 |
| 7,107,349 | B2 | 9/2006 | Britt, Jr. | |
| 7,752,288 | B2 * | 7/2010 | Mihira | G06F 9/44505 358/1.15 |
| 7,818,557 | B2 * | 10/2010 | Bestmann | G06F 8/63 709/220 |
| 7,818,803 | B2 * | 10/2010 | Gordon | G06F 21/88 380/247 |
| 7,945,709 | B2 * | 5/2011 | Cain | G06F 21/313 342/450 |
| 8,062,380 | B2 * | 11/2011 | Stevens | G06F 21/70 713/189 |
| 8,234,359 | B2 * | 7/2012 | Bestmann | G06F 8/63 709/215 |
| 8,241,369 | B2 * | 8/2012 | Stevens | G06F 21/70 713/194 |
| 8,307,055 | B2 * | 11/2012 | Banga | G06F 21/32 709/222 |
| 8,317,878 | B2 * | 11/2012 | Chhabra | G06F 21/88 713/184 |
| 8,332,953 | B2 * | 12/2012 | Lemieux | G06F 21/88 726/26 |
| 8,346,234 | B2 * | 1/2013 | Banga | G06F 1/3203 455/115.1 |
| 8,362,901 | B2 * | 1/2013 | Jung | G06F 21/88 340/500 |
| 8,418,226 | B2 * | 4/2013 | Gardner | G06F 9/4411 380/247 |
| 8,419,806 | B2 * | 4/2013 | Chase | G06F 21/88 726/26 |
| 8,441,348 | B2 * | 5/2013 | Loveland | G06Q 10/06 340/539.13 |
| 8,510,825 | B2 * | 8/2013 | Tarkhanyan | G06F 21/57 726/16 |
| 8,528,105 | B1 | 9/2013 | Miller | |
| 8,601,606 | B2 * | 12/2013 | Hafeman | G06F 21/88 715/747 |
| 8,721,738 | B1 | 5/2014 | Miller | |
| 9,021,610 | B2 * | 4/2015 | Hafeman | G06F 21/88 715/747 |
| 9,390,296 | B2 * | 7/2016 | Hafeman | G06F 21/88 |
| 9,672,388 | B2 * | 6/2017 | Hafeman | G06F 21/88 |
| 2015/0319178 | A1 * | 11/2015 | Desai | G06F 9/4443 726/1 |

OTHER PUBLICATIONS

Crouch, "Tips for keeping a leash on your PDA's data," Network World, Dialog text search, p. 1-3, (Feb. 9, 2001).

* cited by examiner


10
12
14
PROCESSOR
16
MEMORY
CHANGING MEANS
CAUSING MEANS
22
SOFTWARE PROGRAM
24
PRIMARY OPERATING SYSTEM
18
DISPLAY
RETURN SCREEN
20
OPERATING SCREEN
26
REMOTE STATION
CHANGING MEANS

FIG.1

Workstation Locked

[Picture]
Red Stop
Sign w/white
word STOP

The Retriever by WorldsecurityCorp.com

The workstation has been locked. This equipment is protected against theft by the World Security Corp. International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.

---

To Indentify Rightful Owner & Avoid Prosecution CALL NOW :

[Recovery Name/(input from database / required)]
[Organization Name / ABC Corp/ input/ not required]
[Address 1 / input from database / not required]
[Address 2 / input from database / not required]
[City] [State] [Zip / all of these input from database / not required
[Phone 1 / input from database / required][Phone 2 / not required]
[Email / input from database / required][Fax / not required]

OR VISIT

[Picture]
Retriever Logo

www.worldsecuritycorp.com/lostandfound.html
Email : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx

Registration # : xxxxxxxxxxxxxxxx (sequential number unique to each software license

User : [ ________________ ]

Password : [ ________________ ]

[OK]
(moves user to operating system with correct password)

[SHUTDOWN]
(initiates operating system shutdown)

*FIG.2*



Turn Computer On
Recovery / Return Dialog Box appears on monitor's display screen.
(Occurs before or with Password or Security Prompt : Dialog Box)
Computer Password or Security Prompt Dialog Box Prompt Screen
(Can appear as a screen after the Recovery / Return Dialog box or preferably at the bottom of the Recovery/Return Dialog Box as in Sample 1 above)
[OK]
[SHUTDOWN]
User enters computer operating system to access programs and information.
Windows or Other Operating System Standard Shutdown Computer Screen
(*) Shutdown
( ) Shutdown and Reboot
[OK]
[CANCEL]
(Shuts down computer)
(Returns back to previous screen)
Back up to previous screen.


FIG.3


Turn Computer On
Welcome
[Picture] Windows hand with key
Press [CTRL + ALT + DEL] to Logon.
C 2002-200_ World Computer Security Corp
Distribuited by www.worldsecuritycorp.com
Telephone : (303) 670-8800
[Picture] Retriever Logo
Recovery/Return Dialog Box appears on monitor's display screen.
(Occurs before or with password or Security Prompt Dialog Box)
Computer Password or Security Dialog Box Prompt Screen
(Can appear as a screen after the Recovery/Return Dialog box or preferably at the bottom of the Recovery/Return Dialog Box)

*FIG. 4*



Computer Monitor Screen
at Operating System Screen
MS Word >
MS Excel >
Programs >
Administration Section >
Find >
DVD Player >
Help >
Etc ... >
Run >
START


FIG. 5



Windows Logon
[Picture]
Keys
Enter a valid user name and password to logon to this system :
User :
Password :
[Picture]
Retriever Logo
[OK]
[CANCEL]
[SHUTDOWN]


FIG. 7


Workstation Locked
[Picture] Red Stop Sign w/white word STOP
The Retriever by WorldsecurityCorp.com
The workstation has been locked. This equipment is protected against theft by the World Security Corp. International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.
To Indentify Rightful Owner & Avoid Prosecution CALL NOW :
[Recovery Name/(input from database / required)]
[Organization Name / ABC Corp/ input/ not required]
[Address 1 / input from database / not required]
[Address 2 / input from database / not required]
[City] [State] [Zip / all of these input from database / not required
[Phone 1 / input from database / required][Phone 2 / not required]
[Email / input from database / required][Fax / not required]
OR VISIT
[Picture] Retriever Logo
www.worldsecuritycorp.com/lostandfound.html
Email : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx
Registration # : xxxxxxxxxxxxxxxx
PRESS
[OK]
[CANCEL]
[SHUTDOWN]

*FIG.6*


The Retriever Owner Administration
Logo
Last login: Date, Time, Time Zone/ex. Oct 27, 2003 14:41 MST
Customer# : Appears and is protected/ex. 54658653
Log-Off
Select Registration # for global or single update : ?
Select Scroll
Edit All/Global Edit-------------0
100012345--Assigned To---Dept---0
100012346--Assigned To---Dept---0
OR select the
Browse List View
button to see entire list.
Edit Record
Cancel
Update/Save
Clear All Fields
Reported
Report Lost/Stolen
X
Report Equip Sold
X
Export Record
Report All
Selected Registration # Displayed
Owner Display Recovery Info
Property of :
Owner Contact :
Owner Phone :
Owner Email :
*
*
*
* Required
CHANGE OWNER PASSWORD
Assigned to Display Recovery Info
Assigned To :
Department :
Phone :
Email :
CHANGE/CLEAR "ASSIGNED TO" PASSWORD

*FIG.8*


The Retriever "Assigned To" Administration
Assigned TO : Appears and is protected / ex. Sam Stoneworth
Department : Appears and is protected / ex. Harvard Law Dept
Log-Off
Logo
Edit Record
Cancel
Update/Save
Assigned to Display Recovery Info
Phone :
Email :
CHANGE ASSIGNED TO PASSWORD
Screensaver Automatic
Log Off Time: ?
seconds
www.worldsecuritycorp.com (add to the bottom of every page)

FIG. 9


Windows Logon
The RETRIEVER from World Security Corp
[Stop Sign]
Enter a valid user name and password to log on this system.
Sign On
Name :
Password :
PRESS :
OK
CANCEL
SHUTDOWN
Correct PW
Incorrect PW
This equipment is protected against theft by the World Security Corp International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.
To Identify Rightful Owner, Collect Reward & Avoid Prosecution CALL NOW :
Owner Info:
Property of ABC Corporation
Bill Smith, Security Dept
800-222-1234
itadmin@abccorp.com
AD SPACE
Assigned To:
Carrie Hafeman
303-670-8800
lightguardian@msn.com
AD SPACE
Distributed by
AD SPACE
OR VISIT
Web Site :
www.worldsecuritycorp.com/lostandfound/html
Emai :
lostandfound@worldsecuritycorp.com
Phone :
1-800-xxx-xxxx
The Retriever
Registration # : xxxxxxxxxxxxxxxxxxxxxx

*FIG.10*


Workstation Locked
The RETRIEVER from World Security Corp
[Stop Sign] Enter a valid user name and password to log on this system.
Sign On Name : Password :
PRESS : OK CANCEL SHUTDOWN
Correct PW
Incorrect PW
This equipment is protected against theft by the World Security Corp International Registration and Recovery System. The Retriever Program has been installed to help stop theft, protect information and recover lost or stolen equipment.
To Identify Rightful Owner, Collect Reward & Avoid Prosecution CALL NOW :
Owner Info: Property of ABC Corporation
Bill Smith, Security Dept
800-222-1234
itadmin@abccorp.com
AD SPACE
Assigned To: Carrie Hafeman
303-670-8800
lightguardian@msn.com
AD SPACE
Distributed by
AD SPACE
The Retriever
OR VISIT
Web Site : www.worldsecuritycorp.com/lostandfound/html
Emai : lostandfound@worldsecuritycorp.com
Phone : 1-800-xxx-xxxx
Registration # : xxxxxxxxxxxxxxxxxxxxxx

*FIG.11*

# COMPUTER RECOVERY OR RETURN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of U.S. patent application Ser. No. 15/199,316 filed Jun. 30, 2016, now U.S. Pat. No. 9,672,388 which is a continuation of U.S. patent application Ser. No. 14/691,222 filed Apr. 20, 2015, now U.S. Pat. No. 9,390,296 issued Jul. 12, 2016, which is a continuation of U.S. patent application Ser. No. 14/087,866 filed Nov. 22, 2013, now U.S. Pat. No. 9,021,610 issued Apr. 28, 2015, which is a continuation of U.S. patent application Ser. No. 10/945,332 filed Sep. 20, 2004, now U.S. Pat. No. 8,601,606 issued Dec. 3, 2013, which is a continuation-in-part of U.S. patent application Ser. No. 10/304,827 filed Nov. 25, 2002, all of which are incorporated by reference herein.

## FIELD OF THE INVENTION

The present invention is related to the return of lost or stolen computers. More specifically, the present invention is related to the return of lost or stolen computers using a recovery screen that appears during or after boot-up of the computer.

## BACKGROUND OF THE INVENTION

Current methods of computer return or recovery products include:

(1) Physical labels that attach to the outside hardware of the computer equipment.

These hardware labels can contain custom recovery information, but because they are hardware based, they can not be interactively changed by the owner. Also, since they do not have any ability to affect the computer boot-up process, they can do nothing to help protect the confidential owner information on the hard drive. An example of a well known physical hardware/recovery label is the STOP Tag by Security Tracking of Office Property in Connecticut. This labeling system has been patented in France, the US, and other countries. The product can be easily defeated by removing the physical label. In the case of STOP Tag which includes a 'recovery mark' which states "STOLEN PROPERTY" underneath the label, a new label can be simply added over the 'recovery mark' to hide the STOLEN PROPERTY sign. (The Security Tracking of Office Property equipment recovery patent is U.S. Pat. No. 5,163,711 This patent actually refers to how the labels adhere to the equipment—but this is their patent).

The computer security recovery/return program of the present invention utilizes this type of hardware recovery approach to a small degree, but is greatly different from this system, because this is a software program rather than a hardware solution. Additionally, the present invention is greatly superior, since the owner can interactively customize the return/recovery information displayed at any time, and the present invention also helps protect the important, confidential owner information on the hard drive, by the positioning of the program layer in the equipment boot-up process.

(2) Computer Software Programs that attempt recovery through the use of the modem.



There are several patented computer security software products on the market today that are designed for the purpose of recovering lost or stolen equipment. These programs use the computer's modem to regularly call a recovery center. Then once a computer is stolen, the recovery center waits for the stolen computer to call in. When the computer modem calls in, the recovery centers use something similar to the reverse 911 system to get the phone number that the stolen equipment is accessing. Using the phone number, the recovery system then can try to get a map of where the computer is. Some of these computer security recovery programs can also attempt to locate stolen computers through an IP address. Some of these computer security recovery software programs, can actually attempt to seize the communication between the stolen computer and the recovery center and delete selected files to help protect the owner's confidential information. Products like these include CompuTrace, PC Phone Home, CyberAngel, LapTrak and Luceria.

The present invention is also designed for the purpose of recovering lost or stolen equipment, but the method is distinctively different and unique from the current methods. The present invention does not rely on the use of the computer modem. The present invention uses a layered program in the boot-up process to provide a display of the proper owner recovery and return information using the computer's own monitor or screen. The present invention is also different and superior to the above software tracking products, in helping to accomplish international recovery. None of the above products to date have been able to use the modem phone or IP system to track stolen equipment internationally. The present invention provides international recovery by displaying owner email information as well as providing recovery help through an international recovery internet web site.

There are other differences as well in how these programs try to also protect the information on the hard drive. The present invention automatically initiates during the boot-up process of the equipment, in order to display the recovery/return information before a security prompt screen to always help protect the owner's confidential information on the hard drive. Some of the programs above do nothing to protect the user information. Others like LapTrak include a Hide-A-File feature that an owner can access after the user enters the operating system. CyberAngel includes an encryption feature. Luceria includes the ability to delete pre-selected files from the recovery center. By layering this computer security application strategically before or during a security prompt in the boot-up process, this application provides a unique and different method to help protect owner information.

(An example of patents for these types of products would be the CompuTrace U.S. Pat. No. 5,715,174, No. 5,764,892, and No. 5,802,280).

(3) Bios Based Password Identification systems.

There are some computers that are sold with Bios based identification systems included. These products activate immediately when a computer is turned on, and prompt the user for a password before accessing the data on the computer.

The present invention is very different and unique from the Bios based program, for many reasons. Most importantly the bios based password identification products are built into the hardware of the computer equipment—not the hard drive. In other words, if you removed the hard drive from a stolen or lost laptop, and inserted the stolen hard drive into a different laptop, you would bypass the bias based password identification system, and the bios based password identification system would remain with the original equipment. Thus, the Bios Based Password Identification system can identify the computer hardware, but not the hard drive (the most important part of the computer equipment).

In addition, the Bios Based Password Identification systems are designed as a unique method for providing an additional layer of password protection to the equipment hardware, but are not designed for recovery or return. There is no design for including complete owner information, no recovery information displayed, no effective protection of the information on the hard drive, no effective method for the recovery or return of the hard drive—the most important item that a consumer would want back. In fact the Bios Password Identification product occurs before allowing the hard drive to boot up. The present invention is unique because it is an application software program that provides its layer of protection during the boot-up process (not before), and thus allows the security product to move with the hard drive, the most critical part of the computer.

## SUMMARY OF THE INVENTION

The present invention pertains to a computer return apparatus. The apparatus comprises a processor. The apparatus comprises a memory connected to the processor. The apparatus comprises a display. The apparatus comprises a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that displays ownership information concerning who owns the computer and return information for returning the computer to the owner from data stored in the memory.

The present invention pertains to a method for returning a computer to its owner. The method comprises the steps of activating a computer. Then there is the step of displaying automatically a return screen on a display of the computer during or after boot-up of the computer, which displays information concerning owner information about who owns the computer and return information for returning the computer to the owner from data stored in the memory of the computer.

The present invention pertains to a computer readable medium whose contents cause a computer to show who is its owner by performing the steps of activating a computer. Then there is the step of displaying automatically a return screen on a display of the computer during or after boot-up of the computer, which displays information concerning owner information about who owns the computer and return information for returning the computer to the owner from data stored in the memory of the computer.

The present invention pertains to a computer return apparatus. The apparatus comprises a processor. The apparatus comprises a memory connected to the processor. The apparatus comprises a display. The apparatus comprises a return screen that the processor automatically causes to appear during or after boot-up of the processor on the display, that



displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in the memory.

The present invention pertains to a method for displaying information to assist with returning a computer to its owner. The method comprises the steps of activating a computer. There is the step of displaying automatically a return screen on a display of the computer during or after boot-up which displays information concerning owner information about who owns the computer, concerning user information about who the user is who the computer is assigned to for use, and return information for returning the computer to the owner from data stored in a memory of the computer.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings, the preferred embodiment of the invention and preferred methods of practicing the invention are illustrated in which:

FIG. **1** is a schematic representation of the apparatus of the present invention.

FIG. **2** is a representation of a return/recovery dialog box of an embodiment of the present invention.

FIG. **3** is a flow chart regarding an embodiment of the present invention.

FIG. **4** is a flow chart regarding a second embodiment of the present invention.

FIG. **5** is a representation of an administration program section of the present invention.

FIG. **6** is a representation of a return screen of the present invention.

FIG. **7** is an example of a password screen utilized by the present invention.

FIG. **8** is a return administration screen of the present invention.

FIG. **9** is a second return administration screen of the present invention.

FIG. **10** is a third return administration screen of the present invention.

FIG. **11** is a fourth return administration screen of the present invention.

## DETAILED DESCRIPTION

Referring now to the drawings wherein like reference numerals refer to similar or identical parts throughout the several views, and more specifically to FIG. **1** thereof, there is shown a computer **12** return apparatus **10**. The apparatus **10** comprises a processor **14**. The apparatus **10** comprises a memory **16** connected to the processor **14**. The apparatus **10** comprises a display **18**. The apparatus **10** comprises a return screen **20** that the processor **14** automatically causes to appear during or after boot-up of the processor **14** on the display **18**, that displays ownership information concerning who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16**. The Owner is defined as the person or entity that owns, rents, or licenses the Retriever, and/or the person or entity who controls the recovery service. The Owner has greater control over the computer **12** than the user. This could include, but not be limited to, an employee of a company that owns the computer **12**, or an agent of the owner or a friend that has the permission of the owner to use or have or recover the computer **12**.

Preferably, the apparatus **10** includes means for causing the screen to appear on the display **18** with the owner and return information. The causing means **22** is stored in the memory **16**. The causing means **22** preferably is a software program **24**. Preferably, the memory **16** includes a primary operating system having an operating screen **26** for the computer **12**, and the return screen **20** appears on the display **18** before the operating screen **26** of the operating system appears on the display **18**.

The software program **24** preferably appears before a security prompt such as a password to be entered to obtain access to the primary operating system of the computer **12**. Preferably, the software program **24** allows the owner to change the return information and the owner information, after the password or security prompt is satisfied for the computer **12**. The software program **24** is preferably able to communicate through a modem (or wireless) to a predetermined location to transfer the return information to the location to facilitate return of the computer **12** if it becomes lost by the owner.

The present invention pertains to a method for returning a computer **12** to its owner. The method comprises the steps of activating a computer **12**. Then there is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up of the computer **12**, which displays information concerning owner information about who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16** of the computer **12**.

Preferably, the displaying step includes the step of displaying automatically the return screen **20** before an operating screen **26** of the primary operating system of the computer **12**. There is preferably the step of displaying the return screen **20** before satisfying a security prompt such as entering a password into the computer **12** to access the primary operating system. Preferably, there is the step of changing the return information, and the owner information after the step of satisfying a security prompt such as entering the password into the computer **12**.

The present invention pertains to a computer **12** readable medium whose contents cause a computer **12** to show who is its owner by performing the steps of activating a computer **12**. Then there is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up of the computer **12**, which displays information concerning owner information about who owns the computer **12** and return information for returning the computer **12** to the owner from data stored in the memory **16** of the computer **12**.

Preferably, the displaying step includes the step of displaying automatically the return screen **20** before an operating screen **26** of the primary operating system of the computer **12**. There is preferably the step of displaying the return screen **20** before satisfying a security prompt such as entering a password into the computer **12** to access the primary operating system. Preferably, there is the step of changing the return information and the owner information after the step of satisfying a security prompt such as entering a password into the computer **12**.

In the operation of the invention, first, the owner of the computer **12** would install the computer **12** security recovery/return software program **24** application. The program could be installed to work on any type of computer **12** screen including but not limited to, PC's, laptops, handheld computers (such as blackberries, palm pilots), UPS computerized handheld tracking display units, and even cell phone displays. The unique recovery/return computer **12** security program could in fact, be installed and used by any type of computer **12** that utilized a monitor display screen. The software application program provides an additional layer to the existing operating system of each computer **12**. The coding language used for the software program **24** could and would vary depending upon the computer **12** equipment, but the core structure of how the program operates would be similar in all items.



Once the computer **12** security software program **24** is installed, the monitor of the computer **12** will display the complete and current recovery/return information that the program has allowed the owner of the equipment to interactively enter, change and update at anytime.

This "on the fly" ability to change owner recovery information to aid return of equipment is an important feature for anyone, including college students who travel from home to college during different parts of the year, people who move, and particularly business people who travel throughout the world. The recovery/return information would not only allow the display **18** of physical address return information, and owner contact telephone information, but would also provide for international internet based recovery through the added display **18** of owner email information, as well as the ability to display an international recovery center web site.

In addition to increasing chances of return and recovery of the stolen or lost equipment by using the computer's **12** display **18** monitor, the program is an additional programming layer added into the initial start up program of the computer **12**, so that the recovery/return display **18** information occurs during or before a password or security prompt screen. This is an important feature that helps create an environment whereby the individual that happens upon a stolen or lost piece of equipment will see the owner recovery/return information displayed before a password or security prompt screen. By automatically initiating this program during or before a user's security prompt, such as a password screen program, the recovery/return program will not only increase chances of recovery, but will also increase chances that the computer **12** information on the hard drive is protected while the computer **12** is not in the owner's possession.

For example, the actual step by step operation of the program is as follows:

(1) Someone finds a lost or stolen computer **12**. The person who finds the computer **12**, turns the computer **12** on.

(The software program **24** could be provided with a warning sticker that will be placed on the outside of the equipment telling anyone finding the equipment, about the program and the display recovery screen.)

(2) The computer **12** display **18** screen turns on. The computer **12** security software return/recovery program automatically initiates during the computer's **12** boot-up process.

(3) As the computer **12** booting up process moves the user to a password or security prompt screen, the computer **12** security software program **24** displays a dialog box which includes owner recovery and return information, so that the person finding the equipment can return the equipment either directly or through the international web site recovery center. The information screen can include any of the following items of information that the owner would like displayed including but not limited to: contact name, organization name, owner address, owner telephone number, owner email, international web site recovery site, international recovery email information, unique program serial/registration number. (See FIG. **2**).

Virtually all of this information would have been interactively inputted by the owner, and the owner

would have control over how much recovery information is displayed. (This is important, because some owners would like all the available information displayed, and others would not. For example, a U.S. secret service agent, accountant, or military personnel, might only want his name and phone number displayed, and would not like the organization name displayed for fear that would encourage a thief to try harder to break into the system rather than return the equipment.)

(4) The individual who has found the lost or stolen computer **12**, is now able to easily return the equipment to the rightful owner. Because the display **18** screen showing the owner information is before, or during a password or security prompt screen that occurs before allowing the user to access the full operating system, the person recovering the equipment is blocked by the password or security prompt screen from accessing the data, and is unable to avoid seeing the recovery information screen.

It is important to note only that the computer **12** security software recovery/return program be displayed on the computer **12** screen monitor before, or during a password or security prompt display screen, because the operating system password screen creates a 'wall' before taking the computer **12** user to the computer **12** operating system. (See FIG. **3**). This helps not only protect the owner's information on the hard drive, but also ensures that the person finding the equipment will see the owner recovery/return information. If the program initiated after the password or security prompt screen, the person finding the lost or stolen equipment would have difficulty ever seeing the recovery/return display **20**.

It is also important to note that even through the recovery screen dialog box would ideally be the first screen, this may not be possible due to the wide variety of software operating systems used by computer **12** systems. Each computer **12** security program will attempt to display the recovery information on the initial screen when possible. However, for one of the Window operating systems for example, the first boot-up default screen is a CTR+ALT+DEL screen, and then the program can move to a password screen. In this case, the recovery/return program could provide a display **18** dialog screen that would be an additional layer between the CTR+ALT+DEL dialog box and the password dialog box. (See FIG. **4**). Other operating systems could allow the program to display the recovery dialog box, with the password or security prompt at the bottom of the dialog box (so that even though the recovery dialog application is an additional layer during the boot-up, it would appear that the password or security prompt is included within the same dialog box). (See FIGS. **2** and **3**). The recovery dialog box would occur before or during the password or security dialog box that 'blocks' the user from accessing the operating system.

Operation Administration Feature:

The computer **12** security software recovery/return program would also include an administration section to the program through hard drive or remote. The operation of the administration section features could work like this:

(1) The owner of the computer **12** would turn their machine on.

(2) As the boot-up begins, the owner sees the recovery/return display **18** dialog box appear.

(3) The owner then may see a password or security prompt to allow the owner into the operating system.

(4) In the event that there is a security prompt, the owner types in the correct password or satisfies the security prompt to access the hard drive's operating system and programs.

(5) Once the owner gains access to the primary operating system, the owner will have the ability to select an administration section for the computer **12** security software recovery/return program through the Start Up button or a shortcut icon on the display **18** screen. (See FIG. **5**). The administration dialog box will allow the owner to interactively change the recovery/return display **18** information that appears in the recovery/return dialog box displayed during the boot-up process.



(6) There are additional features to the administration dialog box that may be added. Some of the features include:

a) added password or security protection prompt to allow the owner to access the administrative part of the program in order to change the recovery/return dialog display information,

b) interactive email based registration capability that would export owner information to an international recovery center using the internet,

c) a 'where to order more licenses' information screen (that could be tailored to allow dealer/distributor contact information),

d) screen saver lock feature, and

e) possible audit log to track user activity.

There are at least 3 important features that are critical and unique to the program, and make this program vastly different from other equipment security recovery products:

(1) The ability to display recovery/return information on the computer's **12** monitor screen.

(2) The ability to make sure that the display **18** occurs before or during a password or security prompt stopping the user from accessing the full operating system and hard drive information.

(3) The ability using an administrative program feature to allow the owner to interactively change the recovery/return information at any time.

Installation of the program is simple. The owner would load an installation CD into the computer **12** equipment or download the program from the internet. During the installation process, the owner will be prompted to provide some recovery/return information that the owner would like displayed; for example, contact name, phone and email information. The installation process will create the recovery/return display **18** screen, input the owner information, and create an administration section that can be accessed by the owner to be able to change recovery information at any time. After installation is complete, the computer **12** will be rebooted, and the program installation will be complete.

The program is essentially a recovery/return information screen that is displayed, and does not attempt to duplicate or replace more sophisticated access security programs already on the system. In the event that there is a security access program on the system using a password, security card, or biometric recognition device, the recovery/return screen **20** is ideally layered before the security screen (otherwise the recovery/return information would never be displayed—except to the owner since the person finding the equipment would not be able to enter the correct security information to get to the return screen **20**). In operation:

1) The equipment is turned on.

2) The equipment processor **14** begins to go through the steps necessary to open up and allow access to the equipment's operating system. These steps may involve displaying various visual screens, depending upon the equipment.

a) For example, a typical Gateway computer may have the following series of displays:

| Ideal Return Dialog Display Spots | | | | At minimum needs to display before Operating System and should appear before security prompt. | |
|---|---|---|---|---|---|
| Monitor self-test display | Gateway & Gateway logo display | Copyright Promise Technology display | MS Windows 98 Logo display | Microsoft Password Security Prompt | Main/Primary Operating System where user can begin using equip & programs |

In this example, the recovery/return program would display before or with the Microsoft password or security prompt.

b) Another example is with a Dell computer, which may have the following series of displays:

| Ideal Return Dialog Display Spots | | | | At minimum needs to display before Operating System and should appear before security prompt | | |
|---|---|---|---|---|---|---|
| Dell Name and Logo display | MS Windows 98 Logo ology display | Copyright ESS Tech- Prompt | MS Ctr + Alt + Del Logon display | Security Program that uses a Windows password and a physical access card | Network Prompts if not connected | Main Operating System where user can begin using equip. & programs |

c) Another example is with an AT&T Cellular phone, which may have the following series of displays:

| Ideal Display Spots for Return Display Program using OK prompt | | At minimum needs to display before operating system |
|---|---|---|
| AT&T Name & Logo display | Display showing phone number | Main/Primary Operating System where user can begin using equip. & programs |

3) The Return/Recovery owner information display screen is displayed before the main operating system. The Return/Recovery owner information screen has been customized by the owner (and can be interactively changed using an administrative program that can be accessed when the user gets to the operating system).

4) Once the owner information dialog box is displayed, it remains displayed until the user satisfies a security prompt and/or pushes an OK button or says "OK". The security program prompt could include a password that might need to be entered, a card access card that might need to be used, or a biometric impression that might need to be used, such as fingerprint, face, eye, or voice recognition system. Once the security program is satisfied, the computer **12** program continues to the main operating system.

The definition of the "boot-up" process includes a series of steps that the computer **12** is taking (including the series of displays that the programs are automatically displaying) in order to move the user to gaining access to the main operating system. And, as can be seen from the 3 examples above, the booting up process entails different steps and different display **18** screens on its way to the operating system.

It is important that

1) the Recovery/Return screen **20** be displayed before the operating system, and

2) that the display remains displayed until the user does something (like pushes an OK button on the screen, or says OK for future voice activation programs, or satisfies a security prompt).

This software application:

should be layered before the main operating system,

and in the event that a security program exists,

should be layered before or during the security program prompt (otherwise the recovery screen would only be seen by the authorized owner).

Security programs that currently exist could include:

a) entering a correct password (in the example of the current computers that have a Microsoft password system already built in and available).

b) entering another type of security prompt such as future security applications with a voice activated security prompt, an access card which needs to be within the vicinity of the computer **12**, or even a fingerprint or eye recognition security program (which are currently available).

The basic Recovery/Return computer **12** security software program **24** may or may not include a security prompt feature as an option. The point of the program is that the recovery information can be customized, interactively changed, and displayed using the computer's **12** screen, and layered at the correct point (before the operating system, and before or during a security program prompt if a security program exists).

The present invention pertains to a computer **12** return apparatus **10**, as shown in FIG. **1**. The apparatus **10** comprises a processor **14**. The apparatus **10** comprises a memory **16** connected to the processor **14**. The apparatus **10** com-

prises a display **18**. The apparatus **10** comprises a return screen **20** that the processor **14** automatically causes to appear during or after boot-up of the processor **14** on the display **18**, that displays information concerning an owner who owns the computer, concerning user information about who the user is who the computer **12** is assigned to for use, and return information for returning the computer **12** to the owner from data stored in the memory **16**.

Preferably, the apparatus **10** includes means **22** for causing the screen to appear on the display **18** with the owner, user and return information. The causing means **22** is stored in the memory **16**. The apparatus **10** preferably includes means for changing the return information by the user through remote communication with the computer **12**. Preferably, the changing means changes a security prompt by the owner, overriding any security prompt entered into the computer **12** by the user. The apparatus **10** preferably includes means for changing recovery information of additional computers **12** owned by the owner through remote communication by the owner with the additional computers **12**.

The present invention pertains to a method for displaying information to assist with returning a computer **12** to its owner. The method comprises the steps of activating a computer **12**. There is the step of displaying automatically a return screen **20** on a display **18** of the computer **12** during or after boot-up which displays information concerning owner information about who owns the computer **12**, concerning user information about who the user is who the computer **12** is assigned to for use, and return information for returning the computer **12** to the owner from data stored in a memory **16** of the computer **12**.

Preferably, the displaying step includes the step of changing the return information by the user. The changing step preferably includes the step of changing the return information by the user through remote communication with the computer **12**. Preferably, there is the step of changing a security prompt by the owner, overriding any security prompt entered into the computer **12** by the user. There is preferably the step of the owner changing recovery information of additional computers **12** owned by the owner through remote communication by the owner with the additional computers **12**.

The Retriever is preferably a software program **24** that is disposed in a memory **16** of a computer **12** and at a remote station to allow an owner to communicate and control the computer **12**, as needed.

The Retriever clearly distinguishes between the "Owner" of the equipment and the person(s) "Assigned To" the equipment. See FIGS. **9** and **10**.

The Owner is defined as the person or entity that owns, rents, or licenses the Retriever, and/or the person or entity who controls the recovery service. The Owner has greater control over the computer **12** than the user.

The Retriever allows the ability to distinguish between the 'owner' and the 'assigned to' person who may be allowed possession of the equipment. These two entities can be the same, but very often are not. For example, a bank may be the owner of 5,000 laptops, and then issue them out to 5,000 different employees. The Bank owns the laptops, and the employees are the "assigned to" persons. Another example would be a company that may provide a recovery security service to equipment owners, and would also be able to control the recovery screen information and display through their recovery service.

The Retriever allows the 'owner' of the protected equipment to ultimately control the recovery information displayed on the protected equipment, not the user.

The current PDA recovery programs, for example, are all completely controlled by the equipment user. Again the 'owner' and 'assigned to' user of the equipment may or may not be the same people, but the Retriever is unique because it allows the ability to distinguish between the 'owner' and the 'assigned to' person. The Retriever allows the 'owner' to have control over both the 'owner' recovery information displayed AND the 'assigned to' recovery information displayed. The 'assigned to' person(s) can only change or control the 'assigned to' recovery information.

The Retriever also allows the owner ultimate control over the security prompt, not the user.

The current PDA software recovery program gives ultimate control over the security prompt to the user or 'assigned to' individual(s). The 'owner' would want the ability to reassign the equipment to a new person. The current PDA recovery program does not satisfy this need. If a disgruntled employee quits or gets fired and hands back their PDA with a unique secret password prompt and says they cannot remember the password, the current PDA recovery program makes it very difficult for the owner to be able to regain control over the password prompt and assign the equipment to someone new.

Both the pocket PC, Palm and other handhelds do have the ability to create a screen on the monitor in conjunction with a password prompt. However, the design of these current programs are flawed, as evidenced by the fact that the program feature is rarely used, even though available.

The Retriever satisfies a need that the pocket PC, Palm and other PDA recovery programs do not. It is the 'owner' of the equipment that needs to have ultimate control of (1) the program, (2) the recovery screen and (3) the password—not the person who is using the equipment. There are many reasons why this is important.

## EXAMPLES

There is a school district in Virginia that issued 25,000 laptops to students at the high school and middle school level last year. The school district owns the laptops—not the students assigned to the equipment. The students are unlikely to care as much as the school district as to the loss of the equipment.

If the current PDA recovery software program **24** was loaded onto these laptops, the kids could easily (and more than likely would) disable the security prompt since it would be inconvenient to continually have to satisfy a password prompt every time the computer **12** was turned on or timed out. In addition, with the current PDA recovery system the owner of the equipment (the school district) would loose control of not only the recovery information displayed on the monitor, but the password that allows access to the equipment. The Retriever is unique since it distinguishes between the 'owner' and the 'assigned to' person, allows the owner to have ultimate control over the display **18** screen, allows the 'owner' to override recovery information displayed by the 'assigned to' person if necessary, and allows the 'owner' to have ultimate control of the password to access the equipment.

Individuals who are 'assigned to' equipment have inherently less liability and concern if the equipment is lost or stolen than 'the owner'. This is true for not only students, but employees at sales firms, banks, accounting firms, corpora-

tions, healthcare facilities, high school students, university personnel, people who rent or lease equipment, etc.

It is the 'owner' who should have ultimate control over security decisions regarding the equipment, not necessarily the person who happens to be in possession of or assigned to the equipment. The current PDA design causes an 'inconvenience' by creating an extra logon screen, and therefore, is not likely to be used by the equipment holder, especially if the equipment holder is not the owner. The owner needs the ability to control whether the program is enabled, and thus ensure that the 'assigned to' person use the program if the owner desires for them to use it.

The current PDA recovery system design is indeed flawed. With the current PDA recovery program, the user or person assigned to the equipment has complete and sole control over recovery information, complete and sole control over the security password, and complete and sole control over whether the security program is even enabled or not. These are some of the reasons that help explain why people that do have a PDA rarely use the recovery security feature available.

As further proof as to the inadequacy of this current program, is the fact that The World Computer Security Company of Colorado has sold "outside" glue on recovery labels to customers to protect hundreds of PDAs, Palms, etc. that indeed already have the PDA recovery program mentioned by the patent office. In fact, this company recently sold a couple hundred of these glue-on security STOP Tag recovery labels that were PDA size this month to Bertek Pharmaceuticals and Washington University St. Louis (June 2004). This is further proof that the current program design is flawed and not commercially viable.

Most alarmingly, the current program does not take into account that many crime statistics suggest that 90% of all theft is internal (committed by those non-owners allowed access to property)!

Perhaps one of the most important and critical differences between the Retriever and the existing programs is the type of communication possible made possible with the Retriever. The Retriever is designed to enable communication of the recovery display information back and forth from the recovery administration center to the equipment being protected to control changes to the recovery display **18** screen, and this communication from the recovery administration center is not limited to only the hard drive of the equipment being protected or the computer **12** that the equipment is synchronized with.

The recovery administration update center for the current PDA recovery program is limited to the user updating the owner information directly on the PDA, or directly on the computer **12** the PDA is set up to synchronize with when accessing the PDA program on the main computer **12**. This recovery display information can then be synchronized using the PDA synchronize capability.

The Retriever's recovery administration update center can be an administration program located on the hard drive of the protected equipment, an administration program located on a server on a network and/or an administration program located on a hard drive of a computer **12** that is completely remote from the protected equipment, for example, a web based recovery center. This is an very unique and important feature.



The program design feature allows the 'owner' to access the recovery center administration program, initiate a download of changes to the protected equipment, control the entire recovery screen displayed, and even override the 'assigned to' person's input. This is an important feature, in case the 'assigned to' person is a disgruntled employee who simply reports equipment as stolen and is still using the equipment or has sold it. The Retriever program design allows the owner to make changes at the recovery center level, have the recovery center attempt to communicate those changes to the 'stolen equipment' via phone line (or cable, wi-fi, bluetooth, satellite etc. in the future). This allows the owner to eliminate erroneous or misleading 'assigned to' recovery information that might have been created by the rogue "assigned to" individual, replace the display **18** screen with correct owner recovery information and even change or delete the 'assigned to' password to stop access to the equipment information. By attempting to disable the 'assigned to' password from remote, the equipment becomes extremely difficult if not impossible to use, the information on the hard drive is better protected, and the chances of a quick recovery of the stolen equipment are dramatically enhanced. This remote communication ability makes the Retriever design completely unique and very different from the current PDA recovery software programs.

It is this remote communication ability in the design of the Retriever software recovery program that helps better meet the challenges of internal theft (again many statistics suggest that it is internal theft that comprises 90% of all theft). With the current PDA recovery program, the 'owner' is limited to only making changes directly on the 'assigned to' person's equipment and/or the 'assigned to' person's computer **12** or over a limited network that the assigned to person may never access again. With the Retriever's recovery software design, the 'owner' can also attempt to access the 'assigned to' person's equipment by additional ways, such as over the internet, phone lines, cable, etc. thereby having a more effective ability to try to locate the equipment and control the recovery information displayed by remote.

The "assigned to" person can only control the "assigned to" recovery information and password. The "owner" can control both the owner information and all the "assigned to" recovery information at the recovery center level, and then attempt to communicate this to the protected equipment using the Retriever licensed security recovery program.

Using this unique communication power, both 'owner' and "assigned to" information can be uploaded to the recovery center and/or downloaded to the protected equipment in order to synchronize the international recovery center information and the recovery information displayed on the initial display **18** screen. (This is a combination of the PDA type of synchronization between the main computer **12** and the PDA, and the McAfee anti-virus software internet updating capability where every time you go on-line, your computer **12** automatically checks to make sure that you have the most current anti-virus software and automatically updates your computer **12** with the latest changes.) Nobody has ever before considered or designed a product combining

this type of communication ability with this type of recovery security program that seizes control of the display **18** monitor until a security prompt is satisfied. The Retriever design allows an equipment recovery capability that just does not exist on today's market, and is completely unique from all current products on the market.

Current PDA Communication is limited:

User input/update PDA<--->User input/update Host Computer w/PDA program

The Retriever Design Communication is much broader:

```
Outside communication via phone line < ---- > Protected Computer
< ---- > Network Server
cable, wireless, internet etc . user        user input/update
input/update ^                                      |
                                                    |
                                            User input/update on equip
```

The Retriever design has both a stand-alone and a network based program. This allows an owner to handle multiple machines easily for organizations or entities with more than one equipment.

Each program license has a unique program registration license number that is unique. This is extremely important feature that allows many features that owners would need in handling the protection of multiple machines. From looking at the current PDA security recovery software, the program appears to be only to have 'single license' capability.

The Retriever program design can also allow global changes by the owner who might handle multiple computers.

This is a very important feature for organizations who are in charge of large numbers of computers. For example, let's say that Sgt. Cody is the crime prevention officer at Georgetown University and then retires. Let's say that Sgt. Grier is the contact person currently listed on 700 university owned computers. Now Sgt. Smith is in charge. The Retriever program design allows Sgt. Smith (assuming she uses the correct password), to access the recovery center and globally change all the computers that she wants to change and display her phone number and name to help with recovery. This ability to allow the owner to globally make changes to certain display information over multiple licensed computers is also extremely useful if a phone number changes, a corporate name or logo changes, a recovery contact name changes or a phone number area code changes.

The program also allows owners to easily tag or mark equipment that is ready or available to be sold making it easy for new owners to re-register under the initial security software license registration number. Let's say for example that ABC Telecommunications decided to sell 100 laptops that they are replacing with new ones. The owner or authorized person representing the owner (the IT director for example) can preset the 100 serial license numbers as for sale to allow easier sales to new owners using organizations such as Ebay. New owners can easily be allowed to re-register under the released registration number that is associated with the Retriever recovery license.

The program also allows owners to easily report equipment as stolen over the internet. Owners can go to the recovery administration center, find the license number of the equipment they believe might be lost or stolen, update the information for this specific license number and report the information over the internet for all to see. This is very helpful resource for both owners and authorities to facilitate recovery of lost or stolen items.

The security program can also not only display 'owner' and 'assigned to' information but also display organization logos and/or other pictures or designs. This is another extremely important feature. The Retriever program seizes control of the entire display **18** screen.



Many, many customers currently desire to customize their physical security tags with owner and logo information. This is often difficult, since the security label manufacturer has to get art design approval, fit corporate and logo information on an often limited space, and then set the tool to run the special labels at the manufacturing plant. Lead times can often go over 3 weeks, and once the customer has their special customized tag, they must often order a minimum amount (STOP Tag has a minimum order of 200 tags for customization for example). If the company changes names, logos or phone numbers the physical security label suddenly becomes incorrect. And, when these customized security tag customers want to sell their equipment, it becomes difficult, since the security label can permanently read 'Property of ABC Corp".

Let's say the company wants to donate 25 laptops to the church. A nun or other church personnel would not really want to be carrying around laptops where the cover of the laptops state "Property of the US Army", "Property of Waste Management Company", or "Property of XYZ University". This becomes awkward for the new owner who actually is the new rightful owner, and cannot always easily remove the existing security label.

The Retriever provides an interactive method of designing and changing the entire recovery screen 'on the fly' that eliminates all of these current problems. Organization logos or ads can be easily and quickly downloaded onto the recovery screens of protected equipment. The current PDA system does not allow this.

The Retriever creates an audit trail of changes. Time and Date fields registering changes are logged and maintained at the recovery center to provide the customer with a security audit trail of changes.

The Retriever display not only appears during the initial boot-up, but the Retriever program security recovery display screen can also be manually initiated by the computer **12** user. This would be the Workstation Locked display. (FIG. **10**). This allows the computer **12** user to manually lock the computer **12** screen and protect the computer **12** if they need to leave their computer **12** for a few minutes. This feature is handy for all types of situations, like emergency room laptops at hospitals, etc.

The Retriever display not only appears during the initial boot-up or with a manual activation by the computer **12** user; the Retriever workstation locked recovery screen can also be initiated automatically using a screen saver timer feature that can be changed by the Owner or the Assigned To person. For example, let's say the computer **12** screen saver time feature has a 10 minute timer. If there is no activity on the computer **12**, the Workstation Locked security Recovery screen will display and stay displayed until the password prompt is satisfied.

The owner can browse the entire database of there own licensed Retriever security software licenses. The owner can look at an individual license record, or browse the entire database and use features such as EDIT, SORT, SEARCH/FIND, and EXPORT when working with the licensed records.

The Retriever provides the owner with extra data information fields that owners can assign their own values to. These data fields are not really related to recovery information displayed, but this is a handy convenience for owners who would like to correlate their own inventory numbers to Retriever license numbers, search by lease dates on equipment, etc.

It should be noted that the communication ability is not limited to internet communication. Satellite, WI-FI, cable, bluetooth, or any other type of remote communication can be used.

Although the invention has been described in detail in the foregoing embodiments for the purpose of illustration, it is to be understood that such detail is solely for that purpose and that variations can be made therein by those skilled in the art without departing from the spirit and scope of the invention except as it may be described by the following claims.

What is claimed is:

**1**. A method for displaying information to assist with returning a computer comprising the steps of:

activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying recovery information, to facilitate return of the computer so the return information is visible to anyone viewing the display screen;

initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;

displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and

activating the processor to allow a warning message to the user.

**2**. The method as described in claim **1** including the step of selecting by the owner or user an Internet link on the screen, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is automatically able to access the computer and the Internet location associated with the Internet link.

**3**. The method as described in claim **1** wherein the screen having an active link allowing remote communication to a remote server which provides recovery information to facilitate return of the computer.

**4**. An apparatus for displaying information at a computer owned by an owner which can be used by an owner or user, the apparatus comprising:

a computer comprising;

a memory;

a display; and

a processor in communication with the display and the memory which displays on the display with the computer recovery information for returning the computer to an owner from data stored in the memory of the computer to facilitate return of the computer so the return information is visible to anyone viewing the display, the processor initiating or changing the return information through remote communication without assistance by the user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer and which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the recovery information on the display.

**5**. The apparatus as described in claim **4** wherein the display includes an Internet link that can be selected by the owner or user, an Internet location associated with the Internet link stored in the memory of the computer, the owner or user is automatically able to access the computer and the Internet location associated with the Internet link.

**6**. The system as described in claim **4** wherein the display having an active link to allow remote communication to the remote server which provides recovery information to facilitate return of the computer.

**7**. A computer program stored in a non-transient memory for displaying information to assist with returning a computer to its owner comprising the computer generated steps of:

displaying by a processor on a display of the computer which displays return information for returning the computer to an owner from data stored in a memory of the computer, the display displaying the recovery information, to facilitate return of the computer so the return information is visible to anyone viewing the display; and

initiating or changing the recovery information through remote communication without assistance by the user with the computer, wherein the initiating or changing of the additional information is done through an interactive program stored in the memory of the computer and is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the recovery information.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1600, 24-1601, 24-1602, 24-1603, 24-1604, 24-1605

**Short Case Caption:** Hafeman v. Google LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 11,203 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ___________ lines of text.
- [ ] the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 09/03/2024

Signature: /s/ Lawrence M. Hadley

Name: Lawrence M. Hadley