**2024-1600, -1601, -1602, -1603, -1604, -1605**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

CAROLYN W. HAFEMAN,
*Appellant*

v.

GOOGLE LLC, MICROSOFT CORPORATION,
*Appellees*

DERRICK BRENT, Acting Under Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office,
*Intervenor.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2022-01188, IPR2022-01189, IPR2022-01190, IPR2022-01191, IPR2022-01192, IPR2022-01193

# CORRECTED BRIEF OF APPELLEES GOOGLE AND MICROSOFT

Andrew S. Baluch
Matthew A. Smith
Elizabeth A. Laughton
SMITH BALUCH LLP
700 Pennsylvania Ave. SE
Second Floor
Washington, DC 20003
(202) 669-6207
smith@smithbaluch.com

*Counsel for Google LLC*

Carrie A. Beyer
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. Canal Street
Suite 3300
Chicago, IL 60606
(312) 569-1000
carrie.beyer@faegredrinker.com

*Counsel for Microsoft Corporation*

(Additional counsel listed on next page)

Kirstin Stoll-DeBell
FAEGRE DRINKER BIDDLE & REATH LLP
1144 15th Street, Suite 3400
Denver, CO 80202
(303) 927-5212
kirstin.stolldebell@faegredrinker.com

Brianna Lynn Silverstein
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW
Washington, DC 20005
(202) 230-5136
brianna.silverstein@faegredrinker.com

*Counsel for Microsoft Corporation*

## REPRESENTATIVE PATENT CLAIMS

U.S. Patent No. 10,325,122

1. A method for displaying information to assist with returning a computer comprising the steps of:

[1] activating a processor to display on a display screen on the computer which displays information concerning return information for returning the computer to an owner from data stored in a memory of the computer, the screen displaying return information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the return information is visible to anyone viewing the display screen, the lock screen locks the display screen and protects the computer;

[2] ***initiating or changing return information which appears on the display through remote communication <u>without assistance by a user</u> with the computer***, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;

[3] displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and

[4] activating the processor to allow a message to the user.

Appx132–133 (16:50–17:6) (bracketed numbers and emphasis added).

# CERTIFICATE OF INTEREST
## (Google LLC)

I certify that the information below is complete to the best of my knowledge:

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| Google LLC | LG Electronics Inc.<br>LG Electronics U.S.A., Inc. | Alphabet Inc.<br>XXVI Holdings Inc. |

| 4. Other Legal Representatives | | |
|---|---|---|
| Perkins Coie LLP: | Lori A. Gordon | Kyle R. Canavera |

| 5. Related Cases |
|---|
| Hafeman v. LG Electronics Inc. et al., Case No. 6:21-cv-00696 (W.D. Tex.) |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| none |

January 2, 2025

/s/ Andrew S. Baluch
Andrew S. Baluch

**CERTIFICATE OF INTEREST**
**(Microsoft Corporation)**

I certify that the information below is complete to the best of my knowledge:

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| Microsoft Corporation | LG Electronics Inc.<br>LG Electronics U.S.A., Inc. | None |

| 4. Other Legal Representatives | | |
|---|---|---|
| Perkins Coie LLP: | Lori A. Gordon | Kyle R. Canavera |

| 5. Related Cases |
|---|
| Hafeman v. LG Electronics Inc. et al., Case No. 6:21-cv-00696 (W.D. Tex.) |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| none |

January 2, 2025

/s/ Carrie A. Beyer
Carrie A. Beyer

# TABLE OF CONTENTS

REPRESENTATIVE PATENT CLAIMS ............ i

CERTIFICATE OF INTEREST ............ ii

TABLE OF AUTHORITIES ............ vi

STATEMENT OF RELATED CASES ............ 1

STATEMENT OF THE ISSUES ............ 2

STATEMENT OF THE CASE ............ 4

I. The Patents-at-Issue ............ 4

II. Hafeman's "Retriever" Product ............ 8

III. Hafeman's Infringement Complaint against LG ............ 8

IV. Google and Microsoft's IPR Petitions through Institution ............ 9

V. District Court Ruling on *Sotera* Stipulation and Jury Verdict ............ 12

VI. Board Proceedings from Institution to Final Written Decision ............ 15

SUMMARY OF THE ARGUMENT ............ 20

STANDARD OF REVIEW ............ 22

ARGUMENT ............ 23

I. This Court Should Dismiss the Appeal of the *Fintiv/Sotera* Issue, or Alternatively, Affirm the Board's Discretionary Determination ............ 23

A. This Court Lacks Jurisdiction over Hafeman's Case-Specific *Fintiv*/*Sotera* Appeal ............ 24

B. Alternatively, the Board Did Not Abuse Its Discretion in Declining to Revisit the *Fintiv/Sotera* Issue in the Final Written Decision or Terminate the IPRs ............ 26

II. The Board Did Not Implicitly Construe the Claims; Alternatively, Hafeman's Proposed Construction on Appeal Lacks Merit ............ 31

A. The Board Did Not Implicitly Construe "Without Assistance" .........31

B. Alternatively, Hafeman's Construction Is Wrong on the Merits........36

1. Hafeman Ignores the Language of the Claims .........................37

2. The Specification Does Not Prohibit User Assistance in Connecting the Computer to the Internet ................................39

3. The Prosecution History Confirms the Board's Understanding.........................................................................44

4. Extrinsic Evidence Contradicts Hafeman's Technical Arguments .........................................................................45

III. Even under Hafeman's Construction, Remand Would Be Required for the Board to Address Petitioners' Alternative Arguments Below ......................47

IV. The Board's Findings Regarding Secondary Considerations are Supported by Substantial Evidence ........................................................................50

A. No Error Shown in the Board's Analysis of Presumption of Nexus ...........................................................................................51

B. The Board Adequately Explained Its Reasoning ...............................55

C. Praise Focused on Unpatented Features ............................................56

D. Lack of Evidence of Commercial Success .........................................58

E. Lack of Evidence of Copying ..........................................................59

CONCLUSION ...........................................................................................61

CERTIFICATE OF FILING AND SERVICE .....................................................62

CERTIFICATE OF COMPLIANCE ..................................................................63

# TABLE OF AUTHORITIES

## Cases

*ABS Glob., Inc. v. Cytonome/St, LLC*, 84 F.4th 1034 (Fed. Cir. 2023) ........ 48

*Apple Inc. v. Uniloc 2017 LLC*, 843 F. App'x 281 (Fed. Cir. 2021) ........ 34

*Apple Inc. v. Vidal*, 63 F.4th 1 (Fed. 2023) ........ 25, 26

*Arbutus Biopharma Corp. v. ModenraTX, Inc.*, 65 F.4th 656 (Fed. Cir. 2023) ........ 54

*Bos. Sci. Corp. v. Cook Grp. Inc.*, 2023 WL 1452172 (S.D. Ind. Jan. 31, 2023) ........ 14

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120 (Fed. Cir. 2000) ........ 52

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 2022 WL 2643517 (D. Del. July 8, 2022) ........ 14

*Cuozzo Speed Techs. v. Lee*, 579 U.S. 261 (2016) ........ 24

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354 (Fed. Cir. 2018) ........ 23, 56

*Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366 (Fed. Cir. 2019) ........ 55

*Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049 (Fed. Cir. 2024) ........ 32

*Hewlett–Packard Co. v. Mustek Systems, Inc.*, 340 F.3d 1314 (Fed. Cir. 2003) ........ 49

*HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361 (Fed. Cir. 2017) ........ 32

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212 (Fed. Cir. 2020) ........ 22

*In re Baxter Int'l, Inc.*, 678 F.3d 1357 (Fed. Cir. 2012) ........ 23

*In re Couvaras*, 70 F.4th 1374 (Fed. Cir. 2023) ........ 23

*In re Cuozzo Speed Techs.*, LLC, 793 F.3d 1268 (Fed. Cir. 2015) ........ 22, 46

*In re Google Tech. Holdings LLC*, 980 F.3d 858 (Fed. Cir. 2020) ........ 35

*In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282 (Fed. Cir. 2016) ....................23

*In re Roku, Inc.*, No. 2022-116, 2022 WL 1485721 (Fed. Cir. May 11, 2022) ....................25

*In re Thrift*, 298 F.3d 1357 (Fed. Cir. 2002) ....................27, 28

*Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364 (Fed. Cir. 2003) ....................38

*Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144 (Fed. Cir. 1983) ....................59

*Medline Indus., Inc. v. C.R. Bard, Inc.*, 2020 WL 5512132 (N.D. Ill. Sept. 14, 2020)....................14

*MRC Innovations, Inc. v. Hunter Mfg., LLP*, 747 F.3d 1326 (Fed. Cir. 2014) ....................54

*Mylan Lab'ys Ltd. v. Janssen Pharmaceutica, N.V.*, 989 F.3d 1375 (Fed. Cir. 2021)....................25

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ....................54

*Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368 (Fed. Cir. 2019)....................53, 58, 60

*Owens Corning v. Fast Felt Corp.*, 873 F.3d 896 (Fed. Cir. 2017) ....................47

*Pegram v. Herdrich*, 530 U.S. 211 (2000) ....................54

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).....37, 39, 44, 46

*Prolitec Inc. v. ScentAir Techs., LLC*, 2023 WL 8697973 (D. Del. Dec. 13, 2023)....................30

*Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117 (Fed. Cir. 2022) ....................27

*Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373 (Fed. Cir. 2003) ....................53

*SmithKline Beecham Corp. v. Apotex Corp.,* 439 F.3d 1312 (Fed. Cir. 2006) ....................26

*Thryv, Inc v. Click-To-Call Techs., LP*, 590 U.S. 45 (2020)....................24

*Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202 (Fed. Cir. 2023)....................passim

*Wasica Finance GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448 (D. Del. 2020) ........ 14

*Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*, 2023 WL 112733 (D. Minn. Jan. 5, 2023) ........ 13

**Statutes**

35 U.S.C. § 314(a) ........ 23, 24, 26

35 U.S.C. § 314(d) ........ 20, 24, 26

35 U.S.C. § 318(a) ........ 20, 27, 29

5 U.S.C. § 704 ........ 28

5 U.S.C. § 706(2)(A) ........ 22

**Other Authorities**

Federal Rule of Civil Procedure 11 ........ 15

H. Batts & L. Guo, *Divergent Decisions Highlight Uncertainty of IPR Estoppel*, IP LAW360 (May 4, 2023) ........ 30

K. Del Dotto et al., *When Does IPR Estoppel Apply to Product or System Art in District Court?*, WORLD INTELLECTUAL PROPERTY REVIEW (Mar. 27, 2024) ........ 30

L. Goodman, *Product of IPR Estoppel: A District Court Split*, 29 IP LITIGATOR 1 (2023) ........ 30

M. Rueckheim & R. Jung, *The Evolving Scope of IPR Estoppel as Applied to System and Product Prior Art*, 23 CHI.-KENT J. INTELL. PROP. 137 (2024) ........ 30

**Regulations**

37 C.F.R. § 42.11(d)(2) ........ 17, 28

37 C.F.R. § 42.71(a) ........ 28

37 C.F.R. § 42.71(d)(1) ........ 15, 26

37 C.F.R. § 42.72 ........ 28

*Consolidated Trial Practice Guide* (Nov. 2019) ........ 58, 60

**Administrative Decisions**

*Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ........................................................................10

*Interim Procedures for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation* (Jun. 21, 2022) ..................................................................................11, 29

*Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 (PTAB Dec. 1, 2020) (precedential) ..........................................................11

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the originating tribunal was previously before this or any other appellate court. This Court's decision in this appeal may directly affect or be directly affected by *Hafeman v. LG Electronics Inc. et al.*, Case No. 6:21-cv-00696 (W.D. Tex.).

## STATEMENT OF THE ISSUES

Appellees restate the issues as follows:

1. Whether the appeal bar of 35 U.S.C. § 314(d) deprives this Court of jurisdiction over Hafeman's appeal of the Board's discretionary *Fintiv*/*Sotera* determination. If not, whether the Board abused its discretion in deferring enforcement of the *Sotera* stipulation to the district court in which the stipulation has effect, rather than revisiting the discretionary institution issue in the Board's final written decision or terminating the IPRs.

2. Whether the Board implicitly construed the term "without assistance by a user" when the Board announced no general statement of what types of user actions constitute "assistance," and instead merely found (1) a factual similarity between the prior art in this case (Jenne) and an embodiment in the patents' specification; and (2) a factual distinction between Jenne and a reference distinguished during the patents' prosecution (Broyles). If the Board did implicitly engage in claim construction, whether the term "without assistance by a user" should be construed to prohibit a user from merely connecting the computer to the Internet, as Hafeman proposes on appeal.

3. If Hafeman's new proposed construction is adopted, whether a remand would be required for the Board to consider in the first instance Petitioners' alternative arguments that the Jenne-Cohen ground meets the "without assistance"

limitation where the owner (rather than the user) establishes the initial connection to the Internet.

4. Whether substantial evidence supports the Board's finding that Hafeman's secondary considerations—based on a commercial product Hafeman never introduced into evidence in the IPRs and never alleged to be coextensive with the claims—lack nexus to the claimed invention.

# STATEMENT OF THE CASE

## I. The Patents-at-Issue

Each of the three patents-at-issue in these proceedings—U.S. Patent No. 10,325,122 ("'122 patent"), U.S. Patent No. 10,789,393 ("'393 patent"), and U.S. Patent No. 9,892,287 ("'287 patent")—is titled "Computer Recovery or Return" and names Carolyn W. Hafeman ("Hafeman") as the inventor. Appx113. Each patent claims priority to an application filed in 2002. Appx113. The parties treat the '122 patent as representative for purposes of this appeal. *See* Br. 8, n.2.

The patents' "Field of Invention" states that the invention relates to the "return of lost or stolen computers using a ***recovery screen that appears*** during or after boot-up of the computer." Appx125, 1:24–27 (emphasis added). This "recovery screen" displays "information concerning who owns the computer and return information for returning the computer to the owner." Appx126, 3:30–47. This so-called "return/recovery information" can be as simple as the owner's name, address, and/or telephone number. Appx127, 6:50–63; Appx123, Fig. 10. As the patents admit, "The program is essentially a recovery/return ***information screen that is displayed***, and does not attempt to duplicate or replace more sophisticated access security programs already on the system." Appx128, 8:49–52 (emphasis added).

Although the patents are titled "Computer Recovery or Return," the claims do not require the return, recovery, or even locating of a computer. Instead, the claims

provide that a person who finds a computer and attempts to use it (thereby becoming a temporary "user" of the computer) will see a display screen on the computer showing "information concerning return information for returning the computer to an owner" (in the first step) and, potentially, "a message to the user" (in the fourth step):

> 1. A method for displaying information to assist with returning a computer comprising the steps of:
>
> [1] activating a processor to display on a display screen on the computer which displays ***information concerning return information for returning the computer to an owner*** from data stored in a memory of the computer, the screen displaying return information before or with a lock screen, to facilitate return of the computer and which is maintained on or before or with the lock screen so the return information is visible to anyone viewing the display screen, the lock screen locks the display screen and protects the computer;
>
> [2] initiating or changing return information which appears on the display through remote communication without assistance by a user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen;
>
> [3] displaying the screen before or with a security prompt which prevents the user from accessing operatively the computer; and
>
> [4] activating the processor to allow ***a message to the user***.

Appx132–133 (16:50–17:6) (bracketed numbers and emphases added).[1]

As seen in the claim above, none of the four steps requires the physical return

---

[1] The parties treat claim 1 of the '122 patent as representative of all claims of all three patents.

or locating of the computer. Instead, it is up to the user, if they wish, to contact the owner by calling the telephone number or emailing the address displayed on the screen, to let the owner know they found the computer. Appx120, Appx123–124, Figs. 6, 10–11 (display screen requesting the user to "CALL NOW" the owner's telephone number); Appx128, 7:8–10 ("The individual who has found the lost or stolen computer 12, is now able to easily return the equipment to the rightful owner.").

Just as the claim is silent about a user ***contacting*** the owner to return the computer after all the steps of the method claim have been performed, so too is it silent about any person initially ***connecting*** the computer to a remote network. Indeed, the method claim does not mention a "remote communication" until its second step. And in that step, this "remote communication" allows the computer to be "remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen." Appx132–133 (cl. 1). But the claim itself does not specify ***how*** or ***by whom*** that remote connection was initially made. Examples of remote network connections are listed in the specification. Appx131, 13:50–54. Reflecting the state of the art as of the patents' claimed 2002 priority date, a "phone line" is mentioned as the then-current way to remotely connect the computer to a network, followed by "future" types of network connections ("cable, wi-fi, bluetooth, satellite etc. ***in the future***"). Appx131, 13:50–

54 (emphasis added); Appx127, 5:11–12 ("communicate through a modem"). Using such wired or wireless connections, the computer can then be remotely networked to the "Internet." Appx132, 16:37–40.

The act of connecting the computer to the Internet (or other remote network) is further mentioned in the patents' characterization of the invention as a "combination" of prior art PDA synchronization and McAfee anti-virus Internet updating capability, where "***every time you go on-line***, your computer 12 automatically checks to make sure that you have the most current anti-virus software and automatically updates your computer 12 with the latest changes." Appx131, 14:21–40 (emphasis added); *see also* Appx3081–3082 (Applicant arguing copying by a Symantec/Norton product that "[w]orks securely over the Internet," including tracking and mapping "your device when anyone uses it to go online").

During prosecution, the words "without assistance by [a] user" were added to the "initiating or changing" step to distinguish over Broyles—a prior art reference that allegedly required a user at the computer to push an interrupt key to allow the owner to change the display. Appx1133, Appx1141-1142, Appx3083. Applicant's arguments to the examiner stressed that the user's specific act of pressing the interrupt key "at the proper time" was "what initiates changes to the ownership tag in Broyles." Appx1142; *see also* Appx3083 (arguing "the Broyles patent requires a user to push an interrupt key to allow the owner to change the display from remote").

Nearly seven years after this claim amendment was filed, the examiner allowed the claims, with no discussion of the Broyles reference in the examiner's reasons for allowance. Appx3105–3108.

## II. Hafeman's "Retriever" Product

The patents' earliest claimed priority application, filed in 2002, contains at least 12 mentions of a prophetic "Retriever" program. Appx918, Appx920–926. Hafeman admits that "a working software product," which she also named "The Retriever," was not built until "March of 2007." Br. 3. During the five years between the filing of the initial patent application and the creation of a working product, eight contractors "tried and failed" to write the software for Hafeman. Appx7729.

The record in these IPRs does not indicate, and Hafeman in these IPRs has not explained, which, if any, of the various functions of the prophetic examples of the 2002 priority application, described in the application as "preferred" or "preferabl[e]," were ultimately incorporated into the working product. Appx921–922, Appx928–929 ("preferred" or "preferably" used at least 13 times in priority application); Appx8498, 58:7–13; Appx8531, 91:4–6 ("We don't have in this [IPR] proceeding evidence of what functionality was actually incorporated into the product that was constructed in 2007.").

## III. Hafeman's Infringement Complaint against LG

In 2021, Hafeman filed a patent infringement complaint against LG

Electronics Inc. ("LG") in the U.S. District Court for the Western District of Texas, alleging infringement of the three patents-at-issue. Appx4376. The case was assigned to Judge Albright.

The devices that Hafeman accused of infringement were LG-made laptops, tablets, and smartphones that were sold with pre-loaded Google or Microsoft "Find My Device" features. Appx4381–4383. Hafeman alleged that these devices allow an owner to remotely access the device (while it is connected to the Internet) and to change or add information displayed on the device's screen by logging in remotely to a Google or Microsoft account on an Internet browser on a different computer. Appx4383; Appx4522-4523 (Hafeman's expert explaining the accused devices must be connected over a network to receive a Find My Device message).

## IV. Google and Microsoft's IPR Petitions through Institution

Within one year of service of Hafeman's district court complaint, Google and Microsoft (collectively "Petitioners") timely filed six *inter partes* review ("IPR") petitions against the three patents-in-suit. The petitions named LG as a real party-in-interest. Each patent was challenged with two IPR petitions: one assumed the patents were entitled to the 2002 priority date (Appx7896; Appx9642; Appx10853), and the other sought to establish a later effective filing date of 2013 by breaking the patents' priority chain (Appx8863; Appx10017; Appx11238).

The petitions that assumed a 2002 effective date presented two grounds of

unpatentability: obviousness over Jenne and Cohen, and obviousness over Angelo and Helle. Appx7897–7898. None of these references was substantively considered during prosecution (Appx7975–7976), and both grounds contended that it was well-known before 2002 to use remote communication without user assistance to change return/recovery information displayed on a computer (Appx7914–7941, Appx7945–7974).

The petitions that challenged the patents' entitlement to a priority date before 2013 presented two grounds of unpatentability, albeit in view of printed publications that published before 2013: obviousness over Hafeman 298 and Chiu, and anticipation by Hafeman 670. Appx8864–8865.

In response to the petitions, Hafeman filed a preliminary response in the IPRs, arguing that, due to the co-pending litigation in the Western District of Texas, the Board should discretionarily deny the IPR petitions under *Apple Inc. v. Fintiv, Inc*., IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential). Appx8974.

After Hafeman's preliminary response, but before institution of the IPRs, LG served Hafeman with a so-called "*Sotera* stipulation" in the district court litigation. Appx4375. Petitioners obtained permission from the Board to submit and explain the relevance of this *Sotera* stipulation to the IPRs. Appx8065–8067. LG's stipulation was dated November 30, 2022, and stated in relevant part:

> In accordance with the Board's precedential decision in *Sotera Wireless, Inc. v. Masimo Corp*., IPR2020-01019, Paper 12 at 18-19

> (PTAB Dec. 1, 2020), LG Electronics Inc. agrees that if any of IPR Nos. IPR2022-01188, IPR2022-01189, IPR2022-01190, IPR2022-01191, IPR2022-01192, and IPR2022-01193 is instituted, LG Electronics Inc. will not pursue in the related district court proceeding "any ground that [Google or Microsoft] raised or reasonably could have raised" during the instituted IPRs. 35 U.S.C. § 315(e).

Appx4375 (alterations in original). As Petitioners explained, under the Memorandum from Director Vidal titled *Interim Procedures for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation* (Jun. 21, 2022) ("*Interim Procedures*"),[2] the Board will not discretionarily deny an IPR petition under *Fintiv* if the accused infringer in the ongoing litigation makes a stipulation equivalent to the one in *Sotera Wireless, Inc. v. Masimo Corp*., IPR2020-01019, Paper 12 (PTAB Dec. 1, 2020) (precedential). Appx8067.

On January 31, 2023, the Board issued its institution decisions in the IPRs. Appx8094. The Board reviewed LG's stipulation and determined it was "effective as a *Sotera* stipulation even though made by a different party." Appx8099. Applying the *Interim Procedures*, the Board declined to exercise its discretion to deny institution under *Fintiv*. Appx8100. The Board also noted that LG's stipulation, like the stipulation in the *Sotera* case itself, is "conditional on institution." Appx8100 (citing *Sotera* at 18). On the merits of Petitioners' unpatentability challenge, the

---

[2] Available at https://www.uspto.gov/sites/default/files/documents/interim_proc_discretionary_denials_aia_parallel_district_court_litigation_memo_20220621_.pdf.

Board agreed that each of the six petitions established a reasonable likelihood of unpatentability of the challenged claims and ordered institution of all six IPRs. Appx8110–8111; Appx8114–8115; Appx9020–9021. Among its findings in favor of Petitioners, the Board preliminarily determined that the challenged claims were not entitled to a priority date earlier than 2013 and that there was a reasonable likelihood of anticipation by Hafeman 670. Appx9036–9037. Moreover, regarding the claim term "without assistance by a user," the Board's institution decision noted that this term was added during prosecution "to distinguish over prior art that allegedly required a user at the computer 'to push an interrupt key to allow the owner to change the display from remote.'" Appx8109 (quoting Appx3083). The Board found that Jenne satisfied the "without assistance" limitation because "Jenne discloses remotely updating using a password without requiring the user at the computer to press a particular key to start the [initiating or changing return information] process." Appx8109.

## V. District Court Ruling on *Sotera* Stipulation and Jury Verdict

On February 1, 2023—one day after the IPRs were instituted—LG notified the district court of the Board's institution decisions and of the effect of LG's *Sotera* stipulation on its invalidity contentions going forward in the litigation. Appx11563–11564. As LG explained, "Because Defendant served a *Sotera* stipulation conditioned on institution of these IPRs, Defendant will no longer be pursuing [six]

invalidity grounds" from its expert report. Appx11563 (listing, among others, all grounds raised in the IPRs as being dropped from litigation).[3] After dropping those invalidity defenses, LG limited its remaining prior art invalidity defenses to grounds whose primary prior art were on-sale/public-use ***products*** (not patents or printed publications). Appx11563; Appx7631.

Relying solely on prior art products that cannot be raised in an IPR, LG moved for summary judgment of invalidity on February 6, 2023. Appx7637. LG's motion argued that the claims are anticipated by two different software products, each of which qualify as prior art if the earliest effective priority date of the claims is 2013—Hafeman's own Retriever product (on sale in 2007) and Apple's Find My iPhone product (on sale or otherwise publicly available prior to the 2013 effective date). Appx7652–7653. Explaining why the *Sotera* stipulation did not bar these invalidity grounds, LG stated: "both the Retriever program and Find My iPhone are software products and not the type of references that can be raised in an IPR proceeding." Appx11575. To support its position, LG cited cases from ***three*** different districts that held *Sotera* or IPR estoppel does ***not*** bar invalidity based on product art: *Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*, 2023 WL 112733 (D. Minn. Jan. 5, 2023);

[3] Hafeman points to LG's post-stipulation service of the expert report as "demonstrat[ing] that the *Sotera* stipulation was a sham" (Br. 16) but ignores the Board's own finding that the stipulation was "conditional on institution" (Appx8100).

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 2022 WL 2643517 (D. Del. July 8, 2022); *Medline Indus., Inc. v. C.R. Bard, Inc.*, 2020 WL 5512132 (N.D. Ill. Sept. 14, 2020). Appx11575.

On this product art estoppel issue, the parties' summary judgment briefing noted an unresolved split among district courts (an issue of first impression in the Western District of Texas). Appx7669; Appx11575–11576. But even under the minority line of cases from two other districts that preclude defendants from asserting prior art products that are "materially identical" to IPR printed art, LG explained why the Retriever and Find My iPhone products were not "materially identical" to the IPR printed art under those cases. Appx11575–11576 (distinguishing *Wasica Finance GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 455 (D. Del. 2020), and *Bos. Sci. Corp. v. Cook Grp. Inc.*, 2023 WL 1452172 (S.D. Ind. Jan. 31, 2023)).

On April 12, 2023, Judge Albright ruled on LG's summary judgment motion. Appx7676. In a short order denying the motion, the district court adopted the *Wasica* and *Boston Scientific* minority view of estoppel, without discussion of any district court decision adopting the majority view. Appx7676–7677. Acknowledging that LG's asserted prior art could ***not*** have been raised in the IPR, the district court held:

> Although LG uses two system references—Ms. Hafeman's Retriever product and Apple's Find My iPhone—for its invalidity argument that ***it could not raise before the PTAB***, estoppel still applies when the allegedly new references have 'materially identical' disclosures as the

IPR art.

Appx7676 (emphasis added). The district court concluded that the two systems were barred as "materially identical" to the IPR references because "the related IPRs here are relying on Ms. Hafeman's patents, and Ms. Hafeman has admitted that the Retriever and Find My iPhone practice her patents." Appx7676.

The case then went to a jury on the issues of infringement and invalidity. The invalidity defenses at trial were based on two other system references (BlackBerry and Windows 2000 systems) that were prior art even assuming the patents were entitled to the 2002 earliest-claimed priority date. On April 28, 2023, the jury returned a complete defense verdict, finding all asserted claims invalid and not infringed. Appx7626–7636.

Post-trial motions filed by Hafeman are still pending before Judge Albright. Judgment has not yet been entered in the district court. Concerning the *Sotera*/estoppel issue, Hafeman never sought sanctions against LG, including under Federal Rule of Civil Procedure 11 (and would have had no basis to do so given the unresolved split among the districts on the application of estoppel to prior art products or systems).

## VI. Board Proceedings from Institution to Final Written Decision

After the Board instituted the IPRs on January 31, 2023, Hafeman had 14 days to request rehearing of the institution decisions. *See* 37 C.F.R. § 42.71(d)(1). On

March 17, 2023—more than one month after the February 14, 2023, rehearing deadline had passed—Hafeman contacted the Board to request permission to file a rehearing request out of time. Appx7832. Hafeman's justifications for the tardiness were two alleged "changes in circumstances": (1) a new precedential IPR decision in *CommScope v. Dali Wireless* involving the "compelling merits" factor of *Fintiv*, and (2) LG's February 6, 2023, motion for summary judgment that allegedly "violates LG's *Sotera* stipulation." Appx7832.

Petitioners opposed Hafeman's belated request on the basis that (1) *CommScope* was irrelevant because the Board here did not rely on the "compelling merits" factor in its *Fintiv* analysis; and (2) LG's summary judgment motion could have been timely raised in a rehearing request, and, in any event, the *Sotera* stipulation was not violated because the asserted system art in the litigation could not be raised in the IPRs. Appx7833. Notably, LG's summary judgment motion was filed more than a week before Hafeman's request for rehearing of the institution decision was due. Appx7833.

On March 20, 2023, the Board denied Hafeman's request to file a rehearing request out of time. Appx7830. First, the Board determined that *CommScope*'s "compelling merits" analysis was inapplicable to the instant proceedings. Second, concerning the *Sotera* stipulation, the Board stated that "any dispute regarding the scope or alleged violation of stipulations should be addressed in the district court

proceedings in which such stipulations are to have effect." Appx7830.

Despite being denied permission to seek rehearing of the institution decisions, Hafeman continued to raise the *Sotera* issue throughout the IPRs, urging the Board in her patent owner response to "vacate the institution decision[s] and terminate the IPR[s]." Appx8176. Petitioners responded to Hafeman's *Sotera* invocations by pointing out that enforcement of LG's stipulation was being handled in the district court where LG had already been precluded from relying on its invalidity defenses based on the Retriever product and Apple's Find My iPhone. Appx8229–8232; Appx8483. Even Hafeman's counsel conceded to the Board that the district "court enforced [the *Sotera* stipulation]. They prevented LG from raising this challenge and denied their motion for summary judgment." Appx8469, 29:16–18. Notably, Hafeman never requested authorization from the Board to file a motion for sanctions under 37 C.F.R. § 42.11(d)(2) (requiring sanctions motion to be "made separately from any other motion") and never filed any sanctions motion against Petitioners based on LG's alleged "*Sotera* violation."

In Hafeman's patent owner response, she proposed constructions of certain claim terms, but not for the "without assistance" limitation. Appx8160–8172. Rather than propose a construction for this term, Hafeman merely disputed that Jenne met this limitation on the basis that "Jenne's system requires assistance from the user by logging in and establishing a connection before sending an advertisement through

remote communication." Appx8184. While Hafeman recounted the same prosecution history for the "without assistance" limitation that the Board discussed in its institution decision, she did not contend that the Board somehow misunderstood the meaning of the claim language or import of the prosecution history, nor did she propose her own construction. Appx8186–8188.

The Board then issued its final written decisions on January 23, 2024. Appx1, Appx37, Appx76. Having already denied Hafeman's untimely request to rehear the institution decisions, the Board declined to revisit the discretionary *Fintiv/Sotera* issue in the final written decisions. Instead, the Board focused its final written decisions on the merits of the unpatentability challenge. Specifically, the Board determined that the Jenne-Cohen obviousness ground rendered all challenged claims unpatentable. Appx32–34. Because this ground addressed all challenged claims, the Board did not reach any other ground, including the Angelo-Helle ground or any prior art ground that relied on severing the patents' priority chain. Appx35–36.

With respect to the "without assistance" claim language, since neither party asked for an express construction of this term, the Board did not construe it. Instead, the Board maintained its position from the institution decision that Jenne satisfied this limitation because Jenne remotely updates information displayed on a computer by "using a password without requiring the user at the computer to press a particular key to start the process." Appx23 (distinguishing Jenne's process from the Broyles

prior art at issue during prosecution history). In so doing, the Board found that Jenne's automatic updating functionality was similar to the allegedly inventive combination of the PDA synchronization/McAfee anti-virus capability described in the patents themselves. Appx21–22 (citing Appx131, 14:22–40). The Board supported its findings with respect to the "without assistance" limitation by considering expert testimony regarding the ability of iPhones or other smartphones to automatically connect to the Internet "without any involvement by the user," as Hafeman asserted, and found that Hafeman presented no evidence that such capability existed as of the patents' 2002 priority date. Appx22.

The Board considered Hafeman's evidence of secondary considerations based on the Retriever product—the details of which were never introduced into evidence—and found a lack of nexus to the claimed invention. Appx28–32. The Board arrived at this conclusion after first considering whether the Retriever product was entitled to a presumption of nexus and, failing that, whether Hafeman had shown a nexus independently of a presumption. Appx28–32.

After the final written decisions were issued, Hafeman did not file any request for panel rehearing or Director review. Hafeman instead appealed immediately to this Court. Appx8538–8539.

**SUMMARY OF THE ARGUMENT**

1. This Court lacks jurisdiction over the *Fintiv*/*Sotera* issue in Hafeman's appeal. Both *Fintiv* itself, and stipulations to avoid denial under *Sotera*, govern institution of IPRs and nothing more. Hafeman's recourse from the Board's application of *Fintiv*/*Sotera* to the specific facts of this case was through Director review, not through a judicial appeal barred by 35 U.S.C. § 314(d).

But even if appealable, what Hafeman calls the "*Sotera* violation"—LG's mere act of filing a motion for summary judgment of invalidity based on system prior art—is a legal issue on which district courts remain split, and this Court has not yet resolved. Hafeman was more than a month late in seeking rehearing of the Board's institution decision, and nothing required the Board to revisit the institution-related *Fintiv* issue in the final written decision. Instead, the Board properly addressed the sole issue it was required to address in the final written decision: "the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)." 35 U.S.C. § 318(a).

2. The Board did not implicitly construe the term "without assistance by a user." The Board's decision contains no general statement demarcating the type of user actions that either do or do not constitute "assistance" in the claimed step of "initiating or changing return information"—including the act of "powering on the device," which Hafeman concedes is not "assistance." Nor did the Board announce

any per se rule that a user's act of connecting a computer to the Internet will never fall within the scope of "assistance." Because the Board did not establish the scope of this limitation, the Board did not implicitly engage in claim construction warranting *de novo* review.

Alternatively, if this Court finds the Board did implicitly engage in claim construction, this Court should not adopt Hafeman's proposed construction. Hafeman overlooks the language of the claim and ignores that "without assistance" grammatically modifies the step of "initiating or changing return information," not some unrecited step like supplying the computer with power or initially connecting it to a remote network. Moreover, the specification is replete with examples of wired network connections like a "phone line" or "cable" or "modem" that a user would need to physically connect to the computer to establish an Internet connection.

3. Under Hafeman's proposed construction, a remand would be required to resolve the parties' dispute as to whether Jenne's system requires the "user," as opposed to some other entity (such as the "owner"), to establish the Internet connection. Petitioners presented several alternative arguments for how the Jenne-Cohen ground would satisfy the "without assistance" limitation where the "user" is never the entity who establishes the Internet connection. Because the Board never addressed these arguments (or Petitioners' other invalidity grounds), a remand rather than reversal would be appropriate if Hafeman's construction is adopted.

4. The Board analyzed thoroughly the scant evidence of secondary considerations that Hafeman presented below. Hafeman never introduced the actual working product completed in "March of 2007" into evidence in this IPR proceeding and submitted no declaration of any kind to substantiate her claims about the product. Regarding nexus, the Board found Hafeman did not address coextensiveness at all, and Hafeman continues to ignore coextensiveness on appeal. The Board gave reasoned explanations, supported by substantial evidence, for why Hafeman's secondary considerations did not establish either a presumption of nexus or a nexus independently of any presumption.

## STANDARD OF REVIEW

1. To the extent this Court has jurisdiction to review the Board's exercise of discretion under *Fintiv*, this Court would review such agency action to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

2. To the extent the Board engaged in any claim construction, this Court "review[s] the Board's claim construction de novo and any underlying factual findings for substantial evidence." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1217 (Fed. Cir. 2020). This Court "review[s] underlying factual determinations concerning extrinsic evidence for substantial evidence." *In re Cuozzo Speed Techs*., LLC, 793 F.3d 1268, 1279–80 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo*

*Speed Techs., LLC v. Lee*, 579 U.S. 261 (2016).

3. “Obviousness is a question of law based on underlying factual findings that are reviewed for substantial evidence, including what a reference teaches . . . .” *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1288 (Fed. Cir. 2016) (citing *In re Baxter Int’l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012)).

4. “The Board’s findings regarding objective indicia,” including the existence of a nexus between the objective indicia and the claimed invention, “involve questions of fact that [this Court] review[s] for substantial evidence.” *In re Couvaras*, 70 F.4th 1374, 1380 (Fed. Cir. 2023); *see Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1211–12 (Fed. Cir. 2023) (discussing nexus). “If two inconsistent conclusions may reasonably be drawn from the evidence in record, the PTAB’s decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence.” *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1356 (Fed. Cir. 2018) (internal quotation marks, brackets, and citation omitted).

## ARGUMENT

### I. This Court Should Dismiss the Appeal of the *Fintiv/Sotera* Issue, or Alternatively, Affirm the Board’s Discretionary Determination

After instituting the IPRs under 35 U.S.C. § 314(a), the Board denied Hafeman’s request to rehear the institution decisions out of time and instead advised Hafeman to address “any dispute regarding the scope or alleged violation of

stipulations . . . in the district court proceedings in which such stipulations are to have effect." Appx7830. The Board declined to revisit this discretionary institution issue in its final written decisions or to terminate the IPRs.

Hafeman's appeal of the discretionary institution issue, even as part of a proper appeal of a final written decision on the merits of Petitioners' patentability challenge, is barred by the "No Appeal" provision of 35 U.S.C. § 314(d). Even if the issue were appealable, however, this Court should still affirm the Board's final written decisions. No statute or regulation required the Board to revisit the discretionary institution issue in the final written decisions. Moreover, the Board's stated preference for the district court to resolve disputes about any "alleged violation of stipulations" in the litigation was prudent, not an abuse of discretion.

### A. This Court Lacks Jurisdiction over Hafeman's Case-Specific *Fintiv*/*Sotera* Appeal

The "No Appeal" provision of 35 U.S.C. § 314(d) bars judicial review of "the determination by the Director whether to institute an inter partes review" under § 314(a), as well as "questions that are closely tied" or "closely related to that decision to institute inter partes review." *Cuozzo Speed Techs. v. Lee*, 579 U.S. 261, 275–76 (2016). Appeal is barred where one party challenges another party's compliance with a requirement that "governs institution and nothing more." *Thryv, Inc v. Click-To-Call Techs., LP*, 590 U.S. 45, 54 (2020) (compliance with § 315(b)'s time-limit is not reviewable).

The Board's case-specific discretionary analysis under *Fintiv*—a "six-factor standard for evaluating ***whether to deny institution***"—governs institution and nothing more, so it cannot be appealed to this Court on direct appeal. *Mylan Lab'ys Ltd. v. Janssen Pharmaceutica, N.V.*, 989 F.3d 1375, 1377, 1379 (Fed. Cir. 2021) (emphasis added) (holding § 314(d) bars appeal of *Fintiv* denial); *see also In re Roku, Inc.*, No. 2022-116, 2022 WL 1485721, at *1 (Fed. Cir. May 11, 2022) ("[D]ecisions based on the Board's multi-factor [*Fintiv*] standard for evaluating whether to institute in view of parallel civil litigation [are] 'final and nonappealable' [under § 314(d)].").

Hafeman's sole argument for reviewability of the *Fintiv/Sotera* issue is found in a single sentence of the opening brief: "While the PTAB's institution decisions are not appealable, *Apple Inc. v. Vidal*, 63 F.4th 1, 7 (Fed. 2023), its FWDs are." Br. 30. Hafeman's artful placement of the citation to *Apple v. Vidal* in the middle of this sentence is conspicuous. Notably, Hafeman provides no authority to support her position at the end of the sentence that institution-related issues are reviewable in appeals of "FWDs." In fact, *Apple v. Vidal* says the very opposite. Specifically, in the very context of a party's challenge to the Director's *Fintiv* framework, this Court explained:

> Based on that provision [§ 314(d)], whose terms apply whether the determination is negative or positive, the Supreme Court has held the institution decision is unreviewable, ***even in a proper appeal of a final written decision*** reached by the Board after a positive institution

determination.

63 F.4th at 7 (emphasis added). The appeal bar thus applies "even in a case in which a review was instituted and completed and a ***proper appeal was taken to this court of the Board's final written decision***." *Id.* at 12–13 (emphasis added).

Moreover, Hafeman has never argued—either to the Board below or in its opening brief to this Court—that any statutory provision in Title 35, separate and subsequent to the institution decision under 35 U.S.C. § 314(a), ***required*** the Board to terminate the IPRs as a non-discretionary matter. Any such argument is forfeited and would be meritless. *See SmithKline Beecham Corp. v. Apotex Corp.,* 439 F.3d 1312, 1319–20 (Fed. Cir. 2006) (argument not developed in opening brief's argument section is forfeited).

Accordingly, Hafeman's appeal of the Board's application of *Fintiv*/*Sotera* to the specific facts of this case is barred by § 314(d).

### B. Alternatively, the Board Did Not Abuse Its Discretion in Declining to Revisit the *Fintiv/Sotera* Issue in the Final Written Decision or Terminate the IPRs

The alleged "*Sotera* violation"—LG's mere act of filing a motion for summary judgment of invalidity based on system art—occurred during Hafeman's 14-day window under 37 C.F.R. § 42.71(d)(1) for seeking rehearing of the Board's institution decision. Yet Hafeman inexplicably waited until over a month after the rehearing deadline had passed before raising the alleged *Sotera* violation with the

Board in a request for authorization to file a rehearing request out of time. Appx7832. The Board denied "Patent Owner's request to file a rehearing request out of time." Appx7830.

On appeal, Hafeman does not challenge the Board's denial of authorization to file a rehearing request out of time—indeed, Hafeman does not even mention that she sought and was denied rehearing on the *Fintiv/Sotera* issue. Rather, Hafeman's framing of the issue and her argument on appeal focus solely on the absence of a *Fintiv/Sotera* discussion "in the FWDs" themselves. Br. 6, 25, 31–33.

No statute or regulation required the Board to dedicate space in the final written decisions to revisiting Hafeman's late request for reconsideration of the *Fintiv/Sotera* issue. The only issue that 35 U.S.C. § 318 requires the Board to address in a final written decision is "the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)." 35 U.S.C. § 318(a). Such patentability determinations, of course, must contain the Board's fulsome written analysis to permit effective judicial review, as Hafeman's cited cases make clear. Br. 30 (citing *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 123 (Fed. Cir. 2022); *In re Thrift*, 298 F.3d 1357, 1366 (Fed. Cir. 2002)). In those cited cases, however, it was the Board's patentability determinations, rather than a discretionary institution issue, that this Court found to lack adequate explanation. *See Provisur*, 50 F.4th at 123 ("Board never explained how the [prior art]

combination teaches or suggests the surface-area limitations"); *Thrift*, 298 F.3d at 1366 ("Board failed to provide an adequate ground for sustaining the rejection of claim 11"). By contrast, nothing in § 318 requires the Board in its final written decision to revisit discretionary issues from its earlier institution decision, and Hafeman points to no statute mandating the Board to revisit its preliminary or intermediate agency actions or rulings.[4]

Nor does any agency regulation require the Board to revisit discretionary institution issues in the final written decision. The only regulations Hafeman identifies—37 C.F.R. §§ 42.71(a) and 42.72—give the Board, in Hafeman's words, "broad authority" to dismiss a petition and terminate trial. Br. 33. Those two regulations both contain the permissive "may" and thus do not compel the Board to do, or not do, anything as it pertains to a final written decision.[5]

Similarly, nothing in the Director's *Interim Procedures* memo, which makes *Sotera* stipulations effective to avoid discretionary denial, addresses the Board's ongoing role in policing such stipulations or other elements of the six-factor *Fintiv*

---

[4] The Administrative Procedures Act likewise does not require a final agency decision to re-address each and every preliminary, procedural, or intermediate agency action or ruling. *See* 5 U.S.C. § 704.

[5] Moreover, Hafeman never served or sought authorization to file a motion for sanctions in the IPR under 37 C.F.R. § 42.11(d)(2), thus rendering this regulation inapplicable here.

analysis, after institution. *See Interim Procedures*, at 7–9. The Board thus properly addressed, in the final written decision, the sole issue it was required to address: the patentability of the challenged claims. *See* 35 U.S.C. § 318(a).

Finally, the Board was prudent and did not abuse its discretion when the Board deferred enforcement of the *Sotera* stipulation to the district court. The stipulation, by its terms, applied to the "district court proceeding" between LG and Hafeman. Appx4375 (stipulating that "LG Electronics Inc. ***will not pursue in the related district court proceeding*** 'any ground that [Google or Microsoft] raised or reasonably could have raised' during the instituted IPRs") (alterations in original; emphasis added). Based on this stipulation, the district court granted Hafeman the remedy she requested in connection with the Retriever and Find My iPhone system art—striking those defenses, as Hafeman's counsel conceded to the Board. Appx8469, 29:16–18.

Consider the issue from the Board's perspective. When Hafeman first raised the *Sotera* issue in seeking to file a rehearing request out of time, the district court had not yet ruled on LG's summary judgment motion. Petitioners opposed Hafeman's belated rehearing request, explaining to the Board that LG's motion only raised "prior art defenses in the litigation based solely on system prior art (not printed

prior art)" and so it did not violate the plain text of the *Sotera* stipulation.[6] Appx7833. After the district court denied LG's motion and Hafeman raised the issue again in her patent owner response, Petitioners alerted the Board to the ongoing split among the districts in this unsettled area of the law (Appx8230–8232, Appx8483)—a split that continues to this day.[7] Faced with the unsettled scope of *Sotera/*estoppel as applied to system art, the Board was prudent in deferring enforcement of the *Sotera* stipulation to the district court in which the stipulation has effect.[8]

In sum, no statute or regulation required the Board to address the *Fintiv/Sotera*

---

[6] LG's position regarding the inapplicability of estoppel to system art (also referred to as "device art") has since been confirmed by Judge Bryson sitting by designation. *Prolitec Inc. v. ScentAir Techs., LLC*, 2023 WL 8697973, at *23 (D. Del. Dec. 13, 2023) (Bryson, J.) (adopting "the *Chemours* line of cases and hold[ing] that IPR estoppel does not apply to device art").

[7] *See, e.g.*, M. Rueckheim & R. Jung, *The Evolving Scope of IPR Estoppel as Applied to System and Product Prior Art*, 23 CHI.-KENT J. INTELL. PROP. 137, 139 (2024) ("whether IPR estoppel applies to later-asserted invalidity theories based on system or product prior art has been decided inconsistently by different district courts"); L. Goodman, *Product of IPR Estoppel: A District Court Split*, 29 IP LITIGATOR 1 (2023) (noting a "split even within some districts, which has left litigants struggling to formulate their patent defense strategies"); K. Del Dotto et al., *When Does IPR Estoppel Apply to Product or System Art in District Court?*, WORLD INTELLECTUAL PROPERTY REVIEW (Mar. 27, 2024) (noting the issue "has not yet been addressed by the Federal Circuit," leaving district courts "split on this issue"); H. Batts & L. Guo, *Divergent Decisions Highlight Uncertainty of IPR Estoppel*, IP LAW360 (May 4, 2023).

[8] Tellingly, Hafeman never served or filed any sanctions motion in the litigation or in the IPR; nor would there be any basis for one, given the split among districts and the absence of a Federal Circuit decision resolving the split.

issue in the final written decision. *Sotera* stipulations, by their very terms, operate on invalidity defenses in district court litigation, and their scope is currently unsettled as applied to system prior art. For all these reasons, the Board did not abuse its discretion, much less violate governing law, by declining Hafeman's invitation to revisit the issue in the final written decision or terminate the IPRs.

## II. The Board Did Not Implicitly Construe the Claims; Alternatively, Hafeman's Proposed Construction on Appeal Lacks Merit

Hafeman seeks *de novo* review of the Board's final written decision by arguing that the Board "implicitly" construed the term "without assistance." Br. 40. Although Hafeman never proposed any claim construction for this term below, she now asks this Court to formally construe the term to mean "no user assistance (besides turning on power) to receive return and recovery information, including the establishment on [sic: of] an Internet or remote connection." Br. 39 (emphasis omitted).

The Board did not implicitly construe the claim, and thus Hafeman's attempt to shoehorn a claim construction dispute into the Board's prior art findings should be rejected. Alternatively, the Board was correct to not adopt a construction like the one Hafeman proposes on appeal, and thus the Board's decision should be affirmed.

### A. The Board Did Not Implicitly Construe "Without Assistance"

Attempting to obtain *de novo* review of the Board's factual findings concerning the Jenne reference, Hafeman asserts that the Board engaged in

"implicit" claim construction, citing *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1056 (Fed. Cir. 2024) ("We have found implicit claim constructions even when the Board does not recognize that it is construing a claim."). Br. 40, 44. But Hafeman does not mention the relevant legal standard applied in *EcoFactor* for determining whether a court (or the Board) has implicitly engaged in claim construction—much less why the Board's analysis of the Jenne reference in this case meets that standard. Br. 40–44.

As this Court explained in *EcoFactor*, "If the outcome of the analysis of the claim term establishes the scope (e.g., boundaries) and meaning of *the patented subject matter*, the court (or the Board) has mostly likely construed the claim." 92 F.4th at 1055; *see also HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017) ("Board findings establishing the scope of the patented subject matter may fall within the ambit of claim construction").

In *EcoFactor*, the Board changed its position from the institution decision to the final written decision: after initially determining that a reference satisfied the so-called "[1m] limitation," the Board later determined that the reference did not satisfy that limitation. 92 F.4th at 1053–54. In changing its position, the Board announced a new view of the limitation's requirements that "established the scope of the [1m] limitation." *Id.* at 1056. Specifically, the [1m] limitation lists five enumerated inputs on which the timing for the system to activate is "based at least in part on." *Id.*

Nothing on the face of the claim, however, specifies whether one input may be calculated based on another input, and whether they must be distinct or may be entwined. *Id.* The Board nevertheless determined that "no input can be based in part on another input and that each input must be distinct." *Id.* It was this categorical pronouncement by the Board, establishing a requirement of the [1m] limitation in all circumstances, that this Court held "establish[ed] a limit to the scope of the [1m] claim limitation" and thus "resulted in a construction of the claim." *Id.*

Unlike in *EcoFactor*, the Board here did not "establish[] the scope (e.g., boundaries) and meaning of *the patented subject matter*." *Id.* at 1055. The Board never announced any general statement of the type of user actions that either do or do not constitute "assistance" in the claimed step of "initiating or changing return information." For example, nothing in the Board's final written decision sheds light on whether Hafeman's proposed carveout for a user "turning on power" (Br. 35, 39) would constitute the claimed "assistance" under a construction that appears nowhere in the Board's decision.

Nor did the Board announce any categorical rule that a user's act of connecting a computer to the Internet will ***never*** fall within the scope of "assistance." The Board noted that the action of establishing remote communication in the first instance was "unrecited" in the claim. Appx21. But the Board's mere statement that a feature was unrecited in the claim did not establish the scope (*e.g.*, boundaries) and

meaning of "assistance." If it had, then the Board would not have needed to spend three more pages, as the Board did, analyzing how Jenne checks for an Internet connection and requires a manufacturer's password to perform the claimed "initiating or changing" step "without assistance by a user." Appx21–23.

The Board performed a factual comparison of the process in Jenne to the process described in the challenged patents' specification and found them to be similar. Appx21–22. As this Court has held on similar facts, making a comparison between the prior art and the challenged patents' specification does not amount to an "implicit" claim construction, but rather is a "factual finding" reviewed for substantial evidence. *Apple Inc. v. Uniloc 2017 LLC*, 843 F. App'x 281, 286 (Fed. Cir. 2021) ("Rather than engaging in implicit claim construction, the Board merely made a factual finding that, when Malik describes generating a voice instant message, the message is always generated by recording and storing the voice of the sender, ***akin to the recording mode of the [challenged] patent***.") (emphasis added).

Aside from permissibly comparing Jenne's teachings to the patents' specification, the Board also drew a factual distinction between Jenne's remote updating process and the Broyles reference at issue during prosecution. Appx23. The final written decision maintained the Board's position from institution that Jenne's remote updating capability is unlike that of the Broyles reference because the user in Jenne lacks the password needed to change information displayed on the computer

screen, whereas the user in Broyles actively needed to press a key at a specific time to allow the owner to change the information. *Compare* Appx23 (final written decision) *with* Appx8109 (institution decision). This finding was specific to the Jenne reference and was not a broad pronouncement about the meaning of "without assistance" in all circumstances.

If Hafeman disagreed with the Board's comparison of Jenne and Broyles as articulated in the institution decision (Appx8109), then she had every incentive to change the Board's mind on the "without assistance" limitation, including by proposing an express construction in her patent owner response or arguing that the Board misunderstood the prosecution history, neither of which Hafeman did. With fair warning in the institution decision, Hafeman's situation is unlike that of the appellant's in *EcoFactor*, where the Board issued an institution decision that initially went the appellant's way but later announced a new, narrower view of the claim for the first time in the final written decision. 92 F.4th at 1053–54. Thus, unlike in *EcoFactor*, Hafeman faced no "surprising, unexpected departure" in the Board's position, or other "exceptional circumstances," to excuse her failure to propose an express claim construction before the Board. *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 863–64 (Fed. Cir. 2020) (refusing to "[a]llow[] [appellant] to press, on appeal, a specific claim construction that it did not present to the Board" and finding forfeiture of the same).

The specificity of Hafeman's new proposed construction on appeal goes beyond anything she reasonably argued to the Board concerning the Jenne-Cohen ground. Among other things, Hafeman does not explain why her construction prohibits user assistance in "receiv[ing]" return/recovery information (Br. 35, 39), when the claim recites "initiating or changing" return/recovery information. The Board never addressed any "receiving" requirement in connection with Jenne, thus further confirming the absence of an implicit construction and Hafeman's forfeiture of this new argument.

Accordingly, the Board did not implicitly construe the claims, and Hafeman had every incentive and opportunity to request an express construction from the Board, instead of waiting to present a construction on appeal.

### B. Alternatively, Hafeman's Construction Is Wrong on the Merits

Even if the Board did implicitly construe the claims, the Board did not err in refusing to exclude a user's ability to simply connect the computer to a remote network. Appx21–22 (Board finding "Jenne's disclosure . . . consistent with the [patents'] updating process" that is performed "*every time you go on-line*," and refusing to "interpret the claim to exclude the automatic updating functionality described in the specification").

On appeal, Hafeman urges this Court to adopt a claim construction whereby the term "without assistance" in step two (reproduced below) prohibits a user from

merely connecting a computer to a remote network, such as the Internet. Br. 35, 39. This remote network is what allows "remote communication" and "remote[] access[]" to occur in step two. In Hafeman's strained view of "without assistance," the user is allowed to supply the computer with power, but not with an Internet connection. Br. 35, 39.

Step two, however, does not involve the initial supply of either power or an Internet connection. Step two of the claim recites:

> [2] ***initiating or changing return information*** which appears on the display through remote communication ***without assistance*** by a user with the computer, wherein the changing of the return information is done through an interactive program stored in the memory of the computer which is remotely accessed only by the owner of the computer or the party authorized by the owner to enable the initiating or changing of the display screen . . . .

Appx132–133 (16:50–17:6) (bracketed number and emphases added).

This Court should reject Hafeman's proposed construction as inconsistent with the language of the claims themselves, the specification, the prosecution history, and the extrinsic evidence in this proceeding.

### 1. Hafeman Ignores the Language of the Claims

"Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

Hafeman's claim construction falters from the beginning by overlooking the

language of the claim and ignoring what the phrase "without assistance" grammatically modifies. Step two recites the action of "initiating or changing return information." It is this recited action that "without assistance" modifies, not some unrecited action like supplying the computer with power or connecting it to a remote network that must be done "without assistance by a user."

The claim is silent about how or when a network connection is established. The network connection can be established before any one of the four method steps occurs, given the claim's use of the "open-ended" transition "comprising." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."). If Hafeman believed the specific way the computer is initially connected to the remote network was important, then this action should have been recited explicitly as its own step in the claims.

The Board agreed with Petitioners' grammatical reading of the claims and rejected Hafeman's atextual argument whereby "all other user interactions" are prohibited:

> We disagree with [Hafeman's] argument because, as Petitioner correctly asserts, "[t]he language 'without assistance by a user' refers to the specific recited action of 'initiating or changing [return/recovery] information,' rather than to an unrecited action of establishing the remote communication in the first instance." *See* Pet. Reply 15 (second alteration in original). We do not view the claims as prohibiting all other user interactions.

Appx21 (first alteration added).

Hafeman's opening brief does not dispute the above-quoted analysis as a matter of grammar. She therefore has forfeited any claim construction argument insofar as the claim language itself is concerned.

### 2. The Specification Does Not Prohibit User Assistance in Connecting the Computer to the Internet

"[T]he specification is always highly relevant to the claim construction analysis." *Phillips*, 415 F.3d at 1315 (internal quotes omitted).

Hafeman pointed to exactly five lines of the specification as support for the addition of the "without assistance" language during prosecution. Appx1141 (citing "page 31, lines 1–5" of the original application as support). Those five lines correspond to column 13, lines 43–47 of the issued '122 patent. The text in both documents is identical and states:

> The program design feature allows the 'owner' to access the recovery center administration program, initiate a download of changes to the protected equipment, control the entire recovery screen displayed, and even override the 'assigned to' person's input.

Appx131, 13:43–47 ('122 patent); Appx1027, 31:1–5 (original application).

These five lines are silent about how the remote network connection to the computer is initially made. These five lines certainly do not describe, as Hafeman erroneously argues on appeal, "establishment of a remote connection *automatically*—*i.e.*, without any assistance by the user," much less a process

whereby a computer that had not already been connected to the Internet (via phone line, modem, wi-fi, cable, or otherwise) becomes connected to the Internet for the first time without any action by the user. Br. 37.

To the contrary, those five lines are themselves part of a paragraph that goes on to describe a network connection using a ***physical*** "phone line" or "cable" connection, for the very purpose of transmitting changes of return/recovery information to a stolen computer:

> The Retriever program design allows the owner to make changes at the recovery center level, have the recovery center attempt to communicate those changes to the 'stolen equipment' via ***phone line*** (***or cable***, wi-fi, bluetooth, satellite etc. in the future).

Appx131, 13:50–54 (emphasis added); Appx1027, 31:7–11. The act of physically plugging-in a "phone line" or "cable" into the "stolen equipment" would need to be performed either by the ***owner*** (before it became "stolen") or by the ***user*** (attempting to use the equipment), since the owner is not physically present with the "stolen equipment."

Moreover, the Board was correct about the specification's continued reliance on the prior art PDA synchronization/McAfee anti-virus updating capability which occurs remotely over the Internet. Appx21 (citing Appx131, 14:21–40). That portion of the specification describes the alleged invention as "a combination of the PDA type of synchronization between the main computer 12 and the PDA, and the McAfee anti-virus software Internet updating capability ***where every time you go***

***on-line, your computer 12 automatically checks*** to make sure that you have the most current anti-virus software and automatically updates your computer 12 with the latest changes." Appx131, 14:26–33 (emphasis added). The alleged novelty of Hafeman's invention was "combining this type of communication ability" found in the PDA-McAfee prior art with Hafeman's alleged contribution of a "recovery security program that seizes control of the display 18 monitor until a security prompt is satisfied." Appx131, 14:34–37.

Hafeman's opening brief explains the above passage by placing italics over her alleged inventive contribution: "As the passage explains, the Hafeman improvement takes 'this type' of known technology—using PDA synchronization to update anti-virus software—and *combines it* with Hafeman's *recovery security program that seizes control* of the display 18 monitor until a security prompt is satisfied." Br. 42. But the italicized words are unrelated to how the network connection is initially made. The combination instead relies on the known "Internet updating capability" that requires "you [to] go on-line"; Hafeman's contribution merely adds on top of it an ability to "seize[] control of the display." Thus, after "you go on-line," your computer automatically checks if any new information should be pushed to the computer, and only then—after going online—would any changes be transmitted and appear on the computer display through remote communication without assistance by the user. *See also* Appx128, 8:49–52 (specification admitting

"[t]he program is essentially a recovery/return information screen that is displayed, and does not attempt to duplicate or replace more sophisticated access security programs already on the system").

Hafeman's reliance on the specification's purported criticism of the PDA prior art (*see* Br. 36, 42–43) is misplaced. In particular, the specification mentions that the PDA operated over a "limited network that the assigned to person may never access again." Appx131, 14:4–9. This "limited network" refers to the PDA's ability to be remotely updated "directly on the computer 12 the PDA is set up to synchronize with when accessing the PDA program on the main computer 12." Appx131, 13:27–32. The specification contrasts the PDA's "limited network" on the one hand with "the Internet, phone lines, cable" networks on the other. Appx131, 14:9–12. The latter networks give the owner a "more effective ability to try to locate the equipment and control the recovery information displayed by remote." Appx131, 14:12–14. The specification's criticism of the PDA's "limited network" is overcome in the next paragraph when the specification admittedly ***combines*** PDA synchronization with the "McAfee anti-virus software ***Internet updating capability***." Appx131, 14:27–33 (emphasis added). It is this Internet updating capability—whereby "downloads of new information occur automatically ***when the user goes online***"—that the Board found was retained when Hafeman combined these two known technologies. Appx22 (emphasis added).

None of Hafeman's other citations to the specification (*see* Br. 36–38) support a construction that would prohibit a user from merely connecting the computer to the Internet. Hafeman's citations to Figure 3 and to the timing of a "security prompt" password on the display screen (*see* Br. 36 (citing Appx117, Appx128, 7:24–35)) do not pertain to step ***two's*** "initiating or changing return information" process, but rather to step ***one's*** display of return information and step ***three's*** display of a security prompt. In fact, the timing of when the "security prompt such as a password" appears on the screen is discussed in an earlier part of the specification (Appx127, 5:4–14), where it says the "software program 24 is preferably able to communicate through a ***modem*** (or wireless) . . . to facilitate return of the computer 12 if it becomes ***lost*** by the owner." Appx127, 5:10–14 (emphases added). Nowhere does it state the user has no role in connecting the computer to the modem. To the contrary, because this computer is "lost by the owner," the ***user*** is most likely the one who needs to physically connect the computer to a "modem."

In sum, the Board was correct in its analysis of the specification's continued reliance on the prior art's Internet updating capability; and nothing in the specification that Hafeman points to prohibits the user from merely connecting the device to the remote network—especially since a physical "phone line" and "modem" are mentioned as the primary means of connecting to a lost or stolen computer.

### 3. The Prosecution History Confirms the Board's Understanding

"[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317.

The Board's discussion of the prosecution history was correct in that Hafeman's arguments to the examiner about "without assistance" focused on the user's act of pressing a particular key to start the process of initiating or changing return information. Appx22–23. Hafeman's position during prosecution was much more limited than the broad arguments she makes now (broadly prohibiting any user action other than turning on the computer).

As the record shows, Hafeman focused her prosecution arguments on the immediate, proximate action that caused changes to the ownership information, arguing: "Broyles requires that ***the user depress a suitable key to generate a keyboard interrupt at the proper time. This is what initiates changes to the ownership tag in Broyles.***" Appx1142 (emphasis added); Appx3083 (arguing "the Broyles patent requires a user to push an interrupt key to allow the owner to change the display from remote"). Thus, Hafeman's prosecution statements focused on this proximate act, not some upstream act like connecting the computer to a network, or supplying it with power, or merely "receiv[ing] return and recovery information" under Hafeman's construction (Br. 35, 39)—all of which are several (unrecited) steps removed from the recited act of "initiating or changing" the return/recovery

information.

Apart from this discussion of the Broyles reference, Hafeman also took the position during prosecution that the pending claims were being "copied" by a Norton/Symantec product on the market. Appx3054. In arguing that this product satisfied the "without assistance" limitation, Hafeman focused on the owner's ability to make changes via a website that then caused those changes to be transmitted to the computer without user assistance. Appx3057. As Hafeman explained, "It is important that this is done without user assistance, because the person using the computer may be a person who does not own the computer, for example a Good Samaritan or even a Thief." Appx3057. This statement says nothing about how the network connection was made. In fact, the Norton/Symantec product description itself explains that the product works by tracking the computer's ***online*** activity, thereby requiring an Internet connection. Appx3082 ("Tracks and maps the location of your device ***when anyone uses it to go online***. . . . ***Works securely over the Internet***, so you can easily track, locate, and lock your devices anytime, anywhere.") (emphasis added). The prosecution history thus supports the ability of a user—even a thief—"to go online" with the stolen computer.

#### 4. Extrinsic Evidence Contradicts Hafeman's Technical Arguments

"[E]xtrinsic evidence in the form of expert testimony can be useful . . . to provide background on the technology at issue [and] to explain how an invention

works . . . ." *Phillips*, 415 F.3d at 1318. Here, the Board's findings pertaining to the testimony of Petitioners' expert Dr. Zadok are reviewed for substantial evidence. *See Cuozzo Speed Techs*., 793 F.3d at 1279–80.

Substantial evidence supports—and Hafeman does not dispute on appeal—the Board's finding that Hafeman failed to establish her factual assertion that "iPhones or other smartphones, to the extent they even existed '[a]t the time of invention (2002)' . . . had such capabilities in 2002" to automatically connect to the Internet "without any involvement by the user." Appx22 (quoting Appx8182, Appx8295).

Hafeman attempted to support her technical argument by pointing to select portions of the cross-examination of Dr. Zadok. Appx8295. The Board reviewed this testimony and found nothing to support Hafeman's assertion that the "user simply turns on the device" to connect an iPhone or other smartphone to the Internet. Appx22 (reviewing Appx7766, 44:5–13, Appx7766, 45:2–15, Appx7770–7771, 61:25–62:1). In this testimony, Dr. Zadok explained that the iPhone or other smartphone will connect to the Internet automatically via a cellular network only if they had been initially "configured" to do so. "***Once such an initial configuration is made***," Dr. Zadok explained, "user[s] do not have to reestablish a network connection each time they resume using their devices . . . . " Appx4564-4565, ¶ 76 (emphasis added). Thus, just as with the alleged invention, an initial remote

connection must be made.

The findings by the Board concerning the extrinsic evidence (Appx22) are unchallenged on appeal. Through both forfeiture and substantial evidence, the Board's findings on the extrinsic evidence should be affirmed.

* * *

In summary, the intrinsic and extrinsic evidence confirm that merely supplying the computer with an Internet or other remote connection does not constitute prohibited "assistance" in the "initiating or changing" process. Further, under this correct view of the claim, Hafeman has not argued that the "without assistance" limitation is missing from the Jenne-Cohen ground. Br. 44–48 (arguing only as to how Jenne-Cohen does not meet Hafeman's newly proposed construction). Accordingly, Hafeman has forfeited any such argument, and the Board's decision on the Jenne-Cohen ground should be affirmed.

## III. Even under Hafeman's Construction, Remand Would Be Required for the Board to Address Petitioners' Alternative Arguments Below

Hafeman argues that if this Court adopts her proposed construction of "without assistance," then the Board's decision on the Jenne-Cohen ground "should be reversed." Br. 48. However, reversal rather than vacatur is warranted "where only one answer is supported by substantial evidence and there is neither a request nor an apparent reason to grant a second record-making opportunity." *Owens Corning v. Fast Felt Corp.*, 873 F.3d 896, 901–02 (Fed. Cir. 2017). Otherwise, "the appropriate

course of action is to vacate the Board's decision and remand the matter." *ABS Glob., Inc. v. Cytonome/St, LLC*, 84 F.4th 1034, 1042 (Fed. Cir. 2023).

Here, the parties dispute whether Jenne's system requires the "user," as opposed to some other entity (such as the "owner"), to establish the Internet connection. Although Hafeman's opening brief fails to acknowledge it, Petitioners made two arguments below that the Jenne-Cohen ground satisfies the "without assistance" limitation "even if merely connecting a computer to the Internet constituted the claimed 'assistance' in changing return/recovery information." Appx8243.

Petitioners' first alternative argument was that "Jenne *alone* works if another entity (such as the owner) makes the initial [network] connection instead" of the user. Appx8243. As Dr. Zadok explained, Jenne does not care ***who*** initially connected the device to the Internet; instead, block 55 of Jenne's Figure 1 simply asks ***whether*** the device is connected to the Internet (yes/no). Appx4563-4564, ¶ 75 (citing Appx884). Jenne states that the "Internet browser 545 ***can*** be connected with the Internet 525 by the user." Appx888, ¶ 0027 (emphasis added). As Dr. Zadok emphasized, Jenne "says can, not must." Appx7774, 75:21–23. Jenne's process works if the "owner" rather than the "user" initially connected the device to the Internet. Appx4563-4564, ¶ 75. Once the owner makes this initial connection, the user never needs to re-establish the Internet connection on each subsequent use.

Appx4564-4565, ¶ 76. Thus, Jenne's process works even if the ***user*** himself never connected the device to the Internet. Appx8495, 55:19–23 (exemplifying this alternative ground with a hypothetical ***owner*** who brought his laptop to a Starbucks, connected it to the Starbucks WiFi, but forgot his device there, and then "a good Samaritan opens up the laptop, it's already connected to the Internet"). *See Hewlett–Packard Co. v. Mustek Systems, Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) ("[A] prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention.").

Petitioners' second alternative argument was that "a POSITA would have implemented the Jenne-Cohen *combination* specifically to avoid relying on a user's involvement." Appx8243. As Dr. Zadok explained, "because Jenne does not even require the user to establish the remote communication," "a POSITA would seek to avoid relying exclusively on the user to establish remote communication," since the user might be uncooperative or the device may be hidden from physical access. Appx4565–4566, ¶¶ 77–79. In this way, the device is already configured by the owner to connect to the Internet, and the owner thereby avoids relying on a user's involvement to establish a remote connection. Appx8243.

Because the Board never addressed Petitioners' alternative arguments, remand rather than reversal would be the appropriate course of action if this Court

adopts Hafeman's construction of "without assistance."[9]

## IV. The Board's Findings Regarding Secondary Considerations are Supported by Substantial Evidence

Before the Board, Hafeman's response contained a section on secondary considerations that was limited to a mere page-and-a-half of text, citing only six exhibits (other than the patent itself) and no declaration. Appx8206–8208. The absence of any declaration from the sole named inventor to substantiate her claims about the Retriever product is notable: she is the named party in these proceedings and was available to testify if she wished. Appx8463 (counsel stating "our inventor, Carrie Hafeman, . . . is joining us today" at oral argument).

Rather than submit evidence of the actual working product completed in "March of 2007" (Br. 3), however, Hafeman through her counsel instead provided only two conclusory sentences in the patent owner response:

> Patent Owner's invention was commercialized under the name of "The Retriever." Ex. 1001, 4:55. The Retriever practiced the '122 patent and received tremendous praise from the press and public.

Appx8207. The first sentence cites only to the '122 patent itself. The second sentence contains no citation at all.

---

[9] Even if reversed on the Jenne-Cohen ground, the Board would still need to consider the additional undecided grounds below, including obviousness over Angelo and Helle, obviousness over Hafeman 298 and Chiu, and anticipation by Hafeman 670. Appx72–74.

The Board reviewed the entirety of Hafeman's secondary considerations arguments and all cited exhibits and concluded that Hafeman had "not provided objective evidence of non-obviousness that has a nexus to the claimed invention." Appx32. The Board arrived at this conclusion after considering first whether Hafeman was entitled to a "presumption of nexus," and, failing that, whether Hafeman had shown a "nexus independently of a presumption." Appx29 (quoting *Volvo Penta of the Americas, LLC v. Brunswick Corp*., 81 F.4th 1202, 1210 (Fed. Cir. 2023)). Under both avenues, the Board found Hafeman's evidence came up short. Appx29–32.

On appeal, Hafeman enumerates five alleged errors in the Board's secondary considerations analysis. Br. 48–53. Many of Hafeman's arguments were not presented to the Board, and in any event, none have merit.

### A. No Error Shown in the Board's Analysis of Presumption of Nexus

Hafeman's first argument is that the patent's prophetic mention of "The Retriever" in the specification (which comes from the ***2002*** <u>application</u>) coupled with LG's attempt to use the ***2007*** <u>completed product</u> as an anticipatory reference in the litigation are sufficient to establish a presumption of nexus. Br. 49–50 (challenging Board finding at Appx29). This argument lacks merit.

A "presumption of nexus" requires the asserted objective evidence to be "tied to a ***specific product*** that 'embodies the claimed features, and is ***coextensive*** with

them.'" *Volvo Penta*, 81 F.4th at 1210 (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) (emphases added)).

As an initial matter, the Board found Hafeman did "not address coextensiveness at all" in her briefing before the Board. Appx29. Nor does Hafeman address coextensiveness on appeal. Indeed, the words "coextensive" or "coextensiveness" are absent from Hafeman's opening brief. This silence is fatal to any presumption of nexus, both for the 2002 prophetic example in the specification and for the 2007 completed product.

Second, no "specific product" under *Volvo Penta* existed in 2002 when Hafeman began filing patent applications with the term "Retriever" as her prophetic example. Appx918, Appx920–926. None of the drawings in the patent depict a completed device. The figures cited in Hafeman's brief (Figs. 2, 6, 8–11) are not actual screenshots of a real-world computer screen; they are mere artistic representations of what the display screen might look like in the future, with placeholders for "Picture," "Retriever Logo," "AD SPACE," and "Windows Logon." Appx144 (Fig. 10).

The patent specification uses a combination of present tense to signal prophetic examples and the word "preferably" to describe even the most basic features of the Retriever. Appx130, 11:26–29 ("The Retriever ***is preferably*** a software program 24 that is disposed in a memory 16 of a computer 12 and at a remote station to allow an

owner to communicate and control the computer 12, as needed.") (emphasis added); *see also Schering Corp. v. Geneva Pharms*., 339 F.3d 1373, 1376 n.1 (Fed. Cir. 2003) ("Prophetic examples are set forth in the present tense to indicate that they were not carried out."). Hafeman cites no case law that allows a patent owner to rely entirely on a patent's prophetic examples as the sole "evidence" of a later-completed product and thus be entitled to a presumption of nexus as to that "specific product that 'embodies the claimed features.'" *Volvo Penta*, 81 F.4th at 1210.

Hafeman also faults the Board's finding of no presumptive nexus (at Appx29) because the summary judgment motion LG filed "used The Retriever as an allegedly anticipatory reference in the district court." Br. 49. This argument was not presented in Hafeman's secondary considerations briefing to the Board (Appx8206–8208, Appx8304-8306), which is why the Board did not address LG's anticipation defense as part of its nexus analysis. Hafeman's "argument is forfeited because it was not presented below." *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc*., 923 F.3d 1368, 1379 (Fed. Cir. 2019).

But in addition to being forfeited, this argument is also wrong. Unlike Hafeman's bare reliance in the IPR on the patents' prophetic examples as "evidence" of what might come into existence in the ***future***, LG supported its invalidity defense in court with evidence of an actual reduction-to-practice and sales in the ***past*** (as of 2007), in the form of exhibits submitted to the district court. Appx7653 (citing

Hafeman's interrogatory responses). Hafeman submitted no such evidence in the IPR when arguing nexus in her response and sur-reply to the Board (Appx8207, Appx8305), despite being the party who bore the "burden of production to demonstrate a nexus between the claimed design and the secondary considerations." *MRC Innovations, Inc. v. Hunter Mfg., LLP*, 747 F.3d 1326, 1336 (Fed. Cir. 2014). There is thus no equivalence between the parties' presentation of evidence in their respective proceedings.

Finally, Hafeman made no express argument—either below or on appeal—that LG's mere attempt to use the Retriever as an anticipatory reference in the litigation became somehow binding or preclusive on the issue of secondary considerations, whether through judicial estoppel or otherwise. "[J]udicial estoppel[] 'generally prevents a party from ***prevailing*** in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)) (emphasis added). Here, the district court denied LG's summary judgment motion without deciding whether the 2007 Retriever product anticipated the claims. Because LG did not "prevail" on this issue, judicial estoppel does not apply. Moreover, the issues in the two proceedings are not the same: anticipation requires a showing that each claim element is found in a single prior art reference, *Arbutus Biopharma Corp. v. ModenraTX, Inc.*, 65 F.4th 656, 662 (Fed. Cir. 2023),

whereas a presumption of nexus requires a showing that "the product is essentially the claimed invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1374 (Fed. Cir. 2019); *see id.* at 1376 (rejecting argument that the "coextensiveness requirement is met so long as the patent claim broadly covers the product").

### B. The Board Adequately Explained Its Reasoning

Hafeman's second argument is that "the PTAB committed reversible legal error in finding that there was no nexus without providing any explanation." Br. 50. This statement contains no page citation to the final written decision, so it is unclear to which aspect of the Board's five pages of secondary considerations analysis Hafeman is referring.

Assuming Hafeman is continuing to refer to the Board's finding of no presumptive nexus (Appx29), as discussed above, Hafeman provided only two conclusory sentences of attorney argument to support any presumption of nexus. Appx8207. The Board quoted those arguments and explained: "This is the extent of Patent Owner's argument supporting a presumption of nexus. Indeed, Patent Owner does not address coextensiveness at all." Appx29 (comparing Hafeman's attorney arguments to the conclusory sentence in *Volvo Penta*).

On appeal, Hafeman does not point to any additional argument about coextensiveness properly presented in Hafeman's patent owner response that the Board overlooked. To the contrary, the Board correctly recognized the totality of

Hafeman's sparse arguments and aptly compared their deficiency to that in *Volvo Penta*. Appx29. The patent owner in *Volvo Penta*, whose presumption-of-nexus arguments this Court found lacking, argued that its product was "coextensive with the claims" and provided "a citation to its expert's declaration." 81 F.4th at 1211. Hafeman's presumption-of-nexus arguments are even weaker than those in *Volvo Penta*: Hafeman never mentioned coextensiveness at all and never submitted any declaration discussing secondary considerations.

### C. Praise Focused on Unpatented Features

Under the substantial evidence standard, Hafeman cannot credibly argue that "the PTAB incorrectly found that the praise for the invention was directed only at non-patented features, such as a verbal alarm." Br. 50. First, the Board never said that the alleged praise was "only" directed at non-patented features. Rather, the Board considered the cited exhibits as a whole and determined that, on balance, the non-patented features were the "object of" and "resulted in" any alleged praise. Appx29–30. Second, whether the Board's weighing of the evidence was "incorrect[]" is not the question on appeal. *See Elbit*, 881 F.3d at 1356. Instead, the question is whether those findings are supported by substantial evidence. They are.

As the Board noted (Appx29), the very titles of the Associated Press and Canyon Courier articles are "Stop thief! Software lets stolen laptops speak up" (Appx7728) and "Talking software goes global" (Appx7729), respectively. These

articles tout the "talking" audio features of the Retriever, which are indisputably unclaimed features. Appx29–30 (Board discussing "verbal alarm upgrade to the Retriever software"); Br. 51 (Hafeman admitting "verbal alarm" is "non-patented"). While Hafeman attempts to point to some other claimed features of the Retriever software elsewhere in these articles, the prominence of the unclaimed "talking" verbal alarm, both in the titles and throughout these articles, constitutes substantial evidence that the unclaimed feature was the focus of the praise.

Hafeman also argues that the "start-up brochure from 2011 does not mention The Retriever's audio features, but its 'page view delivery capabilities' (*i.e.*, the return/recovery display screen)." Br. 51 (citing Appx7737). But, as the Board found, the brochure "appears to focus more on the potential for page views than on the claimed features and in that regard is similar to Jenne's teachings of showing messages to a 'captive audience' during boot-up." Appx30 (Board discussing brochure's characterization of invention as "the most powerful targeted opt-in page view delivery capabilities ever," with capability to reach "over 50 million page views @ user license lifetime"). The brochure's focus on the product's "opt-in page view delivery capabilities," rather than any claimed features, constitute substantial evidence supporting the Board's finding.

Finally, in the sole paragraph of Hafeman's brief challenging the Board's finding regarding alleged "***praise*** for the invention" (the paragraph that begins

"Third . . ." (Br. 50 (emphasis added))), Hafeman argues: "Even if there was some praise for non-patented features like the verbal alarm, that would not be a reason to disregard the ***commercial success*** of the patented invention." Br. 51 (emphasis added). This statement does not point to any evidence of "commercial success." Instead, it conflates the distinct issues of praise and commercial success—the latter articulated as Hafeman's fourth argument, addressed next.

### D. Lack of Evidence of Commercial Success

Hafeman's fourth argument is that "the PTAB incorrectly dismissed the evidence of The Retriever's commercial success as unsupported." Br. 51 (citing Appx30–31). Hafeman's appeal brief now includes some new numbers of alleged commercial success: "$600,000 in sales" and "7,500 units." Br. 52. But those numbers were not presented to the Board in Hafeman's response or sur-reply (Appx8207; Appx9142). These numbers are improperly presented for the first time on appeal. *See Nuvo Pharms.*, 923 F.3d at 1379.[10]

In any event, Hafeman does not even address the reasons the Board found her evidence of commercial success to be lacking. The Board found the evidence below

[10] To the extent Hafeman might point to some numbers her attorney mentioned for the first time at oral argument before the Board, "no new evidence may be presented at the oral argument." *Consolidated Trial Practice Guide* 85–86 (Nov. 2019). Moreover, no values at or above "$600,000 in sales" or "7,500 units" were ever mentioned, even at oral argument. Appx8504–8505, Appx8526.

merely showed the number of website visitors, not actual paying customers. Appx31 ("The only specific evidence here is that there were over six million visits to the website."). Moreover, the "number of units sold" is insufficient, without some additional evidence of "market share, of growth in market share, of replacing earlier units sold by others or of dollar amounts," and "evidence of a nexus between sales and the merits of the invention." Appx31 (quoting *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed. Cir. 1983)).

### E. Lack of Evidence of Copying

Hafeman's final argument is that "the PTAB wrongly rejected evidence of copying," and points to Google's and Microsoft's Find My Device programs. Br. 52. But in Hafeman's briefing to the Board, Hafeman never alleged that these Find My Device programs were evidence of "copying." Both her response and sur-reply below contained only a single sentence about Find My Device, and neither stated that such evidence was relevant to any alleged copying. Appx8208 ("Notably, Microsoft did not release its Find My Device product for laptops until 2015, and Google did not release its Find My Device product for smartphones and tablets until 2013."); Appx8306 ("Finally, there is no dispute that Google and Microsoft's Find My Device applications were not released until many years later, in 2013 and 2015.").

The relevance of the Find My Device features to secondary considerations is

entirely unclear. The Board was puzzled too. As the Board observed, "Patent Owner does not explain how Google's and Microsoft's Find My Device features are evidence of non-obviousness of the '122 patent claims." Appx31. Indeed, as mentioned, Hafeman never articulated a copying argument based on Find My Device in her response or sur-reply. On appeal, Hafeman for the first time connects the Find My Device programs to a copying argument. Br. 52. This argument is forfeited for never having been raised properly below. *See Nuvo Pharms.*, 923 F.3d at 1379.[11]

The argument is also objectively baseless. Hafeman argues that "copying can be established when the products are substantially similar and there was access to the patented product." Br. 53. But then, Hafeman fails to point to any evidence of "access to the patented product." Further, the screenshots reproduced at pages 52–53 of Hafeman's brief—presumably intended to show "substantial similarity" between the claimed invention and the Find My Device programs—come directly from Hafeman's infringement contentions in the litigation. Appx3792, Appx3855. As Hafeman is well aware, but fails to mention, the jury returned a verdict of ***no*** infringement of all accused products and of all asserted claims of Hafeman's patents. Appx7626-7636. Thus, no evidence (or argument) of copying was ever properly

[11] Like the sales numbers discussed at *supra* n.10, any argument of copying tied to the Find My Device programs, raised only at the oral hearing, is improper. *Consolidated Trial Practice Guide* 85–86.

presented to the Board.

* * *

Accordingly, the Board's finding of a lack of nexus is supported by substantial evidence and should be affirmed.[12]

**CONCLUSION**

For the foregoing reasons, Hafeman's appeal of the discretionary *Fintiv*/*Sotera* issue should be dismissed and the Board's determination that all challenged claims are unpatentable should be affirmed.

Respectfully submitted,

/s/ Andrew S. Baluch
Andrew S. Baluch
SMITH BALUCH LLP
700 Pennsylvania Ave. SE
Second Floor
Washington, DC 20003

*Counsel for Google LLC*

/s/ Carrie A. Beyer
Carrie A. Beyer
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. Canal Street
Suite 3300
Chicago, IL 60606

*Counsel for Microsoft Corporation*

[12] As Petitioners noted to the Board, secondary considerations are "legally irrelevant" to the anticipation ground based on the Hafeman 670 reference (Appx9118), which is a ground the Board has not yet reached (Appx36). Thus, to the extent the Court determines that these secondary considerations outweigh the finding of obviousness based on Jenne-Cohen, the Board must still consider at least Petitioners' anticipation ground.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 2, 2025, I electronically filed the Corrected Brief of Appellees with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit using the Appellate CM/ECF system.

Accordingly, I certify that all participants in this case that have appeared as CM/ECF users shall be served by the Appellate CM/ECF system.

Date: January 2, 2025

/s/ Andrew S. Baluch
Andrew S. Baluch
SMITH BALUCH LLP
700 Pennsylvania Ave. SE
Second Floor
Washington, DC 20003

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(a) because this brief contains 13,920 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: January 2, 2025

/s/ Andrew S. Baluch
Andrew S. Baluch
SMITH BALUCH LLP
700 Pennsylvania Ave. SE
Second Floor
Washington, DC 20003